Darren H. Lubetzky
Savvas S. Diacosavvas
Brian N. Lasky
Christopher Y. Miller
Laura A. Zuckerwise
(Each appearing per DUCivR 83-1.1(d)(1))
Federal Trade Commission, Northeast Region
One Bowling Green, Suite 318
New York, NY 10004
Tel:  (212) 607-2829
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

Robert G. Wing (4445)
Thomas M. Melton (4999)
Kevin McLean (16101)
Assistant Attorneys General
Utah Attorney General's Office
160 East 300 South, Fifth Floor
Salt Lake City, Utah 84114
Tel: 801-366-0310
Attorneys for Plaintiff
UTAH DIVISION OF CONSUMER PROTECTION

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, and<br><br>UTAH DIVISION OF CONSUMER PROTECTION,<br><br>    Plaintiffs,<br><br>    v.<br><br>NUDGE, LLC, a Utah limited liability company,<br><br>RESPONSE MARKETING GROUP, LLC, also doing business as 3 DAY REAL ESTATE TRAINING, ABUNDANCE EDU, LLC, AFFLUENCE EDU, LLC, | **REDACTED VERSION**<br><br>**Case No.**<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |

AMERICAN MONEY TOUR, CASH
FLOW EDU, CLARK EDU, LLC, EDGE 2
REAL ESTATE, EVTECH MEDIA
NORTH, FLIP FOR LIFE, FLIPPING FOR
LIFE, INCOME EVENTS, INSIDER'S
FINANCIAL EDUCATION, LLC,
LEADING FINANCIAL EDUCATION,
LLC, ONWEALTH, POWER FLIP,
PROSPER LIVE, PROPERTY
EDUCATION, LLC, RENOVATE TO
RENT, SIMPLE REAL ESTATE
TRAINING, SMART FLIP, SNAP FLIP,
US EDUCATION ADVANCE, VINTAGE
FLIP, VISIONARY EVENTS, WEALTH
TRIBE, WOMEN'S EMPOWERMENT,
YANCEY EVENTS, YANCEY, LLC, and
YOUR REAL ESTATE TODAY, a Utah
limited liability company,

BUYPD, LLC, a Utah limited liability
company,

BRANDON B. LEWIS, individually and as
a principal and owner of NUDGE, LLC,
RESPONSE MARKETING GROUP, LLC,
and BUYPD, LLC,

RYAN C. POELMAN, individually and as a
principal and owner of NUDGE, LLC,
RESPONSE MARKETING GROUP, LLC,
and BUYPD, LLC,

PHILLIP W. SMITH, individually and as a
principal and owner of NUDGE, LLC,
RESPONSE MARKETING GROUP, LLC,
and BUYPD, LLC

SHAWN L. FINNEGAN, individually and
as a principal and owner of NUDGE, LLC,
RESPONSE MARKETING GROUP, LLC,
and BUYPD, LLC, and

CLINT R. SANDERSON, individually and
as an officer of RESPONSE MARKETING
GROUP, LLC and BUYPD, LLC,

2

      Defendants.

Plaintiffs, the Federal Trade Commission ("FTC") and the Utah Division of Consumer Protection ("Division"), for their Complaint allege:

1.      The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b), 57b, and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in violation of the FTC's trade regulation rule entitled Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310.

2.      The Division brings this action pursuant to the authority granted by Utah Code §§ 13-2-5(3), 13-11-17, 13-15-6, 13-26-8, and the Telemarketing Act, 15 U.S.C. §§ 6101-6108. The Divison seeks temporary, preliminary, and permanent injunctive relief, rescission of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, civil penalties, fines, and other equitable relief for Defendants' acts, omissions, or practices that violated the Utah Consumer Sales Practices Act ("UCSPA"), Utah Code § 13-11-1 *et seq*., the Business Opportunity Disclosure Act ("BODA"), Utah Code § 13-15-1 *et seq*., the Telephone Fraud Prevention Act ("TFPA"), Utah Code § 13-26-1 *et seq*., and the TSR, 16 C.F.R. Part 310.

## SUMMARY OF THE CASE

3.      From as early as 2012 and continuing through the present, the Defendants have misrepresented to consumers that they will be taught a proven formula on how to make

substantial money from investing in real estate.  Defendants entice consumers to enroll in a series

of increasingly expensive training programs through false claims that:  Defendants' system will

enable consumers to find properties at deeply-discounted prices; Defendants will make funding

available to consumers so they do not have to put their own money down; and Defendants will

show consumers how to gain access to individual investors who will purchase the properties

from them.  Defendants have taken in over $400 million from consumers across the country and

overseas through their deceptive scheme.

      4.     The Defendants use TV personalities from reality real estate shows, including

Scott Yancey from A&E's "Flipping Vegas," Doug Clark from Spike TV's "Flip Men," Drew

Levin and Danny Perkins from HGTV's "Renovate to Rent," and Josh Altman from Bravo's

"Million Dollar Listing Los Angeles," to attract consumers to free ninety-minute events (referred

to as the "Preview Events") that are held primarily in hotel conference rooms throughout the

United States.  Defendants advertise their Preview Events primarily through infomercials and

direct mailings, which falsely promise to show consumers during these events how to find

properties at below market prices and get access to financing without using their own money or

credit.  Since January 2015, over 750,000 individuals have attended one of the Defendants'

Preview Events.

      5.     The Preview Events, however, do not teach students anything of value, but

instead entice consumers to purchase additional training and tools at a paid three-day workshop

(referred to as "Workshops").  Defendants typically charge consumers $1,147 to attend a

Workshop.  At the Preview Events, Defendants promise consumers that if they sign-up for one of

the Workshops, they will get access to a proven system that has helped thousands of consumers

become successful real estate investors, and that Defendants will provide all the training and support the consumers need to establish their own real estate businesses and make money.

6.    Defendants primarily use the Workshops not to educate, but to sell consumers additional, more expensive products and services (referred to as "Advanced Training"), typically for tens of thousands of dollars.  Under the guise of raising funds for real estate deals, Defendants ask consumers to fill out profiles detailing their personal finances, and encourage consumers to increase their existing credit card limits.  Defendants also encourage consumers to obtain "funding" through a third-party.  However, instead of providing funding, the third-party simply applies for a half-dozen or more personal credit cards on the consumer's behalf. Defendants then try to convince consumers to purchase one of Defendants' Advanced Training packages using their newly-available credit and other finances.

7.    Defendants continue to target consumers for additional sales even after the consumers purchase an Advanced Training package.  From at least 2012 to 2016, as part of their Advanced Training packages, Defendants also promised consumers access to "exclusive" events called Buying Summits or Investor Expos where they could buy "turnkey" rental properties at below market value prices.  However, Defendants were actually the ones selling or brokering these properties, and did so after marking up the price as much as 20% or more for their own profit.  Defendants concealed their markups from consumers and, at times, even provided consumers with bogus sales comparables to convince consumers to purchase the properties at inflated prices.

8.    During and after the Advanced Training, Defendants also target consumers with telemarketing calls to induce additional sales, including access to a purported "Inner Circle"

5

personalized real estate coaching program for tens of thousands of dollars more.

9.      The vast majority of consumers who purchase the Defendants' products and services do not become successful real estate investors and do not make any money from Defendants' system, or even recover the cost of the Workshop or Advanced Training.  Many consumers end up heavily in debt and, in numerous instances, consumers have lost their life savings.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

11.     This Court has supplemental jurisdiction over the Division's claims under 28 U.S.C. § 1367.

12.     Venue is proper in this District under 28 U.S.C. § 1391(b) and (c), and 15 U.S.C. § 53(b).

## PLAINTIFFS

13.     The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces the Telemarketing Act.  Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.

14.     The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the TSR and to secure such equitable relief as

may be appropriate in each case, including rescission or reformation of contracts, restitution, the

refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b), 57b, and

6105(b).

16. 15.      The Division is an agency of the State of Utah created by statute. Utah Code § 13-

2-1(1).  The Division administers and enforces the UCSPA, which prohibits deceptive acts and

practices in connection with consumer transactions.  It administers and enforces the BODA,

which requires sellers of assisted marketing plans to provide disclosures to the Division and to

prospective purchasers.  It also administers and enforces the TFPA, which prohibits deceptive

practices in connection with telephone solicitations.

16.      The Division is authorized to take legal action against persons who violate the

UCSPA, the BODA, and the TFPA to enjoin violations of the acts, seek other equitable relief,

and to obtain damages, fines, civil penalties, fees, and costs.  Utah Code §§ 13-2-5(3); 13-11-

17(1)(a)-(d); 13-15-6(3); 13-26-8(2).

17.      The Division is authorized to take legal action against persons who violate the

Telemarketing Act and TSR, and to obtain damages, restitution, and other relief.  15 U.S.C. §§

6103(f)(2); 16 C.F.R. § 310.7.

**DEFENDANTS**

18.      Defendant Nudge, LLC ("Nudge"), formerly known as Internet Experts, LLC, is a

Utah limited liability company with its principal place of business at 380 S Technology Court,

Lindon, Utah 84042.  Nudge transacts or has transacted business in this District and throughout

the United States.  At times material to this Complaint, acting alone or in concert with others,

Nudge has advertised, marketed, distributed, or sold the real estate investment seminars and

related services and products at issue in this Complaint to consumers throughout the United States.

19.     Defendant Response Marketing Group, LLC ("Response"), formerly known as Evtech Media, LLC ("Evtech Media"), is a Utah limited liability company with its principal place of business at 380 S Technology Court, Lindon, Utah 84042.  Response also does business as 3 Day Real Estate Training, Abundance Edu, LLC, Affluence Edu, LLC, American Money Tour, Cash Flow Edu, Clark Edu, LLC, Edge 2 Real Estate, Evtech Media North, Flip for Life, Flipping For Life, Income Events, Insider's Financial Education, LLC, Leading Financial Education, LLC, OnWealth, Power Flip, Property Education, LLC, Prosper Live, Renovate to Rent, Simple Real Property Training, Smart Flip, Snap Flip, US Education Advance, Vintage Flip, Visionary Events, Wealth Tribe, Women's Empowerment, Yancey Events, Yancey, LLC, and Your Real Estate Today.  Response transacts or has transacted business in this District and throughout the United States.  At times material to this Complaint, acting alone or in concert with others, Response has advertised, marketed, distributed, or sold the real estate investment seminars and related services and products at issue in this Complaint to consumers throughout the United States.

20.     Defendant BuyPD, LLC ("BuyPD"), formerly known as Base Camp Ops, LLC and Media Excess Solutions LLC, is a Utah limited liability company with its principal place of business at 380 S Technology Court, Lindon, Utah 84042, and a secondary office address at 10421 South Jordan Gateway, South Jordan, Utah 84095.  BuyPD transacts or has transacted business in this District and throughout the United States.  At times material to this Complaint, acting alone or in concert with others, BuyPD has advertised, marketed, distributed, or sold the

real estate related services and products at issue in this Complaint to consumers throughout the United States.

21.     Nudge, Response, and BuyPD are collectively referred to herein as the "Corporate Defendants" or the "Nudge Enterprise."

22.     Defendant Brandon B. Lewis ("Lewis") is one of the principal owners of the Corporate Defendants.  At times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Defendant Lewis resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

23.     Defendant Ryan C. Poelman ("Poelman") is one of the principal owners of the Corporate Defendants and is the managing member of Nudge, the Chief Executive Officer of BuyPD, and was the Director of Operations of Response.  At times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Defendant Poelman resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

24.     Defendant Phillip W. Smith ("Smith") is one of the principal owners of the Corporate Defendants and the Chief Executive Officer of Response.  At times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Defendant Smith resides in this District and, in connection with the matters alleged herein,

transacts or has transacted business in this District and throughout the United States.

25.     Defendant Shawn L. Finnegan ("Finnegan") is one of the principal owners of the Corporate Defendants and has been the Chief Executive of Sales and Vice President of Response.  At times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Defendant Finnegan resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

26.     Defendant Clint R. Sanderson ("Sanderson") has been the President and Chief Operating Officer of Response since May 2015, and was the Chief Sales Officer of BuyPD from 2012 until May 2015.  At times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Defendant Sanderson resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

27.     The Corporate Defendants are closely held companies that have operated as a common enterprise while engaging in the deceptive acts and practices and other violations of law alleged below.  The Corporate Defendants have conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, business functions, employees, and office locations.  As described below, the Corporate Defendants also co-mingle funds and rely on a shared method to identify potential customers.  Because these Corporate Defendants have operated as a common enterprise, each of

10

them is jointly and severally liable for the acts and practices alleged below.  Furthermore, Lewis,

Poelman, Smith, Finnegan, and Sanderson (the "Individual Defendants," and, together with the

Corporate Defendants, the "Defendants") have formulated, directed, controlled, had the authority

to control, or participated in the acts and practices of the Corporate Defendants that constitute the

common enterprise.

## COMMERCE

28.     At all times material to this Complaint, Defendants have maintained a substantial

course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act,

15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

### The Individual Defendants' Prior Ties

29.     Prior to the formation of the Nudge Enterprise in 2011, several of the Individual

Defendants were involved in selling services purportedly designed to help consumers develop an

e-commerce business.

30.     From 2002 through March 2009, Lewis was President of iMergent, Inc., which,

through its wholly-owned subsidiary StoresOnline, Inc. ("StoresOnline"), marketed website

training and software to consumers at seminars across the country and in Australia.  Sanderson

was the Vice President of Sales of StoresOnline.  Poelman and Smith were principals of

telemarketing floors called Electronic Marketing Services ("EMS") and Professional Marketing

International ("PMI"), respectively, that purchased "leads" (the contact information of potential

customers) from StoresOnline and attempted to sell purported personalized coaching services to

consumers who had attended StoresOnline's seminars.

11

31.     By 2009, StoresOnline had been sued for deceptive sales practices by a number of state Attorneys General and District Attorneys from California, Connecticut, Florida, Illinois, Indiana, North Carolina, Texas, and Washington, as well as the Australian Competition and Consumer Commission ("ACCC"), and had entered into stipulated consent orders with multiple states for injunctive and monetary relief. *See* Complaint, *State of Texas v. iMergent, Inc. et al.*, No. 2005 CI 02791 (Bexar County Cir. Ct. Feb. 21, 2005); Consent Judgment, *State of Indiana v. iMergent, Inc.*, No. 490070601PL001792 (Marion Super. Ct. Mar. 19, 2007); Complaint, *State of Florida v. iMergent, Inc. et al.*, No. 2007CA1665 (Leon County Cir. Ct. June 26, 2017); Final Judgment of Stipulation, *State of Connecticut v. iMergent, Inc.*, No. CV-08-4036653S (Hartford Super. Ct. Apr. 11, 2008); Final Judgment and Consent Decree, *State of Illinois v. Stores Online, Inc. and Galaxy Mall*, No. 2006-CH-1345 (Madison County Super. Ct. June 12, 2008); Consent Judgment, *State of North Carolina v. iMergent, Inc. and StoresOnline, Inc.*, No. 07-CVS-7381 (Wake County Super. Ct. Aug. 4, 2008); Consent Order, *State of California v. iMergent, Inc., et al.*, No. 56-2007-287557 (Ventura County Super Ct. Mar. 10, 2009); Complaint and Final Judgment and Consent Decree, *State of Washington v. iMergent, Inc., StoresOnline, Inc.*,  No. 09-2-29124-1 (King County Super. Ct. Aug. 5, 2009); Judgment, *ACCC v. StoresOnline Int'l Inc., StoresOnline, Inc.*, No. (P)NSD1991/2007 (Federal Court of Australia May 5, 2010).

32.     By 2010, Lewis and Poelman joined Finnegan as officers and owners of Evolution Group, LLC ("Evolution Group"), which marketed and sold real estate and stock investment related services and products at seminars across the country.  Finnegan was a co-founder and a principal owner of Evolution Group.  Smith's telemarketing floor, PMI, purchased consumer leads from Evolution Group and attempted to sell purported personalized coaching

12

services to consumers who had attended Evolution Group's seminars.

### The Formation of the Nudge Enterprise

33.     By the end of 2011, Response's predecessor, Evtech Media, controlled by Lewis, Poelman, and Finnegan, acquired Evolution Group.  Evtech Media (which became Response in January 2016) markets and sells real estate and stock investment related services and products at the live Preview Events and Workshops across the country.

34.     Response induced consumers to pay for Advanced Trainings, in part, by promising them access to discounted properties at "exclusive" Buying Summits.  From at least 2012 to mid-2016, BuyPD was the entity used by the Individual Defendants to market and sell real estate properties to consumers who attended the Buying Summit events.  Through its subsidiaries, Insider's Cash and American Cash Funding, BuyPD provided loans to consumers to purchase these properties, and then sold those loans to other consumers at the Buying Summits.  BuyPD also markets and sells purported entity setup and asset protection services to consumers at the Workshops and at Advanced Training events through a subsidiary, Veil Corporate LLC.

35.     From at least 2012 to 2014, Smith's telemarketing floor, PMI, provided telemarketing services for Evtech Media.  Specifically, PMI purchased consumer leads from Evtech Media and attempted to sell through telemarketing calls purported personalized real estate coaching services to help consumers do real estate deals.

36.     In June 2014, Evtech Media acquired PMI, and Smith became a partner in the Nudge Enterprise.

37.     Since acquiring PMI, Evtech Media itself (and later Response) have conducted telemarketing calls to consumers to sell additional products and services, including purported

personalized real estate coaching services and tax preparation services.

38.     Since 2015, Response and BuyPD have operated out of the same office building in Lindon, Utah (the "Lindon Building").  The exterior signage for the Lindon Building previously bore Nudge's name, but now bears Response's name.

39.     Nudge served as the holding company for the partners of the Nudge enterprise, namely, Lewis, Poelman, Smith, and Finnegan.

40.     The Individual Defendants have been the principal managers in control of the Nudge Enterprise since mid-2014 (when Smith became a Nudge partner).  As the principal managers, the Individual Defendants oversee the enterprise's operations, including deciding what products and services to sell to consumers and managing relationships with celebrity endorsers and third-party vendors.  For example, as referenced below, the Individual Defendants discussed strategic and operational matters for Response and BuyPD at bi-annual Nudge retreats.

41.     The Individual Defendants have also participated in weekly company sales meetings, which Smith often led.

**Defendants' Escalating Sales Funnel**

42.     Since 2011, Defendants have used a variety of deceptive tactics detailed below to sell multiple levels of increasingly expensive seminars, other trainings, and related products, purportedly designed to help consumers become successful real estate investors.

43.     Defendants initially offer consumers at the free Preview Events access to 3-day live training Workshop events.  Defendants charged consumers anywhere from $199 to $1,997 to enroll in one of their Workshops.  Since 2016, Defendants typically charge consumers $1,147 to attend the Workshop.  Since January 2015, over ▌▌▌▌ consumers have purchased one of

14

Defendants' Workshops.

44.     Defendants then offer additional real estate investment products and services at

the Workshops, including additional live training by purported "experts" and "trainers," real

estate investing software branded as "Prop Trend" and "Real Estate Pro," and more online

training videos.  Defendants bundle these products and services into different Advanced Training

package names, such as "Diamond Elite 360," and charge consumers anywhere from $19,000 to

as much as $40,000.

45.     Through the end of 2017, Defendants included in the Advanced Training

packages access to supposedly "exclusive" deals for real estate and financial investment related

products and services offered at events (referred to as the "Buying Summit" and then "Investor

Expo") held monthly in Las Vegas and, later, at the Lindon Building.

46.     Since 2015, Defendants have sold Advanced Training packages to over █████

consumers.

47.     After consumers purchase one of the Advanced Training packages, Defendants

attempt to induce them through telemarketing calls to spend thousands of dollars, and sometimes

tens of thousands of dollars, more on additional products and services, including a purported

exclusive "Inner Circle" personalized real estate coaching program.

48.     In numerous instances, consumers have lost tens of thousands of dollars from

purchasing a series of Defendants' seminars and trainings.  In addition, numerous consumers

who bought purported "turnkey" and "cash flowing" rental properties from BuyPD at the Buying

Summit events discovered the properties were not worth what they paid and did not have paying

tenants in place as had been represented.  Some consumers have lost their life savings as a result

of Defendants' scheme; others have had to file for bankruptcy.  Those victimized include consumers on limited fixed incomes and retirees.

### Step 1: The "Celebrity" Invitation to the Preview Events

49.     Defendants conduct Preview Events across the country to entice consumers to purchase their real estate investment products and services.

50.     Defendants market the Preview Events as exclusive or private events sponsored by a celebrity endorser under a variety of brand names including, among others, Dean Graziosi's Insider's Edge, Scott Yancey's Yancey Events, Josh Altman's Flip for Life, Doug Clark's Unlisted Flip, and Drew Levin and Danny Perkins' Snap Flip.  Defendants pay the celebrity endorsers either a flat fee or a percentage of the consumer payments received from the event.

51.     Since at least 2013, through direct mail, email, and online advertisements, Defendants claimed, among other things, that consumers (i) did not need experience in real estate investing to get involved; (ii) would be shown at the Preview Events how to find properties at wholesale or deeply discounted prices; (iii) would get access to pre-approved funding to do real estate deals regardless of their own credit scores; and (iv) would learn exclusive "ways to profit." Defendants' advertisements for the Preview Events typically included the following kinds of representations:

> A.  "**Make Money with Income Properties** . . . . Purchase real estate at all time low prices before they are bid up by hundreds of investors?  Learn how to generate additional cash flow month after month?" (Emphasis in original)
>
> B.  "**Pre-Approved Funding**: Is there money to do deals?  Find out how to get up to $750,000 in pre-approved real estate funding regardless of credit score." (Emphasis in original)
>
> C.  "See ways to profit from real estate available to only the select few."

52.     Figures 1 and 2 are examples of Preview Event invitations consumers received in 2013 and 2014 featuring Dean Graziosi and Scott Yancey, respectively, both of which make representations about having access ("before the public") to purportedly deeply discounted properties (even "pennies on the dollar" or "all-time low prices"):

**Figure 1**



**Figure 2**



Congratulations! You and your guest's VIP reservation to my Private Income Property Event has been officially confirmed by the event sponsor. We'll see you and your guest at the:

## Omni William Penn Hotel
Saturday, April 19, 2014

530 William Penn Place, Pittsburgh, PA 15219
Event Begins Promptly at 9:00 AM (Registration begins at 8:30 AM)

**When you and your guest attend my Private Income Property Event, I will show you:**

✓ How to buy property for wholesale prices just like the institutional investors!

✓ How to get the best properties before the public has access to them!

✓ How to purchase property at all-time low prices before they are bid up by hundreds of other investors!

To your success!

*Scott Yancey*

Scott Yancey, Star of A&E's "Flipping Vegas"

P.S. Remember, as my personal guest, you and your guest will receive FREE admission, my valuable Resource Discs and a digital camera at the event!"

53.     Figure 3 is another example of a Preview Event invitation featuring Scott Yancey that a consumer received by direct mail in 2015.  It makes representations about access to deeply discounted properties ("all-time low prices"), purportedly pre-approved funding ("up to $750,000"), and generating "additional cash flow month after month after month", among other things:

**Figure 3**

Eva,

We cordially invite you and your guest to join us for a very informative **LUNCH OR DINNER** preview conference on how to create income from today's bounce-back real estate market. This educational event is complimentary and your questions are welcomed and will be addressed.

**Real Estate Income Event**
**"MAKE MONEY WITH INCOME PROPERTIES"**

Now more than ever, wouldn't you like to get the best properties before the public has access to them? Purchase real estate at all-time low prices before they are bid up by hundreds of investors? Learn how to generate additional cash-flow month after month after month?

Topics to be discussed:

- **Beginner & Experienced Opportunities:** How do I get involved even though I've never made money in real estate? What attracts accomplished individuals to this event?

- **Pre-Approved Funding:** Is there money to do deals? Find out how to get up to $750,000 in pre-approved real estate funding regardless of credit score.

- **Monthly Cash-Flow:** How do I get a hold of pre-market and tax deed auction properties and turn them into cash or hold them for long-term monthly income?

- **Reduced Risk:** Is it possible to avoid the common road blocks and avoid the risks most real estate investors eventually face?

- **Self-Direct IRA/401K:** Do you understand how to use your current retirement funds to build wealth in real estate?

- **Flip for Profit(s):** How can I find income properties I can flip overnight?

This LUNCH or DINNER event is Sponsored by Scott Yancey, widely recognized as the star of A&E's hottest show "Flipping Vegas".

Well this is your chance! We've arranged for you and your guest to attend FREE of charge. We promise this will be an eye opening event and an incredible learning opportunity. This exclusive **LUNCH or DINNER** event is typically limited to the first 100 registrants. You and one guest may register by calling **1-800-403-6580**. If you're not one of the first 100 registrants your name may be put on the waiting list.

See ways to profit from real estate available to only the select few.

**FREE Lunch or Dinner!**

**Tuesday, January 20, 2015**
☐ Lunch 12:00 pm ☑ Dinner 6:00 pm
**Sheraton Myrtle Beach Convention Center Hotel**
2101 North Oak Street, Myrtle Beach, SC 29577

**Join Us For Lunch or Dinner!**

GO TIME

*FREE Admission Also Includes:*
Two of my Resource Discs! Plus, a Digital Camera - FREE to attendees!*

**FREE** Tablet Computer For The First 50 People!*

Guarantee your seat by calling 1-800-403-6580

54.    Defendants also advertise their Preview Events through targeted television infomercials featuring a sponsoring celebrity in cities throughout the country.  Through these

infomercials, Defendants claim that consumers will be able to get access to a proven system used by the featured celebrities themselves to make money in real estate, that the consumers do not need to have any previous real estate experience or their own money or credit to use this system to succeed, and that consumers can receive pre-approved real estate funding from the sponsoring celebrity's "money partners."

55.    For example, in February 2016, one of Defendants' infomercials featuring Scott Yancey aired in Denver, Colorado.  Defendants represented, among other things, that ███ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████:

   A.    ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████

   B.    ██████████████████████████████████████████ ████████████

   C.    ██████████████████████████████████████████████ ████████████████████████████████████████████████ ████████

   D.    ████████████████████████████████████████ ████████████████████████████████████████████



56.     Similarly, in August 2017, Defendants aired an infomercial featuring Doug Clark in Norfolk, Virginia, which falsely represented, among other things, that ████████



A.

B.

C.

57.     Likewise, in February 2018, Defendants aired an infomercial featuring Josh Altman in Oklahoma City, Oklahoma, which falsely represented, among other things, that



58.     In addition, Defendants' infomercials contain video testimonials from consumers who claim they were able to do a number of real estate deals within months after having attended one of Defendants' events and receiving their training.

59.     Defendants sometimes display written disclaimers during these video testimonials.  For example, during the 2016 infomercial featuring Yancey, ███████████



60.     Defendants also display general disclaimers at the beginning of the infomercials. One such disclaimer that appeared at the beginning of the February 2018 infomercial featuring :

61.     Defendants' disclaimers do not negate or meaningfully alter the net impression consumers are left with from the repeated and specific representations Defendants make during the infomercials that the sponsoring celebrities have developed a proven and tested system to make money in real estate investing and that consumers can obtain financing from the sponsoring celebrity's "money partners" to do real estate deals.

23

**Step 2: The Preview Events**

62.     Defendants hold the Preview Events in hotel ballrooms across the country.  The Preview Events typically last approximately ninety minutes to two hours and start with motivational videos.

63.     The speakers typically ask at the beginning of the Preview Events how many attendees are new or just getting started in real estate investing.  The vast majority typically do not have experience in real estate investing.

64.     The speakers do not provide consumers with any substantive training or access to funding or discounted properties at the Preview Events.

65.     Instead, Defendants use the Preview Events to convince consumers to enroll in their three-day paid Workshop.  Defendants' speakers typically tell the attendees that there is not enough time at the Preview Event to go into adequate detail to teach the attendees how to do actual real estate deals, but the company offers three-day hands-on training that can be tailored or customized to each individual's needs and goals.

66.     During the course of the Preview Events, Defendants typically portray themselves as a "private funding partner" for consumers where they both profit together from the real estate deals the consumers do.  In doing so, Defendants represent that their interests align with the consumers in order to develop the consumers' trust and reinforce the representations about the nature of the services consumers will receive if they sign up for the Workshop.  As detailed below, these representations are false.

Misrepresentations about the Nature of the Services Included in the Workshop

67.     In numerous instances, Defendants mislead consumers about the nature of the

24

services they offer if consumers enroll in the Workshop.

68.     In numerous instances, Defendants tell consumers that they will get everything they need to do real estate deals within months after completing the Workshop, including access to "experts" who will walk them through completing the deals step-by-step.

69.     Defendants' representatives typically claim that students who enroll in their Workshops will be able to:  (a) use Defendants' funds to do real estate deals without putting any of their own money down; (b) find properties at below market value; and (c) access a list of "cash buyers" to purchase the consumers' investment properties.

70.     For example, on August 31, 2017, speakers at a "Snap Flip" Preview Event sponsored by Drew Levin and Danny Perkins held in Twin Falls, Idaho, claimed that consumers who signed up for the Workshop would get access to the same funding that Defendants themselves use to do real estate deals as well as to Defendants' "buyer system," that would enable consumers to find purchasers for the properties.  The speakers also represented that consumers could get access to funding without using "a dime" of their own money and receive personalized real estate transaction assistance, as part of a business model in which "the more money we make, the more money you make."  Their representations included the following:

> A.  "We have a funding partner that funds our deals for us.  We've been doing so for years and years.  Students who do our training or our classes with us, they get to use our funding partner to fund those transactions.  It's really cool.  I'll talk about that here today.  How many of you would love to have access to funding that you can use to do real estate deals?  It has nothing to do with your credit or income. . . . By the time that I am done here today with my portion, I will be very detailed, very specific and talking step by step on how each one of you here has the opportunity to do multiple real estate transactions without using a dime of your personal money, without accessing your credit to do it.  Still control the deal, get the deal, profit from it without using your money or credit."

> B.  "So they pay for the training.  We show them how to find their first deal. . . . we

25

show them how to find their first deal, locate it, get the offer, get it under contract.
. . . They still need a buyer. So they use our buyer system to get the buyer in
place, which is very valuable to them."

C.   "Number two, they get to use our funding partner under the same – under the
same rate and everything that we use. So we facilitate funding on the deal. We get
it funded for them so they don't lose the deal.  . . . . Just an example.  So you're
sitting there – here's my purpose of this example.  You've got that money right in
front of you.  How many of you truly believe with a little bit of direction with that
money right in front of you that you could do at least one or two real estate deals."

D.   "If we're showing you how to find them and we've got the funding already in
place, and we show you how to get a buyer and you're calling us 10 times a day
every day, why don't we just go get that one on our own?  Why don't we just go
do that deal? . . . The problem is, we cannot be in every state, every county, every
day, every neighborhood, all the time doing all of them.  I love them.  Together
with you we can do more. So a couple years ago our business strategy became
this. We said, hey, we're going to do as many deals as we can handle, and we'll
make money on those.  But at the same time, we want to get a handful of you up
and running. We want to show you how to do the exact same thing and give you
access to the exact same tools. We just want to make a little bit of money on each
one of those deals we help you with and fund them.  How many of you agree
that's a genius business strategy? It's awesome. Because it's win-win. The more
deals you do, the more money we make, the more money you make."

E.   "The tuition for the training again is $1,147. . . .The cool thing is when you get
registered here today, the $1,147 gets you everything you need right now.. . . .
And then number three is the buyer's system. You get access to that included. . . .
The very first thing we show you at that training, especially for the newbies, is we
show you how to use our buyer's system to locate and find 5 to 15 buyers in the
market you want to invest in and know where they bought property and how
much they want to pay for it.  We show you how to get the buyers first and then
we show you how to get the deals.  "

71.     Similarly, on December 27, 2017, Defendants' speakers at another Preview Event

held in Tucson, Arizona, claimed, among other things, that ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████





D.

E.

F.

72.     Likewise, on January 15, 2018, speakers at another Preview Event held in

Redondo Beach, California made similar claims, including that ████████████████

████████████████████████████████████████████

████████████████████████████████████████



73.      Defendants' claims about the consumers' ability to use funding and access to discounted properties and cash buyers are false and misleading.

74.      Virtually none of the consumers obtain Defendants' promised funding to flip properties.  Consumers are not eligible for the promised funding to flip properties except in limited circumstances.  Defendants' promised funding is only available if the consumer finds a buyer who is willing to first place the funds needed to buy the property in trust with the title company.  This limitation, which is not prominently disclosed, if disclosed at all, during the Preview Events, renders the promise of funding without money down largely illusory.

75.      Nor are consumers given any specialized access or tools to find properties at below market value or a network of cash buyers once they enroll in one of Defendants'

Workshops, as promised.  The purported real estate training provided at the Workshops covers basic real estate concepts only superficially and the software provided to consumers contains information that is publicly available for free or at a nominal cost.

<u>Misrepresentations about Earnings</u>

76.     In numerous instances, Defendants encourage consumers to purchase the Workshops by representing that consumers are likely to earn substantial income by using the system Defendants would provide during the Workshop.

77.     Defendants typically share examples or testimonials of purportedly successful purchasers of their system who were able to do a number of real estate deals within weeks or months after having attended Defendants' Workshops.

78.     In numerous instances, Defendants' speakers claim that they have a high success rate of their students doing many real estate deals and making thousands or tens of thousands of dollars.  For example, Defendants' speakers have made the following representations at Preview Events:

> A.  "When Drew [Levin] and Danny [Perkins] started giving their students access to funding, that's the number one challenge that people have investing in real estate. Once we solved that problem, get this. I know this will surprise some of you. Our student success skyrocketed. I mean, now you have access to money. The big problem is this, though.  Many of our students as they started going out and doing deals or multiple deals, they didn't realize how much the government was entitled to from their profits."  (August 31, 2017 Preview Event in Twin Falls, Idaho)

> B.  



C.

D.

79.     Defendants typically make a brief earnings related disclaimer shortly after beginning the Preview Event.  For example, one such disclaimer at the September 2017 Preview Event stated in part: "The students featured in this presentation are some of our company's most successful students.  They are either not typical or purchased additional training.  Most students that attend this introductory preview event do not make money."

80.     These brief disclaimers do not change the net impression consumers are left with by Defendants' repeated representations throughout the Preview Event that consumers are likely to make money and do profitable real estate deals within weeks or months after enrolling in Defendants' system.

81.     Contrary to Defendants' representations, consumers who purchase the Defendants' training are unlikely to make money or do real estate deals within months after attending a Workshop.  In fact, while Defendants offer to reimburse consumers the amount they pay to attend the Workshop if they complete a profitable ("net cash flow") transaction within either three or six months of enrolling in the Workshop, Defendants' own records show that for

every year from at least 2013 to 2017, only 1% (or fewer) of the consumers who had enrolled in a Workshop had received the tuition reimbursement.

82.     The vast majority of consumers who enroll in one of Defendants' Workshops do not make money from using any of Defendants' services or products.

### Step 3: The Workshops

83.     Defendants typically conduct Workshops in the same geographic areas as the Preview Events, a few weeks later.

84.     The Workshop speakers cover only at a general level topics related to flipping properties and investing in rental properties.

85.     The main thrust of the Workshop is not to educate, but instead to convince consumers to buy the more expensive Advanced Training packages.  This is contrary to the expectations of many consumers who understood, based on Defendants' prior representations at the Preview Events, that they would receive the necessary tools and resources to successfully invest in real estate if they enrolled in the Workshop.

86.     During the three-day Workshops, Defendants make a number of misrepresentations to induce consumers to purchase one of the more expensive Advanced Training packages.  First, they mislead consumers into providing their personal financial information to Defendants, increasing their credit card limits, and applying for new credit cards purportedly for investment purposes.  Second, they misrepresent the nature of the products and services consumers will receive by paying for Advanced Training.  Third, they mislead consumers regarding the amount of money they can expect to make as a result of purchasing the Advanced Training.

32

Misrepresentations about the Need for Consumers' Personal
Financial Information and the Purpose of Seeking Additional Credit

87.     At the start of the Workshop, Defendants typically ask consumers to complete an

"investor profile" or "investor goal sheet" about their personal finances under the guise that

Defendants will use this information to advise consumers on funding real estate deals and to help

them reach their goals.

88.     Each consumer is assigned to a "team mentor" or "personal consultant" who

meets privately with the consumer during the Workshop.  The "team mentors" and "personal

consultants" are in fact salespersons hired by Defendants to sell the Advanced Training

packages.  They use the consumers' financial information to find out the consumers' available

credit and funds and determine how much consumers can afford to pay for one of the Advanced

Training packages.

89.     On the Workshop's first or second day, the speakers typically encourage

consumers to increase their limits on their existing personal credit cards, purportedly to provide

them more capital to purchase real estate.  Defendants' representatives provide scripts for

consumers to use when they call their credit card companies.  Unbeknownst to consumers, the

real purpose of this exercise is to increase the amount of credit consumers have available to

purchase one of Defendants' Advanced Training packages.

90.     On the Workshop's second day, since at least March 2016, the speakers typically

encourage consumers to use one of a handful of third-party companies to secure additional

"capital" or "funding" to do real estate deals.

91.     For example, at a Workshop in South Jordan, Utah in October 2017 (the "South

Jordan Workshop"), the speaker, Doug Clark, claimed that consumers should seek this third-party financing to allow consumers to do real estate transactions quickly.  In the following excerpts from that Workshop, Clark spoke at length about (i) why consumers purportedly need immediate funding to complete deals (in addition to Defendants' own promised funding, which purportedly may take three weeks); and (ii) how Defendants found a third-party company that provides "seed capital" for start-up and household company names to help students obtain such immediate ("zero percent") financing to do deals:

> A. "My preferred method for you to do that is our funding, no surprise.  But to be completely transparent with you, some of these deals you should probably fund quicker than it takes to get the money in place.  I don't want you to wait, I want you to do what's best for you.  Now we can fund your deals, but it takes about three weeks, that's why I told you 21 days, expect that.  Here's why.  Because if you look at all the students worldwide, today's Friday, it's not even at 1:00, I don't know, because I'm not near the office, so here's my assumption . . . is that today is like most all days and there could be, there could be anywhere from 600 to 800 deals that could have come through the office so far today already of students wanting to fund deals, probably like something like that, right.  Well they all go in the queue and we have to check them and verify them, which is good for you because then our system goes what is it, let's verify times, dates, stamp, boom, ba, if something's wrong, we go something's wrong. You don't pay anything for that, we just check it, right.  But to fund that many deals in 50 States, I'm teaching you guys nationally, we're talking about Salt Lake because we're sitting here. I'm teaching you how to be a national investor, it's all the same to me, it's all on the computer. But I don't want you to wait three weeks, if you've got something that's so good, write a check and do the deal, I don't know – just do it, fund it, get it done. . . ."

> ". . . . But we came up with a solution.  Now what's interesting is I was looking for a way to help my students that maybe like didn't have as much financial means as some people do, right. . . . so I, I searched for it, I'm thinking how can I help my students that don't have tons and tons of money when they begin, how can I help them get ahead boost.  And what's interesting is my wealthiest clients actually like the product the most, but it makes sense because it's other people's money.  So here's what we did, we found a company that does start-ups and they do household names, the Aldis, the Subways, the Seven Eleven's, all these things there.  The company itself is called [the Nevada Company] and they provide seed capital for business. . . ."

". . . . Now, here's the program.  They offer our students anywhere from 50 to 150 grand just based on credit.  Our average client in about a five-minute process gets anywhere from 80 to 100 grand standing by, and that's not the best part.  The best part is zero percent.  Zero percent locked in guaranteed for a certain time frame depending on the person, and the zero percent can be extended."

B.  "If you, if you have great credit and want to do it, fantastic.  If you're on the fence or whatever, it doesn't affect your credit, you can try, it doesn't make any difference to me.  But I, I can look you in the eye and tell you this, it has been the single biggest boost to the start of students that I have seen added in years, period.  And what's funny is I kind of figured like my mid-level students would use it, and they do, but my wealthiest are like zero percent, where, what, what.  They're the first ones on the computers every time."

92.     In fact, the third-party companies referenced by Workshop speakers do not provide financing for real estate transactions.  Rather, they simply apply for a half dozen or more credit cards in consumers' names.  As with Defendants' attempts to encourage consumers to raise their credit limits, the real purpose of encouraging consumers to seek funding through these third-party companies is to increase the amount of credit consumers have available to purchase one of Defendants' Advanced Training packages.

93.     Defendants have primarily referred consumers to a Nevada company (hereinafter, the "Nevada Company").

94.     The Defendants induced approximately ███ consumers to sign up with the Nevada Company from ████████████████. The Nevada Company used by Defendants typically charged consumers a service fee of at least $3,000 from the personal credit cards they obtained for the consumer.  From at least ████████████████████, the Nevada Company paid the Defendants a referral fee of ███ for each consumer they signed up during Defendants' Workshops.  The Nevada Company paid the referral fees by issuing checks addressed to a Nudge subsidiary, Box Home Loans, to Sanderson's attention.

35

95.     The Nevada Company presents contracts to the consumers titled "Business Consulting Services Agreements" that refer to the consumer as its "client."  The Nevada Company's contracts state that the consumer "retains and hires [the Nevada Company] to provide consulting services and assistance related to establishing financial and credit account on behalf" of the consumer and the consumer's business.  Consumers are typically left with the impression that the Nevada Company will act in the consumers' interests and for their benefit.  However, the Defendants and the Nevada Company instead coordinate with each other concerning the use of consumers' credit.

96.     Unbeknownst to the consumers, the Nevada Company ███████████████████ ████████████████████████████████.  The Defendants coordinate their sales pitches to consumers for additional services with the Nevada Company when the consumers obtained new credit cards.

97.     For example, in June 2017, a Response employee emailed a principal of the Nevada Company, ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████

98.     The Nevada Company also ████████████████████████ ███████████████████████████.  For example, in May 2017, an email among several Nevada Company employees stated: ███████████████████ ████████████████████████████████████████

36

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

<u>Misrepresentations about the Services and Products Included in the Advanced Trainings</u>

99.     The Workshop speakers told consumers that if they purchased the Advanced Training packages, they would receive:  (a) specialized, non-public software that would enable consumers to find cash buyers and discounted properties; (b) specialized access to mentors or experts who would answer all their questions and work with them to complete real estate deals; and (c) access to exclusive deals at the Buying Summit events that included "turnkey" or "cash flowing" investment properties that had been fixed up and already had paying tenants in place.

100.     These claims are false.

101.     Consumers who purchase the Advanced Training do not receive specialized, non-public software that enables them to find discounted properties or cash buyers.  Instead, consumers receive a licensed software product that provides information that is widely accessible by the public for minimal cost.

102.     Consumers who purchase the Advanced Training do not receive personalized access to experts or mentors as promised to complete real estate deals.

103.     In numerous instances, consumers who attended the Buying Summit did not get access to turnkey and "cash flowing" rehabbed rental properties.  Instead, as detailed below, in numerous instances, consumers who bought properties at the Buying Summit incurred, and continue to incur, significant losses because Defendants sold the properties at inflated prices and because the properties did not have paying tenants in place and needed significant repairs.

37

<u>Misrepresentations about Earnings</u>

104.    Defendants encourage consumers to purchase the Advanced Training packages by representing that consumers are likely to earn substantial income from the Advanced Trainings.

105.    Defendants' earnings representations take many forms.

106.    In numerous instances, the Workshop speakers claim that the Advanced Trainings are part of an exclusive, proven system that has helped the speakers themselves and many students succeed quickly, and that even someone with no real estate experience can do at least one real estate deal a month and make money.

107.    For example, at the South Jordan Workshop, the speaker, Doug Clark, made the following representations:

    A.   "This is us funding your deals.  Whatever you want to call it.  I call it transactional funding, and this is my – one of my favorite sections to teach, because this is how we make money together.  And if you've never had a massive, extremely powerful, large, national company that makes money when you do, you are going to enjoy the result more than anything you've ever seen."

    B.   "So the question is, how many of those do you want to do a month?  Start thinking about it.  Tomorrow morning I'm going to have you start writing down goals.  I'm going to have you write down goals. . . . if someone is new, scared, and never done real estate, has kids, grandkids, loves going to the fair, loves going up the mountains, doesn't really like to do a lot, and really has a fear of real estate, then I'm like do one a month. Start with one a month."

    C.   "So the [Diamond Elite] 360 is kind of unique.  It's a private invite only club. . . . It's a special group, and here's the thing.  Is 38,000 a lot of money?  It's all relative. . . .  So if it was a – if it's a program that never goes away, has software that automates it for you, and here is the coolest part.  It comes with a three transaction guarantee.  (Inaudible) Three transaction guarantee.  Clearly I'm only willing to do that for people that I think I can get through three transactions pretty quickly and pretty efficiently.  Now, the thing I always get from people is what happened at three?  You get a high-five.  It's a lifetime program.  It doesn't go away.  Like three is what I want to get to quickly, because you know what?  People who get to three get to ten.  People who get to ten get to – does that make sense?"

D.  "I got stories you wouldn't believe if I told you, who all successfully – know this, all over the world right now . . .  He toured I want to say 16 countries, that might have come up, successfully doing this program, successfully doing what Shawn taught over and over and over.  Some retired, some retired early.  Families working together.  All types of stuff.  You name it, I got it.  The common thread was they joined the system.  They got plugged in, they got help. . . . When I train people, like my goal is, is this, okay, there's a path that I know.  Now it took me years and years and years to learn this, but I condensed it down.  Here's how I condensed it down.  I go you know what, for those who want extra help, here's what I know works, it's called let's immediately, as in starting tomorrow, let's get you on the software and you can fire in offers tomorrow, boom, as many as you want, nationwide. . ."

108.    In addition, in numerous instances, the Workshop speakers often discuss real estate deals where they claim to have earned substantial income using the same tools and system that the consumers will be able to access.

109.    In numerous instances, the Workshop speakers refer to purported purchasers of Defendants' Advanced Training who made substantial income from rental properties purchased at the Buying Summit or from other tools and services included in the Advanced Trainings.

110.    In numerous instances, the Workshop speakers go over "hypothetical" real estate transactions to purportedly help calculate various costs where the consumer's profit often equals tens of thousands of dollars or more.

111.    In numerous instances, Defendants' sales representatives at the Workshop repeat and expand on these earnings claims when they meet privately with consumers during the Workshop by telling consumers they will recoup the purchase price of the Advanced Trainings.

112.    In numerous instances, Defendants' sales representatives at the Workshop advise consumers that the Advance Trainings provide the consumer with a system to generate significant income, and that the consumer should treat the endeavor as a business.

113.     In addition, in numerous instances, once Defendants refer consumers during the Workshop to the Nevada Company for funding, the Nevada Company representatives reinforce these earnings claims.  For example, the Nevada Company representatives tell consumers during the credit card application process that the consumers could expect to earn thousands of dollars per deal or per month from Defendants' system and even as much as one hundred thousand dollars for the following year.

114.     In numerous instances, the Nevada Company representatives advised consumers to state on credit card applications that their projected income from their real estate investments would be ███████████.  The Nevada Company documented these projections in "Ability to Pay" worksheets ████████████████████████████████████ ████████).

115.     ████████████████████████████████████ ████████████████████████████████.  For example, in January 2017, one of Defendants' executives emailed Sanderson: ████████████ ████████████████████████████████████ ████████████████  This practice continued for another year after this exchange and stopped only after Defendants learned that they were the subjects of an FTC investigation.

116.     Defendants typically make an earnings related disclaimer at the beginning of the Workshops, which states in part:  "We provide real estate education and training.  We do not sell a business opportunity, such as a franchise business.  We make no earnings or return on investment claims or guarantees," and that "[t]he case studies provided are from our presenters and trainers, and may be examples from some of our top students who have shared their success

40

with us.  These results may not be typical.  Many of our students do not apply the education and strategies and therefore do not make money.  Many of these students purchased additional education and training materials."

117.   Despite such brief disclaimers, Defendants' repeated representations over the course of the three-day Workshops leave consumers with the net impression that they are likely to earn substantial income from the Advanced Trainings.

118.   Defendants' earnings claims are false.  The overwhelming majority of consumers who purchase the Advanced Trainings do not earn substantial income.  In most instances, consumers who purchase the Advanced Trainings make no money and do not recoup the cost of the Advanced Trainings.

119.   For many consumers, their financial loss is not limited to the purchase amount paid for the Workshop and Advanced Training.  Defendants continue to target consumers for additional sales even after they paid for the Advanced Training.

### Step 4: The Buying Summit

120.   From at least 2012 through at least mid-2016, Defendants through BuyPD and its many subsidiaries marketed and sold real estate properties at the Buying Summits (later called Investor Expos) to consumers who purchased Advanced Training.

121.   Defendants acquired these properties from a handful of third-party companies (the "Property Sourcers").  The Property Sourcers typically purchased distressed properties and purportedly provided some degree of repair or renovation, and then sold the properties to one of dozens of BuyPD subsidiaries.

122.   In 2016, Defendants arranged for the Property Sourcers to sell the properties

41

directly to consumers at the Buying Summit.  In this arrangement, Defendants received a

"commission" from the Property Sourcers that was paid to a Nudge affiliated entity, Nudge Real

Estate, LLC.

123.    From 2012 through 2016, Defendants held the Buying Summits each month in a

ballroom at the Luxor Hotel in Las Vegas.  Several hundred consumers often attended the

Summits as part of the Advanced Training packages they purchased at the Workshops.  The

Summits often started on a Wednesday for registration and ended on a Saturday evening.

124.    When consumers arrived, they had to complete an "investor profile," which asked

for the amount of funds they had available to invest.  The Defendants used these profiles to

identify the consumers who had the most funds and placed these consumers in the front of the

ballroom during the Summit.  The consumers who Defendants identified as having less money

were placed in the back of the ballroom.

125.    The main speaker at the Buying Summit often was Kory Thurston, who acted as

the host.  Thurston introduced to the consumers so-called "strategic partners" who were

purportedly there to help the consumers accomplish their goals.  The "strategic partners"

included BuyPD's "property specialists," funding "partners," and real estate lawyers.

126.    Consumers were encouraged to commit to buy properties while at the Buying

Summit and use the "strategic partners" that were at the Buying Summit to fund and complete

those transactions.  The Buying Summit speakers told consumers that if they waited to think

about a property it would be gone.

127.    Consumers received appointment cards indicating when they would meet with a

purported property specialist.  BuyPD encouraged the property specialists to sell the rental

properties at the Buying Summit. ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████.

128.     The Buying Summit speakers encouraged consumers to use "leverage" or financing to purchase more than one property so they could benefit from the supposed appreciation in the properties' values.

129.     The Buying Summit speakers also encouraged consumers to use the financing offered by BuyPD's "strategic partners," American Cash Funding and Insider's Cash, which are actually subsidiaries of BuyPD.  BuyPD's funding "partners" offered consumers two and three-year interest only loans where consumers had to repay the entire principal amount in one "balloon" payment at the end of the loan term.  Defendants typically charged consumers an upfront "origination" fee of several thousand dollars equal to ten percent or more of the loan amount.

130.     The Buying Summit speakers told consumers that the funding partners normally funded only up to 50% of the property sale but would provide funding up to 66% or 75% of the consumers' purchase price of properties sold at the Buying Summit.

131.     The Buying Summit speakers claimed that consumers could use these loans as "bridge loans" where they could pay off the monthly interest payments with the supposed rental payment income from the properties and then refinance the loans with a bank.

132.     The Buying Summit speakers also encouraged consumers to transfer their savings into self-directed Individual Retirement Accounts ("self-directed IRAs") that could be used to

buy the rental properties.  Beginning in April 2013, Defendants primarily steered consumers to a

Nevada entity that set up consumers' self-directed IRAs during the Buying Summit.  This

Nevada entity split the fees it charged consumers with the Defendants, and has paid Defendants

more than ███████ since April 2013.

133.    Most consumers funded their property purchases from Defendants by either

taking out a loan from BuyPD or by making payments from a self-directed IRA account they

opened at the Buying Summit.

134.    Consumers met with the BuyPD property specialists at the Buying Summit in a

side room next to the main ballroom.  Other "strategic partners," including the self-directed IRA

custodians, sat in the same side room.

135.    The BuyPD property specialists each had a computer terminal screen and showed

consumers the properties for sale on their screens.  In at least 2013, the BuyPD property

specialists referred consumers to a "Ready Prop" website at the domain readyprop.com, which

provided photos as well as a "Suggested Retail Price" and a "Price" for the rental properties.

The "Suggested Retail Price" was higher than the "Price" amount, which was the price offered to

the consumer.  The BuyPD property specialists were directed to tell consumers that the higher

"Suggested Retail Price" was based on sales comparables.

136.    By 2015, the BuyPD property specialists referred consumers to an "Income

Property USA" website at the domain buy.incomepropertyusa.com, which represented that the

rental properties were "Cash flowing," "Projected to appreciate dramatically," and "Majority are

already tenanted (with term contract)."  These statements are consistent with what BuyPD

property specialists were instructed to tell consumers about the rental properties.

137.    At times in 2015, BuyPD property specialists provided consumers with a "Property Analysis Report" on offered rental properties during the sale process.  These reports were prepared by BuyPD's acquisitions group and included a "Comparable Market Analysis" that purported to list sales that were similar or comparable to the property in order to help establish a price range and value for the property.

138.    The comparables that BuyPD provided consumers were cherry-picked to justify BuyPD's price.  They omitted property sales that were closer and in the same neighborhoods as the subject properties.  The property sales that BuyPD omitted had substantially lower sales prices than the purported "comparable" sales that BuyPD included in the reports to support BuyPD's higher offer price to the consumer.  The purported "comparable" sales that BuyPD listed included properties that were more than one mile away from the subject property (even though BuyPD's reports given to consumers claimed that the listed "comps are within 1 mile of property").

139.    Unbeknownst to consumers, Defendants often marketed and sold properties to consumers at prices marked up as much as 20% more than what Defendants would pay for them. In many instances, Defendants sold the properties to consumers at significant markups within days after they had executed agreements to buy the properties themselves, and did so, before their own purchases had closed.

140.    Consumers selected properties shown to them on the BuyPD property specialist's computer screen by clicking on a "Buy Now" button before time on a countdown clock expired. Defendants' "sales support" team then prepared a sales contract for the consumer to sign before they left the Buying Summit.

141.    In numerous instances, Defendants prepared and encouraged consumers to sign a "Limited Power of Attorney" form designating a purported law firm located in Nevada, American Legal & Escrow, LLC ("American Legal"), as the consumer's attorney relating to the property.  American Legal had no employees in Nevada and no physical office there.  It was formed in December 2013 by a Utah attorney who: (i) represents the Defendants in consumer disputes, among other matters; (ii) whose office is in the Lindon Building, and (iii) who is Lewis's brother-in-law.  One of the American Legal individuals designated as the consumer's attorney on the "Limited Power of Attorney" forms worked at BuyPD and is one of Poelman's sisters.

142.    The Buying Summit speakers typically repeated and expanded on claims made earlier at the Workshop that the rental properties at the Buying Summit are: (1) "turnkey" properties that are "cash flowing" with renters and property managers in place; and (2) are available at "wholesale" or below market value prices.

143.    The Buying Summit speakers made other representations about the condition of the properties sold at the Buying Summit, including that all properties for sale at the Buying Summit had been "rental rehabbed" and vetted by BuyPD to ensure that the properties were not something different from how they were represented.

144.    BuyPD also marketed and sold at the Buying Summit the loans that BuyPD, through its subsidiaries, provided consumers to purchase the properties.  In this way, Defendants transferred the default risk from loans they issued to consumers to other consumers at the Buying Summit.  Consumers who purchased these loans (which BuyPD referred to as "trust deeds") were assigned BuyPD's rights and interests in the loan agreements, including the right to all

46

remaining payments due on the loans.

145.    The Buying Summit speakers claimed that the trust deeds sold at the Summit were safe and "low risk" investments and that the Defendants would buy them back if the debtor defaulted for whatever reason.

146.    These representations about the properties and trust deeds were false.

147.    In numerous instances, consumers who purchased properties at the Buying Summit discovered that the properties were not worth what they paid, did not have paying tenants in place, and were not "rental rehabbed" or otherwise in the condition Defendants represented.  In addition, consumers incurred expenses and costs that far exceeded whatever rents were collected.

148.    In numerous instances, consumers discovered they could not refinance the loans they obtained at the Buying Summit because the loan amounts exceeded the properties' value based on independent appraisals.

149.    In numerous instances, consumers defaulted on the loans they obtained at the Buying Summits to purchase the properties.  For example, ▇▇▇ of the ▇▇▇ loans BuyPD made to consumers from March 2015 through December 2015 defaulted.  (Defendants' loan default rate is ▇▇▇▇▇▇ the highest residential loan delinquency rate of 11.36% reported by the Federal Reserve during the Great Recession in early 2010.  See Federal Reserve website, www.federalreserve.gov/releases/chargeoff/delallnsa.htm.)

150.    In numerous instances, consumers had to sell the properties for substantially less than they had paid for the properties at the Buying Summits.

151.    In some instances, Defendants offered to "refinance" consumers' loans just before

the balloon payment became due and charged them another fee of at least a thousand dollars to

extend the loan and delay the balloon repayment obligation.  In some instances, in 2016 and

2017, Defendants then sold the "refinanced" loans through another affiliated entity, Sterling

Capital, LLC, to other consumers.  In at least several instances, consumers who purchased the

"refinanced" loans discovered after the loans defaulted that the loan amounts far exceeded the

market values of the properties securing the loans.

152.    By 2015, several BuyPD sales representatives ████████████████████████

██████████████████████████████████████████████████████

████████████ .

153.    In the summer of 2015, BuyPD sales representatives also ██████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████ .



## Step 5: The Inner Circle

154.    Even consumers who purchase Advanced Training are targeted for additional

sales.  Defendants target these consumers with telemarketing calls pitching additional products,

including purported personalized coaching services under the brand name "The Inner Circle."

155.    Defendants tell consumers that they will get access to a mentor and insider tips to

help them do profitable real estate deals if they pay for the Inner Circle coaching program.

156.    Defendants' telemarketers were instructed to maximize the sale amount they

could get from each consumer.

157.    Defendants kept track of how much their telemarketers sold to each consumer by

tracking each telemarketer's "dollar per lead" ("DPL") amount, which was the sum of all sales made to a set number of consumer leads divided by the number of leads.  The telemarketers discussed their DPLs and acceptable DPL levels with Smith.

158.    Defendants' telemarketers had access to the forms that consumers filled out at the Workshops detailing their personal finances.  Defendants' telemarketers also used scripts that instructed them to ask about the consumers' personal financial situation, including their credit card limits and savings.

159.    In numerous instances, Defendants' telemarketers tell consumers that they will use this personal financial information to assess whether the consumer would be an appropriate candidate for the program.

160.    The Defendants' representations about how they use consumers' financial information are false.

161.    Defendants' telemarketers do not use this information to assess a consumer's qualifications for the program.  Instead, Defendants use this information to decide how much to charge consumers for the one-on-one coaching program.  Defendants charge consumers several thousand dollars, and as much as $20,000, to enroll in this program.  Defendants' telemarketers had discretion to set the cost of the program based in part on what the consumers had available in terms of credit and assets.

162.    In numerous instances, Defendants' telemarketers encouraged consumers to purchase the coaching program by representing that consumers who purchase the program are likely to earn substantial income from future real estate deals.

163.    Defendants' earnings representations lead consumers to believe that they will be

able to recoup the cost of their purchases of the coaching program and earn several thousand dollars a month from future real estate deals.

164.    For example, Defendants' telemarketers typically tell consumers about consumers who made money after purchasing the coaching program.

165.    In addition, the scripts used by Defendants' telemarketers instruct them to tell consumers that: "typically our clients average 6 to 12 months to complete their 1st couple of transactions.  While we cannot offer any guarantees, and your results may vary, generally students are able to complete their first real estate transaction within the first few months of starting the education."

166.    Defendants' earnings claims are false.

167.    The overwhelming majority of students who purchase the coaching program do not earn substantial income and do not complete a real estate transaction within months of starting the purported one-on-one coaching.

### The Individual Defendants Directed and Profited from this Scheme

168.    From at least 2015 through at least 2017, Nudge held company bi-annual retreats in April and November.  At these retreats, the Individual Defendants and several other executives ███████████████████████████████████████████████: ██████████ ██████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████.

169.    For example, in April 2015, the Nudge retreat agenda listed ████████████████████



170.    In November 2016, the Nudge retreat agenda referenced ▮▮▮▮▮▮▮▮

171.    In the Fall of 2017, the Nudge retreat agenda listed ▮▮▮▮▮▮▮▮

172.    The Individual Defendants also opened several merchant accounts used by the Nudge Enterprise to conduct business.  A "merchant account" is a type of account that allows a business to receive payments from customers by credit and debit card.  A merchant account is linked to a routine depository bank account.  When a consumer makes a purchase and pays by credit or debit card, that purchase transaction is processed through the seller's merchant account, and then the sale proceeds are deposited into the seller's depository bank account.

173.    From 2011 to 2015, Finnegan signed applications for merchant accounts in the name of Evtech Media on behalf of the Nudge Enterprise.

174.    From 2012 to 2015, Poelman's brother signed applications for merchant accounts in the name of BuyPD and its affiliated entities, Veil Corporate, Insider's Cash, and Income Property USA, LLC, on behalf of the Nudge Enterprise.

175.    In 2014 and 2015, Smith signed applications for merchant accounts in the name of Response's affiliated entities, Response North, LLC, Constat Medium, LLC, and Constat

Primum, LLC, on behalf of the Nudge Enterprise.

176.    In July and November 2015, over twenty merchant accounts opened in the names of Evtech Media, Response North, and Veil Corporate on behalf of the Nudge Enterprise were closed by American Express for "excessive fraud" and "violation of standards."

177.    The Individual Defendants also opened and maintained multiple commercial bank accounts to receive, redistribute, and withdraw funds from the credit and debit card sales transactions generated by the Nudge Enterprise.

178.    Beginning in 2014, funds from operating bank accounts for Response and BuyPD (in the names of Evtech Media, LLC, Response North, LLC, and BuyPD, LLC) were transferred into bank accounts in the name of Building One, LLC and, later, 415NG, LLC, which were used to fund construction related expenses for the Lindon Building and the use of a private airplane for the Nudge Enterprise.

179.    From at least 2015 through 2016, millions of dollars were also transferred from the operating bank accounts for Response and BuyPD into a Nudge bank account.  Poelman and his sister are the only signatories on this Nudge bank account, which was used to disburse these funds as profit distributions to the Individual Defendants and several other executives.

180.    Since 2015, the Individual Defendants collectively received over $30 million dollars from the following bank accounts used by Defendants to receive and redistribute consumer payments:  Nudge, LLC, BuyPD, LLC, Response North, LLC, Response Live, LLC, Evtech Media, LLC, and Acumen Advantage, LLC.

181.    Poelman and Lewis each received over $10 million through various entities each controls (KBBP, LLC, Net Media, LLC, Eddie Steve, LLC, OneExtreme, LLC, and Black Drive,

LLC for Lewis, and All Source Marketing, 4145 Associates, Distant Path, LLC, Strange Range, LLC, and LC Lake, LLC for Poelman).  Smith received more than $5 million through entities he controls (Smith Business Enterprises and KTSE Real Estate LLC).  Finnegan received more than $4 million through entities he controls (Thermalday, LLC and Media Buzz, LLC).

182.    Based on the facts and violations of law alleged in this Complaint, the FTC and the Division have reason to believe that Defendants are violating or are about to violate laws enforced by the Commission and the Division.

## VIOLATIONS OF THE FTC ACT

183.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

184.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

185.    As set forth below, Defendants are engaging in violations of Section 5(a) of the FTC Act in connection with the marketing and sale of their real estate investment related products and services.

## COUNT ONE – MISREPRESENTATION (EARNINGS)
### (By Plaintiff Federal Trade Commission)

186.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of their real estate investment related products and services, Defendants have represented, directly or indirectly, expressly or by implication, that consumers who purchase and use their products and services are likely to earn substantial income.  Such representations include that consumers who purchase the Workshops or the Advanced Trainings

are likely to earn several thousand dollars monthly.

187.    In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 186, consumers who purchased Defendants' products and services did not earn substantial income.

188.    Defendants' representations as set forth in Paragraph 186 are false or misleading or were not substantiated at the time the representations were made, and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT TWO – MISREPRESENTATION (PRODUCTS AND SERVICES PROVIDED)

### (By Plaintiff Federal Trade Commission)

189.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of their real estate investment related products and services, Defendants have represented, directly or indirectly, expressly or by implication, that they will provide tools and/or access to one or more of the following:

(a) funding to do real estate deals without having the consumers put any of their own money down;

(b) properties at discounted or wholesale prices;

(c) "cash buyers;"

(d)  personalized assistance from experts or mentors who will walk consumers through completing real estate deals;

(d) "turnkey" or "cash flowing" properties at the Buying Summit;

(e) properties in "rental rehabbed" condition, or free of certain defects, at the

Buying Summit or

(f) "low risk" trust deeds at the Buying Summit.

190.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 189, Defendants did not provide the products and services they represented they would provide.

191.     Therefore, Defendants' representations as set forth in Paragraph 189 are false and misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT THREE – MISREPRESENTATION (NEED FOR FINANCIAL INFORMATION AND PURPOSE OF SEEKING ADDITIONAL CREDIT)

### (By Plaintiff Federal Trade Commission)

192.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of their real estate investment related products and services, Defendants have represented, directly or indirectly, expressly or by implication, that they need consumers' financial information to advise consumers on funding real estate deals or to determine whether consumers are qualified for one of their programs.

193.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of their real estate investment related products and services, Defendants have represented, directly or indirectly, expressly or by implication, that consumers should increase their existing credit card limits and apply for additional financing to do real estate deals.

194.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 192, Defendants do not use consumers' financial

information as they represented.  Instead, the Defendants use consumers' financial information to decide how much to charge them for one of their Advanced Training packages and Inner Circle program.

195.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 193, Defendants encourage consumers to increase their existing credit card limits and apply for additional financing not to fund real estate deals, but to convince consumers to purchase the Defendants' Advanced Training packages with their newly-available credit.

196.     Therefore, Defendants' representations as set forth in Paragraphs 192 and 193 are false and misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

197.     In 1994, Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  The FTC adopted the TSR in 1995, extensively amended it in 2003, and amended certain sections thereafter.

198.     Defendants are "sellers" or "telemarketers" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. §§ 310.2(dd), (ff), and (gg).

199.     The TSR prohibits sellers and telemarketers from "[m]isrepresenting, directly or by implication, in the sale of goods and services . . . [a]ny material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer."  16 C.F.R. § 310.3(a)(2)(iii).

200.     The TSR prohibits sellers and telemarketers from "[m]aking a false or misleading statement to induce any person to pay for goods or services. . . ."  16 C.F.R. § 310.3(a)(4).

201.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).  Pursuant to Section 4 of the Telemarketing Act, 15 U.S.C. § 6103(f)(2), the Division is authorized to bring civil actions to enforce the TSR.

### COUNT FOUR – MISREPRESENTATION (PERFORMANCE, EFFICACY, NATURE, ESSENTIAL CHARACTERISTICS)

### (By Plaintiffs Federal Trade Commission and Utah Division of Consumer Protection)

202.     In numerous instances, in connection with telemarketing offers to sell the Inner Circle program, Defendants have misrepresented, directly or indirectly, expressly or by implication, material aspects of the performance, efficacy, nature, or central characteristics of the Inner Circle one-on-one coaching services, such as that consumers who purchase the Inner Circle program are likely to earn substantial income.

203.     Defendants' acts or practices, as set forth in Paragraph 202, are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a)(2)(iii) and (a)(4).

### VIOLATIONS OF THE UCSPA

204.     The UCSPA prohibits suppliers from committing deceptive and unconscionable acts or practices in connection with a consumer transaction, whether the act occurs before, during, or after the transaction. Utah Code §§ 13-11-4(1); 13-11-5(1).

205.     The Defendants engage in "consumer transaction[s]" by marketing and selling to

57

"person[s]" products and services that are primarily for personal, family, or household purposes, or for purposes that relate to a business opportunity. Utah Code §§ 13-11-3(2), (5).

206.    Each Defendant is a "supplier" because they regularly solicit, engage in, or enforce consumer transactions, whether or not they deal directly with consumers. Utah Code § 13-11-3(6).

207.    As set forth below, the Defendants have violated the UCSPA by engaging in deceptive and unconscionable acts and practices in connection with the marketing and sale of their real estate investment related products and services.

## COUNT FIVE – DECEPTIVE ACTS OR PRACTICES (EARNINGS CLAIMS)

### (By Plaintiff Utah Division of Consumer Protection)

208.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of their real estate investment related products and services, Defendants have represented, directly or indirectly, expressly or by implication, that consumers who purchase and use their products and services are likely to earn substantial income.  Such representations include that consumers who purchase the Workshops or the Advanced Trainings are likely to earn several thousand dollars monthly.

209.    In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 208, consumers who purchased Defendants' products and services did not earn substantial income.

210.    Defendants' representations as set forth in Paragraph 208 are false or misleading or were not substantiated at the time the representations were made, and constitute a deceptive act or practice in violation of the UCSPA, Utah Code § 13-11-4(1).

58

## COUNT SIX – DECEPTIVE ACTS OR PRACTICES (PRODUCTS AND SERVICES PROVIDED)

### (By Plaintiff Utah Division of Consumer Protection)

211.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of their real estate investment related products and services, Defendants have represented, directly or indirectly, expressly or by implication, that they will provide tools and/or access to one or more of the following:

(a) funding to do real estate deals without having the consumers put any of their own money down;

(b) properties at discounted or wholesale prices;

(c) "cash buyers;"

(d)  personalized assistance from experts or mentors who will walk consumers through completing real estate deals;

(d) "turnkey" or "cash flowing" properties at the Buying Summit;

(e) properties in "rental rehabbed" condition, or free of certain defects, at the Buying Summit; or

(f) "low risk" trust deeds at the Buying Summit.

212.    In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 211, Defendants did not provide the products and services they represented they would provide.

213.    Therefore, Defendants' representations as set forth in Paragraph 211 are false and misleading and constitute deceptive acts or practices in violation of the UCSPA, Utah Code § 13-11-4(1).

**COUNT SEVEN – DECEPTIVE ACTS OR PRACTICES (NEED FOR FINANCIAL INFORMATION AND PURPOSE OF SEEKING ADDITIONAL CREDIT)**

**(By Plaintiff Utah Division of Consumer Protection)**

214.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of their real estate investment related products and services, Defendants have represented, directly or indirectly, expressly or by implication, that they need consumers' financial information to advise consumers on funding real estate deals or to determine whether consumers are qualified for one of their programs.

215.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of their real estate investment related products and services, Defendants have represented, directly or indirectly, expressly or by implication, that consumers should increase their existing credit card limits and apply for additional financing to do real estate deals.

216.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 214, Defendants do not use consumers' financial information as they represented.  Instead, the Defendants use consumers' financial information to decide how much to charge them for one of their Advanced Training packages and Inner Circle programs.

217.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 215, Defendants encourage consumers to increase their existing credit card limits and apply for additional financing not to fund real estate deals, but to convince consumers to purchase the Defendants' Advanced Training packages with their newly-available credit.

218.     Therefore, Defendants' representations as set forth in Paragraphs 214 and 215 are

false and misleading and constitute a deceptive act or practice in violation of the UCSPA, Utah

Code § 13-11-4(1).

**COUNT EIGHT – UNCONSCIONABLE ACTS OR PRACTICES (EXPLOITING CONSUMERS' PERSONAL FINANCIAL INFORMATION TO ENCOURAGE CONSUMERS TO INCUR DEBT OR OTHER FINANCIAL OBLIGATIONS DEFENDANTS KNEW OR SHOULD HAVE KNOWN THE CONSUMER COULD NOT REASONABLY REPAY OR AFFORD)**

**(By Plaintiff Utah Division of Consumer Protection)**

219.    In numerous instances in connection with the advertising, marketing, promotion,

offering for sale, or sale of their real estate investment related products and services, Defendants

represented to consumers that by purchasing Defendants' products and services, consumers

would be able to generate substantial income and that high rates of consumers who previously

purchased Defendants' products and services were successful.

220.    In numerous instances in connection with the advertising, marketing, promotion,

offering for sale, or sale of their real estate investment related products and services, Defendants

received from consumers detailed personal financial information, including the consumers'

income, savings, and credit availability.

221.    In numerous instances in connection with the advertising, marketing, promotion,

offering for sale, or sale of their real estate investment related products and services, Defendants

together and in concert with others used consumers' personal financial information to encourage

consumers to increase their existing credit card limits to apply for and open new credit cards, and

to use savings and retirement funds purportedly to help launch consumers' real estate investment

ventures.

222.    In truth and in fact, Defendants together and in concert with others sought to use

61

the consumers' newly-available credit, savings, and retirement funds to pay for Defendants'

products or services that cost thousands or tens of thousands of dollars.

223.    Defendants knew or should have known that their representations about earnings

potential and success rates were false, misleading, and deceptive.

224.    Defendants knew or should have known the financial condition of consumers

whom they encouraged to increase existing credit card limits, open new credit cards, or to use

savings and retirement funds.

225.    Defendants knew or should have known that consumers would not reasonably be

able to repay the significant cost of Defendants' products or services, particularly because

Defendants knew or should have known that their representations about earnings potential and

prior consumers' success were false, misleading, and deceptive.

226.    Defendants' acts and practices were unconscionable because Defendants

exploited consumers' financial information to sell products and services that Defendants knew or

should have known would not enable consumers to generate significant income and be

successful.

227.    Defendants' acts and practices were unconscionable because Defendants

encouraged consumers to incur significant debt and spend savings or retirement funds that

Defendants, through their knowledge of consumers' financial information and through their

knowledge of their own false representations, knew or should have known consumers would be

unable to repay or recover.

228.    Defendants seek to induce consumers to assume risks, including the obligation to

repay tens of thousands of dollars of credit card debit, which materially exceed the benefits to the

consumers of their transactions with Defendants.

229.     Therefore, Defendants' acts and practices set forth in Paragraphs 219 to 228 constitute unconscionable acts and practices in violation of the UCSPA, Utah Code § 13-11-5(1).

## VIOLATIONS OF THE BODA

230.     The BODA requires sellers of "assisted marketing plans" to annually file certain information with the Division.  Utah Code § 13-15-4.

231.     The BODA also requires sellers of assisted marketing plans to provide to prospective purchasers of the assisted marketing plans written disclosures at least ten days prior to execution of a purchase agreement or payment by the purchaser.  Utah Code §§ 13-15-4; 13-15-5.

232.     Defendants' Workshop, Advanced Training, and Inner Circle products are "assisted marketing plans" as defined by Utah Code § 13-15-2(1)(a)(iv).

233.     Defendants are "sellers" of assisted marketing plans as defined by Utah Code § 13-15-2(8).

234.     As set forth below, Defendants have violated the BODA by failing to file required information with the Division, and by failing to provide required disclosures to prospective purchasers of Defendants' assisted marketing plans.

## COUNT NINE – FAILURE TO FILE REQUIRED INFORMATION WITH THE DIVISION

### (By Plaintiff Utah Division of Consumer Protection)

235.     During the five years preceding this action, Defendants have offered and sold multiple different assisted marketing plans through a variety of corporate entities.

236.     For each assisted marketing plan offered and sold by the Defendants, Defendants were required to file annually with the Division the information described by Utah Code § 13-15-4.

237.     During the five years preceding this action, Defendants have failed to file with the Division the information required by Utah Code § 13-15-4 with respect to any of the assisted marketing plans Defendants offered, sold, and continue to offer and sell.

238.     As described in Paragraphs 235 to 237, Defendants violated the BODA by failing to file with the Division the information required by Utah Code § 13-15-4 for each assisted marketing plan Defendants offered, and for each year Defendants failed to file the required information while offering a given assisted marketing plan.

## COUNT TEN - FAILURE TO PROVIDE REQUIRED DISCLOSURES TO PROSPECTIVE PURCHASERS

### (By Plaintiff Utah Division of Consumer Protection)

239.     During the five years preceding this action, Defendants have sold thousands of assisted marketing plans to consumers.

240.     Defendants were required to provide certain disclosures to prospective purchasers of its assisted marketing plans in a single disclosure statement or prospectus at least ten business days prior to the execution of a consumer's agreement to purchase one of Defendants' plans, or ten business days prior to payment by the consumer of any consideration in exchange for the assisted marketing plan. Utah Code § 13-15-5.

241.     Defendants did not provide the required disclosure statement or prospectus to any of the thousands of consumers who purchased one of Defendants' assisted marketing plans.

242.     As described in Paragraphs 239 to 241, Defendants violated the BODA each time they sold an assisted marketing plan to a consumer without providing the required disclosure statement or prospectus.

## VIOLATIONS OF THE TFPA

243.     The TFPA prohibits telephone soliciting businesses and solicitors from making or causing to be made any untrue material statements, or failing to disclose material facts necessary to make a statement not misleading.  Utah Code § 13-26-11(1)(c).

244.     The TFPA also prohibits any telephone soliciting business from causing or permitting any solicitor to violate the TFPA.  Utah Code § 13-26-11(2)(a).

245.     Defendants operate a telephone soliciting business as defined by Utah Code §13-26-2(8).

246.     Defendants are solicitors because they make telephone solicitations, and cause telephone solicitations to be made.  Utah Code §§ 13-26-2(9)(a), (b).

## COUNT ELEVEN – UNTRUE MATERIAL STATEMENTS OR FAILURE TO DISCLOSE MATERIAL FACTS

### (By Plaintiff Utah Division of Consumer Protection)

247.     In numerous instances, in connection with telephone solicitations to sell the Inner Circle program, Defendants have misrepresented, directly or indirectly, expressly or by implication, material aspects of the performance, efficacy, nature, or central characteristics of the Inner Circle one-on-one coaching services, such as by representing that consumers who purchase the Inner Circle program are likely to earn substantial income.

248.     Defendants' acts or practices, as described in Paragraph 247 above, are unlawful

65

practices that violate the TFPA.  Utah Code §§ 13-26-11(1)(c); 13-26-11(2)(a).

## CONSUMER INJURY

249.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the TSR, the UCSPA, the BODA, and the TFPA.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

250.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

251.    Section 19 of the FTC Act, 15 U.S.C. § 57b and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b) authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, including the rescission or reformation of contracts and the refund of money.

252.    The UCSPA authorizes this Court to enter a declaratory judgment that Defendants' acts or practices violate the UCSPA, to enjoin, in accordance with the principles of equity, any person who has violated, is violating, or is otherwise likely to violate the UCSPA, to award damages or relief on behalf of consumers for Defendants' violations of the UCSPA, to

award a fine against Defendants for violations of the UCSPA in an amount determined by the Court, and to award the Division reasonable attorney's fees, court costs, and costs of investigation.  Utah Code §§ 13-11-17(1)(a)-(d); 13-11-17.5.

253.    The BODA authorizes this Court, in addition to any other relief granted by the Court, to grant judgment and injunctive relief in favor of the Division, and to award the Division reasonable attorney's fees, costs of court, and investigative fees for Defendants' violations of the BODA.  Utah Code § 13-15-6(3).

254.    The TFPA authorizes this Court to impose a civil penalty not exceeding $2,500 against the Defendants for each of Defendants' transactions that violated the TFPA.  Utah Code § 13-26-8(2).

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), and Plaintiff Utah Division of Consumer Protection, pursuant to the UCSPA, the BODA, the TFPA, and the TSR, and as authorized by the Court's own equitable powers, request that the Court:

A.    Award Plaintiffs such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including temporary and preliminary injunctions, an order freezing assets and immediate access;

B.    Enter a permanent injunction to prevent future violations of the FTC Act, the TSR, the UCSPA, the BODA, and the TFPA by Defendants;

C.    Award such relief as the Court finds necessary to redress injury to consumers

resulting from Defendants' violations of the FTC Act, the TSR, the UCSPA, the BODA, and the

TFPA, including rescission or reformation of contracts, restitution, the refund of monies paid,

and the disgorgement of ill-gotten monies;

      D.     Award civil penalties in an amount up to $2,500 for each violation of the UCSPA,

the BODA, and the TFPA; and

      E.     Award Plaintiffs the costs of bringing this action as well as such other and

additional relief as the Court may determine to be just and proper.

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

Dated: Nov. 5, 2019

Darren H. Lubetzky
Savvas S. Diacosavvas
Brian N. Lasky
Christopher Y. Miller
Laura A. Zuckerwise
Federal Trade Commission, Northeast Region
One Bowling Green, Suite 318
New York, NY 10004
Tel: (212) 607-2829
Email: dlubetzky@ftc.gov
Email: sdiacosavvas@ftc.gov
Email: blasky@ftc.gov
Email: cmiller@ftc.gov
Email: lzuckerwise@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

ATTORNEY GENERAL,

Robert G. Wing (4445)

Thomas M. Melton (4999)
Kevin McLean (16101)
Assistant Attorneys General
Utah Attorney General's Office
160 East 300 South, Fifth Floor
Salt Lake City, Utah 84114
Tel: 801-366-0310
Email: rwing@agutah.gov
Email: tmelton@agutah.gov
Email: kmclean@agutah.gov

Attorneys for Plaintiff
UTAH DIVISION OF
CONSUMER PROTECTION