IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| FEDERAL TRADE COMMISSION, and UTAH DIVISION OF CONSUMER PROTECTION,<br><br>                    Plaintiffs,<br><br>v.<br><br>NUDGE, LLC, a Utah limited liability company, RESPONSE MARKETING GROUP, LLC, a Utah limited liability company, BUYPD, LLC, a Utah limited liability company, BRANDON B. LEWIS, individually and as a principal and owner of NUDGE, LLC, RESPONSE MARKETING GROUP, LLC, and BUYPD, LLC, RYAN C. POELMAN, individually and as a principal and owner of NUDGE, LLC, RESPONSE MARKETING GROUP, LLC, and BUYPD, LLC, PHILLIP W. SMITH, individually and as a principal and owner of NUDGE, LLC, RESPONSE MARKETING GROUP, LLC, and BUYPD, LLC, SHAWN L. FINNEGAN, individually and as a principal and owner of NUDGE, LLC, RESPONSE MARKETING GROUP, LLC, and BUYPD, LLC, and CLINT R. SANDERSON, individually and as an officer of RESPONSE MARKETING GROUP, LLC and BUYPD, LLC,<br><br>                    Defendants. | **ORDER DENYING DEFENDANTS' PARTIAL MOTION TO DISMISS**<br><br>Case No. 2:19-cv-00867<br><br>Chief Judge Robert J. Shelby<br><br>Magistrate Judge Evelyn J. Furse |

This is an enforcement action brought by Plaintiffs Federal Trade Commission (FTC) and

the Utah Division of Consumer Protection (the Division) against Defendants Nudge, LLC,

Response Marketing Group, LLC, BuyPD, LLC and their corporate officers, Defendants Lewis,

Poelman, Smith, Finnegan, and Sanderson (collectively, Defendants).  Plaintiffs allege

Defendants have operated their business(es) in violation of the FTC Act, the Telemarketing Sales

Rule, the Utah Consumer Sales Practices Act (UCSPA), the Utah Business Opportunity

Disclosure Act (BODA), and the Utah Telephone Fraud Prevention Act (TFPA).[1]

On November 5, 2019, Plaintiffs filed a Complaint[2] seeking permanent injunctive relief

against Defendants.  That same day, Plaintiffs filed a Motion on Notice for a Temporary

Restraining Order (TRO) against Defendants.[3]  On November 19, 2019, Defendants filed a

Partial Motion to Dismiss Plaintiffs' Complaint.[4]  On December 18, 2019, the parties consented

to and the court entered a Stipulated Preliminary Injunction.[5]  Before the court now is

Defendants' Partial Motion to Dismiss Plaintiffs' Complaint.[6]  For the reasons stated below,

Defendants' Motion is DENIED.

---

[1] Dkt. 4 at ¶¶ 183–248.

[2] Dkt. 4.

[3] Dkt. 6.

[4] Dkt. 58.

[5] Dkt. 89.

[6] Dkt. 58.

BACKGROUND[7]

## I. OVERVIEW OF DEFENDANTS

This case involves a number of corporate entities and individual defendants.  Because the relationships between these entities and individuals are relevant to the court's ruling, a brief overview of those relationships is helpful.

There are three limited liability companies named as defendants in this case: (1) Nudge, LLC; (2) Response Marketing Group, LLC; and (3) BuyPD, LLC (collectively, Corporate Defendants).  Nudge served as the holding company for the partners of the Corporate Defendants.[8]  The Corporate Defendants share a principal place of business at the same address in Lindon, Utah.[9]  Since 2015, Response and BuyPD have operated out of the same office building.[10]  The exterior signage for the building previously bore Nudge's name, but now bears Response's name.[11]  The Corporate Defendants share common principal owners and corporate officers, as briefly detailed below.

There are five individuals named as defendants in this case: (1) Brandon Lewis; (2) Ryan Poelman; (3) Phillip Smith; (4) Shawn Finnegan; and (5) Clint Sanderson (collectively, Individual Defendants).

Lewis is one of the principal owners of the Corporate Defendants.[12]

---

[7] Because this case comes before the court on a motion to dismiss, the court accepts as true all well-pled factual allegations contained in the complaint.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007) ("[A] judge ruling on a defendant's motion to dismiss a complaint 'must accept as true all of the factual allegations contained in the complaint.'" (citation omitted)).  Additionally, the court's recitation of the facts here is limited to those facts in the Complaint relevant to Defendants' Partial Motion to Dismiss.

[8] Dkt. 4 at ¶ 39.

[9] Dkt. 4 at ¶¶ 18–20.

[10] Dkt. 4 at ¶ 38.

[11] Dkt. 4 at ¶ 38.

[12] Dkt. 4 at ¶ 22.

Poelman is a principal owner of the Corporate Defendants.[13]  He is the managing member of Nudge and the Chief Executive Officer of BuyPD, and was formerly the Director of Operations at Response.[14]

Smith is a principal owner of the Corporate Defendants.[15]  He is also the Chief Executive Officer of Response.[16]

Finnegan is a principal owner of the Corporate Defendants.[17]  He has also served as the Chief Executive of Sales and Vice President of Response in the past.[18]

Sanderson has served as the President and Chief Operating Officer of Response since May 2015.[19]  Prior to that, he served as the Chief Sales Officer of BuyPD from 2012 until May 2015.[20]

The Individual Defendants have been the principal managers in control of the Corporate Defendants since mid-2014.[21]

## II. FACTUAL BACKGROUND

Since 2011, Defendants have been engaged in the business of selling real estate investment seminars and related services.[22]

---

[13] Dkt. 4 at ¶ 23.

[14] Dkt. 4 at ¶ 23.

[15] Dkt. 4 at ¶ 24.

[16] Dkt. 4 at ¶ 24.

[17] Dkt. 4 at ¶ 25.

[18] Dkt. 4 at ¶ 25.

[19] Dkt. 4 at ¶ 26.

[20] Dkt. 4 at ¶ 26.

[21] Dkt. 4 at ¶ 40.

[22] Dkt. 4 at ¶¶ 18–20, 42.

Defendants attract consumers by inviting them to free Preview Events.[23]  Defendants

advertise the Preview Events through mail, email, online ads, and infomercials.[24]  In these

advertisements, Defendants state that consumers would be shown at the Preview Events how to

find properties at wholesale or discounted prices, would be given access to proven systems used

to make money in real estate, and would be given access to pre-approved funding to finance real

estate deals.[25]

The Preview Events are held in hotel ballrooms across the country and typically last

between ninety minutes to two hours.[26]  At the Preview Events, consumers are not provided with

any substantive training or access to funding.[27]  Instead, the speakers at the Preview Events tell

the attendees that, while there is not enough time during the Preview Event, the company offers

three-day hands-on trainings (Workshops) that can be tailored and customized to meet each

individual's goals and needs.[28]  The speakers generally represent that students who enroll in the

three-day Workshops will be able to find properties at below market value, access a list of "cash

buyers" to purchase the student's investment properties, and use Defendants' funds to do real

estate deals.[29]  Since 2016, Defendants have typically charged $1,147 to attend a Workshop.[30]

The Workshops are generally held a few weeks after the Preview Events in the same

geographical areas as the Preview Events.[31]  At the start of the Workshop, attendees are

---

[23] Dkt. 4 at ¶ 49.

[24] Dkt. 4 at ¶¶ 51, 54.

[25] Dkt. 4 at ¶¶ 51, 54.

[26] Dkt. 4 at ¶ 62.

[27] Dkt. 4 at ¶ 64.

[28] Dkt. 4 at ¶ 65.

[29] Dkt. 4 at ¶ 69.

[30] Dkt. 4 at ¶ 43.

[31] Dkt. 4 at ¶ 83.

instructed to complete an investor profile, in which they provide details about their personal finances.[32]  The Workshop speakers typically encourage attendees to increase credit limits on their existing personal credits cards and use one of a handful of third-party companies to secure additional funding for real estate deals.[33]  Defendants primarily refer attendees to a Nevada company to secure additional funding.[34]  The Nevada company provides funding for attendees by applying for credit cards in the attendees' names.[35]

The Workshop speakers also encourage consumers to purchase Advanced Training packages.[36]  The Workshop speakers tell attendees that those who sign up for Advanced Training will receive: (1) specialized software enabling them to find cash buyers and discounted properties, (2) specialized access to mentors who will work with them to complete real estate deals, and (3) access to exclusive deals at Buying Summit events that include turnkey investment properties.[37]

From at least 2012 through at least mid-2016, Defendants conducted Buying Summit events through BuyPD and its subsidiaries.[38]  The properties offered at the Buying Summits were generally owned by BuyPD or one its subsidiaries.[39]  At some Buying Summits, however, the properties offered were owned by a third-party and Defendants received a commission from the third-party for each sale made at the Buying Summit.[40]

---

[32] Dkt. 4 at ¶ 88.

[33] Dkt. 4 at ¶¶ 89–90.

[34] Dkt. 4 at ¶ 93.

[35] Dkt. 4 at ¶ 92.

[36] Dkt. 4 at ¶ 99.

[37] Dkt. 4 at ¶ 99.

[38] Dkt. 4 at ¶ 120.

[39] Dkt. 4 at ¶ 121.

[40] Dkt. 4 at ¶ 122.

Buying Summit attendees would meet with BuyPD's "property specialists," who showed attendees electronic listings for properties for sale.[41]  The electronic listings provided photos as well as the price offered to attendees to purchase the property and the suggested retail value of the property.[42]  The suggested retail values were based on sales comparables generated by BuyPD.[43]

At Buying Summits, BuyPD also marketed and sold the loans it provided to consumers to purchase Buying Summit properties.[44]  Customers who purchased these loans were assigned BuyPD's rights and interests in the loan agreements.[45]

In addition to being invited to Buying Summits, Workshop attendees who purchased Advanced Training were further encouraged by Defendants' telemarketers to purchase personalized one-on-one coaching services under the brand name "The Inner Circle."[46]  In a number of instances, Defendants' telemarketers represented that those who purchase Inner Circle training are likely to earn substantial income from future real estate deals and would be able to recoup the cost of the Inner Circle program.[47]  Purchase prices for the Inner Circle training ranged from several thousand dollars to as much as twenty-thousand dollars.[48]

---

[41] Dkt. 4 at ¶ 135.

[42] Dkt. 4 at ¶ 135.

[43] Dkt. 4 at ¶ 138.

[44] Dkt. 4 at ¶ 144.

[45] Dkt. 4 at ¶ 144.

[46] Dkt. 4 at ¶ 154.

[47] Dkt. 4 at ¶¶ 162–63.

[48] Dkt. 4 at ¶ 161.

### III. PROCEDURAL HISTORY

Plaintiffs filed their Complaint on November 5, 2019, seeking a permanent injunction and various forms of other equitable relief against Defendants.[49]  Plaintiffs also filed a Motion for Temporary Restraining Order that same day.[50]  (Dkt. 6).  Defendants filed a Partial Motion to Dismiss Plaintiffs' Complaint on November 19, 2019.[51]  On December 18, 2019, the parties consented to and the court entered a Stipulated Preliminary Injunction.[52]  Before the court now is Defendants' Partial Motion to Dismiss Plaintiffs' Complaint for failure to state a claim.[53]

### LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief."[54]  Under Rule 12(b)(6), a court must dismiss causes of action that "fail[ ] to state a claim upon which relief can be granted."[55]  To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[56]  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the

---

[49] Dkt. 4.

[50] Dkt. 6.

[51] Dkt. 58.

[52] Dkt. 89.

[53] Dkt. 58.  The Division tries to recast Defendants' Motion as a rule 12(b)(1) motion—dismissal for lack of subject-matter jurisdiction—with respect to certain arguments regarding the Division's authority to bring its claims against Defendants.  *See* dkt. 66 at 3.  This is an incorrect reading of Defendants' Motion.  Defendants' Motion does not challenge the court's subject-matter jurisdiction.  Instead, Defendants' Motion challenges *the Division's* jurisdiction over Defendants with respect to certain out-of-state activities.  *See* dkt. 58 at 34–46.  The question of whether the Division can regulate the Defendants' out-of-state behavior is well within this court's subject-matter jurisdiction and therefore the court will treat Defendants' Motion as a rule 12(b)(6) motion for failure to state a claim.

[54] Fed. R. Civ. P. 8(a)(2).

[55] Fed. R. Civ. P. 12(b)(6).

[56] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

reasonable inference that the defendant is liable for the misconduct alleged."[57]  When evaluating

a motion to dismiss, the court "accept[s] all well-pleaded facts [in the complaint] as true and

view[s] them in the light most favorable to the plaintiff."[58]  However, the court will not accept as

true "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements."[59]  The reviewing court is required to "draw on its judicial experience and common

sense" to evaluate whether the well-pled facts state a plausible claim for relief.[60]  "Though a

complaint need not provide detailed factual allegations, it must give just enough factual detail to

provide [defendants] fair notice of what the . . . claim is and the grounds upon which it rests."[61]

## ANALYSIS

Defendants' Partial Motion to Dismiss raises five arguments.  The first two relate to

claims brought by the FTC and the latter three relate to claims brought by the Division.  The

court will address each of these arguments in turn, beginning with the arguments directed at the

FTC's claims.

### I. EQUITABLE MONETARY RELIEF UNDER THE FTC ACT

Defendants' first argument is that the FTC's requests for equitable monetary relief in

Counts One, Two, and Three of the Complaint must be dismissed with prejudice.[62]

The FTC's claim for equitable relief is rooted in the permanent injunction it seeks

pursuant to the second proviso of Section 13(b) of the FTC Act.[63]  The second proviso of Section

---

[57] *Id.*

[58] *Jordan-Arapahoe, LLP v. Bd. of Cty. Comm'rs*, 633 F.3d 1022, 1025 (10th Cir. 2011) (citation omitted).

[59] *Iqbal*, 556 U.S. at 678.

[60] *Id.* at 679.

[61] *Warnick v. Cooley*, 895 F.3d 746, 751 (10th Cir. 2018) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (internal quotation marks omitted).

[62] Dkt. 58 at 16.

[63] 15 U.S.C. § 53(b).

13(b) reads, "*Provided further*, That in proper cases the Commission may seek, and after proper

proof, the court may issue, a permanent injunction."[64]

Defendants argue the FTC's request for equitable monetary relief pursuant to the second

proviso is improper.  In support, Defendants point to the language of Section 13(b) and a recent

case out of the Seventh Circuit, *Federal Trade Commission v. Credit Bureau Center, LLC*, 937

F.3d 764 (7th Cir. 2019), interpreting Section 13(b) to not provide for monetary equitable relief.

In response, the FTC points to Tenth Circuit precedent holding that the FTC may seek

monetary equitable relief in actions brought pursuant to the second proviso of Section 13(b).[65]

Given the binding Tenth Circuit precedent on this issue, the court agrees with the FTC that it

may seek equitable monetary relief in this action.

In *FTC v. Freecom Communications, Inc.*, 401 F.3d 1192 (10th Cir. 2005)—a case

vacating an award of attorney fees against the FTC—the Tenth Circuit addressed the issue of the

scope of the relief the FTC may seek in a Section 13(b) action.  The *Freecom* court explained:

> Section 13(b), 15 U.S.C. § 53(b), provides the remedy for a § 5 violation.
> Although § 13(b) does not expressly authorize a court to grant consumer redress
> (i.e., refund, restitution, rescission, or other equitable monetary relief), § 13(b)'s
> grant of authority to provide injunctive relief carries with it the full range of
> equitable remedies, including the power to grant consumer redress. In cases where
> the FTC seeks injunctive relief, courts deem any monetary relief sought as
> incidental to injunctive relief.[66]

More recently, the Tenth Circuit reaffirmed this position in *FTC v. LoanPointe, LLC*, 525 F.

App'x 696 (10th Cir. 2013) (unpublished), in which it held, "[a]lthough the FTC Act 'does not

expressly authorize a court to grant consumer redress (i.e., refund, restitution, rescission, or other

---

[64] *Id.*

[65] Dkt. 67 at 11.

[66] *Id.* at 1202 n.6 (citing *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468–69 (11th Cir.1996); *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir.1994)).

equitable monetary relief), § 13(b)'s grant of authority to provide injunctive relief carries with it the full range of equitable remedies,' including disgorgement of profits."[67]

Defendants argue the Tenth Circuit's statement in *Freecom* about the scope of section 13(b) is dicta and therefore the court is not bound by that precedent.[68]  The FTC disagrees, arguing the *Freecom* court "analyzed . . . underlying substantive law" to determine whether the FTC's claims seeking "both injunctive relief and ancillary relief in the form of consumer redress" lacked legal or factual basis and, therefore, *Freecom*'s pronouncement about the scope of the section 13(b) is part of the case's holding.[69]

The court agrees with the FTC.  While the ultimate issue in *Freecom* was whether the district court abused its discretion in awarding attorney fees to the defendant pursuant to 28 U.S.C. § 2412(b),[70] the resolution of that issue required an analysis of section 13(b) of the FTC Act.  In determining the propriety of the award of attorney fees, the *Freecom* court had to consider "whether, viewed in light of the record evidence and underlying substantive law, the losing party's claims lacked *any* legal or factual basis."[71]  In the underlying case, the FTC sought both injunctive relief and ancillary relief in the form of consumer redress pursuant to section 13(b).[72]  In other words, the FTC sought both non-monetary and monetary equitable relief.  And a section of the *Freecom* decision is dedicated to whether the FTC satisfied its burden of showing an individual defendant should be "personally liable for consumer redress."[73]  A

---

[67] *LoanPointe*, 525 F. App'x at 699 (quoting *Freecom*, 401 F.3d at 1202 n.6) (citing *CFTC v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1344 (11th Cir. 2008); *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 365 (2d Cir. 2011)).

[68] Dkt. 75 at 18.

[69] Dkt. 67 at 11 n.3.

[70] *See Freecom*, 401 F.3d at 1197.

[71] *Id.* at 1201.

[72] *Id.* at 1202.

[73] *Id.* at 1207.

necessary antecedent to the Tenth Circuit's discussion of the FTC's burden in proving liability

for consumer redress was holding that section 13(b) allows for monetary equitable relief in the

first place.  Indeed, if section 13(b) did not allow the FTC to seek monetary equitable relief, there

would have been no need for the Tenth Circuit to discuss whether the FTC had met any burden

related to that relief.  Accordingly, the court concludes *Freecom*'s statement about the scope of

section 13(b) is not dicta, but rather binding precedent.[74]

---

[74] Additionally, even if the language in *Freecom* was dicta, it would be highly persuasive dicta.  In *LoanPointe*, the Tenth Circuit addressed whether a district court's order of disgorgement pursuant to section 13(b) was proper.  525 F. App'x at 699.  Before analyzing the district court's reasoning, the Tenth Circuit cited *Freecom* for the baseline proposition that section 13(b) allows for monetary equitable relief such as disgorgement.  *Id.*  So, the Tenth Circuit has cited its decision in *Freecom* (albeit in *LoanPointe*, an unpublished decision) for the very proposition the FTC advances here.  Furthermore, sister circuit courts across the country have also cited to *Freecom* for the proposition that section 13(b) authorizes monetary equitable relief.  *See FTC v. Bronson Partners, LLC*, 654 F.3d 359, 365 (2d Cir. 2011); *FTC v. Magazine Solutions, LLC*, 432 F. App'x 155, 158 n.2 (3d Cir. 2011) (unpublished); *FTC v. Direct Marketing Concepts, Inc.*, 624 F.3d 1, 15 (1st Cir. 2010).  While the subsequent treatment of *Freecom* in other courts cannot transform dicta into precedent, it speaks to the persuasive value of *Freecom*.

Relatedly, Defendants urge the court "not to defer to the *LoanPointe* decision because it holds that disgorgement is a form of equitable relief, rather than a type of penalty."  Dkt. 75 at 18.  Defendants argue the Supreme Court has since challenged this view in *Kokesh v. SEC*, 137 S.Ct. 1635 (2017), in which it held that the SEC's request for disgorgement constituted a penalty for purposes of a statute of limitations.  Dkt. 75 at 19.  This argument is unpersuasive.  As the Supreme Court noted in *Kokesh*, "[n]othing in this opinion should be interpreted as an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings or on whether courts have properly applied disgorgement principles in this context. The sole question presented in this case is whether disgorgement, as applied in SEC enforcement actions, is subject to § 2462's limitations period." 137 S. Ct. at 1642 n.3.  Therefore, by its very terms, *Kokesh* does not bear on the issue in *LoanPointe*.  Accordingly, the court will not discount *LoanPointe* on that basis.

This court cannot ignore or overrule binding precedent.  Accordingly, the FTC may seek monetary equitable relief in this action.[75]

## II. BUYPD AS A PARTY

Defendants' second argument is that BuyPD should be dismissed as a party because the Complaint fails to adequately allege facts to support the claim that BuyPD is violating or is about to violate the law.[76]

Section 13(b) authorizes the FTC to "bring suit in a district court of the United States" to enjoin violations of the FTC Act "[w]henever the [FTC] has reason to believe that any person,

---

[75] It is also worth noting that, even though *Freecom* is dispositive here, the FTC also makes a compelling argument that the Tenth Circuit would reject the reasoning of the Seventh Circuit's *Credit Bureau* opinion were it to take up the issue.  Dkt. 67 at 11–16.

In *Credit Bureau*, the Seventh Circuit reversed course on its position that the FTC was entitled to seek monetary equitable relief in Section 13(b) actions.  937 F.3d at 767.  The *Credit Bureau* court based this holding primarily on its reading of the Supreme Court's decision in *Meghrig v. KFC Western, Inc.*, 516 U.S. 479 (1996).  The *Credit Bureau* court reasoned that *Meghrig* and subsequent Supreme Court precedent mandates a "more limited understanding of judicially implied remedies."  937 F.3d at 781.  Accordingly, the *Credit Bureau* court held the Supreme Court's precedent in *Porter v. Warner Holding Co.*, 328 U.S. 395 (1946), and *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288 (1960), "cannot be used as . . . a license to equity jurisdiction recognize all ancillary forms of equitable relief without a close analysis of statutory text and structure."  937 F.3d at 782.  After examining the FTC Act and Section 13(b), the *Credit Bureau* court concluded the second proviso of Section 13(b) does not authorize monetary relief in light of the FTC Act's explicit grant of monetary equitable relief in two other sections.  *Id.* at 767, 786.

The FTC argues the Tenth Circuit takes a different view of *Meghrig*.  In support, the FTC points to the Tenth Circuit's opinion in *United States v. Rx Depot, Inc.*, 438 F.3d 1052 (10th Cir. 2006).  In *Rx Depot*, the Tenth Circuit considered the application of *Meghrig* to the Federal Food, Drug and Cosmetic Act (FDCA).  *Id.* at 1053.  The *Rx Depot* court concluded *Meghrig* stands for the proposition that "a statute's particular characteristics may preclude application of" "*Porter*'s and *Mitchell*'s general rule that a grant of equity jurisdiction enables courts to order any form of equitable relief."  *Id.* at 1057.  The *Rx Depot* court also reasoned "*Meghrig*'s restrictive view of the remedies available under RCRA's citizen suit provision is likely due in part to the private nature of actions brought under the provision."  *Id.*  In other words, the statute at issue in *Meghrig* was materially different from the FDCA (and the FTC Act) because it authorized private suits.  Accordingly, the *Rx Depot* court stated, "the general rule announced in *Porter*, and followed by *Mitchell* and *Meghrig*, guides our analysis," before holding monetary equitable relief was available under the FDCA.  *Id.*

Given that *Freecom* and *LoanPointe* are closely aligned with the Supreme Court's holdings in *Porter* and *Mitchell*, and given that *Freecom* and *LoanPointe* were decided well after the Supreme Court issued *Meghrig*, it seems unlikely the Tenth Circuit would adopt the Seventh Circuit's analysis in *Credit Bureau*.

[76] Dkt. 58 at 25.

partnership or corporation is violating, or is about to violate, any provision of law enforced by the [FTC]."[77]

Defendants argue "the Complaint contains no facts alleging or supporting an inference that Buy PD is currently violating any law."[78]  Specifically, Defendants point to the fact that the Complaint does not allege BuyPD to have engaged in the business of marketing and selling properties at Buying Summits since 2016.[79]  Defendants also argue nothing in the Complaint would support a reasonable inference that the FTC has "reason to believe" BuyPD is violating or is about to violate the law.[80]

In response, the FTC argues the Complaint states a claim for injunctive relief against BuyPD because BuyPD is a member of a common enterprise that is violating or is about to violate the law, namely the Corporate Defendants.[81]  The court agrees.

As a threshold matter, the Complaint alleges facts sufficient to support a reasonable inference that BuyPD is part of a common enterprise with Response and Nudge.  "A common enterprise may exist where companies share common control, office space, employees, interrelated funds, and other factors."[82]  "Where the same individuals transact business through a 'maze of interrelated companies,' all of them may be held liable as a joint enterprise."[83]

Here, the Complaint alleges a number of facts to suggest BuyPD is part of a common enterprise with Response and Nudge.  The Corporate Defendants, including BuyPD, all share a

---

[77] 15 U.S.C. § 53(b).

[78] Dkt. 58 at 28.

[79] Dkt. 58 at 28.

[80] Dkt. 58 at 29.

[81] Dkt. 67 at 26.

[82] *FTC v. LoanPointe, LLC*, No. 2:10-cv-225, 2011 WL 4348304, at *10 (D. Utah Sept. 16, 2011).

[83] *Id.* (citation omitted).

principal place of business.[84]  The Corporate Defendants also share a common control and

ownership structure.[85]  Furthermore, the Corporate Defendants have transferred millions of

dollars between bank accounts for BuyPD, Response, and Nudge.[86]  Additionally, although it has

ceased marketing and selling properties at Buying Summits, BuyPD continues to provide

services related to "entity setup and asset protection" for Workshop and Advanced Training

students.[87]  Taken together, the court finds the Complaint sufficiently alleges BuyPD to be part

of the common enterprise consisting of BuyPD, Response, and Nudge.

      In addition to containing sufficient allegations that BuyPD is part of a common

enterprise, the court also concludes the Complaint alleges facts sufficient to reasonably infer the

common enterprise is violating or is about to violate the law.[88]

      Having established the Complaint sufficiently alleges BuyPD is part of a common

enterprise that is violating or is about to violate the law, the court now turns to the question of

whether that entitles the FTC to seek injunctive relief against BuyPD.

      The Tenth Circuit has not directly answered this question.  But this court has previously

answered this question in the affirmative.  As this court explained in *LoanPointe*, members of a

common enterprise "are liable for injunctive relief and, jointly and severally, for monetary

relief."[89]  The court sees no reason to depart now from its earlier pronouncement in *LoanPointe*.

---

[84] Dkt. 4 at ¶¶ 18–20.

[85] Dkt. 4 at ¶¶ 22–26.

[86] Dkt. 4 at ¶¶ 177–81.

[87] Dkt. 4 at ¶ 34.

[88] Defendants do not dispute whether the Complaint adequately alleges that the common enterprise is violating or about to violate the law.  Instead, Defendants focus on BuyPD individually.

[89] *FTC v. LoanPointe*, 2011 WL 4348304, at *10 (D. Utah Sept. 16, 2011).

Other courts across the country have also held that members of common enterprises are liable jointly and severally in FTC actions.[90]  And for this reason, a complaint need only allege that the FTC believes the common enterprise—as opposed to each member of the common enterprise—is violating or is about to violate the law.[91]

It seems clear, then, that BuyPD should be held jointly and severally liable with Response and Nudge should it ultimately be determined that the three acted together as a common enterprise in violation of the FTC Act.  Thus, to dismiss BuyPD at this stage would be premature.[92]  Because the Complaint alleges facts sufficient to reasonably infer BuyPD operated

---

[90] *See*, *e.g.*, *FTC. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 636 (6th Cir. 2014) ("[E]ach of these corporations is to be held jointly and severally liable as they are part of a common enterprise . . . ."); *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 635 (7th Cir. 2005) ("The corporate defendants do not dispute the district court's conclusion that they operated as a 'common enterprise' such that they are jointly and severally liable for the injuries caused by their violations of the FTC Act . . . ."); *FTC v. Johnson*, 156 F. Supp. 3d 1202, 1207 (D. Nev. 2015) ("Under the theory of common enterprise, each entity in a group of interrelated companies can be held jointly and severally liable for the actions of other entities in that group." (citing *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1142–43 (9th Cir.2010)); *FTC v. Tax Club, Inc*., 994 F. Supp. 2d 461, 469 (S.D.N.Y. 2014) ("Under the common enterprise theory, each entity within a set of interrelated companies may be held jointly and severally liable for the actions of other entities that are part of the group.").

[91] *Cf. Tax Club,* 994 F. Supp. 2d at 470 ("Defendants' arguments that the Amended Complaint inadequately alleges specific conduct by certain corporate entities fail to recognize the effect of the common enterprise theory. The very nature of this theory is that corporate entities that are a part of the common enterprise are liable for the conduct of other entities in the enterprise, *regardless of whether the particular entity engaged in the behavior at issue*. Thus, *so long as the Amended Complaint adequately alleges wrongdoing by the common enterprise,* as well as facts supporting a finding that the entity in question is part of the common enterprise, *it is immaterial whether the Amended Complaint alleges that each Corporate Defendant 'specifically engaged in deceptive telemarketing practice[s].'*") (emphases added).

[92] Indeed, if BuyPD were dismissed from the Complaint, then there would be no way to hold it jointly and severally liable because a judgment could not be entered against it.

as part of a common enterprise that the FTC has reason to believe is violating (or is about to

violate the law), the court denies Defendants' motion to dismiss BuyPD as a party at this time.[93]

### III. ASSISTED MARKETING PLANS UNDER BODA

Defendants' third argument is that the Division's claims that Defendants violated BODA

should be dismissed because Defendants' do not offer an "assisted marketing plan" as defined by

BODA.[94]  Additionally, Defendants argue that, even if they did offer an assisted marketing plan,

the Division was required to institute administrative proceedings before bringing suit in this

court.

### A. Assisted Marketing Plans

BODA requires sellers of assisted marketing plans to file certain annual disclosures with

the Division as well as provide certain disclosures to prospective purchasers of the assisted

marketing plan.[95]  BODA defines "assisted marketing plan" as:

> the sale or lease of any products, equipment, supplies, or services that are sold to
> the purchaser upon payment of an initial required consideration of $500 or more
> for the purpose of enabling the purchaser to start a business, and in which the
> seller represents:

---

[93] Defendants resist this conclusion because they read section 13(b) to require the FTC to plead a "reason to believe" with respect to each individual and corporation. Dkt. 75 at 23.  Specifically, they point to the language of section 13(b) providing the FTC can bring suit "[w]henever the [FTC] has reason to believe that *any person, partnership, or corporation* is violating, or is about to violate, any provision of law enforced by the [FTC]."  (Emphasis added). Defendants read this to require the FTC to have reason believe that *each* person, partnership, or corporation named in the suit is violating or about to violate the law, including BuyPD. Dkt. 75 at 23.  The court does not read the statute to compel such a conclusion.  The statute allows the FTC to bring suit when it has reason to believe *any* person, partnership, or corporation is violating the law.  Of course, the FTC cannot use this as a basis to loop anyone it wishes into a suit.  But the language of the statute does not foreclose the FTC from naming members of a common enterprise in the suit.  Indeed, the opposite conclusion would be in direct conflict with common enterprise case law, in which courts have said members of a common enterprise can be liable jointly and severally for the acts of the common enterprise, even if those members have not violated any laws.  *See Tax Club*, 994 F. Supp. 2d. at 470 ("The very nature of this theory is that corporate entities that are a part of the common enterprise are liable for the conduct of other entities in the enterprise, *regardless of whether the particular entity engaged in the behavior at issue*.") (emphasis added).

[94] Dkt. 58 at 29.

[95] *See* Utah Code §§ 13-15-4, -5.

. . .

> (iv) that upon payment by the purchaser of a fee or sum of money, which exceeds $500 to the seller, the seller will provide a sales program or marketing program that will enable the purchaser to derive income from the assisted marketing plan that exceeds the price paid for the marketing plan.[96]

In the Complaint, the Division alleges Defendants' Workshop, Advanced Training, and Inner Circle products (collectively, the Offerings) are assisted marketing plans.[97]

Defendants argue none of the Offerings constitute assisted marketing plans under BODA. Defendants' argument is twofold.  First, Defendants argue the Complaint fails to adequately allege that Defendants sell any "products" or "services" to consumers.[98]  Second, Defendants argue that, even if they sell products or services, the Complaint fails to adequately allege Defendants represented that purchasers of the Offerings would be provided with a "sales program" or "marketing program."[99]

In response, the Division argues the Offerings are products or services under BODA.[100] The Division also argues Defendants "offer[] a program which purportedly enables consumers to derive income from buying and selling real estate or buying and leasing real estate" and this qualifies as a "marketing program" or "sales program" under BODA.[101]

---

[96] *Id.* § 13-15-2(1)(a)(iv).  There are three other subsections in BODA's definition of "assisted marketing plan" but they are not at issue here.  Additionally, the parties only dispute whether Defendants offered a product or service and whether Defendants represented purchasers would receive a sales program or marketing program.  In other words, other statutory requirements such as the payment of $500 consideration and the plan being offered for the purpose of starting a business are not in dispute here.

[97] Dkt. 4 at ¶ 232.

[98] Dkt. 58 at 32.

[99] Dkt. 58 at 30–31.

[100] Dkt. 66 at 20.

[101] Dkt. 66 at 18.

It is worth noting at the outset that BODA does not provide definitions of the terms at issue between the parties.  Accordingly, the court will follow the Utah Supreme Court's lead and endeavor to give the terms their "ordinary and usually accepted" meanings.[102]

This court has already unpacked the meaning of "marketing," "sales," and "program" as those terms are used in BODA.  As this court explained in *Roberts v. C.R. England, Inc.*:

> Marketing is often defined as the 'act or process of promoting and selling, leasing, or licensing products or services,' or alternatively, as the 'part of a business concerned with meeting customers' needs.' The noun 'sales' is used to refer to 'operations and activities involved in promoting and selling goods or services,' or, as an adjective, to connote 'of, relating to, or used in selling.' Among other things, 'program' has been defined as 'a plan or system under which action may be taken toward a goal.'[103]

This court has not previously defined "services" as used in BODA.  But "services" generally refer to "[l]abor performed in the interest or under the direction of others; specifically, the performance of some useful act or series of acts for the benefit of another, usually for a fee."[104]  "In this sense, *service* denotes an intangible commodity in the form of human effort, such as labor, skill, or advice."[105]  Nor has the court previously defined "products" in this context.  But a "product" is generally "[s]omething that is distributed commercially for use or consumption."[106]

---

[102] *See Marion Energy, Inc. v. KFJ Ranch Partnership*, 267 P.3d 863 (Utah 2011) ("The best evidence of the legislature's intent is the plain language of the statute itself. Thus, [w]hen interpreting a statute, we assume, absent a contrary indication, that the legislature used each term advisedly according to its ordinary and usually accepted meaning." (citation omitted) (internal quotation marks omitted)).

[103] 318 F.R.D. 457, 496 (D. Utah 2017) (citations omitted).

[104] *Service*, Black's Law Dictionary (11th ed. 2019).

[105] *Id.*

[106] *Product*, Black's Law Dictionary (11th ed. 2019).

With these definitions in hand, the court concludes the Complaint alleges sufficient facts to support a reasonable inference that the Offerings constitute "assisted marketing plans" under BODA.

The Complaint adequately alleges facts to support the conclusion that the Offerings constitute "services." Defendants argue any statements in the Complaint "regarding education and training fall far short of the statutory standard" of "products and services."[107] But the court disagrees. Any education or training offered by Defendants could rightfully be characterized as a service. Indeed, education and training fits the definition advanced above of "labor performed in the interest . . . of others; specifically, the performance of some useful act or series of acts for the benefit of another." Those who purchased any of the Offerings were promised access to mentors and experts who would offer advice and labor to those purchasers for the purpose of helping purchasers complete real estate deals. Defendants' provision of labor for the purpose of educating and training those who purchased the Offerings satisfies the definition of services as used in BODA.[108]

Having made that determination, the question then becomes whether Defendants represented they would "provide a sales program or marketing program." The court concludes the Complaint alleges sufficient facts to find Defendants represented that people who purchased the Offerings would be given a sales program.

As this court explained in *Roberts v. C.R. England*, BODA "merely requires a party to show that a seller represented that, on the payment of a threshold amount, it would provide the benefits of a program or plan relating to selling, leasing, or licensing goods or services, and that

---

[107] Dkt. 58 at 32.

[108] Additionally, these services were often bundled with a product, such as the computer software Defendants represented would help purchasers locate discounted properties and cash buyers. *See* dkt. 4 at ¶ 99.

this plan or program would permit the purchaser to derive income in excess of the price paid."[109] The Complaint adequately alleges that Defendants represented purchasers of the Offerings would be given "the benefits of a program or plan relating to selling . . . goods."

According to the Complaint, the gist of Defendants' pitch for the Offerings was this: Those who purchase the Offerings will be provided with training as well as access to funding, buyers, and properties in order to successfully buy and sell real estate.[110]  The training combined with access to funding, buyers, and properties meets the definition of "sales program" under BODA.  Indeed, it represents a "plan or system under which action may be taken towards a goal," in this case, towards the goal of buying and selling real estate.  Or put simply, Defendants represented that the Offerings would provide a system by which purchasers could successfully sell real estate.  These allegations satisfy BODA and therefore the court denies Defendants' motion to dismiss Plaintiffs' Ninth and Tenth Claims on the basis that the Complaint fails to allege sufficient facts to support a reasonable inference that the Offerings are assisted marketing plans under BODA.

---

[109] 318 F.R.D. at 497.

[110] The Complaint is replete with allegations to support this characterization of Defendants' representations.  *See* dkt 4 at ¶ 69 (Defendants representing "students who enroll in their Workshops will be able to: (a) use Defendants' funds to do real estate deals without putting any of their own money down; (b) find properties at below market value; and (c) access a list of 'cash buyers' to purchase the consumers' investment properties"); dkt. 16 at ¶ 71 (Defendants representing that Defendants "'plug' [Workshop purchasers] into their 'system' so that they both can share in the profits from all the real estate deal consumers will do once they enroll in Defendants' Workshop"; dkt. 16 at ¶ 71A (Defendants representing "We've got a step by step process."); dkt. 16 at ¶ 72B (Defendants representing "What we need to do is put a system in place. But more importantly, back it up with the money. Now we have done that."); dkt. 16 at ¶ 71D (Defendants representing "This isn't typical customer service. . . . These are investors, experts, that we have handpicked to walk you through your deals, everything from finding properties, making offers, writing contracts, they're there to help you along the way."); dkt. 16 at ¶ 72A (Defendants representing "Our company has a system . . . where we can provide you education, training, award winning support, man-hours, and money for your actual deals."; dkt. 16 ¶ 78C (Defendants representing "What we teach, what our system allows you to do, what our training does for you, our support and especially access to our money can be life changing money").

*B. Administrative Proceedings*

Defendants also argue that, even if the Offerings are assisted marketing plans, BODA requires the Division to initiate administrative proceedings before filing an action in court.[111] The court disagrees.

As the Division points out, BODA provides that, "[i]f a seller fails to file the disclosures required" then "the division, consistent with Section 13-2-5, shall begin adjudicative proceedings and shall issue a cease and desist order."[112]  Section 13-2-5, in turn, provides that the director of the Division has the authority to "take administrative *and judicial action* against persons in violation of the division rules and the laws administered and enforced by it, including the issuance of cease and desist orders."[113]  As the statute makes clear, the Division's obligation to "begin adjudicative proceedings" is not limited to administrative proceedings.  Instead, the Division is also authorized to begin adjudicative proceedings through the initiation of a judicial action.  Therefore, Defendants' motion to dismiss on this basis is denied.

IV. SCOPE OF THE DIVISION'S AUTHORITY AND STATUTE OF LIMITATIONS

Defendants' fourth and fifth arguments are separate but share a common thread. Defendants' fourth argument is that Counts Five through Ten of the Complaint must be limited to harm to Utah consumers because the Division does not have the authority to seek relief for activities that occurred outside of Utah.[114]  And Defendants' fifth argument is that the Division

---

[111] Dkt. 58 at 34.

[112] Utah Code § 13-15-6(1).

[113] Utah Code § 13-2-5(3) (emphasis added).

[114] Dkt. 58 at 34.

cannot seek disgorgement, penalties, or fines that occurred outside the applicable statute of limitations period.[115]

The common thread tying these arguments together is that each argument seeks to dismiss only parts of each of the Division's claims.  With respect to the fourth argument, Defendants seek to dismiss those parts of the Division's claims relating to out-of-state conduct.  And with respect to the fifth argument, Defendants seek to limit recovery on any claim based on the relevant statute of limitations.  But neither Defendants' fourth nor fifth argument seeks dismissal of any of Plaintiffs' claims in their entirety.  This kind of argument is improper in a motion to dismiss for failure to state a claim pursuant to rule 12(b)(6).

Rule 12(b)(6) permits a party to seek dismissal of a claim for "failure to state a claim upon which relief can be granted."[116]  Here, Defendants do not seek to dismiss Plaintiffs' claims in their entirety.  Instead, they seek to dismiss only portions of these claims related to out-of-state activity and relief foreclosed by the relevant statute of limitations.  In other words, they do not contest whether relief can be granted on those claims, but rather what the scope of that relief may be.  Rule 12(b)(6) is an improper procedural vehicle for such a challenge.

As many courts have recognized, parties may not use rule 12(b)(6) to dismiss only parts of a claim.[117]  "A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims; the question at this stage is simply whether the complaint includes factual

---

[115] Dkt. 58 at 46.

[116] Fed. R. Civ. P. 12(b)(6).

[117] *See Redwind v. Western Union, LLC*, No. 3:18-cv-02094, 2019 WL 3069864, at *4 (D. Ore. June 21, 2019) (collecting cases).

allegations that state a plausible claim for relief."[118]  "In other words, courts may not dismiss only some of the claim's allegations if the claim otherwise survives."[119]

Here, Defendants have not challenged the Division's claims in their entirety.[120]  And because Defendants' asserted defenses do not dispose of the Division's claims in their entirety, those claims cannot be dismissed at this stage.[121]  Instead, if Defendants wish to challenge only parts of Plaintiffs' claims, such a challenge would be appropriate at summary judgment.[122]

## CONCLUSION

For the reasons explained above, Defendants' Partial Motion to Dismiss[123] is DENIED.[124]

**SO ORDERED** this 31st day of December, 2019.

BY THE COURT:

_____

---

[118] *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015).

[119] *Redwind*, 2019 WL 3069864, at *4.

[120] Defendants did challenge the BODA counts on the grounds that the Offerings are not assisted marketing plans. But because that part of Defendants' Motion has been denied, *see* supra section III.A, there are no outstanding challenges to Counts Five through Ten in their entirety.

[121] *See Abraham P. v. Los Angeles Unified Sch. Dist.*, No. CV 17-3105-GW (FFMX), 2017 WL 4839071, at *6 (C.D. Cal. Oct. 5, 2017) ("This Court's practice is to not dismiss parts of claims at the FRCP 12(b)(6) stage because—unlike Rule 56, for example—FRCP 12(b)(6) speaks of a motion to discuss 'a claim,' not part of a claim. If the statute of limitations does not get rid of the entire claim, then it cannot be dismissed. This is reason enough to reject this particular argument on this motion.").

[122] *See* Fed. R. Civ. P. 56 (permitting parties to identify "the part of each claim or defense" on which summary judgment is sought); *see also BBL, Inc. v. City of Angola*, 809 F.3d at 325 (7th Cir. 2015) ("A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief. Summary judgment is different. The Federal Rules of Civil Procedure explicitly allow for "[p]artial [s]ummary [j]udgment" and require parties to "identif[y] each claim or defense—*or the part of each claim or defense*—on which summary judgment is sought.").

[123] Dkt. 58.

[124] The court is aware Defendants have filed a Motion to Stay Proceedings Pending Supreme Court Review in this case.  Dkt. 91.  Insofar as Defendants' Motion to Stay Proceedings requests the court not decide this fully briefed Partial Motion to Dismiss, that portion of the Motion to Stay is DENIED.

ROBERT J. SHELBY
United States Chief District Judge