Erik A. Christiansen (Bar No. 7372)
Zack L. Winzeler (Bar No. 12280)
Alan S. Mouritsen (Bar No. 13558)
Gregory H. Gunn (Bar No. 15610)
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
P.O. Box 45898
Salt Lake City, Utah 84111
Telephone: (801) 532-1234
EChristiansen@parsonsbehle.com
ZWinzeler@parsonsbehle.com
AMouritsen@parsonsbehle.com
GGunn@parsonsbehle.com
ecf@parsonsbehle.com

Leonard L. Gordon (*pro hac vice*)
Alexandra Megaris (*pro hac vice*)
**VENABLE LLP**
1270 Avenue of the Americas
24th Floor
New York, NY 10020
Telephone:  (212) 370-6277
Fax:  (212) 307-5598
LLGordon@venable.com
AMegaris@venable.com

J. Douglas Baldridge (*pro hac vice*)
Stephen R. Freeland (*pro hac vice*)
Michael A. Munoz (*pro hac vice*)
**VENABLE LLP**
600 Massachusetts Ave., N.W.
Washington, D.C. 20001
Telephone:  (202) 344-4000
Fax:  (202) 344-8300
JBaldridge@venable.com
SRFreeland@venable.com
MAMunoz@venable.com

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, and UTAH DIVISION OF CONSUMER PROTECTION,<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>NUDGE, LLC; RESPONSE MARKETING GROUP, LLC; BUYPD, LLC; BRANDON B. LEWIS; RYAN C. POELMAN; PHILLIP W. SMITH; SHAWN L. FINNEGAN; and CLINT R. SANDERSON,<br><br>　　　　Defendants. | **REDACTED VERSION**<br><br>**DEFENDANTS' FIRST AMENDED ANSWER TO PLAINTIFFS' SEALED COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF**<br><br>Case No.: 2:19-cv-00867-DBB-EJF<br><br>Judge David B. Barlow |

Defendants NUDGE, LLC; RESPONSE MARKETING GROUP, LLC; BUYPD, LLC; BRANDON B. LEWIS; RYAN C. POELMAN; PHILLIP W. SMITH; SHAWN L. FINNEGAN; and CLINT R. SANDERSON (collectively "Defendants"), by and through their undersigned attorneys, hereby file their First Amended Answer to Plaintiffs' Complaint for Permanent Injunction and other Equitable Relief ("Complaint"). The Defendants deny each and every allegation of Plaintiffs' Complaint not specifically admitted, qualified, or explained and, in response to each of the numbered allegations in the Complaint, state as follows:

1.     The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b), 57b, and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in violation of the FTC's trade regulation rule entitled Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310.

**RESPONSE TO PARAGRAPH NO. 1:**  Defendants admit that the FTC has brought this action pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b, and the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101-6108, and that it seeks the relief stated.  Defendants deny that the FTC is entitled to any relief and otherwise deny the allegations contained in Paragraph 1 of the Complaint.

2.     The Division brings this action pursuant to the authority granted by Utah Code §§ 13-2-5(3), 13-11-17, 13-15-6, 13-26-8, and the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  The Division seeks temporary, preliminary, and permanent injunctive relief, rescission of contracts,

restitution, the refund of monies paid, disgorgement of ill-gotten monies, civil penalties, fines, and other equitable relief for Defendants' acts, omissions, or practices that violated the Utah Consumer Sales Practices Act ("UCSPA"), Utah Code § 13-11-1 *et seq*., the Business Opportunity Disclosure Act ("BODA"), Utah Code § 13-15-1 *et seq*., the Telephone Fraud Prevention Act ("TFPA"), Utah Code § 13-26-1 *et seq*., and the TSR, 16 C.F.R. Part 310.

**RESPONSE TO PARAGRAPH NO. 2:**  Defendants admit that the Division has brought this action pursuant to Utah Code §§ 13-2-5(3), 13-11-17, 13-15-6, 13-26-8, and the Telemarketing Act, 15 U.S.C. §§ 6101-6108, and that it seeks the relief stated.  Defendant deny that the Division is entitled to any relief and otherwise deny the allegations contained in Paragraph 2 of the Complaint.

3.      From as early as 2012 and continuing through the present, the Defendants have misrepresented to consumers that they will be taught a proven formula on how to make substantial money from investing in real estate.  Defendants entice consumers to enroll in a series of increasingly expensive training programs through false claims that: Defendants' system will enable consumers to find properties at deeply-discounted prices; Defendants will make funding available to consumers so they do not have to put their own money down; and Defendants will show consumers how to gain access to individual investors who will purchase the properties from them.  Defendants have taken in over $400 million from consumers across the country and overseas through their deceptive scheme.

**RESPONSE TO PARAGRAPH NO. 3:**  Defendants deny the allegations contained in Paragraph 3 of the Complaint.

4.      The Defendants use TV personalities from reality real estate shows, including Scott Yancey from A&E's "Flipping Vegas," Doug Clark from Spike TV's "Flip Men," Drew

Levin and Danny Perkins from HGTV's "Renovate to Rent," and Josh Altman from Bravo's "Million Dollar Listing Los Angeles," to attract consumers to free ninety-minute events (referred to as the "Preview Events") that are held primarily in hotel conference rooms throughout the United States.  Defendants advertise their Preview Events primarily through infomercials and direct mailings, which falsely promise to show consumers during these events how to find properties at below market prices and get access to financing without using their own money or credit.  Since January 2015, over 750,000 individuals have attended one of the Defendants' Preview Events.

   **RESPONSE TO PARAGRAPH NO. 4:** Defendants admit that Defendant Response has at times worked with the identified TV personalities.  Defendants further admit that Defendant Response has held free preview events primarily in hotel conference rooms in the United States, that said free preview events are advertised through infomercials, direct mailings, and other media, and that, since January 2015, over 750,000 individuals have attended one of Response's preview events.  Defendants deny the remaining allegations contained in Paragraph 4 of the Complaint.

   5.  The Preview Events, however, do not teach students anything of value, but instead entice consumers to purchase additional training and tools at a paid three-day workshop (referred to as "Workshops").  Defendants typically charge consumers $1,147 to attend a Workshop.  At the Preview Events, Defendants promise consumers that if they sign-up for one of the Workshops, they will get access to a proven system that has helped thousands of consumers become successful real estate investors, and that Defendants will provide all the training and support the consumers need to establish their own real estate businesses and make money.

**RESPONSE TO PARAGRAPH NO. 5:**  Defendants deny the allegations contained in Paragraph 5 of the Complaint.

6.      Defendants primarily use the Workshops not to educate, but to sell consumers additional, more expensive products and services (referred to as "Advanced Training"), typically for tens of thousands of dollars.  Under the guise of raising funds for real estate deals, Defendants ask consumers to fill out profiles detailing their personal finances, and encourage consumers to increase their existing credit card limits.  Defendants also encourage consumers to obtain "funding" through a third-party.  However, instead of providing funding, the third-party simply applies for a half-dozen or more personal credit cards on the consumer's behalf.  Defendants then try to convince consumers to purchase one of Defendants' Advanced Training packages using their newly-available credit and other finances.

**RESPONSE TO PARAGRAPH NO. 6:**  Defendants deny the allegations contained in Paragraph 6 of the Complaint.

7.      Defendants continue to target consumers for additional sales even after the consumers purchase an Advanced Training package.  From at least 2012 to 2016, as part of their Advanced Training packages, Defendants also promised consumers access to "exclusive" events called Buying Summits or Investor Expos where they could buy "turnkey" rental properties at below market value prices.  However, Defendants were actually the ones selling or brokering these properties, and did so after marking up the price as much as 20% or more for their own profit. Defendants concealed their markups from consumers and, at times, even provided consumers with bogus sales comparables to convince consumers to purchase the properties at inflated prices.

**RESPONSE TO PARAGRAPH NO. 7:** Defendants admit that between 2012 and 2016, Defendants Response and BuyPD hosted events called Buying Summits or Investor Expos where

5

students could purchase properties.  In some instances, properties were sold by Defendant BuyPD. Defendants deny the remaining allegations contained in Paragraph 7 of the Complaint.

8.      During and after the Advanced Training, Defendants also target consumers with telemarketing calls to induce additional sales, including access to a purported "Inner Circle" personalized real estate coaching program for tens of thousands of dollars more.

**RESPONSE TO PARAGRAPH NO. 8:**  Defendants admit that Response sells certain training programs through telemarketing and otherwise deny the allegations contained in Paragraph 8 of the Complaint.

9.      The vast majority of consumers who purchase the Defendants' products and services do not become successful real estate investors and do not make any money from Defendants' system, or even recover the cost of the Workshop or Advanced Training.  Many consumers end up heavily in debt and, in numerous instances, consumers have lost their life savings.

**RESPONSE TO PARAGRAPH NO. 9:**  Defendants state that they have many students who are successful in real estate investing after purchasing and using Response's training. Defendants otherwise lack knowledge or information sufficient to form a belief regarding the truth of the allegations contained in Paragraph 9 and on this basis deny these allegations.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

**RESPONSE TO PARAGRAPH NO. 10:**  Defendants deny the allegations contained in Paragraph 10 of the Complaint.

11.     This Court has supplemental jurisdiction over the Division's claims under 28 U.S.C. § 1367.

**RESPONSE TO PARAGRAPH NO. 11:**  Defendants deny the allegations contained in Paragraph 11 of the Complaint.

12.     Venue is proper in this District under 28 U.S.C. § 1391(b) and (c), and 15 U.S.C. § 53(b).

**RESPONSE TO PARAGRAPH NO. 12:**  Defendants admit the allegations contained in Paragraph 12 of the Complaint.

**PLAINTIFFS**

13.     The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces the Telemarketing Act.  Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.

**RESPONSE TO PARAGRAPH NO. 13:**  Defendants admit that the FTC is an independent agency created by statute.  Defendants further admit that the FTC has limited powers to enforce the statutes and the regulation referenced in Paragraph 13 of the Complaint, and Defendants deny any characterization of those statutes and that regulation inconsistent therewith.

14.     The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the TSR and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b), 57b, and 6105(b).

**RESPONSE TO PARAGRAPH NO. 14:**  Paragraph 14 of the Complaint purports to characterize the statutes and regulation cited therein.  Those statutes and regulation speak for themselves, and Defendants deny any characterization of those statutes and regulation inconsistent with the express language of those statutes and regulation.  Defendants further deny that the FTC is entitled to the relief it seeks in this action and otherwise deny the allegations contained in Paragraph 14 of the Complaint.

15.     The Division is an agency of the State of Utah created by statute.  Utah Code § 132-1(1).  The Division administers and enforces the UCSPA, which prohibits deceptive acts and practices in connection with consumer transactions.  It administers and enforces the BODA, which requires sellers of assisted marketing plans to provide disclosures to the Division and to prospective purchasers.  It also administers and enforces the TFPA, which prohibits deceptive practices in connection with telephone solicitations.

**RESPONSE TO PARAGRAPH NO. 15:**  Defendants admit that the Division is an agency of the State of Utah created by statute.  Defendants further admit that the Division has limited powers to enforce the statutes referenced in Paragraph 15 of the Complaint, and Defendants deny any characterization of those statutes inconsistent therewith.

16.     The Division is authorized to take legal action against persons who violate the UCSPA, the BODA, and the TFPA to enjoin violations of the acts, seek other equitable relief, and to obtain damages, fines, civil penalties, fees, and costs.  Utah Code §§ 13-2-5(3); 13-1117(1)(a)-(d); 13-15-6(3); 13-26-8(2).

**RESPONSE TO PARAGRAPH NO. 16:**  Paragraph 16 of the Complaint purports to characterize the statutes cited therein.  Those statutes speak for themselves, and Defendants deny any characterization of those statutes inconsistent with the express language of those statutes.

Defendants further deny that the Division is entitled to the relief it seeks in this action and otherwise deny the allegations contained in Paragraph 16 of the Complaint.

17.     The Division is authorized to take legal action against persons who violate the Telemarketing Act and TSR, and to obtain damages, restitution, and other relief.  15 U.S.C. §§ 6103(f)(2); 16 C.F.R. § 310.7.

**RESPONSE TO PARAGRAPH NO. 17:**  Paragraph 17 of the Complaint purports to characterize the statute and regulation cited therein.  The statute and the regulation speak for themselves, and Defendants deny any characterization of the statute and regulation inconsistent with the express language of the statute and regulation.  Defendants further deny that the Division is entitled to the relief it seeks in this action and otherwise deny the allegations contained in Paragraph 17 of the Complaint.

## DEFENDANTS

18.     Defendant Nudge, LLC ("Nudge"), formerly known as Internet Experts, LLC, is a Utah limited liability company with its principal place of business at 380 S Technology Court, Lindon, Utah 84042.  Nudge transacts or has transacted business in this District and throughout the United States.  At times material to this Complaint, acting alone or in concert with others, Nudge has advertised, marketed, distributed, or sold the real estate investment seminars and related services and products at issue in this Complaint to consumers throughout the United States.

**RESPONSE TO PARAGRAPH NO. 18:**  Defendants admit the allegations contained in the first sentence of Paragraph 18 of the Complaint.  Defendants admit further that, in the past, Nudge has transacted business in this District and throughout the United States, but deny that Nudge is currently transacting any business, and further deny that Nudge will transact any business in the future.  Defendants further admit that Defendant Response and BuyPD have advertised,

marketed, and sold real estate education training to students in the United States.  Defendants deny the remaining allegations contained in Paragraph 18 of the Complaint.

19.     Defendant Response Marketing Group, LLC ("Response"), formerly known as Evtech Media, LLC ("Evtech Media"), is a Utah limited liability company with its principal place of business at 380 S Technology Court, Lindon, Utah 84042.  Response also does business as 3 Day Real Estate Training, Abundance Edu, LLC, Affluence Edu, LLC, American Money Tour, Cash Flow Edu, Clark Edu, LLC, Edge 2 Real Estate, Evtech Media North, Flip for Life, Flipping For Life, Income Events, Insider's Financial Education, LLC, Leading Financial Education, LLC, OnWealth, Power Flip, Property Education, LLC, Prosper Live, Renovate to Rent, Simple Real Property Training, Smart Flip, Snap Flip, US Education Advance, Vintage Flip, Visionary Events, Wealth Tribe, Women's Empowerment, Yancey Events, Yancey, LLC, and Your Real Estate Today.  Response transacts or has transacted business in this District and throughout the United States.  At times material to this Complaint, acting alone or in concert with others, Response has advertised, marketed, distributed, or sold the real estate investment seminars and related services and products at issue in this Complaint to consumers throughout the United States.

**RESPONSE TO PARAGRAPH NO. 19:**  Defendants admit the allegations contained in the first three sentences of Paragraph 19 of the Complaint save for the allegation that Response was formerly known as Evtech Media, LLC, which is denied.  Defendants further admit that Response has advertised, marketed, and sold real estate education training to students in the United States.  Defendants deny the remaining allegations contained in Paragraph 19 of the Complaint.

20.     Defendant BuyPD, LLC ("BuyPD"), formerly known as Base Camp Ops, LLC and Media Excess Solutions LLC, is a Utah limited liability company with its principal place of business at 380 S Technology Court, Lindon, Utah 84042, and a secondary office address at 10421

South Jordan Gateway, South Jordan, Utah 84095.  BuyPD transacts or has transacted business in this District and throughout the United States.  At times material to this Complaint, acting alone or in concert with others, BuyPD has advertised, marketed, distributed, or sold the real estate related services and products at issue in this Complaint to consumers throughout the United States.

**RESPONSE TO PARAGRAPH NO. 20:**  Defendants admit the allegations contained in the first two sentences of Paragraph 20 of the Complaint save for the allegation that BuyPD maintained a secondary office address at 10421 South Jordan Gateway, South Jordan, Utah 84095, which is denied.  Defendants further admit that Defendant BuyPD has advertised, sold, and provided real estate related services to students in the United States.  Defendants deny the remaining allegations contained in Paragraph 20 of the Complaint.

21.    Nudge, Response, and BuyPD are collectively referred to herein as the "Corporate Defendants" or the "Nudge Enterprise."

**RESPONSE TO PARAGRAPH NO. 21:**  Defendants deny the accuracy of the characterization in Paragraph 21 of the Complaint and therefore deny the allegations contained in Paragraph 21 of the Complaint.

22.    Defendant Brandon B. Lewis ("Lewis") is one of the principal owners of the Corporate Defendants.  At times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Defendant Lewis resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

**RESPONSE TO PARAGRAPH NO. 22:**  Defendants admit that Defendant Lewis was an owner of Nudge, but deny that Defendant Lewis has ever had any ownership interest in

Response or BuyPD.  Defendants further admit that Defendant Lewis resides in this District, and has, as a corporate officer, transacted business in this District and in the United States.  Defendants deny the remaining allegations contained in Paragraph 22 of the Complaint.

23.    Defendant Ryan C. Poelman ("Poelman") is one of the principal owners of the Corporate Defendants and is the managing member of Nudge, the Chief Executive Officer of BuyPD, and was the Director of Operations of Response.  At times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Defendant Poelman resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

**RESPONSE TO PARAGRAPH NO. 23:**  Defendants admit that Defendant Poelman was an owner of Nudge and BuyPD, and further admit that he was at times the managing member of Nudge, was the Chief Executive Officer of BuyPD, and was the Director of Operations of Response.  Defendants further admit that Defendant Poelman resides in this District and has, as a corporate officer, transacted business in this District and in the United States.  Defendants deny the remaining allegations contained in Paragraph 23 of the Complaint.

24.    Defendant Phillip W. Smith ("Smith") is one of the principal owners of the Corporate Defendants and the Chief Executive Officer of Response.  At times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Defendant Smith resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

12

**RESPONSE TO PARAGRAPH NO. 24:**  Defendants admit that Defendant Smith is the principal owner of Response, and the Chief Executive Officer of Response.  Defendants further admit that Defendant Smith resides in this District and has, as a corporate officer, transacted business in this District and in the United States.  Defendants deny the remaining allegations contained in Paragraph 24 of the Complaint.

25.    Defendant Shawn L. Finnegan ("Finnegan") is one of the principal owners of the Corporate Defendants and has been the Chief Executive of Sales and Vice President of Response. At times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Defendant Finnegan resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

**RESPONSE TO PARAGRAPH NO. 25:**  Defendants admit that Defendant Finnegan was the owner of Evtech Media, LLC, and is the Chief Executive of Sales and Vice President of Response.  Defendants further admit that Defendant Finnegan resides in this District and has, as a corporate officer, transacted business in this District and in the United States.  Defendants deny the remaining allegations contained in Paragraph 25 of the Complaint.

26.    Defendant Clint R. Sanderson ("Sanderson") has been the President and Chief Operating Officer of Response since May 2015, and was the Chief Sales Officer of BuyPD from 2012 until May 2015.  At times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Defendant Sanderson resides in this District and, in

connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

**RESPONSE TO PARAGRAPH NO. 26:**  Defendants admit that Defendant Sanderson has been the President and Chief Operating Officer of Response since May 2015, and was the Chief Sales Officer of BuyPD from 2013 until May 2015.  Defendants further admit that Defendant Sanderson resides in this District and has, as a corporate officer, transacted business in this District and in the United States.  Defendants deny the remaining allegations contained in Paragraph 26 of the Complaint.

27.    The Corporate Defendants are closely held companies that have operated as a common enterprise while engaging in the deceptive acts and practices and other violations of law alleged below.  The Corporate Defendants have conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, business functions, employees, and office locations.   As described below, the Corporate Defendants also co-mingle funds and rely on a shared method to identify potential customers. Because these Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.  Furthermore, Lewis, Poelman, Smith, Finnegan, and Sanderson (the "Individual Defendants," and, together with the Corporate Defendants, the "Defendants") have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise.

**RESPONSE TO PARAGRAPH NO. 27:**  Defendants deny the allegations contained in Paragraph 27 of the Complaint.

28.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**RESPONSE TO PARAGRAPH NO. 28:**  Defendants admit the allegations contained in Paragraph 28 of the Complaint.

29.     Prior to the formation of the Nudge Enterprise in 2011, several of the Individual Defendants were involved in selling services purportedly designed to help consumers develop an e-commerce business.

**RESPONSE TO PARAGRAPH NO. 29:**  Given the vague nature of the allegations in Paragraph 29 of the Complaint, Defendants lack sufficient information to either admit or deny the allegations and therefore deny them.

30.     From 2002 through March 2009, Lewis was President of iMergent, Inc., which, through its wholly-owned subsidiary StoresOnline, Inc. ("StoresOnline"), marketed website training and software to consumers at seminars across the country and in Australia.  Sanderson was the Vice President of Sales of StoresOnline.  Poelman and Smith were principals of telemarketing floors called Electronic Marketing Services ("EMS") and Professional Marketing International ("PMI"), respectively, that purchased "leads" (the contact information of potential customers) from StoresOnline and attempted to sell purported personalized coaching services to consumers who had attended StoresOnline's seminars.

**RESPONSE TO PARAGRAPH NO. 30:**  Defendants admit that Defendant Lewis was President of iMergent, Inc. and that StoresOnline, Inc. was iMergent, Inc.'s wholly-owned subsidiary.  Defendants further admit that StoresOnline, Inc. marketed website training and software to students in the United States and in Australia.  Defendants admit that Defendant

Sanderson was the Vice President of Sales of StoresOnline.  Defendants further admit that Defendants Poelman and Smith were principals of EMS and PMI, respectively, which received potential contact information for potential customers from StoresOnline who had attended StoresOnline's seminars and who had expressed interest in purchasing additional services. Defendants deny the remaining allegations contained in Paragraph 30 of the Complaint.

31.     By 2009, StoresOnline had been sued for deceptive sales practices by a number of state Attorneys General and District Attorneys from California, Connecticut, Florida, Illinois, Indiana, North Carolina, Texas, and Washington, as well as the Australian Competition and Consumer Commission ("ACCC"), and had entered into stipulated consent orders with multiple states for injunctive and monetary relief.  *See* Complaint, *State of Texas v. iMergent, Inc. et al.*, No. 2005 CI 02791 (Bexar County Cir. Ct. Feb. 21, 2005); Consent Judgment, *State of Indiana v. iMergent, Inc.*, No. 490070601PL001792 (Marion Super. Ct. Mar. 19, 2007); Complaint, *State of Florida v. iMergent, Inc. et al.*, No. 2007CA1665 (Leon County Cir. Ct. June 26, 2017); Final Judgment of Stipulation, *State of Connecticut v. iMergent, Inc.*, No. CV-08-4036653S (Hartford Super. Ct. Apr. 11, 2008); Final Judgment and Consent Decree, *State of Illinois v. Stores Online, Inc. and Galaxy Mall*, No. 2006-CH-1345 (Madison County Super. Ct. June 12, 2008); Consent Judgment, *State of North Carolina v. iMergent, Inc. and StoresOnline, Inc.*, No. 07-CVS-7381 (Wake County Super. Ct. Aug. 4, 2008); Consent Order, *State of California v. iMergent, Inc., et al.*, No. 56-2007-287557 (Ventura County Super Ct. Mar. 10, 2009); Complaint and Final Judgment and Consent Decree, *State of Washington v. iMergent, Inc., StoresOnline, Inc.*, No. 09-2-29124-1 (King County Super. Ct. Aug. 5, 2009); Judgment, *ACCC v. StoresOnline Int'l Inc., StoresOnline, Inc.*, No. (P)NSD1991/2007 (Federal Court of Australia May 5, 2010).

**RESPONSE TO PARAGRAPH NO. 31:**  The allegations contained in Paragraph 31 of the Complaint refer to publicly filed documents in other fora and those documents speak for themselves.  To the extent that a response is required, Defendants deny the allegations contained in Paragraph 31 of the Complaint.

32.    By 2010, Lewis and Poelman joined Finnegan as officers and owners of Evolution Group, LLC ("Evolution Group"), which marketed and sold real estate and stock investment related services and products at seminars across the country.  Finnegan was a cofounder and a principal owner of Evolution Group.  Smith's telemarketing floor, PMI, purchased consumer leads from Evolution Group and attempted to sell purported personalized coaching services to consumers who had attended Evolution Group's seminars.

**RESPONSE TO PARAGRAPH NO. 32:**  Defendants admit that, by 2010, Defendant Lewis became a co-owner, along with Defendant Finnegan, of Evolution Group, LLC, which marketed and sold real estate and stock education and services to students in the United States. Defendants further admit that Defendant Finnegan was a co-founder and owner of Evolution Group.  Defendants further admit that PMI contacted students who had attended Evolution seminars and expressed interest in purchasing additional services.  Defendants deny the remaining allegations contained in Paragraph 32 of the Complaint.

33.    By the end of 2011, Response's predecessor, Evtech Media, controlled by Lewis, Poelman, and Finnegan, acquired Evolution Group.  Evtech Media (which became Response in January 2016) markets and sells real estate and stock investment related services and products at the live Preview Events and Workshops across the country.

**RESPONSE  TO  PARAGRAPH  NO.  33:**  Defendants admit that Evtech Media was controlled by Finnegan and that, by the end of 2011, Evtech Media had purchased some assets

from Evolution Group.  Defendants admit further that in or around January 2016, Response purchased Finnegan's interest in Evtech Media.  Defendants admit that Evtech Media and Response marketed and sold real estate and stock education related services and products at live preview events and workshops in the United States.  Defendants deny the remaining allegations contained in Paragraph 33 of the Complaint.

34.    Response induced consumers to pay for Advanced Trainings, in part, by promising them access to discounted properties at "exclusive" Buying Summits.  From at least 2012 to mid-2016, BuyPD was the entity used by the Individual Defendants to market and sell real estate properties to consumers who attended the Buying Summit events.  Through its subsidiaries, Insider's Cash and American Cash Funding, BuyPD provided loans to consumers to purchase these properties, and then sold those loans to other consumers at the Buying Summits.  BuyPD also markets and sells purported entity setup and asset protection services to consumers at the Workshops and at Advanced Training events through a subsidiary, Veil Corporate LLC.

**RESPONSE TO PARAGRAPH NO. 34:**  Defendants deny the allegations contained in the first sentence of Paragraph 34 of the Complaint.  Defendants admit that, between 2012 and mid-2016, BuyPD offered for sale and sold real estate properties to certain students who attended Buying Summit events.  Defendants further admit that Insider's Cash and American Cash Funding were subsidiaries of BuyPD that provided loans to certain students to purchase the properties.  Defendants admit that certain of those loans were sold to other students who attended the Buying Summits.  Defendants further admit that Veil Corporate LLC provided entity setup and asset protection services to students at certain of the Corporate Defendants' events.  Defendants deny the remaining allegations contained in Paragraph 34 of the Complaint.

18

35.     From at least 2012 to 2014, Smith's telemarketing floor, PMI, provided telemarketing services for Evtech Media.  Specifically, PMI purchased consumer leads from Evtech Media and attempted to sell through telemarketing calls purported personalized real estate coaching services to help consumers do real estate deals.

**RESPONSE TO PARAGRAPH NO. 35:**  Defendants admit that, between 2012 and 2014, PMI provided some telemarketing services for Evtech Media.  Defendants deny the remaining allegations contained in Paragraph 35 of the Complaint.

36.     In June 2014, Evtech Media acquired PMI, and Smith became a partner in the Nudge Enterprise.

**RESPONSE TO PARAGRAPH NO. 36:**  Defendants deny the allegations contained in Paragraph 36 of the Complaint.

37.     Since acquiring PMI, Evtech Media itself (and later Response) have conducted telemarketing calls to consumers to sell additional products and services, including purported personalized real estate coaching services and tax preparation services.

**RESPONSE TO PARAGRAPH NO. 37:**  Defendants deny that Evtech Media acquired PMI.  Defendants admit that Evtech Media and Response have conducted telemarketing calls to students to offer additional products and services.  Defendants deny the remaining allegations contained in Paragraph 37 of the Complaint.

38.     Since 2015, Response and BuyPD have operated out of the same office building in Lindon, Utah (the "Lindon Building").  The exterior signage for the Lindon Building previously bore Nudge's name, but now bears Response's name.

**RESPONSE TO PARAGRAPH NO. 38:**  Defendants admit that from 2015 through 2016, Response and BuyPD operated out of separate office space within an office building in

Lindon, Utah.  Defendants admit further that the exterior signage for that building previously bore Nudge's name, but now bears Response's name.  Defendants deny the remaining allegations contained in Paragraph 38 of the Complaint.

39.     Nudge served as the holding company for the partners of the Nudge enterprise, namely, Lewis, Poelman, Smith, and Finnegan.

**RESPONSE TO PARAGRAPH NO. 39:**  Defendants deny the allegations contained in Paragraph 39 of the Complaint.

40.     The Individual Defendants have been the principal managers in control of the Nudge Enterprise since mid-2014 (when Smith became a Nudge partner).  As the principal managers, the Individual Defendants oversee the enterprise's operations, including deciding what products and services to sell to consumers and managing relationships with celebrity endorsers and third-party vendors.  For example, as referenced below, the Individual Defendants discussed strategic and operational matters for Response and BuyPD at bi-annual Nudge retreats.

**RESPONSE TO PARAGRAPH NO. 40:**  Defendants admit that Defendant Lewis was an owner of Nudge.  Defendants admit further that Defendant Poelman was an owner of Nudge and BuyPD, respectively, and was Vice President of Operations at Response.  Defendants admit that Defendant Smith is the owner of Response.  Defendants admit further that Defendant Finnegan was the owner of Evtech Media and is the Vice President of Sales at Response.  Defendants admit that Defendant Sanderson was the Vice President of Sales at BuyPD and is the President and Chief Operations Officer at Response.  Defendants admit further that Lewis, Poelman, Smith, Finnegan and Sanderson have discussed the products and services to sell to students.  Defendants admit that Finnegan managed relationships with celebrity endorsers, and Poelman, Smith and Finnegan managed relationships with third-party vendors of their respective companies.  Defendants further

20

admit that Lewis, Poelman, Smith, Finnegan, and Sanderson discussed strategic and operational matters for certain of the Corporate Defendants at retreats. Defendants deny the remaining allegations contained in Paragraph 40 of the Complaint.

41.     The Individual Defendants have also participated in weekly company sales meetings, which Smith often led.

**RESPONSE TO PARAGRAPH NO. 41:** Defendants admit that, at times, Defendants Lewis, Poelman, Smith, Finnegan, and Sanderson participated in weekly sales meetings. Defendants deny the remaining allegations contained in Paragraph 41 of the Complaint.

42.     Since 2011, Defendants have used a variety of deceptive tactics detailed below to sell multiple levels of increasingly expensive seminars, other trainings, and related products, purportedly designed to help consumers become successful real estate investors.

**RESPONSE TO PARAGRAPH NO. 42:** Defendants deny the allegations contained in Paragraph 42 of the Complaint.

43.     Defendants initially offer consumers at the free Preview Events access to 3-day live training Workshop events. Defendants charged consumers anywhere from $199 to $1,997 to enroll in one of their Workshops. Since 2016, Defendants typically charge consumers $1,147 to attend the Workshop. Since January 2015, over 70,000 consumers have purchased one of Defendants' Workshops.

**RESPONSE TO PARAGRAPH NO. 43:** Defendants admit the allegations contained in the first, second, and fourth sentences of Paragraph 43 of the Complaint as to Defendant Response. Defendants deny the remaining allegations contained in Paragraph 43 of the Complaint.

44.     Defendants then offer additional real estate investment products and services at the Workshops, including additional live training by purported "experts" and "trainers," real estate

investing software branded as "Prop Trend" and "Real Estate Pro," and more online training videos. Defendants bundle these products and services into different Advanced Training package names, such as "Diamond Elite 360," and charge consumers anywhere from $19,000 to as much as $40,000.

**RESPONSE TO PARAGRAPH NO. 44:** Defendants admit that Defendant Response offered additional real estate education training and services at the workshops, including additional live training by real estate experts and trainers, access to real estate education software, including software branded as "Prop Trend" and "Real Estate Pro," and access to additional online training videos. Defendants further admit that these services were sold by Response as a package, including as a Diamond Elite 360 package, and that the package was offered for sale at varying price ranges, depending on the amount of additional services purchased. Defendants deny the remaining allegations contained in Paragraph 44 of the Complaint.

45. Through the end of 2017, Defendants included in the Advanced Training packages access to supposedly "exclusive" deals for real estate and financial investment related products and services offered at events (referred to as the "Buying Summit" and then "Investor Expo") held monthly in Las Vegas and, later, at the Lindon Building.

**RESPONSE TO PARAGRAPH NO. 45:** Defendants admit that, through the end of 2017, Defendant Response offered for sale and sold advanced training packages, some of which included the opportunity to attend a Buying Summit and/or Investor Expo event which were held monthly in Las Vegas, and, later, at the Lindon Building, and which provided, *inter alia*, exclusive products and services to participants. Defendants deny the remaining allegations contained in Paragraph 45 of the Complaint.

46.     Since 2015, Defendants have sold Advanced Training packages to over 30,000 consumers.

**RESPONSE TO PARAGRAPH NO. 46:**  Defendants admit that, between 2015 and the fall of 2019, Defendant Response sold real estate training and services beyond the three-day workshop to over 30,000 students.  Defendants deny the remaining allegations contained in Paragraph 46 of the Complaint.

47.     After consumers purchase one of the Advanced Training packages, Defendants attempt to induce them through telemarketing calls to spend thousands of dollars, and sometimes tens of thousands of dollars, more on additional products and services, including a purported exclusive "Inner Circle" personalized real estate coaching program.

**RESPONSE TO PARAGRAPH NO. 47:**  Defendants admit that Response used telemarketing to offer advanced training to students.  Defendants deny the remaining allegations contained in Paragraph 47 of the Complaint.

48.     In numerous instances, consumers have lost tens of thousands of dollars from purchasing a series of Defendants' seminars and trainings.  In addition, numerous consumers who bought purported "turnkey" and "cash flowing" rental properties from BuyPD at the Buying Summit events discovered the properties were not worth what they paid and did not have paying tenants in place as had been represented.  Some consumers have lost their life savings as a result of Defendants' scheme; others have had to file for bankruptcy.  Those victimized include consumers on limited fixed incomes and retirees.

**RESPONSE TO PARAGRAPH NO. 48:**  Defendants lack knowledge or information sufficient to form a belief regarding the truth of the allegations contained in Paragraph 48 of the Complaint and on this basis deny these allegations.

49.     Defendants conduct Preview Events across the country to entice consumers to purchase their real estate investment products and services.

**RESPONSE TO PARAGRAPH NO. 49:**  Defendants admit that Defendant Response hosted preview events in certain states in the United States.  Defendants deny the remaining allegations contained in Paragraph 49 of the Complaint.

50.     Defendants market the Preview Events as exclusive or private events sponsored by a celebrity endorser under a variety of brand names including, among others, Dean Graziosi's Insider's Edge, Scott Yancey's Yancey Events, Josh Altman's Flip for Life, Doug Clark's Unlisted Flip, and Drew Levin and Danny Perkins' Snap Flip.  Defendants pay the celebrity endorsers either a flat fee or a percentage of the consumer payments received from the event.

**RESPONSE TO PARAGRAPH NO. 50:**  Defendants admit that Defendant Response marketed preview events on the real estate methods and strategies used by real estate experts, including celebrity endorsers, under brand names such as Dean Graziosi's Insider's Edge, Scott Yancey's Yancey Events, Josh Altman's Flip for Life, Doug Clark's Unlisted Flip, and Drew Levin and Danny Perkins' Snap Flip.  Defendants further admit that Defendant Response compensated the real estate experts based on either a flat fee or a percentage of the payments received from the events.  Defendants deny the remaining allegations contained in Paragraph 50 of the Complaint.

51.     Since at least 2013, through direct mail, email, and online advertisements, Defendants claimed, among other things, that consumers (i) did not need experience in real estate investing to get involved; (ii) would be shown at the Preview Events how to find properties at wholesale or deeply discounted prices; (iii) would get access to pre-approved funding to do real estate deals regardless of their own credit scores; and (iv) would learn exclusive "ways to profit."

Defendants' advertisements for the Preview Events typically included the following kinds of representations:

      A.    "**Make Money with Income Properties** . . . . Purchase real estate at all time low prices before they are bid up by hundreds of investors? Learn how to generate additional cash flow month after month?" (Emphasis in original)

      B.    "<u>**Pre-Approved Funding**</u>: Is there money to do deals? Find out how to get up to $750,000 in pre-approved real estate funding regardless of credit score." (Emphasis in original)

      C.    "See ways to profit from real estate available to only the select few."

**<u>RESPONSE TO PARAGRAPH NO. 51:</u>**  Defendants admit that, between 2013 and the fall of 2019, Defendant Response advertised free preview events through direct mail, email, and online advertisements.  Defendants deny that Paragraph 51 of the Complaint accurately or completely characterizes those advertisements, and therefore deny the allegations contained in Paragraph 51.

52.    Figures 1 and 2 are examples of Preview Event invitations consumers received in 2013 and 2014 featuring Dean Graziosi and Scott Yancey, respectively, both of which make representations about having access ("before the public") to purportedly deeply discounted properties (even "pennies on the dollar" or "all-time low prices"):

**Figure 1**



**Figure 2**

Congratulations! You and your guest's VIP reservation to my Private Income Property Event has been officially confirmed by the event sponsor. We'll see you and your guest at the:

**Omni William Penn Hotel**
Saturday, April 19, 2014
530 William Penn Place, Pittsburgh, PA 15219
Event Begins Promptly at 9:00 AM (Registration begins at 8:30 AM)

**When you and your guest attend my Private Income Property Event, I will show you:**

✓ How to buy property for wholesale prices just like the institutional investors!

✓ How to get the best properties before the public has access to them!

✓ How to purchase property at all-time low prices before they are bid up by hundreds of other investors!

To your success!

Scott Yancey, Star of A&E's "Flipping Vegas"

P.S. Remember, as my personal guest, you and your guest will receive FREE admission, my valuable Resource Discs and a digital camera at the event!"

It's True! Properties' like exist at my PRIVATE PRE-A Real Estate Event!

4 Bed, 1 Bath
Only $93,952

4 Bed, 2 Bath
Only $30,704

4 Bed, 2 Bath
Only $26,698

26

**RESPONSE TO PARAGRAPH NO. 52:**  Defendants admit that Paragraph 52 of the Complaint contains communications with students who registered for preview events.  Those communications speak for themselves.  Defendants deny the remaining allegations contained in Paragraph 52.

53.     Figure 3 is another example of a Preview Event invitation featuring Scott Yancey that a consumer received by direct mail in 2015.  It makes representations about access to deeply discounted properties ("all-time low prices"), purportedly pre-approved funding ("up to $750,000"), and generating "additional cash flow month after month after month", among other things:

**Figure 3**



**RESPONSE TO PARAGRAPH NO. 53:**  Defendants admit that Paragraph 53 of the Complaint contains an invitation to a preview event.  That invitation speaks for itself.  Defendants deny the remaining allegations contained in Paragraph 53.

54.   Defendants also advertise their Preview Events through targeted television infomercials featuring a sponsoring celebrity in cities throughout the country.   Through these infomercials, Defendants claim that consumers will be able to get access to a proven system used by the featured celebrities themselves to make money in real estate, that the consumers do not need to have any previous real estate experience or their own money or credit to use this system to succeed, and that consumers can receive pre-approved real estate funding from the sponsoring celebrity's "money partners."

**RESPONSE TO PARAGRAPH NO. 54:**  Defendants admit that at times Defendant Response advertised preview events through television informercials featuring a sponsoring celebrity in cities in the United States.  Those informercials speak for themselves.  Defendants deny that Paragraph 54 of the Complaint accurately or completely characterizes those informercials and therefore deny the remaining allegations contained in Paragraph 54.

55.   For example, in February 2016, one of Defendants' infomercials featuring Scott Yancey aired in Denver, Colorado.  Defendants represented, among other things, that (i) at the Preview Event, consumers with no previous real estate experience would learn Yancey's proven method of how to profit in real estate; (ii) consumers would be able to do real estate deals with Yancey's "money partners" putting up "100% of the money"; and (iii) consumers using the program were exceptionally successful.  The infomercial included the following representations:

A.    "You don't need any previous real estate experience or your own money to invest to profit in real estate the Yancey Way.  Scott Yancey's free lunch and dinner events bring you all the live local training you need to succeed in real estate and his money partners will put up to 100% of the money you need to do your deals.  It's simple.

You find the properties to flip. They put up the money and you each get a piece of the profits." (Voiceover speaker)

B.    "This isn't a theory, this isn't something we're trying. This is something that works and we are doing it right now all over the country." (Scott Yancey speaking)

C.    "I've got to tell you I have never seen a way to profit in real estate like the Yancey Way. Because it requires no previous real estate experience or money to invest, anyone can do it. In fact, Scott has received literally thousands of success story videos from people who have changed their lives with what they've learned at one of his free events." (Rachel Reenstra, a HGTV television personality, speaking)

D.    Reenstra interviews Yancey. A transcription of this interview appears below in relevant part:
**Scott Yancey**: ". . . my money partners put up the money so my students don't have to use their own . . . I already have the money in place. . . ."
**Reenstra**: "What's the catch? . . . How much of the profits are your money partners keeping, like 50%, 25%?"
**Yancey**: "No, try less than 5% . . . and that only comes out of your profit after each deal is done, not upfront out of your pocket."
**Reenstra**: "Your money partners only make money once your students have made money?"
**Yancey**: "That's exactly right. . . . My money partners have already funded thousands of real estate deals for my attendees."

**<u>RESPONSE TO PARAGRAPH NO. 55</u>:** Defendants admit that Paragraph 55 of the Complaint quotes from an informercial featuring Scott Yancey that aired in Denver, Colorado in or around February 2016. Defendants deny that Paragraph 55 of the Complaint accurately or completely characterizes that informercial and therefore deny the remaining allegations contained in Paragraph 55.

56.    Similarly, in August 2017, Defendants aired an infomercial featuring Doug Clark in Norfolk, Virginia, which falsely represented, among other things, that consumers would learn at the Preview Event Clark's proven "formula for success" to buy properties "that few people know exist" at deeply discounted prices, using funds from Clark's "money partners," and "flip[] them for amazing profits." The infomercial included the following representations:

A.   "[Doug Clark] profits from a unique group of unlisted properties that few people know exist, properties that are not publicly advertised for sale but for reasons you'll learn at this event must be sold immediately, so he gets them for 25% off, 50% off or more off their full market price and flips them for amazing profits, and now at his free Unlisted Flip events, he is going to show you how to do it too, using little or none of your own cash or credit, because Doug's money partners are going to put up the money for you, up to one million dollars per flip." (Voiceover speaker)

B.   "I don't have to use any of my own money or credit on these flips, not a single penny, and you won't either because when you come to my event and learn how to find unlisted properties this far under market value, my money partners will put up the money for you in exchange for a little piece of the profits after the property is flipped . . . You pay them nothing upfront yet you walk away with the lion's share of the profits." (Doug Clark speaking)

C.   "I have created a formula for success that can be duplicated. My family and friends have proven that and now I am excited to share it with others." (Doug Clark speaking)

**RESPONSE TO PARAGRAPH NO. 56:** Defendants admit that Paragraph 56 of the Complaint quotes from an informercial featuring Doug Clark that aired in Norfolk, Virginia in or around August 2017. Defendants deny that Paragraph 56 of the Complaint accurately or completely characterizes that informercial and therefore deny the remaining allegations contained in Paragraph 56. Defendants expressly deny any allegations of false representations contained in Paragraph 56.

57.   Likewise, in February 2018, Defendants aired an infomercial featuring Josh Altman in Oklahoma City, Oklahoma, which falsely represented, among other things, that consumers would (i) receive a proven "roadmap" to "find, fund, and flip for profit"; (ii) be given a "hand-picked list of the top properties"; and (iii) receive funding for their deals from Altman's "partners." The infomercial included the following representations:

A.   "You don't need any previous experience or even good credit in order to profit. When you attend one of my live Flip for Life events, you will be introduced to my team who will show you how to find it, how to fund it, and how to flip it for profit. Just like I do. (Altman speaking)

B.     "This isn't a theory, this isn't something I am just testing out.  It's a roadmap that my team and I use day in and day out and right now for the very first time, I am revealing my insider's edge and I am going to introduce you to my team who will show you how to find, fund, and flip for profits."  (Altman speaking)

C.     "When you come to my free event, we are going to give you a hand-picked list of the top properties and introduce you to my partners who will fund up to 100% of your deals so you can profit from my program."  (Altman speaking)

D.     "At our events . . . we are giving away information that has been proven time and time again, that has been tested time and time again, and it really allows you to get to a place in your life that you have always wanted to get to."  (Altman speaking)

**RESPONSE TO PARAGRAPH NO. 57:**  Defendants admit that Paragraph 57 of the Complaint quotes from an informercial featuring Josh Altman that aired in Oklahoma City, Oklahoma in or around February 2018.  Defendants deny that Paragraph 57 of the Complaint accurately or completely characterizes that informercial and therefore deny the remaining allegations contained in Paragraph 57.  Defendants expressly deny any allegations of false representations contained in Paragraph 57.

58.     In addition, Defendants' infomercials contain video testimonials from consumers who claim they were able to do a number of real estate deals within months after having attended one of Defendants' events and receiving their training.

**RESPONSE TO PARAGRAPH NO. 58:**  Defendants admit that certain infomercials aired by Defendant Response contained video testimonials from students who were able to do a number of real estate deals within months after having attended Defendant Response's real estate and education events and received their training.  Defendants deny the remaining allegations contained in Paragraph 58 of the Complaint.

59.     Defendants sometimes display written disclaimers during these video testimonials. For example, during the 2016 infomercial featuring Yancey, a purported "Free Event Attendee" appears in a video and states, "before I went to your free event I just filed bankruptcy . . . after I

attended your event and learned how to invest in real estate without using any of my own money
or credit . . . and here I am now at age 70 years old, I flipped over 20 properties."  Below a graphic
stating "Flipped More Than 20 Properties," a disclaimer in much smaller font size states:  "Results
not typical. Most people who attend Scott's events do not apply the strategies they learn and make
little to no money.  Results vary based on education, financial condition, experience, and effort.
Investing in real estate involves risk, and you could lose money."

       **RESPONSE TO PARAGRAPH NO. 59:**  Defendants admit that video testimonials of
successful students used by Response contained clear and conspicuous disclaimers, including but
not limited to the one identified in Paragraph 59 of the Complaint.  Defendants deny the remaining
allegations contained in Paragraph 59 of the Complaint.

       60.    Defendants also display general disclaimers at the beginning of the infomercials.
One such disclaimer that appeared at the beginning of the February 2018 infomercial featuring
Altman stated in part:

> The Company does not sell a get rich quick program, guaranteed system, or business
> opportunity.  The Company and its trainers are not licensed financial consultants, tax
> accountants, real estate brokers, dealer brokers, or attorneys – they do not offer financial,
> tax, or legal advice and highly recommend individuals work with these licensed
> professionals in concert with the training.  Investing of any kind carries risk, and its
> possible to lose some or all of your money.

> Effective training requires active participation by the student.  Most attendees of the free
> introductory event do not purchase additional education and their use of the free education
> materials is unknown.  Testimonials are from individuals who purchased additional
> education.  Your experience will vary and results will require effort, time, and an ability to
> apply the training and take action.

> Josh Altman has had extraordinary success in real estate.  You should not view his
> experience and results as common.  Due to his production schedule Josh will not attend the
> free introductory event.

**RESPONSE TO PARAGRAPH NO. 60:** Defendants admit that Response used prominent and conspicuous disclaimers such as those referenced in Paragraph 60 of the Complaint. Defendants deny the remaining allegations contained in Paragraph 60 of the Complaint.

61.     Defendants' disclaimers do not negate or meaningfully alter the net impression consumers are left with from the repeated and specific representations Defendants make during the infomercials that the sponsoring celebrities have developed a proven and tested system to make money in real estate investing and that consumers can obtain financing from the sponsoring celebrity's "money partners" to do real estate deals.

**RESPONSE TO PARAGRAPH NO. 61:** Defendants deny the allegations contained in Paragraph 61 of the Complaint.

62.     Defendants hold the Preview Events in hotel ballrooms across the country. The Preview Events typically last approximately ninety minutes to two hours and start with motivational videos.

**RESPONSE TO PARAGRAPH NO. 62:** Defendants admit that Defendant Response typically held preview events in hotel ballrooms in the United States, and that the preview events typically lasted approximately ninety minutes to two hours. Defendants deny the characterization that these events started with "motivational videos." Defendants deny the remaining allegations of Paragraph 62 of the Complaint.

63.     The speakers typically ask at the beginning of the Preview Events how many attendees are new or just getting started in real estate investing. The vast majority typically do not have experience in real estate investing.

**RESPONSE TO PARAGRAPH NO. 63:** Defendants admit the allegations contained in the first sentence of Paragraph 63 of the Complaint as to Defendant Response. Defendants deny

the characterization that the "vast majority typically do not have experience in real estate investing." Defendants deny the remaining allegations contained in Paragraph 63 of the Complaint.

64. The speakers do not provide consumers with any substantive training or access to funding or discounted properties at the Preview Events.

**RESPONSE TO PARAGRAPH NO. 64:** Defendants deny the allegations contained in Paragraph 64 of the Complaint.

65. Instead, Defendants use the Preview Events to convince consumers to enroll in their three-day paid Workshop. Defendants' speakers typically tell the attendees that there is not enough time at the Preview Event to go into adequate detail to teach the attendees how to do actual real estate deals, but the company offers three-day hands-on training that can be tailored or customized to each individual's needs and goals.

**RESPONSE TO PARAGRAPH NO. 65:** Defendants admit that Defendant Response described and offered for sale three-day workshop real estate education training to students at free preview events. Defendants deny that the remaining allegations contained in Paragraph 65 of the Complaint accurately or completely characterize what presenters said and presented to students at free preview events over time, and therefore deny those allegations.

66. During the course of the Preview Events, Defendants typically portray themselves as a "private funding partner" for consumers where they both profit together from the real estate deals the consumers do. In doing so, Defendants represent that their interests align with the consumers in order to develop the consumers' trust and reinforce the representations about the nature of the services consumers will receive if they sign up for the Workshop. As detailed below, these representations are false.

34

**RESPONSE TO PARAGRAPH NO. 66:**  Defendants deny that the allegations contained in Paragraph 66 of the Complaint accurately or completely characterize what presenters said and presented to students at Defendant Response's free preview events over time, and therefore deny those allegations.  Defendants expressly deny that any representations have ever been false.

67.    In numerous instances, Defendants mislead consumers about the nature of the services they offer if consumers enroll in the Workshop.

**RESPONSE TO PARAGRAPH NO. 67:**  Defendants deny the allegations contained in Paragraph 67 of the Complaint.

68.    In numerous instances, Defendants tell consumers that they will get everything they need to do real estate deals within months after completing the Workshop, including access to "experts" who will walk them through completing the deals step-by-step.

**RESPONSE TO PARAGRAPH NO. 68:**  Defendants deny that the allegations contained in Paragraph 68 of the Complaint accurately or completely characterize what presenters said and presented to students at Defendant Response's free preview events over time, and therefore deny those allegations.  Defendants expressly deny that any representations have ever been false.

69.    Defendants' representatives typically claim that students who enroll in their Workshops will be able to: (a) use Defendants' funds to do real estate deals without putting any of their own money down; (b) find properties at below market value; and (c) access a list of "cash buyers" to purchase the consumers' investment properties.

**RESPONSE TO PARAGRAPH NO. 69:**  Defendants deny that Paragraph 69 of the Complaint accurately or completely characterizes what Defendant Response's representatives "typically claim[ed]" in conversations with students, and therefore deny the allegations contained in Paragraph 69.

70.     For example, on August 31, 2017, speakers at a "Snap Flip" Preview Event sponsored by Drew Levin and Danny Perkins held in Twin Falls, Idaho, claimed that consumers who signed up for the Workshop would get access to the same funding that Defendants themselves use to do real estate deals as well as to Defendants' "buyer system," that would enable consumers to find purchasers for the properties.  The speakers also represented that consumers could get access to funding without using "a dime" of their own money and receive personalized real estate transaction assistance, as part of a business model in which "the more money we make, the more money you make."  Their representations included the following:

A.      "We have a funding partner that funds our deals for us.  We've been doing so for years and years.  Students who do our training or our classes with us, they get to use our funding partner to fund those transactions.  It's really cool.  I'll talk about that here today.  How many of you would love to have access to funding that you can use to do real estate deals?  It has nothing to do with your credit or income. . . . By the time that I am done here today with my portion, I will be very detailed, very specific and talking step by step on how each one of you here has the opportunity to do multiple real estate transactions without using a dime of your personal money, without accessing your credit to do it.  Still control the deal, get the deal, profit from it without using your money or credit."

B.      "So they pay for the training.  We show them how to find their first deal. . . . we show them how to find their first deal, locate it, get the offer, get it under contract. . . . They still need a buyer.  So they use our buyer system to get the buyer in place, which is very valuable to them."

C.      "Number two, they get to use our funding partner under the same – under the same rate and everything that we use.  So we facilitate funding on the deal.  We get it funded for them so they don't lose the deal. . . . . Just an example.  So you're sitting there – here's my purpose of this example.  You've got that money right in front of you.  How many of you truly believe with a little bit of direction with that money right in front of you that you could do at least one or two real estate deals."

D.      "If we're showing you how to find them and we've got the funding already in place, and we show you how to get a buyer and you're calling us 10 times a day every day, why don't we just go get that one on our own?  Why don't we just go do that deal? . . .  The problem is, we cannot be in every state, every county, every day, every neighborhood, all the time doing all of them.  I love them.  Together with you we can do more.  So a couple years ago our business strategy became this.  We said, hey, we're going to do as many deals as we can handle, and we'll make money on

those.  But at the same time, we want to get a handful of you up and running.  We want to show you how to do the exact same thing and give you access to the exact same tools.  We just want to make a little bit of money on each one of those deals we help you with and fund them.  How many of you agree that's a genius business strategy?  It's awesome.  Because it's win-win.  The more deals you do, the more money we make, the more money you make."

E.      "The tuition for the training again is $1,147. . . . The cool thing is when you get registered here today, the $1,147 gets you everything you need right now.. . . . And then number three is the buyer's system.  You get access to that included. . . . The very first thing we show you at that training, especially for the newbies, is we show you how to use our buyer's system to locate and find 5 to 15 buyers in the market you want to invest in and know where they bought property and how much they want to pay for it.  We show you how to get the buyers first and then we show you how to get the deals. "

**RESPONSE TO PARAGRAPH NO. 70:**  Defendants deny that Paragraph 70 of the Complaint accurately or completely characterizes what presenters said and presented to students at the referenced event and therefore deny the allegations contained in Paragraph 70.

71.     Similarly, on December 27, 2017, Defendants' speakers at another Preview held in Tucson, Arizona, claimed, among other things, that consumers who signed up for the Workshop would (i) be able to use Defendants' funding to do real estate deals ("without using a dollar" of their own money or credit); (ii) receive special access to properties directly from banks at deeply discounted prices using Defendants' relationships with the banks; and (iii) be able to connect to cash buyers actively looking to buy properties.  Defendants' speakers reinforced these false representations by claiming that Defendants (i) give consumers' access to their resources, including personalized assistance from "investors, experts;" and (ii) "plug" them into their "system" so that they both can share in the profits from all the real estate deals the consumers will do once they enroll in Defendants' Workshop ("there is a lot of money in this to be made together").  The speakers' representations included the following:

A.      "We've got a step by step process.  We've seen thousands of students take part in throughout the country to do deals quickly and effectively where they live. . . .  The

37

company that we represent, Visionary Events . . . has put in place the funding for you to do your real estate deals. In fact, we have funded for our students nearly a billion dollars worth of real estate transactions. . . . How many of you would say I would do real estate if you show me how to do deals without using a dollar of your own money or any of your credit? Lets see those hands."

B.      "In real estate you got to have a lot of money to make it happen. So what Drew and Danny said was this. They said look, we are not going to come out and just talk about real estate. We are not just going to put on informative events. What we need to do is put a system in place. But more importantly, back it up with the money. Now we have done that. And I'll tell you our company, we walk the walk, we do about 200 real estate deals a month as a company independent of our students. Two hundred properties we buy and sell throughout the country. In order to do that each month, you can imagine we had to put some things in place. First off, we had to come up with a strategy to find all these properties. Then we had to come up with the money to fund them all. Then the other things you don't think of along the way, property management teams, insurance teams, legal teams, rehab teams. We had to put that all in place. We have done that and that's what allows us to do as many deals as we do. Now, why does that matter to you. Well listen carefully. For those of you that come to this training, that learn our system and let us plug you into it, we give you access to those teams, we let you use those resources, and most importantly, we let you use our money."

C.      "We have students all throughout the country doing deals where they live. If they choose to use our help, we're going to make a little bit of money each time. Folks, are you all right with me saying this, the more deals you do, the more money we make. . . . Our goal is to get you doing deals. It does us no good to go out and train a bunch of people and then never do anything with them after. What we are focused on is creating students that are going to be doing deal after deal after deal. We want you to use our resources. We want you to get hooked. And we know if you do, there is a lot of money in this to be made together."

D.      "Most of the people that go to that training, they ain't ever done a deal before. So what we realize is, the 3 Days are awesome, you'll leave fired up ready to go, but your questions will come up the minute you leave the training. Once you now go out to do deals, that's when you need us and that's when this team kicks in play. Now let me be clear. This isn't typical customer service. These aren't people paid eight bucks an hour to answer telephones. These are investors, experts, that we have handpicked to walk you through your deals, everything from finding properties, making offers, writing contracts, they're there to help you along the way."

E.      "Our organization, we are one of the big boys. We buy properties from these banks on a weekly basis all throughout the country. We know who they are. But more important than that to the equation, they know who we are because of our buying power. Now, here's where this matters to you. At the training, we are going to

38

walk you through our system of how we have our students deal directly with banks working underneath our umbrella.  Piggybacking off these relationships we've already created.  And here's these best part, using our cash to close.  Now, here's where this gets really lucrative, often the properties that are most deeply discounted when it comes to working with banks, they are typically cherry-picked long before the auctions ever happen. . . .  At the training we are going to show you how to do exactly that.  We're not going to show you how to go to the auction, stand in line with your number and compete with everyone else.  We'll show you how to work directly with banks underneath our umbrella, picking up properties before they even get to that point.  Folks, how many of you in the room would love a connection like that?"

F.      "Say I gave you 6 months, 6 months from today and I said, look, we'll help you find it, we'd fund it, we'd help put a buyer in place.  I said look, if we helped you through that whole process and . . . when you have a question along the way, call our support team, they are there to help you through it all step-by-step.  If you had all of that in place, I want to see your hands on this, how many of you feel in the next 6 months you could do at least one deal?"

**RESPONSE TO PARAGRAPH NO. 71:**  Defendants deny that Paragraph 71 of the Complaint accurately or completely characterizes what presenters said and presented to students at the referenced event and therefore deny the allegations contained in Paragraph 71.

72.     Likewise, on January 15, 2018, speakers at another Preview Event held in Redondo Beach, California made similar claims, including that (i) consumers who sign up for the Workshop would receive access to funding, properties at "way below market value," and cash buyers; and (ii) Defendants' "system" has an "incredibly high" success rate. The speakers' representations included the following:

A.      "Our company actually gives you access to money for your actual real estate deals.  How many of you in this room love the sound of that? . . . If you are just starting out, it's a hot market. . . . We can give you some incredible funding on fix and flips with great rates, we are going to get cash buyers, and obviously we are going to show you properties at way below market value."

B.      "Our company has a system, I am going to show you here in a second, to where we can provide you education, training, award winning support, man-hours, and money for your actual deals.  In the last little while, our company has provided funding for over thirty thousand real estate deals for our clients.  It equates to well over a billion

39

dollars we have put forward directly to our students for their actual real estate deals."

C.      "We are holding a three day real estate retreat, hands-on training, here in the area. . . . We are the largest real estate investment education company in the world.  We buy and sell properties daily on a scale that would blow you away.  We have an incredibly high success rate with our advanced students."

D.      "We are going to give you numerous strategies that we are using right now to get properties at way below market value."

**RESPONSE TO PARAGRAPH NO. 72:**  Defendants deny that Paragraph 72 of the Complaint accurately or completely characterizes what presenters said and presented to students at the referenced event and therefore deny the allegations contained in Paragraph 72.

73.     Defendants' claims about the consumers' ability to use funding and access to discounted properties and cash buyers are false and misleading.

**RESPONSE TO PARAGRAPH NO. 73:**  Defendants deny the allegations contained in Paragraph 73 of the Complaint.

74.     Virtually none of the consumers obtain Defendants' promised funding to flip properties.  Consumers are not eligible for the promised funding to flip properties except in limited circumstances.  Defendants' promised funding is only available if the consumer finds a buyer who is willing to first place the funds needed to buy the property in trust with the title company.  This limitation, which is not prominently disclosed, if disclosed at all, during the Preview Events, renders the promise of funding without money down largely illusory.

**RESPONSE TO PARAGRAPH NO. 74:**  Defendants deny the allegations contained in Paragraph 74 of the Complaint.

75.     Nor are consumers given any specialized access or tools to find properties at below market value or a network of cash buyers once they enroll in one of Defendants' Workshops, as promised.  The purported real estate training provided at the Workshops covers basic real estate

40

concepts only superficially and the software provided to consumers contains information that is publicly available for free or at a nominal cost.

**RESPONSE TO PARAGRAPH NO. 75:**  Defendants deny the allegations contained in Paragraph 75 of the Complaint.

76.    In numerous instances, Defendants encourage consumers to purchase the Workshops by representing that consumers are likely to earn substantial income by using the system Defendants would provide during the Workshop.

**RESPONSE TO PARAGRAPH NO. 76:**  Defendants deny the allegations contained in Paragraph 76 of the Complaint.

77.    Defendants typically share examples or testimonials of purportedly successful purchasers of their system who were able to do a number of real estate deals within weeks or months after having attended Defendants' Workshops.

**RESPONSE TO PARAGRAPH NO. 77:**  Defendants admit that Defendant Response has, in certain instances in the past, shared examples or testimonials of students who completed the real estate education training and who were able to do a number of real estate deals within weeks or months after completing the real estate education training.   Defendants deny the remaining allegations contained in Paragraph 77 of the Complaint.

78.    In numerous instances, Defendants' speakers claim that they have a high success rate of their students doing many real estate deals and making thousands or tens of thousands of dollars.  For example, Defendants' speakers have made the following representations at Preview Events:

      A.    "When Drew [Levin] and Danny [Perkins] started giving their students access to funding, that's the number one challenge that people have investing in real estate. Once we solved that problem, get this.  I know this will surprise some of you.  Our student success skyrocketed.  I mean, now you have access to money.  The big

problem is this, though.  Many of our students as they started going out and doing deals or multiple deals, they didn't realize how much the government was entitled to from their profits."  (August 31, 2017 Preview Event in Twin Falls, Idaho)

B.     "Write down those two words you see on the top of the screen, MY WHY. . . . I want you to think along these lines.  Maybe you are here tonight for the quick cash.  What did I say was the average profit on a quick flip last year?  Yeah, it's about sixty thousand.  If it were half that.  Thirty.  If you did a deal in the next couple months of the year and pocketed . . . thirty grand, what would that allow you to do? . . . You do three or four deals like that, would that make your 2018 different than your 2017 financially.  I would think so.  A deal or two.  Let me ask you this.  Maybe you are here for the cash flow.  Picture on the first day of every month.  You simply had a ten thousand dollar check directly deposited in your bank account.  Ten grand like clockwork.  What would that allow you to do? How would that benefit you and you and your family?" (December 27, 2017 Preview Event in Tucson, Arizona)

C.     "What we teach, what our system allows you to do, what our training does for you, our support and especially access to our money can be life changing money, the average flip right now is 58 to 70 grand per flip."  (January 15, 2018 Preview Event at Redondo Beach, Florida)

D.     "We have an incredibly high success rate.  Well here we go, 83 percent of our new students in the last calendar year who had hands-on training . . . done at least one deal.  83 percent.  So we can look any investor in the eye and say with this money and our support and help you will do deals." (January 15, 2018 Preview Event at Redondo Beach, Florida)

**RESPONSE TO PARAGRAPH NO. 78:**  Defendants deny that Paragraph 78 of the Complaint accurately or completely characterizes what presenters said and presented to students at preview events, and therefore deny the allegations contained in Paragraph 78.

79.     Defendants typically make a brief earnings related disclaimer shortly after beginning the Preview Event.  For example, one such disclaimer at the September 2017 Preview Event stated in part:  "The students featured in this presentation are some of our company's most successful students.  They are either not typical or purchased additional training.  Most students that attend this introductory preview event do not make money."

42

**RESPONSE TO PARAGRAPH NO. 79:**  Defendants admit that Defendant Response made clear and conspicuous disclaimers shortly after the beginning of preview events and throughout the preview events, including but not limited to the one identified in Paragraph 79 of the Complaint.  Defendants deny the remaining allegations contained in Paragraph 79 of the Complaint.

80.     These brief disclaimers do not change the net impression consumers are left with by Defendants' repeated representations throughout the Preview Event that consumers are likely to make money and do profitable real estate deals within weeks or months after enrolling in Defendants' system.

**RESPONSE TO PARAGRAPH NO. 80:**  Defendants deny the allegations contained in Paragraph 80 of the Complaint.

81.     Contrary to Defendants' representations, consumers who purchase the Defendants' training are unlikely to make money or do real estate deals within months after attending a Workshop.  In fact, while Defendants offer to reimburse consumers the amount they pay to attend the Workshop if they complete a profitable ("net cash flow") transaction within either three or six months of enrolling in the Workshop, Defendants' own records show that for every year from at least 2013 to 2017, only 1% (or fewer) of the consumers who had enrolled in a Workshop had received the tuition reimbursement.

**RESPONSE TO PARAGRAPH NO. 81:**  Defendants deny the allegations contained in Paragraph 81 of the Complaint.

82.     The vast majority of consumers who enroll in one of Defendants' Workshops do not make money from using any of Defendants' services or products.

**RESPONSE TO PARAGRAPH NO. 82:**  Defendants state that they have many students who are successful in real estate investing after purchasing and using Response's training taught at the workshop.  Defendants otherwise lack knowledge or information sufficient to form a belief regarding the truth of the remaining allegations contained in Paragraph 82 and on this basis deny these allegations.

83.    Defendants typically conduct Workshops in the same geographic areas as the Preview Events, a few weeks later.

**RESPONSE TO PARAGRAPH NO. 83:**  Defendants admit that Defendant Response typically conducted three-day workshops in the same geographic areas as the preview events, and that those workshops were typically held a week or more after the preview event.  Defendants deny the remaining allegations contained in Paragraph 83 of the Complaint.

84.    The Workshop speakers cover only at a general level topics related to flipping properties and investing in rental properties.

**RESPONSE TO PARAGRAPH NO. 84:**  Defendants deny that Paragraph 84 accurately or completely characterizes what has been taught at the workshops and therefore deny the allegations contained in Paragraph 84.

85.    The main thrust of the Workshop is not to educate, but instead to convince consumers to buy the more expensive Advanced Training packages. This is contrary to the expectations of many consumers who understood, based on Defendants' prior representations at the Preview Events, that they would receive the necessary tools and resources to successfully invest in real estate if they enrolled in the Workshop.

**RESPONSE TO PARAGRAPH NO. 85:**  Defendants deny the allegations contained in Paragraph 85 of the Complaint.

86. During the three-day Workshops, Defendants make a number of misrepresentations to induce consumers to purchase one of the more expensive Advanced Training packages. First, they mislead consumers into providing their personal financial information to Defendants, increasing their credit card limits, and applying for new credit cards purportedly for investment purposes. Second, they misrepresent the nature of the products and services consumers will receive by paying for Advanced Training. Third, they mislead consumers regarding the amount of money they can expect to make as a result of purchasing the Advanced Training.

**RESPONSE TO PARAGRAPH NO. 86:** Defendants deny the allegations contained in Paragraph 86 of the Complaint.

87. At the start of the Workshop, Defendants typically ask consumers to complete an "investor profile" or "investor goal sheet" about their personal finances under the guise that Defendants will use this information to advise consumers on funding real estate deals and to help them reach their goals.

**RESPONSE TO PARAGRAPH NO. 87:** Defendants deny the allegations contained in Paragraph 87 of the Complaint.

88. Each consumer is assigned to a "team mentor" or "personal consultant" who meets privately with the consumer during the Workshop. The "team mentors" and "personal consultants" are in fact salespersons hired by Defendants to sell the Advanced Training packages. They use the consumers' financial information to find out the consumers' available credit and funds and determine how much consumers can afford to pay for one of the Advanced Training packages.

**RESPONSE TO PARAGRAPH NO. 88:** Defendants deny the allegations contained in Paragraph 88 of the Complaint.

89.     On the Workshop's first or second day, the speakers typically encourage consumers to increase their limits on their existing personal credit cards, purportedly to provide them more capital to purchase real estate.  Defendants' representatives provide scripts for consumers to use when they call their credit card companies.  Unbeknownst to consumers, the real purpose of this exercise is to increase the amount of credit consumers have available to purchase one of Defendants' Advanced Training packages.

**RESPONSE TO PARAGRAPH NO. 89:**  Defendants deny the allegations contained in Paragraph 89 of the Complaint.

90.     On the Workshop's second day, since at least March 2016, the speakers typically encourage consumers to use one of a handful of third-party companies to secure additional "capital" or "funding" to do real estate deals.

**RESPONSE TO PARAGRAPH NO. 90:**  Defendants admit that during the second day of Response's three-day workshop, since at least March 2016 through fall 2019, speakers typically informed students that third-party companies could assist in real estate deals by providing additional capital or funding to students, and also identified some of those third-party companies that could assist.  Defendants deny the remaining allegations contained in Paragraph 90 of the Complaint.

91.     For example, at a Workshop in South Jordan, Utah in October 2017 (the "South Jordan Workshop"), the speaker, Doug Clark, claimed that consumers should seek this third-party financing to allow consumers to do real estate transactions quickly.  In the following excerpts from that Workshop, Clark spoke at length about (i) why consumers purportedly need immediate funding to complete deals (in addition to Defendants' own promised funding, which purportedly may take three weeks); and (ii) how Defendants found a third-party company that provides "seed

capital" for start-up and household company names to help students obtain such immediate ("zero

percent") financing to do deals:

> A.   "My preferred method for you to do that is our funding, no surprise.  But to be
> completely transparent with you, some of these deals you should probably fund
> quicker than it takes to get the money in place.  I don't want you to wait, I want you
> to do what's best for you.  Now we can fund your deals, but it takes about three
> weeks, that's why I told you 21 days, expect that.  Here's why.  Because if you look
> at all the students worldwide, today's Friday, it's not even at 1:00, I don't know,
> because I'm not near the office, so here's my assumption . . . is that today is like
> most all days and there could be, there could be anywhere from 600 to 800 deals
> that could have come through the office so far today already of students wanting to
> fund deals, probably like something like that, right.  Well they all go in the queue
> and we have to check them and verify them, which is good for you because then
> our system goes what is it, let's verify times, dates, stamp, boom, ba, if something's
> wrong, we go something's wrong.  You don't pay anything for that, we just check
> it, right.  But to fund that many deals in 50 States, I'm teaching you guys nationally,
> we're talking about Salt Lake because we're sitting here.  I'm teaching you how to
> be a national investor, it's all the same to me, it's all on the computer.  But I don't
> want you to wait three weeks, if you've got something that's so good, write a check
> and do the deal, I don't know – just do it, fund it, get it done. . . ."
>
> ". . . . But we came up with a solution.  Now what's interesting is I was looking for
> a way to help my students that maybe like didn't have as much financial means as
> some people do, right. . . . so I, I searched for it, I'm thinking how can I help my
> students that don't have tons and tons of money when they begin, how can I help
> them get ahead boost.  And what's interesting is my wealthiest clients actually like
> the product the most, but it makes sense because it's other people's money.  So
> here's what we did, we found a company that does start-ups and they do household
> names, the Aldis, the Subways, the Seven Eleven's, all these things there.  The
> company itself is called [the Nevada Company] and they provide seed capital for
> business. . . ."
>
> ". . . . Now, here's the program.  They offer our students anywhere from 50 to 150
> grand just based on credit.  Our average client in about a five-minute process gets
> anywhere from 80 to 100 grand standing by, and that's not the best part.  The best
> part is zero percent.  Zero percent locked in guaranteed for a certain time frame
> depending on the person, and the zero percent can be extended."

> B.   "If you, if you have great credit and want to do it, fantastic.  If you're on the fence
> or whatever, it doesn't affect your credit, you can try, it doesn't make any difference
> to me.  But I, I can look you in the eye and tell you this, it has been the single
> biggest boost to the start of students that I have seen added in years, period.  And
> what's funny is I kind of figured like my mid-level students would use it, and they

do, but my wealthiest are like zero percent, where, what, what. They're the first ones on the computers every time."

**RESPONSE TO PARAGRAPH NO. 91:**  Defendants deny that Paragraph 91 of the Complaint accurately or completely characterizes what was said and presented to students at the referenced workshop and therefore deny the allegations contained in Paragraph 91.

92.      In fact, the third-party companies referenced by Workshop speakers do not provide financing for real estate transactions. Rather, they simply apply for a half dozen or more credit cards in consumers' names. As with Defendants' attempts to encourage consumers to raise their credit limits, the real purpose of encouraging consumers to seek funding through these third-party companies is to increase the amount of credit consumers have available to purchase one of Defendants' Advanced Training packages.

**RESPONSE TO PARAGRAPH NO. 92:**  Defendants deny that Paragraph 92 of the Complaint accurately or completely characterizes what was presented to students at workshops and therefore deny the allegations contained in Paragraph 92.

93.      Defendants have primarily referred consumers to a Nevada company (hereinafter, the "Nevada Company").

**RESPONSE TO PARAGRAPH NO. 93:**  Defendants admit that Defendant Response has, in the past, referred certain students to a Nevada company. Defendants deny the remaining allegations contained in Paragraph 93 of the Complaint.

94.      The Defendants induced approximately 3,700 consumers to sign up with the Nevada Company from March 2016 to June 2018. The Nevada Company used by Defendants typically charged consumers a service fee of at least $3,000 from the personal credit cards they obtained for the consumer. From at least ██████████████████████, the Nevada Company paid the Defendants a referral fee of ████ for each consumer they signed up during Defendants'

48

Workshops.  The Nevada Company paid the referral fees by issuing checks addressed to a Nudge subsidiary, Box Home Loans, to Sanderson's attention.

**RESPONSE TO PARAGRAPH NO. 94:**  Defendants lack knowledge or information sufficient to form a belief regarding the truth of the allegations contained in the first two sentences of Paragraph 94 of the Complaint and on this basis deny these allegations.  Defendants admit that they received a referral fee of ███ for approximately 400 to 500 students who ultimately chose to contract with the Nevada Company, and that these fees were paid by check to Box Home Loans in connection with a contemplated technology integration between the companies.  Defendants deny the remaining allegations contained in Paragraph 94 of the Complaint.

95.    The Nevada Company presents contracts to the consumers titled "Business Consulting Services Agreements" that refer to the consumer as its "client."   The Nevada Company's contracts state that the consumer "retains and hires [the Nevada Company] to provide consulting services and assistance related to establishing financial and credit account on behalf" of the consumer and the consumer's business.  Consumers are typically left with the impression that the Nevada Company will act in the consumers' interests and for their benefit.  However, the Defendants and the Nevada Company instead coordinate with each other concerning the use of consumers' credit.

**RESPONSE TO PARAGRAPH NO. 95:**  Defendants lack knowledge or information sufficient to form a belief regarding the truth of the allegations contained in the first three sentences of Paragraph 95 of the Complaint and on this basis deny these allegations.  Defendants deny the remaining allegations contained in Paragraph 95 of the Complaint.

96.    Unbeknownst to the consumers, the Nevada Company keeps Defendants updated as to the status of the consumers' credit card applications.  The Defendants coordinate their sales

pitches to consumers for additional services with the Nevada Company when the consumers obtained new credit cards.

**RESPONSE TO PARAGRAPH NO. 96:**  Defendants deny the allegations contained in Paragraph 96 of the Complaint.

97.     For example, in June 2017, a Response employee emailed a principal of the Nevada Company, asking for a breakdown of a consumer's available credit to use for another potential sale of a training package for nearly thirty thousand dollars: "we are going to discuss an investment w/[consumer] this evening after hours the most it would be is $29,600.  Could we get a breakdown of what cards to use?  Please don't contact the client about the investment as we have not discussed it with them yet, thanks."

**RESPONSE TO PARAGRAPH NO. 97:**   Defendants admit that Paragraph 97 of the Complaint quotes a portion of an email sent by a Response employee.  Defendants deny any characterization of that communication and otherwise deny the allegations of Paragraph 97 of the Complaint.

98.     The Nevada Company also coordinated closely with Defendants to overcome consumers' concerns about Defendants' products and services.  For example, in May 2017, an email among several Nevada Company employees stated:  "Can you have someone from Nudge reach out to [a consumer] right away?  He has some questions and concerns about his training, he feels like he might be getting scammed by them."  A Nevada Company principal forwarded the email to a Response employee, stating: "Just passing along exactly what the student is telling us.  Looks like he might benefit from a little extra love."

**RESPONSE TO PARAGRAPH NO. 98:**  Defendants admit that Paragraph 98 of the Complaint quotes a portion of an email received by a Response employee.  Defendants deny any

characterization of that communication and otherwise deny the allegations of Paragraph 98 of the Complaint.

99.     The Workshop speakers told consumers that if they purchased the Advanced Training packages, they would receive: (a) specialized, non-public software that would enable consumers to find cash buyers and discounted properties; (b) specialized access to mentors or experts who would answer all their questions and work with them to complete real estate deals; and (c) access to exclusive deals at the Buying Summit events that included "turnkey" or "cash flowing" investment properties that had been fixed up and already had paying tenants in place.

**RESPONSE TO PARAGRAPH NO. 99:**  Defendants deny that the allegations contained in Paragraph 99 of the Complaint accurately or completely characterize what speakers said and presented to students at the three-day workshops and therefore deny those allegations.

100.     These claims are false.

**RESPONSE TO PARAGRAPH NO. 100:**  Defendants deny the allegations contained in Paragraph 100 of the Complaint.

101.     Consumers who purchase the Advanced Training do not receive specialized, non-public software that enables them to find discounted properties or cash buyers.  Instead, consumers receive a licensed software product that provides information that is widely accessible by the public for minimal cost.

**RESPONSE TO PARAGRAPH NO. 101:**  Defendants deny the allegations contained in Paragraph 101 of the Complaint.

102.     Consumers who purchase the Advanced Training do not receive personalized access to experts or mentors as promised to complete real estate deals.

51

**RESPONSE TO PARAGRAPH NO. 102:**  Defendants deny the allegations contained in Paragraph 102 of the Complaint.

103.    In numerous instances, consumers who attended the Buying Summit did not get access to turnkey and "cash flowing" rehabbed rental properties.  Instead, as detailed below, in numerous instances, consumers who bought properties at the Buying Summit incurred, and continue to incur, significant losses because Defendants sold the properties at inflated prices and because the properties did not have paying tenants in place and needed significant repairs.

**RESPONSE TO PARAGRAPH NO. 103:**  Defendants deny the allegations contained in Paragraph 103 of the Complaint.

104.    Defendants encourage consumers to purchase the Advanced Training packages by representing that consumers are likely to earn substantial income from the Advanced Trainings.

**RESPONSE TO PARAGRAPH NO. 104:**  Defendants deny the allegations contained in Paragraph 104 of the Complaint.

105.    Defendants' earnings representations take many forms.

**RESPONSE TO PARAGRAPH NO. 105:**  Defendants deny the allegations contained in Paragraph 105 of the Complaint.

106.    In numerous instances, the Workshop speakers claim that the Advanced Trainings are part of an exclusive, proven system that has helped the speakers themselves and many students succeed quickly, and that even someone with no real estate experience can do at least one real estate deal a month and make money.

**RESPONSE TO PARAGRAPH NO. 106:**  Defendants deny the allegations contained in Paragraph 106 of the Complaint.

107.    For example, at the South Jordan Workshop, the speaker, Doug Clark, made the following representations:

A.    "This is us funding your deals.  Whatever you want to call it.  I call it transactional funding, and this is my – one of my favorite sections to teach, because this is how we make money together.  And if you've never had a massive, extremely powerful, large, national company that makes money when you do, you are going to enjoy the result more than anything you've ever seen."

B.    "So the question is, how many of those do you want to do a month? Start thinking about it.  Tomorrow morning I'm going to have you start writing down goals.  I'm going to have you write down goals. . . . if someone is new, scared, and never done real estate, has kids, grandkids, loves going to the fair, loves going up the mountains, doesn't really like to do a lot, and really has a fear of real estate, then I'm like do one a month. Start with one a month."

C.    "So the [Diamond Elite] 360 is kind of unique.  It's a private invite only club. . . . It's a special group, and here's the thing. Is 38,000 a lot of money?  It's all relative. . . . So if it was a – if it's a program that never goes away, has software that automates it for you, and here is the coolest part.  It comes with a three transaction guarantee. (Inaudible) Three transaction guarantee.  Clearly I'm only willing to do that for people that I think I can get through three transactions pretty quickly and pretty efficiently.  Now, the thing I always get from people is what happened at three?  You get a high-five.  It's a lifetime program.  It doesn't go away.  Like three is what I want to get to quickly, because you know what? People who get to three get to ten.  People who get to ten get to – does that make sense."

D.    "I got stories you wouldn't believe if I told you, who all successfully – know this, all over the world right now . . . He toured I want to say 16 countries, that might have come up, successfully doing this program, successfully doing what Shawn taught over and over and over. Some retired, some retired early.  Families working together.  All types of stuff.  You name it, I got it.  The common thread was they joined the system.  They got plugged in, they got help. . . . When I train people, like my goal is, is this, okay, there's a path that I know.  Now it took me years and years and years to learn this, but I condensed it down.  Here's how I condensed it down.  I go you know what, for those who want extra help, here's what I know works, it's called let's immediately, as in starting tomorrow, let's get you on the software and you can fire in offers tomorrow, boom, as many as you want, nationwide. . ."

**RESPONSE TO PARAGRAPH NO. 107:**  Defendants deny that Paragraph 107 of the Complaint accurately or completely characterizes what was said and presented to students at the referenced workshop and therefore deny the allegations contained in Paragraph 107.

108.    In addition, in numerous instances, the Workshop speakers often discuss real estate deals where they claim to have earned substantial income using the same tools and system that the consumers will be able to access.

**RESPONSE TO PARAGRAPH NO. 108:**  Defendants deny that Paragraph 108 of the Complaint accurately or completely characterizes what was taught at the workshops and therefore deny the allegations contained in Paragraph 108.

109.    In numerous instances, the Workshop speakers refer to purported purchasers of Defendants' Advanced Training who made substantial income from rental properties purchased at the Buying Summit or from other tools and services included in the Advanced Trainings.

**RESPONSE TO PARAGRAPH NO. 109:**  Defendants deny that Paragraph 109 of the Complaint accurately or completely characterizes what was taught at the workshops and therefore deny the allegations contained in Paragraph 109.

110.    In numerous instances, the Workshop speakers go over "hypothetical" real estate transactions to purportedly help calculate various costs where the consumer's profit often equals tens of thousands of dollars or more.

**RESPONSE TO PARAGRAPH NO. 110:**  Defendants deny that Paragraph 110 of the Complaint accurately or completely characterizes what was taught at the workshops and therefore deny the allegations contained in Paragraph 110.

111.    In numerous instances, Defendants' sales representatives at the Workshop repeat and expand on these earnings claims when they meet privately with consumers during the Workshop by telling consumers they will recoup the purchase price of the Advanced Trainings.

**RESPONSE TO PARAGRAPH NO. 111:**  Defendants deny that Paragraph 111 of the Complaint accurately or completely characterizes what was taught at the workshops and therefore deny the allegations contained in Paragraph 111.

112.    In numerous instances, Defendants' sales representatives at the Workshop advise consumers that the Advance Trainings provide the consumer with a system to generate significant income, and that the consumer should treat the endeavor as a business.

**RESPONSE TO PARAGRAPH NO. 112:**  Defendants deny that Paragraph 112 of the Complaint accurately or completely characterizes what was taught at the workshops and therefore deny the allegations contained in Paragraph 112.

113.    In addition, in numerous instances, once Defendants refer consumers during the Workshop to the Nevada Company for funding, the Nevada Company representatives reinforce these earnings claims.  For example, the Nevada Company representatives tell consumers during the credit card application process that the consumers could expect to earn thousands of dollars per deal or per month from Defendants' system and even as much as one hundred thousand dollars for the following year.

**RESPONSE TO PARAGRAPH NO. 113:**  Defendants lack knowledge or information sufficient to form a belief regarding the truth of the allegations contained in Paragraph 113 of the Complaint and on this basis deny these allegations.

114.    In numerous instances, the Nevada Company representatives advised consumers to state on credit card applications that their projected income from their real estate investments would be $100,000 or more.  The Nevada Company documented these projections in "Ability to Pay" worksheets (which in many cases reflected over a 200% increase in the consumers' actual current income).

**RESPONSE TO PARAGRAPH NO. 114:**  Defendants lack knowledge or information sufficient to form a belief regarding the truth of the allegations contained in Paragraph 114 of the Complaint and on this basis deny these allegations.

115.     Defendants' executives, including Sanderson, had knowledge that the Nevada Company was inflating consumers' income when applying for credit cards.  For example, in January 2017, one of Defendants' executives emailed Sanderson:  "We've heard from that [Nevada Company] is telling them to state larger incomes than the student really makes.  Just curious if that is their practice?"  This practice continued for another year after this exchange and stopped only after Defendants learned that they were the subjects of an FTC investigation.

**RESPONSE TO PARAGRAPH NO. 115:**  Defendants deny the allegations contained in Paragraph 115 of the Complaint.

116.     Defendants typically make an earnings related disclaimer at the beginning of the Workshops, which states in part: "We provide real estate education and training.  We do not sell a business opportunity, such as a franchise business.  We make no earnings or return on investment claims or guarantees," and that "[t]he case studies provided are from our presenters and trainers, and may be examples from some of our top students who have shared their success with us.  These results may not be typical.  Many of our students do not apply the education and strategies and therefore do not make money.  Many of these students purchased additional education and training materials."

**RESPONSE TO PARAGRAPH NO. 116:**  Defendants admit that Defendant Response made clear and conspicuous disclaimers, including but not limited to the one quoted in part in Paragraph 116 of the Complaint, in the beginning and throughout each workshop event.  Defendants deny the remaining allegations contained in Paragraph 116.

117.    Despite such brief disclaimers, Defendants' repeated representations over the course of the three-day Workshops leave consumers with the net impression that they are likely to earn substantial income from the Advanced Trainings.

**RESPONSE TO PARAGRAPH NO. 117:**  Defendants deny the allegations contained in Paragraph 117 of the Complaint.

118.    Defendants' earnings claims are false.  The overwhelming majority of consumers who purchase the Advanced Trainings do not earn substantial income.  In most instances, consumers who purchase the Advanced Trainings make no money and do not recoup the cost of the Advanced Trainings.

**RESPONSE TO PARAGRAPH NO. 118:**  Defendants expressly deny the allegations contained in the first sentence of Paragraph 118 of the Complaint.  Defendants state that they have many students who are successful in real estate investing after purchasing and using Response's training.  Defendants otherwise lack knowledge or information sufficient to form a belief regarding the truth of the remaining allegations contained in Paragraph 118 and on this basis deny these allegations.

119.    For many consumers, their financial loss is not limited to the purchase amount paid for the Workshop and Advanced Training.  Defendants continue to target consumers for additional sales even after they paid for the Advanced Training.

**RESPONSE TO PARAGRAPH NO. 119:**  Defendants deny the allegations contained in Paragraph 119 of the Complaint.

120.    From at least 2012 through at least mid-2016, Defendants through BuyPD and its many subsidiaries marketed and sold real estate properties at the Buying Summits (later called Investor Expos) to consumers who purchased Advanced Training.

**RESPONSE TO PARAGRAPH NO. 120:**  Defendants admit that, between 2012 and mid-2016, BuyPD and its subsidiaries offered for sale and sold real estate properties at the Buying Summits (later called Investor Expos) to students who purchased training beyond the three-day workshop.  Defendants deny the remaining allegations contained in Paragraph 120 of the Complaint.

121.    Defendants acquired these properties from a handful of third-party companies (the "Property Sourcers").  The Property Sourcers typically purchased distressed properties and purportedly provided some degree of repair or renovation, and then sold the properties to one of dozens of BuyPD subsidiaries.

**RESPONSE TO PARAGRAPH NO. 121:**  Defendants deny the allegations contained in Paragraph 121 of the Complaint.

122.    In 2016, Defendants arranged for the Property Sourcers to sell the properties directly to consumers at the Buying Summit.  In this arrangement, Defendants received a "commission" from the Property Sourcers that was paid to a Nudge affiliated entity, Nudge Real Estate, LLC.

**RESPONSE TO PARAGRAPH NO. 122:**  Defendants admit that, in 2016, Defendant BuyPD permitted third-party property sellers to engage with students at the Buying Summit who were interested in purchasing properties, and that Nudge Real Estate, LLC received a small commission from the third-party property owners for sales that were consummated.  Defendants deny the remaining allegations contained in Paragraph 122 of the Complaint.

123.    From 2012 through 2016, Defendants held the Buying Summits each month in a ballroom at the Luxor Hotel in Las Vegas.  Several hundred consumers often attended the Summits

as part of the Advanced Training packages they purchased at the Workshops.  The Summits often started on a Wednesday for registration and ended on a Saturday evening.

**RESPONSE TO PARAGRAPH NO. 123:**  Defendants admit that, from 2012 to 2016, Defendant BuyPD held a Buying Summit generally each month in a hotel ballroom in Las Vegas, which certain students who had purchased additional training after completing the workshop would attend.  Defendants further admit that the BuyPD summits often started on a Wednesday and ended on the following Saturday.  Defendants deny the remaining allegations contained in Paragraph 123 of the Complaint.

124.    When consumers arrived, they had to complete an "investor profile," which asked for the amount of funds they had available to invest.  The Defendants used these profiles to identify the consumers who had the most funds and placed these consumers in the front of the ballroom during the Summit.  The consumers who Defendants identified as having less money were placed in the back of the ballroom.

**RESPONSE TO PARAGRAPH NO. 124:**  Defendants deny the allegations contained in Paragraph 124 of the Complaint.

125.    The main speaker at the Buying Summit often was Kory Thurston, who acted as the host.  Thurston introduced to the consumers so-called "strategic partners" who were purportedly there to help the consumers accomplish their goals.  The "strategic partners" included BuyPD's "property specialists," funding "partners," and real estate lawyers.

**RESPONSE TO PARAGRAPH NO. 125:**  Defendants admit that Kory Thurston was the host of several of BuyPD's Buying Summits.  Defendants deny that the remaining allegations contained in Paragraph 125 of the Complaint accurately or completely characterize what Mr. Thurston said and presented at the Buying Summits and therefore deny those allegations.

126.     Consumers were encouraged to commit to buy properties while at the Buying Summit and use the "strategic partners" that were at the Buying Summit to fund and complete those transactions.  The Buying Summit speakers told consumers that if they waited to think about a property it would be gone.

**RESPONSE TO PARAGRAPH NO. 126:**  Defendants deny that Paragraph 126 of the Complaint accurately or completely characterizes what was said and presented to students at the Buying Summits and therefore deny the allegations contained in Paragraph 126.

127.     Consumers received appointment cards indicating when they would meet with a purported property specialist.  BuyPD encouraged the property specialists to sell the rental properties at the Buying Summit.  Sanderson oversaw the property specialists from 2012 to 2015, and he often led weekly meetings on sales techniques.  These techniques included finding the consumers' "pain points" and overcoming their "objections" to buying, such as, that the property was not located near the consumer or was out of the consumer's price range.

**RESPONSE TO PARAGRAPH NO. 127:**  Defendants admit that certain students received appointment cards indicating when they would meet with a representative.  Defendants further admit that Mr. Sanderson, as a corporate officer of BuyPD, managed the representatives between 2013 and 2015.  Defendants deny the remaining allegations contained in Paragraph 127 of the Complaint.

128.     The Buying Summit speakers encouraged consumers to use "leverage" or financing to purchase more than one property so they could benefit from the supposed appreciation in the properties' values.

**RESPONSE TO PARAGRAPH NO. 128:**  Defendants deny that Paragraph 128 of the Complaint accurately or completely characterizes what was said and presented to students at the Buying Summits and therefore deny the allegations contained in Paragraph 128.

129.    The Buying Summit speakers also encouraged consumers to use the financing offered by BuyPD's "strategic partners," American Cash Funding and Insider's Cash, which are actually subsidiaries of BuyPD.  BuyPD's funding "partners" offered consumers two and three-year interest only loans where consumers had to repay the entire principal amount in one "balloon" payment at the end of the loan term.  Defendants typically charged consumers an upfront "origination" fee of several thousand dollars equal to ten percent or more of the loan amount.

**RESPONSE TO PARAGRAPH NO. 129:**  Defendants deny that the first and second sentences of Paragraph 129 of the Complaint accurately or completely characterize what was said and presented to students at the Buying Summits and therefore deny the allegations contained in those sentences.  Defendants deny the remaining allegations contained in Paragraph 129.

130.    The Buying Summit speakers told consumers that the funding partners normally funded only up to 50% of the property sale but would provide funding up to 66% or 75% of the consumers' purchase price of properties sold at the Buying Summit.

**RESPONSE TO PARAGRAPH NO. 130:**  Defendants deny that Paragraph 130 of the Complaint accurately or completely characterizes what was said and presented to students at the Buying Summits and therefore deny the allegations contained in Paragraph 130.

131.    The Buying Summit speakers claimed that consumers could use these loans as "bridge loans" where they could pay off the monthly interest payments with the supposed rental payment income from the properties and then refinance the loans with a bank.

**RESPONSE TO PARAGRAPH NO. 131:**  Defendants deny that Paragraph 131 of the Complaint accurately or completely characterizes what was said and presented to students at the Buying Summits and therefore deny the allegations contained in Paragraph 131.

132.    The Buying Summit speakers also encouraged consumers to transfer their savings into self-directed Individual Retirement Accounts ("self-directed IRAs") that could be used to buy the rental properties.  Beginning in April 2013, Defendants primarily steered consumers to a Nevada entity that set up consumers' self-directed IRAs during the Buying Summit.  This Nevada entity split the fees it charged consumers with the Defendants, and has paid Defendants more than ███████ since April 2013.

**RESPONSE TO PARAGRAPH NO. 132:**  Defendants deny that the first two sentences of Paragraph 132 of the Complaint accurately or completely characterize what was said and presented to students at the Buying Summits and therefore deny those allegations.  Defendants admit that the Nevada entity paid BuyPD approximately ██████ since April 2013.  Defendants deny the remaining allegations contained in Paragraph 132 of the Complaint.

133.    Most consumers funded their property purchases from Defendants by either taking out a loan from BuyPD or by making payments from a self-directed IRA account they opened at the Buying Summit.

**RESPONSE TO PARAGRAPH NO. 133:**  Defendants deny the allegation that most consumers funded their property purchases by taking out a loan from BuyPD.  Defendants lack knowledge or information sufficient to form a belief regarding the truth of the remaining allegations contained in Paragraph 133 and on this basis deny these allegations.

134.    Consumers met with the BuyPD property specialists at the Buying Summit in a side room next to the main ballroom. Other "strategic partners," including the self-directed IRA custodians, sat in the same side room.

**RESPONSE TO PARAGRAPH NO. 134:**  Defendants admit that, in many instances, students met with BuyPD representatives at the Buying Summit in a room adjacent to or in the back of the main ballroom.  Defendants further admit that other third-party service providers, including those who could provide self-directed IRA services, were also available in the same room.  Defendants deny the remaining allegations contained in Paragraph 134 of the Complaint.

135.    The BuyPD property specialists each had a computer terminal screen and showed consumers the properties for sale on their screens.  In at least 2013, the BuyPD property specialists referred consumers to a "Ready Prop" website at the domain readyprop.com, which provided photos as well as a "Suggested Retail Price" and a "Price" for the rental properties.  The "Suggested Retail Price" was higher than the "Price" amount, which was the price offered to the consumer. The BuyPD property specialists were directed to tell consumers that the higher "Suggested Retail Price" was based on sales comparables.

**RESPONSE TO PARAGRAPH NO. 135:**  Defendants admit that BuyPD representatives used a computer terminal screen to permit students to scroll through and view information and pictures of properties available for sale.  Defendants further admit that in 2013, certain BuyPD representatives referred students to the website at the domain readyprop.com, which provided photographs and pricing information for the properties.  Defendants deny the remaining allegations contained in Paragraph 135 of the Complaint.

136.    By 2015, the BuyPD property specialists referred consumers to an "Income Property USA" website at the domain buy.incomepropertyusa.com, which represented that the

rental properties were "Cash flowing," "Projected to appreciate dramatically," and "Majority are already tenanted (with term contract)." These statements are consistent with what BuyPD property specialists were instructed to tell consumers about the rental properties.

**RESPONSE TO PARAGRAPH NO. 136:** Defendants admit that, by 2015, BuyPD representatives referred students to the website at the domain buy.incomepropertyusa.com. Defendants deny that the allegations contained in Paragraph 136 of the Complaint accurately or completely characterize the information provided on that website. Defendants deny the remaining allegations contained in Paragraph 136 of the Complaint.

137.    At times in 2015, BuyPD property specialists provided consumers with a "Property Analysis Report" on offered rental properties during the sale process. These reports were prepared by BuyPD's acquisitions group and included a "Comparable Market Analysis" that purported to list sales that were similar or comparable to the property in order to help establish a price range and value for the property.

**RESPONSE TO PARAGRAPH NO. 137:** Defendants admit that, in certain instances in 2015, BuyPD representatives provided students with a Property Analysis Report on certain of the properties that were available for sale which included, among other information, a comparable market analysis that, among other things, listed sales that were similar or comparable to the property available for sale and that were used to help establish an estimated valuation for the property. Defendants deny that these reports were prepared by BuyPD's acquisitions group. Defendants deny the remaining allegations contained in Paragraph 137 of the Complaint.

138.    The comparables that BuyPD provided consumers were cherry-picked to justify BuyPD's price. They omitted property sales that were closer and in the same neighborhoods as the subject properties. The property sales that BuyPD omitted had substantially lower sales prices

than the purported "comparable" sales that BuyPD included in the reports to support BuyPD's higher offer price to the consumer.  The purported "comparable" sales that BuyPD listed included properties that were more than one mile away from the subject property (even though BuyPD's reports given to consumers claimed that the listed "comps are within 1 mile of property").

**RESPONSE TO PARAGRAPH NO. 138:**  Defendants deny the allegations contained in Paragraph 138 of the Complaint.

139.    Unbeknownst to consumers, Defendants often marketed and sold properties to consumers at prices marked up as much as 20% more than what Defendants would pay for them. In many instances, Defendants sold the properties to consumers at significant markups within days after they had executed agreements to buy the properties themselves, and did so, before their own purchases had closed.

**RESPONSE TO PARAGRAPH NO. 139:**  Defendants deny the allegations contained in Paragraph 139 of the Complaint.

140.    Consumers selected properties shown to them on the BuyPD property specialist's computer screen by clicking on a "Buy Now" button before time on a countdown clock expired. Defendants' "sales support" team then prepared a sales contract for the consumer to sign before they left the Buying Summit.

**RESPONSE TO PARAGRAPH NO. 140:**  Defendants deny that the allegations contained in Paragraph 140 of the Complaint fully and accurately describe the property sales process at the Buying Summit and afterwards, and therefore deny those allegations.

141.    In numerous instances, Defendants prepared and encouraged consumers to sign a "Limited Power of Attorney" form designating a purported law firm located in Nevada, American Legal & Escrow, LLC ("American Legal"), as the consumer's attorney relating to the property.

American Legal had no employees in Nevada and no physical office there. It was formed in December 2013 by a Utah attorney who: (i) represents the Defendants in consumer disputes, among other matters; (ii) whose office is in the Lindon Building, and (iii) who is Lewis's brother-in-law.  One of the American Legal individuals designated as the consumer's attorney on the "Limited Power of Attorney" forms worked at BuyPD and is one of Poelman's sisters.

**RESPONSE TO PARAGRAPH NO. 141:**  Defendants deny that Defendants prepared Limited Power of Attorney forms.  Defendants admit that BuyPD, at times, encouraged students to sign limited power of attorney forms.  Defendants deny any characterization of those forms different from their express terms.  Defendants lack sufficient information to either admit or deny the allegations in the second sentence of Paragraph 141 of the Complaint and therefore deny them. Defendants admit the allegations contained in the third and fourth sentences of Paragraph 141 of the Complaint but note that such information is irrelevant.  Defendants otherwise deny the allegations contained in Paragraph 141 of the Complaint.

142.    The Buying Summit speakers typically repeated and expanded on claims made earlier at the Workshop that the rental properties at the Buying Summit are: (1) "turnkey" properties that are "cash flowing" with renters and property managers in place; and (2) are available at "wholesale" or below market value prices.

**RESPONSE TO PARAGRAPH NO. 142:**  Defendants deny that Paragraph 142 of the Complaint accurately or completely characterizes what was said and presented to students at the Buying Summits, and therefore deny the allegations contained in Paragraph 142.

143.    The Buying Summit speakers made other representations about the condition of the properties sold at the Buying Summit, including that all properties for sale at the Buying Summit

had been "rental rehabbed" and vetted by BuyPD to ensure that the properties were not something different from how they were represented.

**RESPONSE TO PARAGRAPH NO. 143:** Defendants deny that Paragraph 143 of the Complaint accurately or completely characterizes what was said and presented to students at the Buying Summits, and therefore deny the allegations contained in Paragraph 143.

144. BuyPD also marketed and sold at the Buying Summit the loans that BuyPD, through its subsidiaries, provided consumers to purchase the properties. In this way, Defendants transferred the default risk from loans they issued to consumers to other consumers at the Buying Summit. Consumers who purchased these loans (which BuyPD referred to as "trust deeds") were assigned BuyPD's rights and interests in the loan agreements, including the right to all remaining payments due on the loans.

**RESPONSE TO PARAGRAPH NO. 144:** Defendants admit that BuyPD made available for sale and, in certain instances, sold at the Buying Summits the promissory notes executed by students who purchased a property to other students who attended the Buying Summit, and that these were generally referred to as "trust deeds." Defendants further admit that students who purchased trust deeds were assigned all rights and interest in the promissory notes, including the right to all remaining payments due on the promissory notes. Defendants deny the remaining allegations contained in Paragraph 144 of the Complaint.

145. The Buying Summit speakers claimed that the trust deeds sold at the Summit were safe and "low risk" investments and that the Defendants would buy them back if the debtor defaulted for whatever reason.

**RESPONSE TO PARAGRAPH NO. 145:**  Defendants deny that Paragraph 145 of the Complaint accurately or completely characterizes what was said and presented to students at the Buying Summits, and therefore deny the allegations contained in Paragraph 145.

146.    These representations about the properties and trust deeds were false.

**RESPONSE TO PARAGRAPH NO. 146:**  Defendants deny the allegations contained in Paragraph 146 of the Complaint.

147.    In numerous instances, consumers who purchased properties at the Buying Summit discovered that the properties were not worth what they paid, did not have paying tenants in place, and were not "rental rehabbed" or otherwise in the condition Defendants represented. In addition, consumers incurred expenses and costs that far exceeded whatever rents were collected.

**RESPONSE TO PARAGRAPH NO. 147:**  Defendants deny that Paragraph 147 of the Complaint accurately or completely characterizes what BuyPD representatives said and presented during the Buying Summit, and therefore deny that portion of Paragraph 147.  With respect to the remaining allegations contained in Paragraph 147, Defendants lack knowledge or information sufficient to form a belief regarding the truth of the matters asserted, and on this basis deny these allegations.

148.    In numerous instances, consumers discovered they could not refinance the loans they obtained at the Buying Summit because the loan amounts exceeded the properties' value based on independent appraisals.

**RESPONSE TO PARAGRAPH NO. 148:**  Defendants lack knowledge or information sufficient to form a belief regarding the truth of the allegations contained in Paragraph 148 of the Complaint and on this basis deny these allegations.

149.    In numerous instances, consumers defaulted on the loans they obtained at the Buying Summits to purchase the properties.  For example, 20% of the 510 loans BuyPD made to consumers from March 2015 through December 2015 defaulted.  (Defendants' loan default rate is almost double the highest residential loan delinquency rate of 11.36% reported by the Federal Reserve during the Great Recession in early 2010. See Federal Reserve website, www.federalreserve.gov/releases/chargeoff/delallnsa.htm.)

**RESPONSE TO PARAGRAPH NO. 149:**  Defendants admit that some consumers defaulted on loans obtained at the Buying Summits.  Defendants lack sufficient information to either admit or deny the remaining allegations contained in Paragraph 149 and therefore deny them.

150.    In numerous instances, consumers had to sell the properties for substantially less than they had paid for the properties at the Buying Summits.

**RESPONSE TO PARAGRAPH NO. 150:**  Defendants lack knowledge or information sufficient to form a belief regarding the truth of the allegations contained in Paragraph 150 of the Complaint and on this basis deny these allegations.

151.    In some instances, Defendants offered to "refinance" consumers' loans just before the balloon payment became due and charged them another fee of at least a thousand dollars to extend the loan and delay the balloon repayment obligation.  In some instances, in 2016 and 2017, Defendants then sold the "refinanced" loans through another affiliated entity, Sterling Capital, LLC, to other consumers.  In at least several instances, consumers who purchased the "refinanced" loans discovered after the loans defaulted that the loan amounts far exceeded the market values of the properties securing the loans.

**RESPONSE TO PARAGRAPH NO. 151:**   Defendants admit that BuyPD offered to facilitate a refinance of some students' loans and that students were charged a modest fee for such facilitation.   Defendants further admit that, in 2016 and part of 2017, students participated in certain refinanced loans with other students through Sterling Capital, LLC, but deny that Sterling Capital, LLC funded the refinanced loans.   Defendants lack knowledge or information sufficient to form a belief regarding the truth of the allegations contained in the third sentence of Paragraph 151 of the Complaint and on this basis deny these allegations.   Defendants deny the remaining allegations contained in Paragraph 151.

152.     By 2015, several BuyPD sales representatives told Sanderson and another manager about concerns that BuyPD sold properties at the Buying Summit for more than their appraised values.

**RESPONSE TO PARAGRAPH NO. 152:**   Defendants deny the allegations contained in Paragraph 152 of the Complaint.

153.     In the summer of 2015, BuyPD sales representatives also conveyed their concerns to their managers and Poelman that consumers were given "comp reports" that included BuyPD sales to other consumers.   The BuyPD sales representatives were concerned that by using other BuyPD sales as comparables, they were "giving legitimacy" to inflated sale prices.

**RESPONSE TO PARAGRAPH NO. 153:**   Defendants deny the allegations contained in Paragraph 153 of the Complaint.

154.     Even consumers who purchase Advanced Training are targeted for additional sales. Defendants target these consumers with telemarketing calls pitching additional products, including purported personalized coaching services under the brand name "The Inner Circle."

**RESPONSE TO PARAGRAPH NO. 154:**  Defendants admit that certain students who completed real estate education training purchased after the three-day workshop were offered additional real estate education training and coaching through telemarketing calls, including those services provided through the Inner Circle program.  Defendants deny the remaining allegations contained in Paragraph 154 of the Complaint.

155.    Defendants tell consumers that they will get access to a mentor and insider tips to help them do profitable real estate deals if they pay for the Inner Circle coaching program.

**RESPONSE TO PARAGRAPH NO. 155:**  Defendants deny that Paragraph 155 of the Complaint accurately and completely characterizes what students were told about the Inner Circle program and therefore deny the allegations contained in Paragraph 155.

156.    Defendants' telemarketers were instructed to maximize the sale amount they could get from each consumer.

**RESPONSE TO PARAGRAPH NO. 156:**  Defendants deny the allegations contained in Paragraph 156 of the Complaint.

157.    Defendants kept track of how much their telemarketers sold to each consumer by tracking each telemarketer's "dollar per lead" ("DPL") amount, which was the sum of all sales made to a set number of consumer leads divided by the number of leads.  The telemarketers discussed their DPLs and acceptable DPL levels with Smith.

**RESPONSE TO PARAGRAPH NO. 157:**  Defendants admit the allegations contained in Paragraph 157 as to Defendant Response, but deny those allegations as to the other Defendants.

158.    Defendants' telemarketers had access to the forms that consumers filled out at the Workshops detailing their personal finances.  Defendants' telemarketers also used scripts that

instructed them to ask about the consumers' personal financial situation, including their credit card limits and savings.

**RESPONSE TO PARAGRAPH NO. 158:**  Defendants admit that in certain very limited cases in the past, Response's telemarketers had access to forms completed by students at the three-day workshops and that certain of Response's telemarketers asked personal questions.  Defendants deny the remaining allegations contained in Paragraph 158.

159.    In numerous instances, Defendants' telemarketers tell consumers that they will use this personal financial information to assess whether the consumer would be an appropriate candidate for the program.

**RESPONSE TO PARAGRAPH NO. 159:**  Defendants admit the allegations contained in Paragraph 159 as to Defendant Response, but deny those allegations as to the other Defendants.

160.    The Defendants' representations about how they use consumers' financial information are false.

**RESPONSE TO PARAGRAPH NO. 160:**  Defendants deny the allegations contained in Paragraph 160 of the Complaint.

161.    Defendants' telemarketers do not use this information to assess a consumer's qualifications for the program.  Instead, Defendants use this information to decide how much to charge consumers for the one-on-one coaching program.  Defendants charge consumers several thousand dollars, and as much as $20,000, to enroll in this program.  Defendants' telemarketers had discretion to set the cost of the program based in part on what the consumers had available in terms of credit and assets.

**RESPONSE TO PARAGRAPH NO. 161:**  Defendants deny the allegations contained in Paragraph 161 of the Complaint.

162.    In numerous instances, Defendants' telemarketers encouraged consumers to purchase the coaching program by representing that consumers who purchase the program are likely to earn substantial income from future real estate deals.

**RESPONSE TO PARAGRAPH NO. 162:**  Defendants deny the allegations contained in Paragraph 162 of the Complaint.

163.    Defendants' earnings representations lead consumers to believe that they will be able to recoup the cost of their purchases of the coaching program and earn several thousand dollars a month from future real estate deals.

**RESPONSE TO PARAGRAPH NO. 163:**  Defendants deny the allegations contained in Paragraph 163 of the Complaint.

164.    For example, Defendants' telemarketers typically tell consumers about consumers who made money after purchasing the coaching program.

**RESPONSE TO PARAGRAPH NO. 164:**  Defendants deny the allegations contained in Paragraph 164 of the Complaint.

165.    In addition, the scripts used by Defendants' telemarketers instruct them to tell consumers that: "typically our clients average 6 to 12 months to complete their 1st couple of transactions.  While we cannot offer any guarantees, and your results may vary, generally students are able to complete their first real estate transaction within the first few months of starting the education."

**RESPONSE TO PARAGRAPH NO. 165:**  Defendants deny that Paragraph 165 of the Complaint accurately and completely characterizes the scripts and therefore deny the allegations contained in Paragraph 165.

166.    Defendants' earnings claims are false.

**RESPONSE TO PARAGRAPH NO. 166:**  Defendants deny the allegations contained in Paragraph 166 of the Complaint.

167.     The overwhelming majority of students who purchase the coaching program do not earn substantial income and do not complete a real estate transaction within months of starting the purported one-on-one coaching.

**RESPONSE TO PARAGRAPH NO. 167:**  Defendants deny the allegations contained in Paragraph 167 of the Complaint.

168.     From at least 2015 through at least 2017, Nudge held company bi-annual retreats in April and November.  At these retreats, the Individual Defendants and several other executives discussed strategic and operational matters for Response and BuyPD, including: using online marketing strategies to improve the brand image, adding "credibility" to Workshop speakers, collecting and distributing consumer data profiles obtained at the Workshops, implementing new policies on BuyPD's asset sales at the Buying Summits, selling additional services and products to consumers, and responding to consumer concerns.

**RESPONSE TO PARAGRAPH NO. 168:**  Defendants admit that retreats were held to discuss the operations of and strategy for the business.  Defendants deny that Paragraph 168 accurately characterizes what was discussed at those retreats, and therefore deny the remaining allegations contained in Paragraph 168.

169.     For example, in April 2015, the Nudge retreat agenda listed ███████████████

███████████████████████████████████████████████████████

███████████████████████████████████

**RESPONSE TO PARAGRAPH NO. 169:**  Defendants admit that retreats were held to discuss the operations of and strategy for the business.  Defendants deny that Paragraph 169

accurately characterizes what was discussed at those retreats, and therefore deny the remaining allegations contained in Paragraph 169.

170.    In November 2016, the Nudge retreat agenda referenced 

**RESPONSE TO PARAGRAPH NO. 170:**  Defendants admit that retreats were held to discuss the operations of and strategy for the business.  Defendants deny that Paragraph 170 accurately characterizes what was discussed at those retreats, and therefore deny the remaining allegations contained in Paragraph 170.

171.    In the Fall of 2017, the Nudge retreat agenda listed

**RESPONSE TO PARAGRAPH NO. 171:**  Defendants admit that retreats were held to discuss the operations of and strategy for the business.  Defendants deny that Paragraph 171 accurately characterizes what was discussed at those retreats, and therefore deny the remaining allegations contained in Paragraph 171.

172.    The Individual Defendants also opened several merchant accounts used by the Nudge Enterprise to conduct business.  A "merchant account" is a type of account that allows a business to receive payments from customers by credit and debit card.  A merchant account is linked to a routine depository bank account.  When a consumer makes a purchase and pays by credit or debit card, that purchase transaction is processed through the seller's merchant account, and then the sale proceeds are deposited into the seller's depository bank account.

**RESPONSE TO PARAGRAPH NO. 172:** Defendants admit that certain of the Corporate Defendants opened the merchant accounts required to process the volume of business engaged in by the Corporate Defendants. Defendants deny the remaining allegations contained in the first sentence of Paragraph 172 of the Complaint. Defendants admit the allegations contained in the second, third, and fourth sentences of Paragraph 172.

173. From 2011 to 2015, Finnegan signed applications for merchant accounts in the name of Evtech Media on behalf of the Nudge Enterprise.

**RESPONSE TO PARAGRAPH NO. 173:** Defendant Finnegan admits that he signed applications for merchant accounts in the name of Evtech Media, but notes that this information is irrelevant. Defendant Finnegan denies the remaining allegations of Paragraph 173. The remaining Defendants lack knowledge or information sufficient to form a belief regarding the truth of the allegations contained in Paragraph 173 and on this basis deny these allegations.

174. From 2012 to 2015, Poelman's brother signed applications for merchant accounts in the name of BuyPD and its affiliated entities, Veil Corporate, Insider's Cash, and Income Property USA, LLC, on behalf of the Nudge Enterprise.

**RESPONSE TO PARAGRAPH NO. 174:** Defendants admit that Mr. Poelman's brother, while the lawful and registered owner of BuyPD, signed applications for certain merchant accounts, but note that this information is irrelevant. Defendants deny the remaining allegations contained in Paragraph 174 of the Complaint.

175. In 2014 and 2015, Smith signed applications for merchant accounts in the name of Response's affiliated entities, Response North, LLC, Constat Medium, LLC, and Constat Primum, LLC, on behalf of the Nudge Enterprise.

**RESPONSE TO PARAGRAPH NO. 175:**  Defendant Smith admits that he signed applications for Response's affiliated entities Response North, LLC, Constat Medium, LLC, and Constat Primum, LLC, but notes that this information is irrelevant.  Defendants deny the remaining allegations contained in Paragraph 175 of the Complaint.

176.    In July and November 2015, over twenty merchant accounts opened in the names of Evtech Media, Response North, and Veil Corporate on behalf of the Nudge Enterprise were closed by American Express for "excessive fraud" and "violation of standards."

**RESPONSE TO PARAGRAPH NO. 176:**  Defendants admit that in July and November 2015, American Express suspended certain merchant accounts held by Evtech Media, Response North, and Veil Corporate, but Defendants note that many of these accounts were subsequently re-opened by American Express and transactions continued to be processed.  Defendants note further that this information is irrelevant.  Defendants deny the remaining allegations in Paragraph 176 of the Complaint.

177.    The Individual Defendants also opened and maintained multiple commercial bank accounts to receive, redistribute, and withdraw funds from the credit and debit card sales transactions generated by the Nudge Enterprise.

**RESPONSE TO PARAGRAPH NO. 177:**  Defendants Sanderson and Lewis deny the allegations contained in Paragraph 177 of the Complaint.  Defendants Poelman, Smith and Finnegan admit that they each opened and maintained commercial bank accounts that were used to receive and transfer funds from credit and debit card sales of Defendants Response and BuyPD.  Defendants deny the remaining allegations contained in Paragraph 177 of the Complaint.

178.    Beginning in 2014, funds from operating bank accounts for Response and BuyPD (in the names of Evtech Media, LLC, Response North, LLC, and BuyPD, LLC) were transferred

77

into bank accounts in the name of Building One, LLC and, later, 415NG, LLC, which were used to fund construction related expenses for the Lindon Building and the use of a private airplane for the Nudge Enterprise.

**RESPONSE TO PARAGRAPH NO. 178:** Defendants admit the allegations contained in Paragraph 178 of the Complaint, except that Defendants deny the characterization of the "Nudge Enterprise" in Paragraph 178.

179.    From at least 2015 through 2016, millions of dollars were also transferred from the operating bank accounts for Response and BuyPD into a Nudge bank account.  Poelman and his sister are the only signatories on this Nudge bank account, which was used to disburse these funds as profit distributions to the Individual Defendants and several other executives.

**RESPONSE TO PARAGRAPH NO. 179:**   Defendants admit that between 2015 and approximately 2016, funds were transferred from operating bank accounts for Response and BuyPD into a Nudge bank account, that Poelman and his sister were the only signatories on said Nudge bank account, that certain of these funds were distributed as profit to the Individual Defendants and other executives of Response and BuyPD, and note that this information is irrelevant.   Defendants deny the remaining allegations contained in Paragraph 179 of the Complaint.

180.    Since 2015, the Individual Defendants collectively received over $30 million dollars from the following bank accounts used by Defendants to receive and redistribute consumer payments: Nudge, LLC, BuyPD, LLC, Response North, LLC, Response Live, LLC, Evtech Media, LLC, and Acumen Advantage, LLC.

**RESPONSE TO PARAGRAPH NO. 180:** Defendants deny the allegations contained in Paragraph 180 of the Complaint.

181.    Poelman and Lewis each received over $10 million through various entities each controls (KBBP, LLC, Net Media, LLC, Eddie Steve, LLC, OneExtreme, LLC, and Black Drive, LLC for Lewis, and All Source Marketing, 4145 Associates, Distant Path, LLC, Strange Range, LLC, and LC Lake, LLC for Poelman).  Smith received more than $5 million through entities he controls (Smith Business Enterprises and KTSE Real Estate LLC).  Finnegan received more than $4 million through entities he controls (Thermalday, LLC and Media Buzz, LLC).

**RESPONSE TO PARAGRAPH NO. 181:**  Defendants admit that Poelman, Lewis, Smith and Finnegan each received money from entities that they each, respectively, controlled, but note that this information is irrelevant.  Defendants deny the remaining allegations contained in Paragraph 181 of the Complaint.

182.    Based on the facts and violations of law alleged in this Complaint, the FTC and the Division have reason to believe that Defendants are violating or are about to violate laws enforced by the Commission and the Division.

**RESPONSE TO PARAGRAPH NO. 182:**  Defendants deny the allegations contained in Paragraph 182 of the Complaint.

## THE FTC ACT CLAIMS

183.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

**RESPONSE TO PARAGRAPH NO. 183:**  Defendants admit that the allegation contained in Paragraph 183 of the Complaint is an accurate recitation of part of the referenced statute.  To the extent any further responsive pleading is required, Defendants deny the allegation.

184.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

**RESPONSE TO PARAGRAPH NO. 184:** Paragraph 184 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendants lack sufficient information to either admit or deny the allegation and therefore deny it.

185.    As set forth below, Defendants are engaging in violations of Section 5(a) of the FTC Act in connection with the marketing and sale of their real estate investment related products and services.

**RESPONSE TO PARAGRAPH NO. 185:** Defendants deny the allegations contained in Paragraph 185 of the Complaint.

<div align="center">

**COUNT ONE – ALLEGED MISREPRESENTATION (EARNINGS)**

**(By Plaintiff Federal Trade Commission)**

</div>

186.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of their real estate investment related products and services, Defendants have represented, directly or indirectly, expressly or by implication, that consumers who purchase and use their products and services are likely to earn substantial income.  Such representations include that consumers who purchase the Workshops or the Advanced Trainings are likely to earn several thousand dollars monthly.

**RESPONSE TO PARAGRAPH NO. 186:** Defendants deny the allegations contained in Paragraph 186 of the Complaint.

187.    In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 186, consumers who purchased Defendants' products and services did not earn substantial income.

**RESPONSE TO PARAGRAPH NO. 187:** Defendants deny the allegations contained in Paragraph 187 of the Complaint.

188.    Defendants' representations as set forth in Paragraph 186 are false or misleading or were not substantiated at the time the representations were made, and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**RESPONSE TO PARAGRAPH NO. 188:**  Defendants deny the allegations contained in Paragraph 188 of the Complaint.

## COUNT TWO – ALLEGED MISREPRESENTATION (PRODUCTS AND SERVICES PROVIDED)

### (By Plaintiff Federal Trade Commission)

189.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of their real estate investment related products and services, Defendants have represented, directly or indirectly, expressly or by implication, that they will provide tools and/or access to one or more of the following:

(a)    funding to do real estate deals without having the consumers put any of their own money down;

(b)    properties at discounted or wholesale prices;

(c)    "cash buyers;"

(d)    personalized assistance from experts or mentors who will walk consumers through completing real estate deals;

(d)[sic]"turnkey" or "cash flowing" properties at the Buying Summit;

(e)    properties in "rental rehabbed" condition, or free of certain defects, at the properties in "rental rehabbed" condition, or free of certain defects, at the Buying Summit or

(f)    "low risk" trust deeds at the Buying Summit.

**RESPONSE TO PARAGRAPH NO. 189:** Defendants deny that Paragraph 189 of the Complaint accurately or completely characterizes statements made by the Corporate Defendants and therefore deny the allegations contained in Paragraph 189.

190.    In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 189, Defendants did not provide the products and services they represented they would provide.

**RESPONSE TO PARAGRAPH NO. 190:** Defendants deny the allegations contained in Paragraph 190 of the Complaint.

191.    Therefore, Defendants' representations as set forth in Paragraph 189 are false and misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**RESPONSE TO PARAGRAPH NO. 191:** Defendants deny the allegations contained in Paragraph 191 of the Complaint.

## COUNT THREE – ALLEGED MISREPRESENTATION (NEED FOR FINANCIAL INFORMATION AND PURPOSE OF SEEKING ADDITIONAL CREDIT)

### (By Plaintiff Federal Trade Commission)

192.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of their real estate investment related products and services, Defendants have represented, directly or indirectly, expressly or by implication, that they need consumers' financial information to advise consumers on funding real estate deals or to determine whether consumers are qualified for one of their programs.

**RESPONSE TO PARAGRAPH NO. 192:** Defendants deny that Paragraph 192 of the Complaint accurately or completely characterizes statements made by the Corporate Defendants and therefore deny the allegations contained in Paragraph 192.

193.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of their real estate investment related products and services, Defendants have represented, directly or indirectly, expressly or by implication, that consumers should increase their existing credit card limits and apply for additional financing to do real estate deals.

**RESPONSE TO PARAGRAPH NO. 193:**  Defendants deny that Paragraph 193 of the Complaint accurately or completely characterizes statements made by the Corporate Defendants and therefore deny the allegations contained in Paragraph 193.

194.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 192, Defendants do not use consumers' financial information as they represented. Instead, the Defendants use consumers' financial information to decide how much to charge them for one of their Advanced Training packages and Inner Circle program.

**RESPONSE TO PARAGRAPH NO. 194:**  Defendants deny the allegations contained in Paragraph 194 of the Complaint.

195.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 193, Defendants encourage consumers to increase their existing credit card limits and apply for additional financing not to fund real estate deals, but to convince consumers to purchase the Defendants' Advanced Training packages with their newly-available credit.

**RESPONSE TO PARAGRAPH NO. 195:** Defendants deny the allegations contained in Paragraph 195 of the Complaint.

196.     Therefore, Defendants' representations as set forth in Paragraphs 192 and 193 are false and misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**RESPONSE TO PARAGRAPH NO. 196:** Defendants deny the allegations contained in Paragraph 196 of the Complaint.

<div align="center">

**THE TELEMARKETING SALES RULE CLAIM**

</div>

197.    In 1994, Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108. The FTC adopted the TSR in 1995, extensively amended it in 2003, and amended certain sections thereafter.

**RESPONSE TO PARAGRAPH NO. 197:** Paragraph 197 of the Complaint purports to characterize the statutes and regulations referenced therein.  To the extent a response is required, Defendants deny the characterizations contained in Paragraph 197.

198.    Defendants are "sellers" or "telemarketers" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. §§ 310.2(dd), (ff), and (gg).

**RESPONSE TO PARAGRAPH NO. 198:** The allegations of Paragraph 198 purport to offer a legal conclusion to which no response is required.  To the extent a response is required, Defendants admit that Defendant Response sold some services through telemarketing.  Defendants deny the remaining allegations contained in Paragraph 198 of the Complaint.

199.    The TSR prohibits sellers and telemarketers from "[m]isrepresenting, directly or by implication, in the sale of goods and services . . . [a]ny material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer."  16 C.F.R. § 310.3(a)(2)(iii).

**RESPONSE TO PARAGRAPH NO. 199:** Defendants admit that Paragraph 199 of the Complaint accurately quotes part of the cited Regulation.  To the extent that any further responsive pleading is required, Defendants deny the allegations contained in Paragraph 199.

200.     The TSR prohibits sellers and telemarketers from "[m]aking a false or misleading statement to induce any person to pay for goods or services. . . ." 16 C.F.R. § 310.3(a)(4).

**RESPONSE TO PARAGRAPH NO. 200:**  Defendants admit that Paragraph 200 of the Complaint accurately quotes part of the cited Regulation.  To the extent that any further responsive pleading is required, Defendants deny the allegations contained in Paragraph 200.

201.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).  Pursuant to Section 4 of the Telemarketing Act, 15 U.S.C. § 6103(f)(2), the Division is authorized to bring civil actions to enforce the TSR.

**RESPONSE TO PARAGRAPH NO. 201:**  Defendants admit that Paragraph 201 accurately characterizes portions of the cited statutes.  To the extent that any further responsive pleading is required, Defendants deny the allegations contained in Paragraph 201 of the Complaint.

### COUNT FOUR – ALLEGED MISREPRESENTATION (PERFORMANCE, EFFICACY, NATURE, ESSENTIAL CHARACTERISTICS)

### (By Plaintiffs Federal Trade Commission and Utah Division of Consumer Protection)

202.     In numerous instances, in connection with telemarketing offers to sell the Inner Circle program, Defendants have misrepresented, directly or indirectly, expressly or by implication, material aspects of the performance, efficacy, nature, or central characteristics of the Inner Circle one-on-one coaching services, such as that consumers who purchase the Inner Circle program are likely to earn substantial income.

**RESPONSE TO PARAGRAPH NO. 202:**  Defendants deny the allegations contained in Paragraph 202 of the Complaint.

203.    Defendants' acts or practices, as set forth in Paragraph 202, are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a)(2)(iii) and (a)(4).

**RESPONSE TO PARAGRAPH NO. 203:**  Defendants deny the allegations contained in Paragraph 203 of the Complaint.

## THE UCSPA CLAIMS

204.    The UCSPA prohibits suppliers from committing deceptive and unconscionable acts or practices in connection with a consumer transaction, whether the act occurs before, during, or after the transaction. Utah Code §§ 13-11-4(1); 13-11-5(1).

**RESPONSE TO PARAGRAPH NO. 204:**  Paragraph 204 of the Complaint purports to characterize provisions of the UCSPA.  To the extent that any response is required, Defendants deny the characterizations contained in Paragraph 204.

205.    The Defendants engage in "consumer transaction[s]" by marketing and selling to "person[s]" products and services that are primarily for personal, family, or household purposes, or for purposes that relate to a business opportunity. Utah Code §§ 13-11-3(2), (5).

**RESPONSE TO PARAGRAPH NO. 205:**  Defendants deny the allegations contained in Paragraph 205 of the Complaint.

206.    Each Defendant is a "supplier" because they regularly solicit, engage in, or enforce consumer transactions, whether or not they deal directly with consumers. Utah Code § 13-11-3(6).

**RESPONSE TO PARAGRAPH NO. 206:**  Defendants deny the allegations contained in Paragraph 206 of the Complaint.

207.    As set forth below, the Defendants have violated the UCSPA by engaging in deceptive and unconscionable acts and practices in connection with the marketing and sale of their real estate investment related products and services.

**RESPONSE TO PARAGRAPH NO. 207:**  Defendants deny the allegations contained in Paragraph 207 of the Complaint.

## COUNT FIVE – ALLEGED DECEPTIVE ACTS OR PRACTICES (EARNINGS CLAIMS)

### (By Plaintiff Utah Division of Consumer Protection)

208.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of their real estate investment related products and services, Defendants have represented, directly or indirectly, expressly or by implication, that consumers who purchase and use their products and services are likely to earn substantial income. Such representations include that consumers who purchase the Workshops or the Advanced Trainings are likely to earn several thousand dollars monthly.

**RESPONSE TO PARAGRAPH NO. 208:**  Defendants deny the allegations contained in Paragraph 208 of the Complaint.

209.    In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 208, consumers who purchased Defendants' products and services did not earn substantial income.

**RESPONSE TO PARAGRAPH NO. 209:**  Defendants deny the allegations contained in Paragraph 209 of the Complaint.

210.    Defendants' representations as set forth in Paragraph 208 are false or misleading or were not substantiated at the time the representations were made, and constitute a deceptive act or practice in violation of the UCSPA, Utah Code § 13-11-4(1).

**RESPONSE TO PARAGRAPH NO. 210:**  Defendants deny the allegations contained in Paragraph 210 of the Complaint.

**COUNT SIX – ALLEGED DECEPTIVE ACTS OR PRACTICES (PRODUCTS AND SERVICES PROVIDED)**

**(By Plaintiff Utah Division of Consumer Protection)**

211. In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of their real estate investment related products and services, Defendants have represented, directly or indirectly, expressly or by implication, that they will provide tools and/or access to one or more of the following:

(a) funding to do real estate deals without having the consumers put any of their own money down;

(b) properties at discounted or wholesale prices;

(c) "cash buyers;"

(d) personalized assistance from experts or mentors who will walk consumers through completing real estate deals;

(d)[sic]"turnkey" or "cash flowing" properties at the Buying Summit;

(e) properties in "rental rehabbed" condition, or free of certain defects, at the Buying Summit; or

(f) "low risk" trust deeds at the Buying Summit.

**RESPONSE TO PARAGRAPH NO. 211:** Defendants deny that Paragraph 211 of the Complaint accurately or completely characterizes statements made by the Corporate Defendants and therefore deny the allegations contained in Paragraph 211.

212. In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 211, Defendants did not provide the products and services they represented they would provide.

**RESPONSE TO PARAGRAPH NO. 212:** Defendants deny the allegations contained in Paragraph 212 of the Complaint.

213.     Therefore, Defendants' representations as set forth in Paragraph 211 are false and misleading and constitute deceptive acts or practices in violation of the UCSPA, Utah Code § 1311-4(1).

**RESPONSE TO PARAGRAPH NO. 213:** Defendants deny the allegations contained in Paragraph 213 of the Complaint.

**COUNT SEVEN – ALLEGED DECEPTIVE ACTS OR PRACTICES (NEED FOR FINANCIAL INFORMATION AND PURPOSE OF SEEKING ADDITIONAL CREDIT)**

**(By Plaintiff Utah Division of Consumer Protection)**

214.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of their real estate investment related products and services, Defendants have represented, directly or indirectly, expressly or by implication, that they need consumers' financial information to advise consumers on funding real estate deals or to determine whether consumers are qualified for one of their programs.

**RESPONSE TO PARAGRAPH NO. 214:** Defendants deny that Paragraph 214 of the Complaint accurately or completely characterizes statements made by the Corporate Defendants and therefore deny the allegations contained in Paragraph 214.

215.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of their real estate investment related products and services, Defendants have represented, directly or indirectly, expressly or by implication, that consumers should increase their existing credit card limits and apply for additional financing to do real estate deals.

**RESPONSE TO PARAGRAPH NO. 215:** Defendants deny the allegations contained in Paragraph 215 of the Complaint.

216.    In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 214, Defendants do not use consumers' financial information as they represented. Instead, the Defendants use consumers' financial information to decide how much to charge them for one of their Advanced Training packages and Inner Circle programs.

**RESPONSE TO PARAGRAPH NO. 216:**  Defendants deny the allegations contained in Paragraph 216 of the Complaint.

217.    In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 215, Defendants encourage consumers to increase their existing credit card limits and apply for additional financing not to fund real estate deals, but to convince consumers to purchase the Defendants' Advanced Training packages with their newly-available credit.

**RESPONSE TO PARAGRAPH NO. 217:**  Defendants deny the allegations contained in Paragraph 217 of the Complaint.

218.    Therefore, Defendants' representations as set forth in Paragraphs 214 and 215 are 60 false and misleading and constitute a deceptive act or practice in violation of the UCSPA, Utah Code § 13-11-4(1).

**RESPONSE TO PARAGRAPH NO. 218:**  Defendants deny the allegations contained in Paragraph 218 of the Complaint.

**COUNT EIGHT – ALLEGED UNCONSCIONABLE ACTS OR PRACTICES
(EXPLOITING CONSUMERS' PERSONAL FINANCIAL INFORMATION TO
ENCOURAGE CONSUMERS TO INCUR DEBT OR OTHER FINANCIAL
OBLIGATIONS DEFENDANTS KNEW OR SHOULD HAVE KNOWN THE
CONSUMER COULD NOT REASONABLY REPAY OR AFFORD)**

**(By Plaintiff Utah Division of Consumer Protection)**

219.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of their real estate investment related products and services, Defendants represented to consumers that by purchasing Defendants' products and services, consumers would be able to generate substantial income and that high rates of consumers who previously purchased Defendants' products and services were successful.

**RESPONSE TO PARAGRAPH NO. 219:**  Defendants deny the allegations contained in Paragraph 219 of the Complaint.

220.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of their real estate investment related products and services, Defendants received from consumers detailed personal financial information, including the consumers' income, savings, and credit availability.

**RESPONSE TO PARAGRAPH NO. 220:**  Defendants deny the allegations contained in Paragraph 220 of the Complaint.

221.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of their real estate investment related products and services, Defendants together and in concert with others used consumers' personal financial information to encourage consumers to increase their existing credit card limits to apply for and open new credit cards, and to use savings and retirement funds purportedly to help launch consumers' real estate investment ventures.

**RESPONSE TO PARAGRAPH NO. 221:** Defendants deny the allegations contained in Paragraph 221 of the Complaint.

222.    In truth and in fact, Defendants together and in concert with others sought to use the consumers' newly-available credit, savings, and retirement funds to pay for Defendants' products or services that cost thousands or tens of thousands of dollars.

**RESPONSE TO PARAGRAPH NO. 222:** Defendants deny the allegations contained in Paragraph 222 of the Complaint.

223.    Defendants knew or should have known that their representations about earnings potential and success rates were false, misleading, and deceptive.

**RESPONSE TO PARAGRAPH NO. 223:** Defendants deny the allegations contained in Paragraph 223 of the Complaint.

224.    Defendants knew or should have known the financial condition of consumers whom they encouraged to increase existing credit card limits, open new credit cards, or to use savings and retirement funds.

**RESPONSE TO PARAGRAPH NO. 224:** Defendants deny the allegations contained in Paragraph 224 of the Complaint.

225.    Defendants knew or should have known that consumers would not reasonably be able to repay the significant cost of Defendants' products or services, particularly because Defendants knew or should have known that their representations about earnings potential and prior consumers' success were false, misleading, and deceptive.

**RESPONSE TO PARAGRAPH NO. 225:** Defendants deny the allegations contained in Paragraph 225 of the Complaint.

226.    Defendants' acts and practices were unconscionable because Defendants exploited consumers' financial information to sell products and services that Defendants knew or should have known would not enable consumers to generate significant income and be successful.

**RESPONSE TO PARAGRAPH NO. 226:** Defendants deny the allegations contained in Paragraph 226 of the Complaint.

227.    Defendants' acts and practices were unconscionable because Defendants encouraged consumers to incur significant debt and spend savings or retirement funds that Defendants, through their knowledge of consumers' financial information and through their knowledge of their own false representations, knew or should have known consumers would be unable to repay or recover.

**RESPONSE TO PARAGRAPH NO. 227:** Defendants deny the allegations contained in Paragraph 227 of the Complaint.

228.    Defendants seek to induce consumers to assume risks, including the obligation to repay tens of thousands of dollars of credit card debit, which materially exceed the benefits to the consumers of their transactions with Defendants.

**RESPONSE TO PARAGRAPH NO. 228:** Defendants deny the allegations contained in Paragraph 228 of the Complaint.

229.    Therefore, Defendants' acts and practices set forth in Paragraphs 219 to 228 constitute unconscionable acts and practices in violation of the UCSPA, Utah Code § 13-11-5(1).

**RESPONSE TO PARAGRAPH NO. 229:** Defendants deny the allegations contained in Paragraph 229 of the Complaint.

**THE BODA CLAIMS**

230. The BODA requires sellers of "assisted marketing plans" to annually file certain information with the Division. Utah Code § 13-15-4.

**RESPONSE TO PARAGRAPH NO. 230:** Paragraph 230 of the Complaint purports to characterize provisions of the BODA. To the extent a response is required, Defendants deny the allegations contained in Paragraph 230.

231. The BODA also requires sellers of assisted marketing plans to provide to prospective purchasers of the assisted marketing plans written disclosures at least ten days prior to execution of a purchase agreement or payment by the purchaser. Utah Code §§ 13-15-4; 1315-5.

**RESPONSE TO PARAGRAPH NO. 231:** Paragraph 231 of the Complaint purports to characterize provisions of the BODA. To the extent a response is required, Defendants deny the allegations contained in Paragraph 231.

232. Defendants' Workshop, Advanced Training, and Inner Circle products are "assisted marketing plans" as defined by Utah Code § 13-15-2(1)(a)(iv).

**RESPONSE TO PARAGRAPH NO. 232:** Defendants deny the allegations contained in Paragraph 232 of the Complaint.

233. Defendants are "sellers" of assisted marketing plans as defined by Utah Code § 13-15-2(8).

**RESPONSE TO PARAGRAPH NO. 233:** Defendants deny the allegations contained in Paragraph 233 of the Complaint.

234. As set forth below, Defendants have violated the BODA by failing to file required information with the Division, and by failing to provide required disclosures to prospective purchasers of Defendants' assisted marketing plans.

**RESPONSE TO PARAGRAPH NO. 234:** Defendants deny the allegations contained in Paragraph 234 of the Complaint.

## COUNT NINE – ALLEGED FAILURE TO FILE REQUIRED INFORMATION WITH THE DIVISION

### (By Plaintiff Utah Division of Consumer Protection)

235.    During the five years preceding this action, Defendants have offered and sold multiple different assisted marketing plans through a variety of corporate entities.

**RESPONSE TO PARAGRAPH NO. 235:** Defendants deny the allegations contained in Paragraph 235 of the Complaint.

236.    For each assisted marketing plan offered and sold by the Defendants, Defendants were required to file annually with the Division the information described by Utah Code § 1315-4.

**RESPONSE TO PARAGRAPH NO. 236:** Defendants deny the allegations contained in Paragraph 236 of the Complaint.

237.    During the five years preceding this action, Defendants have failed to file with the Division the information required by Utah Code § 13-15-4 with respect to any of the assisted marketing plans Defendants offered, sold, and continue to offer and sell.

**RESPONSE TO PARAGRAPH NO. 237:** Defendants deny the allegations contained in Paragraph 237 of the Complaint.

238.    As described in Paragraphs 235 to 237, Defendants violated the BODA by failing to file with the Division the information required by Utah Code § 13-15-4 for each assisted marketing plan Defendants offered, and for each year Defendants failed to file the required information while offering a given assisted marketing plan.

**RESPONSE TO PARAGRAPH NO. 238:** Defendants deny the allegations contained in Paragraph 238 of the Complaint.

## COUNT TEN – ALLEGED FAILURE TO PROVIDE REQUIRED DISCLOSURES TO PROSPECTIVE PURCHASERS

### (By Plaintiff Utah Division of Consumer Protection)

239.    During the five years preceding this action, Defendants have sold thousands of assisted marketing plans to consumers.

**RESPONSE TO PARAGRAPH NO. 239:** Defendants deny the allegations contained in Paragraph 239 of the Complaint.

240.    Defendants were required to provide certain disclosures to prospective purchasers of its assisted marketing plans in a single disclosure statement or prospectus at least ten business days prior to the execution of a consumer's agreement to purchase one of Defendants' plans, or ten business days prior to payment by the consumer of any consideration in exchange for the assisted marketing plan. Utah Code § 13-15-5.

**RESPONSE TO PARAGRAPH NO. 240:** Defendants deny the allegations contained in Paragraph 240 of the Complaint.

241.    Defendants did not provide the required disclosure statement or prospectus to any of the thousands of consumers who purchased one of Defendants' assisted marketing plans.

**RESPONSE TO PARAGRAPH NO. 241:** Defendants deny the allegations contained in Paragraph 241 of the Complaint.

242.    As described in Paragraphs 239 to 241, Defendants violated the BODA each time they sold an assisted marketing plan to a consumer without providing the required disclosure statement or prospectus.

**RESPONSE TO PARAGRAPH NO. 242:**  Defendants deny the allegations contained in Paragraph 242 of the Complaint.

## THE TFPA CLAIM

243.     The TFPA prohibits telephone soliciting businesses and solicitors from making or causing to be made any untrue material statements, or failing to disclose material facts necessary to make a statement not misleading. Utah Code § 13-26-11(1)(c).

**RESPONSE TO PARAGRAPH NO. 243:**  Paragraph 243 of the Complaint purports to characterize provisions of the TFPA.  To the extent a response is required, Defendants deny the allegations contained in Paragraph 243.

244.     The TFPA also prohibits any telephone soliciting business from causing or permitting any solicitor to violate the TFPA. Utah Code § 13-26-11(2)(a).

**RESPONSE TO PARAGRAPH NO. 244:**  Paragraph 244 of the Complaint purports to characterize provisions of the TFPA.  To the extent a response is required, Defendants deny the allegations contained in Paragraph 244.

245.     Defendants operate a telephone soliciting business as defined by Utah Code §1326-2(8).

**RESPONSE TO PARAGRAPH NO. 245:**  Defendants deny the allegations contained in Paragraph 245 of the Complaint.

246.     Defendants are solicitors because they make telephone solicitations, and cause telephone solicitations to be made. Utah Code §§ 13-26-2(9)(a), (b).

**RESPONSE TO PARAGRAPH NO. 246:**  Defendants deny the allegations contained in Paragraph 246 of the Complaint.

## COUNT ELEVEN – ALLEGEDLY UNTRUE MATERIAL STATEMENTS OR FAILURE TO DISCLOSE MATERIAL FACTS

### (By Plaintiff Utah Division of Consumer Protection)

247.    In numerous instances, in connection with telephone solicitations to sell the Inner Circle program, Defendants have misrepresented, directly or indirectly, expressly or by implication, material aspects of the performance, efficacy, nature, or central characteristics of the Inner Circle one-on-one coaching services, such as by representing that consumers who purchase the Inner Circle program are likely to earn substantial income.

**RESPONSE TO PARAGRAPH NO. 247:** Defendants deny the allegations contained in Paragraph 247 of the Complaint.

248.    Defendants' acts or practices, as described in Paragraph 247 above, are unlawful practices that violate the TFPA. Utah Code §§ 13-26-11(1)(c); 13-26-11(2)(a).

**RESPONSE TO PARAGRAPH NO. 248:** Defendants deny the allegations contained in Paragraph 248 of the Complaint.

## ALLEGED CONSUMER INJURY

249.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the TSR, the UCSPA, the BODA, and the TFPA. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

**RESPONSE TO PARAGRAPH NO. 249:** Defendants deny the allegations contained in Paragraph 249 of the Complaint.

250.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations

of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

**RESPONSE TO PARAGRAPH NO. 250:**  Defendants deny the allegations contained in Paragraph 250 of the Complaint.

251.    Section 19 of the FTC Act, 15 U.S.C. § 57b and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b) authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, including the rescission or reformation of contracts and the refund of money.

**RESPONSE TO PARAGRAPH NO. 251:**  Paragraph 251 purports to characterize the statutes and regulations referenced therein.  To the extent a response is required, Defendants deny the allegations contained in Paragraph 251 of the Complaint.

252.    The UCSPA authorizes this Court to enter a declaratory judgment that Defendants' acts or practices violate the UCSPA, to enjoin, in accordance with the principles of equity, any person who has violated, is violating, or is otherwise likely to violate the UCSPA, to award damages or relief on behalf of consumers for Defendants' violations of the UCSPA, to award a fine against Defendants for violations of the UCSPA in an amount determined by the Court, and to award the Division reasonable attorney's fees, court costs, and costs of investigation. Utah Code §§ 13-11-17(1)(a)-(d); 13-11-17.5.

**RESPONSE TO PARAGRAPH NO. 252:**  Paragraph 252 of the Complaint purports to characterize the statutes referenced therein.  To the extent a response is required, Defendants deny the allegations contained in Paragraph 252 of the Complaint.

253.    The BODA authorizes this Court, in addition to any other relief granted by the Court, to grant judgment and injunctive relief in favor of the Division, and to award the Division reasonable attorney's fees, costs of court, and investigative fees for Defendants' violations of the BODA. Utah Code § 13-15-6(3).

**RESPONSE TO PARAGRAPH NO. 253:**  Defendants deny the allegations contained in Paragraph 253 of the Complaint.

254.    The TFPA authorizes this Court to impose a civil penalty not exceeding $2,500 against the Defendants for each of Defendants' transactions that violated the TFPA. Utah Code § 13-26-8(2).

**RESPONSE TO PARAGRAPH NO. 254:**  Defendants deny the allegations contained in Paragraph 254 of the Complaint.

## PRAYER FOR RELIEF

**RESPONSE:** The allegations set forth on pages 67–68 of the Complaint entitled Prayer for Relief are requests for relief and, as such, require no response.  However, to the extent a response is required, Defendants deny that Plaintiffs are entitled to any relief from Defendants.

## AFFIRMATIVE DEFENSES

### FIRST DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

### SECOND DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrine of estoppel.

### THIRD DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrine of waiver.

## FOURTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrine of laches.

## FIFTH DEFENSE

This Court lacks subject matter jurisdiction to hear this action.

## SIXTH DEFENSE

Any consumer injury resulting from the activities alleged in the Complaint was legally and proximately caused by other persons, entities, or forces over which Defendants exerted no control and for which they had no responsibility.

## SEVENTH DEFENSE

Plaintiffs lack authority to seek disgorgement from Defendants.

## EIGHTH DEFENSE

To the extent the FTC is entitled to seek disgorgement from Defendants, the FTC's claim for disgorgement is subject to and barred by the five-year statute of limitations set forth in 28 U.S.C. § 2462.

## NINTH DEFENSE

Plaintiffs' claims for consumer redress from Defendants for alleged violations of the Telemarketing Sales Rule are subject to and barred by the three-year statute of limitations set forth in 15 U.S.C. § 57b(d).

## TENTH DEFENSE

The Division is barred from seeking disgorgement, civil penalties, and fines from Defendants for alleged violations of the UCSPA, BODA, and TFPA based on allegedly wrongful conduct that occurred on or before May 8, 2017. These remedies constitute a "penalty" under Utah law, and the one-year limitations period for actions "upon a statute . . . for a forfeiture or penalty

to the state" set forth in Utah Code § 78B-2-302(3) applies to requests for such relief based on challenged conduct that occurred on or before May 8, 2017.

## ELEVENTH DEFENSE

The FTC is not entitled to obtain equitable monetary relief from Defendants for alleged violations of the FTC Act brought pursuant to 15 U.S.C. § 53(b).

## TWELFTH DEFENSE

The FTC is not entitled to obtain relief from Defendants for alleged violations of the FTC Act brought pursuant to 15 U.S.C. § 53(b) because the FTC cannot demonstrate that it has a reason to believe that the Defendants are violating or are about to violate the FTC Act.

## THIRTEENTH DEFENSE

The actions of the FTC deprived Defendants of the procedural due process guaranteed by the Fifth Amendment to the U.S. Constitution.

## FOURTEENTH DEFENSE

The actions of the Division deprived Defendants of the procedural due process guaranteed by the Fourteenth Amendment to the U.S. Constitution and Section 7 of the Utah Declaration of Rights.

## FIFTEENTH DEFENSE

The filing requirements of the BODA, Utah Code § 13-15-4, compel speech in violation of the First Amendment to the U.S. Constitution.

## SIXTEENTH DEFENSE

The disclosure requirements of the BODA, Utah Code § 13-15-5, compel speech in violation of the First Amendment to the U.S. Constitution.

## SEVENTEENTH DEFENSE

Any actions taken against Defendants by the FTC under its present structure are invalid because the FTC's structure contravenes Article II of the U.S. Constitution.  Article II requires that Executive principal officers exercising law-enforcement power be removable at will by the President.  Although the FTC clearly exercises law-enforcement power, and its Commissioners are clearly principal officers, the FTC's Commissioners are shielded from at-will removal.

## EIGHTEENTH DEFENSE

The Division's attempt to enforce Utah law extraterritorially by imposing Utah's UCSPA and BODA and the TSR upon alleged conduct that occurred in states other than Utah is unconstitutional because it violates Defendants' substantive due process rights under the Fourteenth Amendment to the U.S. Constitution and Section 7 of the Utah Declaration of Rights.

## NINETEENTH DEFENSE

The Division's attempt to enforce Utah law extraterritorially by imposing Utah's UCSPA and BODA and the TSR upon alleged conduct that occurred in states other than Utah is unconstitutional because it violates the constitutional sovereignty interests of other states.

## TWENTIETH DEFENSE

The Division's attempt to enforce Utah law extraterritorially by imposing Utah's UCSPA and BODA and the TSR upon alleged conduct that occurred in states other than Utah is unconstitutional because it violates the constitutional principle of comity.

**TWENTY-FIRST DEFENSE**

The Division's BODA claims are barred for failure to satisfy statutory conditions precedent prior to filing suit.

**TWENTY-SECOND DEFENSE**

The Plaintiffs' claims violate Defendants' right to communicate truthful commercial speech guaranteed by the First Amendment to the United States Constitution.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38, Defendants hereby demand a trial by jury on all counts and issues so triable.

DATED this 4th day of February, 2020.

Respectfully Submitted,

By: /s/ Alan S. Mouritsen
   Erik A. Christiansen (Bar No. 7372)
   Zack L. Winzeler (Bar No. 12280)
   Alan S. Mouritsen (Bar No. 13558)
   Gregory H. Gunn (Bar No. 15610)
   **PARSONS BEHLE & LATIMER**
   201 South Main Street, Suite 1800
   P.O. Box 45898
   Salt Lake City, Utah 84111
   Telephone: (801) 532-1234
   EChristiansen@parsonsbehle.com
   ZWinzeler@parsonsbehle.com
   AMouritsen@parsonsbehle.com
   GGunn@parsonsbehle.com
   ecf@parsonsbehle.com

   Leonard L. Gordon (*pro hac vice*)
   Alexandra Megaris (*pro hac vice*)
   **VENABLE LLP**
   1270 Avenue of the Americas
   24th Floor
   New York, NY 10020
   Telephone:  (212) 370-6277

Fax:  (212) 307-5598
LLGordon@venable.com
AMegaris@venable.com

J. Douglas Baldridge (*pro hac vice*)
Stephen R. Freeland (*pro hac vice*)
Michael A. Munoz (*pro hac vice*)
**VENABLE LLP**
600 Massachusetts Ave., N.W.
Washington, D.C. 20001
Telephone:  (202) 344-4000
Fax:  (202) 344-8300
JBaldridge@venable.com
SRFreeland@venable.com
MAMunoz@venable.com

*Attorneys for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 4th day of February, 2020, I caused a true and correct copy of

the foregoing **REDACTED VERSION OF DEFENDANTS' FIRST AMENDED ANSWER**

**TO PLAINTIFFS' SELAED COMPLAINT FOR PERMANENT INJUNCTION AND**

**OTHER EQUITABLE RELIEF** to be served on the following by email:

*Attorneys for Plaintiff Federal Trade Commission*
**FEDERAL TRADE COMMISSION**
Darren H. Lubetzky (dlubetzky@ftc.gov)
Savvas S. Diacosavvas (sdiacosavvas@ftc.gov)
Brian N. Lasky (blasky@ftc.gov)
Christopher Y. Miller (cmiller@ftc.gov)
Laura A. Zuckerwise (lzuckerwise@ftc.gov)


*Attorneys for Plaintiff Utah Division of Consumer Protection*
**UTAH DIVISION OF CONSUMER PROTECTION**
Assistant Attorney General's Office
Thomas M. Melton (tmelton@agutah.gov)
Kevin M. McLean (kmclean@agutah.gov)
Robert G. Wing (rwing@agutah.gov)



/s/ Alan S. Mouritsen

106