# THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| FEDERAL TRADE COMMISSION; and UTAH DIVISION OF CONSUMER PROTECTION,<br><br>　　　　　　　Plaintiffs,<br><br>v.<br><br>NUDGE, LLC; RESPONSE MARKETING GROUP, LLC; BUYPD, LLC; BRANDON B. LEWIS; RYAN C. POELMAN; PHILLIP W. SMITH; SHAWN L. FINNEGAN; CLINT L. SANDERSON; DEAN R. GRAZIOSI; and SCOTT YANCEY,<br><br>　　　　　　　Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART BOTH [265] PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND [270] DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:19-cv-867-DBB-DAO<br><br>District Judge David Barlow<br><br>Magistrate Judge Daphne A. Oberg |

     In this enforcement action, Plaintiffs Federal Trade Commission (FTC) and Utah Division of Consumer Protection (UDCP) claim that Defendants have violated § 5 of the FTC Act,[1] the FTC's Telemarketing Sales Rule (TSR),[2] the Utah Consumer Sales Practices Act (UCSPA),[3] Utah's Business Opportunity Disclosure Act (BODA),[4] and Utah's Telephone Fraud Prevention Act (TFPA).[5] Both Plaintiffs and Defendants have moved for summary judgment on

---

[1] 15 U.S.C. § 45.

[2] *See* 16 C.F.R. § 310.3.

[3] *See* Utah Code § 13-11-1 (2019), *et seq.*

[4] *See* Utah Code § 13-15-1 (2019), *et seq.*

[5] *See* Utah Code § 13-26-1 (2019), *et seq.*

most of these claims.[6] Their motions are fully briefed and ready for decision.[7] For the following

reasons, both motions are GRANTED IN PART and DENIED IN PART.

## BACKGROUND[8]

Defendant Response Marketing Group, LLC (Response) is a Utah limited liability

company that sold various real estate training programs and services across the United States

until pausing operations pursuant to a stipulated preliminary injunction in this action in

December 2019.[9] To understand the claims and allegations against Response in this case, it is

helpful to note the successive sales strategy Response utilized to sell its training programs.[10] The

strategy began with advertising a free preview event about real estate investing in a designated

location through mailers, emails, infomercials, and online advertisements.[11] The advertisements

for these preview events were frequently marketed under brand names featuring "celebrity"

endorsers to attract customers.[12] Defendants Dean Graziosi and Scott Yancey were two of the

main "celebrity" endorsers Response used.[13] From 2015 through 2019 alone over 750,000

individuals attended one of Response's preview events.[14]

---

[6] *See* Plaintiffs' Motion for Summary Judgment Against All Defendants, ECF No. 265, filed October 18, 2021; Defendants' Motion for Summary Judgment, ECF No. 270, filed October 18, 2021.

[7] The court concludes that oral argument is not necessary to resolve these motions. *See* DUCivR 7-1(f).

[8] These facts are undisputed unless otherwise noted.

[9] Plaintiffs' Exh. 1, Defendants' First Amended Answer to Plaintiffs' First Amended Complaint at 10–11, ECF No. 265-3. Plaintiffs have numbered all of the exhibits submitted with their briefs sequentially from 1 to 84. For convenience, the court will cite to Plaintiffs' exhibits by these numbers. Defendants, in contrast, restarted the numbering for their exhibits with each brief submitted. The court will note which brief each exhibit accompanied when citing them. The court will provide ECF document numbers for all initial citations.

[10] *See* ECF No. 267 at 16 ¶ 30.

[11] Plaintiffs' Exh. 1, Defendants' First Amended Answer at 4, 26–27.

[12] *Id.* at 27.

[13] Plaintiffs' Exh. 18, Deposition of Che Oliver at 25–27, ECF No. 365-20.

[14] Plaintiffs' Exh. 1, Defendants' First Amended Answer at 4, 26.

During the preview events, Response's presenters provided a brief overview of multiple types of real estate transactions and investment strategies, focusing primarily on a strategy for flipping houses known as "wholesaling" (wholesale flips).[15] However, the purpose of the preview events was to advertise Response's training programs, particularly a three-day "workshop" that it typically conducted soon after, and in the same geographical location as, the preview event.[16] Response's presenters told attendees that in addition to receiving more training, those who participated in its workshops would receive special access to its "funding network," which would enable them to complete real estate transactions without using any of their own money.[17] Attendees were also told that the workshops included access to methods and tools, including software, that would help them find properties at discounted or below-market-value prices.[18] The enrollment fee for Response's workshops typically ranged from $199 to $1,997.[19] And from January 2015 until the commencement of this action, over 70,000 individuals enrolled in a workshop at an average cost of approximately $1,000.[20]

During the three-day workshops, Response offered its customers an opportunity to buy additional "Advanced Training" packages.[21] These packages varied, but they generally included access to additional live training, software, and online training videos and were typically offered

---

[15] *See* Plaintiffs' Exh. 23, Report of Defendants' Real Estate Expert Paul Habibi ¶¶ 17–19, ECF No. 265-25; *see also* Plaintiffs' Exh. 21, Deposition of Paul Habibi at 30–32, ECF No. 265-23. Defendants' expert Paul Habibi defined wholesaling as "a strategy through which investors seek to acquire a home at a discount to its fair market value, then look to transfer the property relatively quickly to another investor who will then perform the necessary improvements to the property and sell it to the final owner." Plaintiffs' Exh. 23, Habibi Rpt. ¶ 32.

[16] Plaintiffs' Exh. 1, Defendants' First Amended Answer at 23.

[17] Plaintiffs' Exh. 58, Declaration of Florence Hogan (FTC Investigator), Exh. B, Transcript of January 3, 2018 Preview Event at 27–28; *id.*, Exh. H, Transcript of July 17, 2019 Preview Event at 121:21–122:21.

[18] *Id.*, Exh. J, Transcript of Undated Preview Event at 36–38, 59:14–21; *id.*, Exh. L, Transcript of July 11, 2019 Preview Event at 96:5–14.

[19] Plaintiffs' Exh. 1, Defendants' First Amended Answer at 23.

[20] *Id.*; Plaintiffs' Exh. 12, Deposition of Clint Sanderson at 77:17–20, ECF No. 265-14.

[21] Plaintiffs' Exh. 1, Defendants' First Amended Answer at 24.

to workshop participants for anywhere from $19,000 to $40,000.[22] Between 2015 and 2019, over 30,000 customers purchased an Advanced Training package.[23]

Approximately one month after each three-day workshop, Response's telemarketers called customers who had purchased an Advanced Training package to try to sell them one of Response's "one-on-one coaching" programs.[24] During the initial call telemarketers, called "setters," told customers that the program was a unique opportunity to be paired with one of Response's real estate experts or top investors and that they were calling to determine whether the customers would be a good match for it.[25] The setters then proceeded to ask the customers about their finances and financial goals ostensibly for that purpose.[26] If the customers seemed open to participating in the program, the setters said they would make a recommendation to have the customers speak with a "senior consultant."[27] Shortly thereafter, these customers would receive a call from a second telemarketer, known as a "closer," who had been told by the setter how much money the customers had available to pay for a coaching program.[28] If customers

---

[22] *Id.*; Plaintiffs' Exh. 7, Deposition of Brandon Lewis at 113:25–114:8, ECF No. 265-9; Plaintiffs' Exh. 74, Declaration of Consumer Shelly Albertson, Exh. K, ECF No. 292-15; Plaintiffs' Exh. 78, Declaration of Consumer Juanita Gonzalez, Exh. H, ECF No. 292-19. At times, Response offered cheaper Advanced Training packages, but it appears they did so only after consumers had rejected the more expensive ones. *See infra* note 381 and accompanying text.

[23] Plaintiffs' Exh. 1, Defendants' First Amended Answer at 25.

[24] Plaintiffs' Exh. 7, Lewis Depo. at 126:10–128:11; Plaintiffs' Exh. 16, Deposition of Chris Brown at 41–42, 48, 56–57; Plaintiffs' Exh. 19, Deposition of Casey Poppinga at 54:17–57:22, ECF No. 265-21. These programs were usually called the "Inner Circle" or "Protégé" programs. The Protégé program was offered to every consumer who purchased Advanced Training, while the Inner Circle program was offered only to those who purchased the most expensive Advanced Training packages. Plaintiffs' Exh. 19, Poppinga Depo. at 57:7–22.

[25] *See* Plaintiffs' Exh. 1, Defendants' First Amended Answer at 75–76; Plaintiffs' Exh. 10, Deposition of Phil Smith at 121:12–122:16, ECF No. 265-12; Plaintiffs' Exh. 59, Declaration of Michael Marino (FTC Investigator), Exh. O at 29:9–11, ECF No. 267-3; *see also* ECF No. 287 at 24.

[26] *See* Plaintiffs' Exh. 1, Defendants' First Amended Answer at 75–76; Plaintiffs' Exh. 10, Smith Depo. at 121:12–122:16; Plaintiffs' Exh. 59, Marino Decl., Exh. O at 29:9–11; *see also* ECF No. 287 at 22–24.

[27] Plaintiffs' Exh. 16, C. Brown Depo. at 67:22–68:10; *see also* ECF No. 287 at 23.

[28] Plaintiffs' Exh. 16, C. Brown Depo. at 124:2–126:20.

desired to purchase a coaching program for the price quoted by the closer, they were transferred to a "registration agent."[29] In the midst of verifying customers' personal and payment information, registration agents read a script that asked customers to confirm that "no earnings claims ha[d] been presented" and informed them of Response's seven-day cancellation policy.[30] Response's one-on-one coaching packages ranged in price from $1,495 to almost $38,000, and at least 5,143 consumers purchased one between January 2016 and November 2019.[31]

Defendants BuyPD, LLC (BuyPD), and Nudge, LLC (Nudge) are connected to Response in two ways.[32] The first is through business relationships. From 2012 through the end of 2017, BuyPD and Response hosted events known as "Buying Summits" or "Investor Expos" that consumers who had purchased an Advanced Training package were permitted to attend.[33] BuyPD originally bought properties from third parties and sold them to Response's customers at these events, but it began allowing Response's customers to buy directly from the third parties in mid-2016.[34] Response and BuyPD also operated out of the same building in Lindon, Utah from 2015 through 2016.[35] Nudge's business relationship with Response and BuyPD included providing payroll and benefit services as well as consulting services.[36]

The second way BuyPD and Nudge are connected to Response is through management and ownership. Although Defendant Phil Smith is officially the sole owner of Response, it

---

[29] Plaintiffs' Exh. 10, Smith Depo. at 150:8–151:10.

[30] *Id.*; *see also* Plaintiffs' Exh. 60, Supplemental Declaration of Daniel Larsen, Exh. A, ECF No. 265-64.

[31] Plaintiffs' Exh. 56, Declaration of Plaintiffs' Expert Patrick McAlvanah ¶ 2, ECF No. 265-58; Plaintiffs' Exh. 59, Marino Decl., Exh. Y.

[32] Response, BuyPD, and Nudge will be referred to collectively, when needed, as the "Corporate Defendants."

[33] Plaintiffs' Exh. 1, Defendants' First Amended Answer at 6, 24–25, 61–62; Plaintiffs' Exh. 7, Lewis Depo. at 183:15–184:13.

[34] Plaintiffs' Exh. 1, Defendants' First Amended Answer at 6, 24–25, 61–62.

[35] *Id.* at 9–12.

[36] *Id.* at 61–62; Plaintiffs' Exh. 7, Lewis Depo. at 13:1–17:9, 23:2–5.

effectively operates as a partnership between Smith and Defendants Brandon Lewis, Ryan Poelman, and Shawn Finnegan (collectively, the "Response Partners"), with each taking a share of Response's profits pursuant to an oral agreement.[37] Smith is Response's CEO.[38] Finnegan—who owned a company acquired by Response in 2016, Evtech Media, LLC (Evtech)—is Response's Vice President and Chief Executive of Sales.[39] Lewis, who was formerly President of Evtech, is an advisor to Response.[40] And Poelman is Response's Director of Operations.[41] BuyPD is owned by Poelman, who is also its CEO, but most of the Response Partners invested in and received distributions from it.[42] And Nudge was established, owned, and managed by Lewis and Poelman to receive compensation for consulting services they provided to Response.[43]

The last individual Defendant, Clint Sanderson, has been Response's President and Chief Operating Officer since May 2015, before which he was Chief Sales Officer for BuyPD.[44] Sanderson reports directly to the Response Partners and has discussed Response's operations and strategies with them in weekly sales and partner meetings and at times during biannual retreats.[45]

---

[37] Plaintiffs' Exh. 7, Lewis Depo. at 19:17–20:15; Plaintiffs' Exh. 8, Deposition of Ryan Poelman at 23, ECF No. 265-10; Plaintiffs' Exh. 10, Smith Depo. at 13:11–25, 30:11–15.

[38] Plaintiffs' Exh. 10, Smith Depo. at 13:11–25.

[39] Plaintiffs' Exh. 1, Defendant's First Amended Answer at 14; Plaintiffs' Exh. 11, Deposition of Shawn Finnegan at 36–37, ECF No. 265-13. Originally, Evtech conducted live events to attract customers and sell coaching and training services that were actually provided by Response. Plaintiffs' Exh. 10, Smith Depo. 28:8–22. However, in January 2016, Response decided to acquire Evtech to fully integrate Evtech's live events with the coaching and fulfillment services Response provided. *Id.* at 28:16–29:4.

[40] Plaintiffs' Exh. 7, Lewis Depo. at 20:20–21, 104:1–8.

[41] Plaintiffs' Exh. 1, Defendants' First Amended Answer at 13.

[42] *Id.*; Plaintiffs' Exh. 7, Lewis Depo. at 52:5–53:11; Plaintiffs' Exh. 8, Poelman Depo. at 7:11–8:20; Plaintiffs' Exh. 10, Smith Depo. at 30:16–18; Plaintiffs' Exh. 11, Finnegan Depo. at 30:2–31:6.

[43] Plaintiffs' Exh. 1, Defendants' First Amended Answer at 12–13; Plaintiffs' Exh. 7, Lewis Depo. at 12–18, 23.

[44] Plaintiffs' Exh. 1, Defendants' First Amended Answer at 14.

[45] *Id.* at 22–23, 78; Plaintiffs' Exh. 7, Lewis Depo. at 106:2–107:24; Plaintiffs' Exh. 12, Sanderson Depo. at 35:11–17.

Sanderson and the Response Partners will be referred to collectively, when necessary, as the "Individual Response Defendants."

After a multi-year investigation into Response and its affiliates,[46] Plaintiffs filed a complaint against the Corporate Defendants and the Individual Response Defendants on November 5, 2019, alleging that their marketing practices violated federal and Utah law.[47] Plaintiffs also filed a motion requesting that the court grant a temporary restraining order and order Defendants to show cause why a preliminary junction should not issue.[48] On December 19, 2019, the court granted a stipulated preliminary injunction.[49] Almost a year later, Plaintiffs filed an amended complaint, which named Defendants Graziosi and Yancey in addition to those named in the original complaint.[50]

In their amended complaint, Plaintiffs assert a total of 12 claims.[51] In Counts I through III and VI through VIII, Plaintiffs assert that Response made various false or misleading representations in violation of § 5 of the FTC Act and the UCSPA.[52] In Counts IV and XII, Plaintiffs assert that Response engaged in deceptive telemarketing practices in violation of the TSR and TFPA.[53] In Count IX, the UDCP asserts that Response's misrepresentations and related conduct constituted an unconscionable act or practice under the UCSPA.[54] In Counts X and XI,

---

[46] *See* Plaintiffs' Exh. 57, Declaration of Daniel Larsen (UDCP Commerce Analyst) ¶¶ 3–4, ECF No. 265-59 (stating that Larsen joined the investigation into Response and its affiliates when he joined the UDCP in July 2016).

[47] ECF No. 4.

[48] ECF No. 6.

[49] ECF No. 89.

[50] Redacted First Amended Complaint, ECF No. 171. Plaintiffs filed a motion to amend their complaint on August 31, 2020, which the court granted on November 17, 2020. ECF Nos. 164, 170.

[51] *See generally* Unredacted First Amended Complaint, ECF No. 173.

[52] *Id.* at 62–64.

[53] *Id.* at 64–66.

[54] *Id.* at 70–72.

the UDCP asserts that Response violated BODA by failing to file required information and provide required disclosures to consumers.[55] Plaintiffs assert that the remaining Corporate Defendants and the Individual Response Defendants are jointly liable for Response's violations. Finally, in Count V, the FTC asserts that Graziosi and Yancey also violated the TSR by providing substantial assistance to Response even though they knew, or consciously avoided knowing, that Response engaged in acts or practices that violated the TSR.[56]

Since Plaintiffs' amended complaint was filed, the court has resolved multiple dispositive motions. The parties filed cross motions for partial summary judgment on the UDCP's claims under the UCSPA, which the court denied.[57] Defendants Graziosi and Yancey filed a motion to dismiss the claim brought against them, which the court also denied.[58] Finally, the Corporate and Individual Response Defendants filed a motion for partial summary judgment on two issues related to Plaintiffs' request for equitable monetary relief.[59] First, they argued the Supreme Court's April 22, 2021 opinion in *AMG Capital Management, LLC v. Federal Trade Commission*[60] prohibits the FTC from recovering equitable monetary relief under § 13(b) of the FTC Act for any § 5 violation.[61] Second, they argued that the UDCP was not entitled to impose fines or civil penalties for any violations of BODA because the UDCP never issued a cease-and-

---

[55] *Id.* at 72–74.

[56] *Id.* at 66.

[57] *See* ECF Nos. 186, 199, 234.

[58] *See* ECF Nos. 193, 240.

[59] ECF No. 222.

[60] *AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*, 141 S. Ct. 1341 (2021).

[61] ECF No. 222 at 1.

desist letter to Response.[62] The court agreed with these arguments and, on September 15, 2021, granted summary judgment in favor of Defendants on those issues.[63]

The case is now before the court again on cross motions for summary judgment. Plaintiffs filed their motion on October 18, 2021.[64] Defendants filed a response on November 23, 2021, and Plaintiffs replied on December 15, 2021.[65] Defendants also filed their motion for summary judgment on October 18, 2021.[66] Plaintiffs filed a response on November 24, 2021, and Defendants replied on December 15, 2021.[67]

## STANDARD

A party is entitled to summary judgment only if it is able to show there is no genuine dispute as to any material fact and the party is entitled to judgment as a matter of law.[68] Material facts are ones that "might affect the outcome of the suit under the governing law."[69] And a dispute regarding a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[70] When cross-motions for summary judgment are filed, the court must treat them "as two individual motions for summary judgment . . . with each motion viewed in the light most favorable to its nonmoving party."[71]

---

[62] *Id.* at 5–6.

[63] ECF No. 254.

[64] ECF No. 265.

[65] ECF Nos. 285, 307.

[66] ECF No. 270.

[67] ECF Nos. 292, 309.

[68] Fed. R. Civ. P. 56(a).

[69] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[70] *Id.*

[71] *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019).

## DISCUSSION

Before discussing the merits of these motions, the court must resolve some evidentiary disputes.

## I.    Evidentiary Disputes

Both Plaintiffs and Defendants have submitted extensive evidence, including expert reports, in support of their motions for summary judgment. The Tenth Circuit has long held that although evidence submitted in support of a motion for summary judgment need not necessarily be in a form that is admissible at trial, the content or substance of that evidence must comport with the Federal Rules of Evidence.[72] With that in mind, both Plaintiffs and Defendants have raised objections to evidence submitted by the other.

### A.  Defendants' Evidentiary Objections

Defendants raise objections to the Plaintiffs' use of three expert reports, a sample of 52 telemarketing call recordings and charts summarizing them, a chart of statements made by presenters at Response's preview events, and the deposition testimony of a former Response employee in support of their motion for summary judgment. The court will address these objections in turn.

#### 1.  Plaintiffs' Expert Reports

Before considering expert evidence in ruling on a motion for summary judgment, the court must determine whether that evidence would be admissible at trial.[73] Expert evidence is admissible when it is sufficiently relevant and reliable to satisfy the requirements of Federal Rule

---

[72] *See Friends of Animals v. Bernhardt*, 15 F.4th 1254, 1272 (10th Cir. 2021); *Thomas v. Int'l Bus. Machines*, 48 F.3d 478, 485 (10th Cir. 1995).

[73] *Powell v. Fournet*, 968 F.2d 21, at *3 (10th Cir. 1992) (unpublished).

of Evidence 702.[74] "[A]ny step that renders [an expert's] analysis unreliable . . . renders the expert's testimony inadmissible," regardless of "whether the step completely changes a reliable methodology or merely misapplies that methodology."[75]

### a. Dr. Isaacson's Surveys and Report

Plaintiffs have submitted an expert report from Dr. Bruce Isaacson to support several of their claims.[76] The report details the methodology and results of two surveys Dr. Isaacson conducted for the FTC.[77] In the first survey, Dr. Isaacson attempted to call 3,375 likely Response customers from a list provided by the FTC.[78] Dr. Isaacson was able to survey 194 consumers who had purchased some form of training from Response.[79] The survey included questions about the consumers' expectations related to Response's training, how much they spent for the training, whether they were able to complete real estate transactions, and whether they made a profit.[80]

In the second survey, Dr. Isaacson surveyed only consumers who had purchased a one-on-one coaching package from Response.[81] One-hundred and two individuals responded to the

---

[74] See *Tudor v. Se. Oklahoma State Univ.*, 13 F.4th 1019, 1029 (10th Cir. 2021); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993) ("[U]nder the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.").

[75] *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).

[76] See generally Plaintiffs' Exh. 24, Report of Plaintiffs' Expert Dr. Bruce Isaacson, ECF No. 265-26. Dr. Isaacson is the President of MMR Strategy Group, a marketing research and consulting firm. *Id.* at 4.

[77] *Id.* at 2–3.

[78] *Id.* at 8. Plaintiffs obtained the list of likely Response customers by searching publicly available business records for entities that named "Veil Corporate Services" as their registered agent between 2014 and 2017. *Id.* at 12. Response offered business-entity set up and registered-agent services to its workshop customers through Veil Corporate, LLC (Veil) from at least 2014 to 2017. *See* Plaintiffs' Exh. 8, Poelman Depo. at 33–36; Plaintiffs' Exh. 31, Declaration of Clint Sanderson ¶ 43, ECF No. 265-33. Approximately 24% of Response's workshop customers used Veil's services. Plaintiffs' Exh. 31, Sanderson Decl. ¶ 43.

[79] *See* Plaintiffs' Exh. 24, Isaacson Rpt. at 12.

[80] *Id.* at 8–25.

[81] *Id.* at 51.

second survey.[82] The second survey included many of the same questions as the first and yielded similar results.[83]

Defendants argue that Dr. Isaacson's surveys are fatally flawed in two main ways.[84] First, they argue that Dr. Isaacson improperly disclosed to survey participants that the FTC was sponsoring the surveys, likely leading to biased results.[85] Second, they argue that the survey results cannot and do not support Plaintiffs' claims because the surveys lacked several relevant questions.[86] However, Defendants do not specify whether these flaws warrant exclusion or merely go to the weight the survey results should be given.

Objections to an expert's methods in conducting a survey, like these, typically bear only on the weight its results should be given, not its admissibility.[87] Exclusion under Rule 702 is necessary only when a survey's methodological flaws are sufficiently "serious and pervasive."[88] The court finds no serious and pervasive methodological flaws here.

Although disclosing a survey's sponsor can lead to unreliable results in some circumstances, Dr. Isaacson's decision to disclose the FTC as the surveys' sponsor here was not so out of line with accepted survey standards, or so likely to lead to biased results, as to warrant the surveys' exclusion. The statements disclosing the FTC as the surveys' sponsor were brief and

---

[82] *Id.* at 53.

[83] *Id.* at 51–54.

[84] ECF No. 287 at 42–43, 46–47.

[85] *Id.* at 43 & n.82 (citing Defendants' Opp. Exh. 17, Defendants' Rebuttal Expert Report of Dr. Wayne Hoyer at 11–17, ECF No. 285-18; Plaintiffs' Exh. 22, Defendants' Rebuttal Expert Report of Brian Sowers at 29–34, ECF No. 265-24).

[86] *Id.* at 42–43, 46–47.

[87] *See 1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1246 (10th Cir. 2013); *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1544 (10th Cir. 1996); *see also Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001) ("[I]ssues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility.").

[88] *1-800 Contacts*, 722 F.3d at 1246.

did not disclose the surveys' purpose.[89] And Dr. Isaacson explained his rationale for disclosing the FTC as the survey's sponsor, stating that doing so would likely increase response rates by addressing concerns or suspicions respondents may have had as to how the surveyors obtained their name and information.[90] While Dr. Isaacson's disclosing the FTC as the surveys' sponsor leaves his results subject to attack on some grounds, it does not render them inadmissible.[91]

The same is true of Defendants' other objections. The questions Dr. Isaacson chose to ask are a matter of methodology. Defendants have had the opportunity to depose Dr. Isaacson and have submitted expert rebuttals critiquing his methods. Those critiques are relevant to the weight to give Dr. Isaacson's findings and whether they support Plaintiffs' claims, but they do not warrant exclusion.[92]

### b. McAlvanah and Nicolais Supplemental Reports

In addition to raising an objection in their opposition to Plaintiffs' motion for summary judgment,[93] Defendants argued in separate motions that supplemental reports provided by two of Plaintiffs' experts, Patrick McAlvanah[94] and Teo Nicolais,[95] should be excluded because they

---

[89] Plaintiffs' Exh. 24, Isaacson Rpt. at 13–15, 57; *see also Fed. Trade Comm'n v. LendingClub Corp.*, No. 18-CV-02454-JSC, 2020 WL 2838827, at *15 (N.D. Cal. June 1, 2020) (declining to exclude a survey in which a sponsor was disclosed when the purpose remained concealed and the expert explained a valid reason for the disclosure); *Fed. Trade Comm'n v. Kutzner*, No. SACV1600999BROAFMX, 2017 WL 4685286, at *4 (C.D. Cal. Sept. 5, 2017), *aff'd sub nom. Fed. Trade Comm'n v. Marshall*, 781 F. App'x 599 (9th Cir. 2019) (declining to exclude survey results when the surveyor "appropriately blinded the study to hide the purpose of the study from the respondents while giving the respondents comfort in the legitimacy of the survey, determined that the response rate was more than sufficient, and determined there were no inherent biases").

[90] Plaintiffs' Exh. 24, Isaacson Rpt. at 13–15, 57.

[91] *See LendingClub Corp.*, 2020 WL 2838827, at *15.

[92] *See Fed. Trade Comm'n v. Dalbey*, No. 11-CV-1396-RBJ-KLM, 2013 WL 934986, at *4 (D. Colo. Mar. 11, 2013) (finding that valid criticisms of surveyor's methods went "to the weight, not the admissibility, of the survey evidence"); *see also LendingClub Corp.*, 2020 WL 2838827, at *15 (noting that surveys can be challenged at trial on grounds that disclosing a sponsor resulted in biased results).

[93] ECF No. 287 at 55–56.

[94] Plaintiffs' Exh. 28, Supplemental Report of Patrick McAlvanah, ECF No. 265-29.

[95] Plaintiffs' Exh. 26, Revised Supplemental Report of Teo Nicolais, ECF No. 265-28.

were disclosed untimely.[96] Those motions were referred to Magistrate Judge Daphne A. Oberg, who denied them in an order issued on March 18, 2022.[97] Neither party objected to Judge Oberg's findings, and the court finds no fault with them. Therefore, the court will consider both supplemental reports in evaluating the parties' motions for summary judgment.

### 2. Plaintiffs' Sample of 52 Telemarketing Call Recordings

During discovery, Plaintiffs obtained recordings of over 4,000 telemarketing calls Response made between 2018 and 2019 from the Electronic Retailing Self-Regulation Program (ERSP), in which Response participated.[98] In support of their motion for summary judgment on their telemarketing-related claims, Plaintiffs have submitted recordings of 52 calls to 35 customers, which were allegedly selected at random from two random samples generated by Dr. McAlvanah.[99] Plaintiffs have also submitted two charts, which they assert are admissible under Federal Rule of Evidence 1006, that present and categorize quotations from the recordings that support their allegations.[100]

Defendants argue that the court should disregard this sample of telemarketing calls under Federal Rule of Civil Procedure 37(c)(1) because Plaintiffs failed to properly disclose it before presenting it in their motion for summary judgment.[101] Defendants also argue that Plaintiffs' charts summarizing these calls are inadmissible under Rule 1006 because they are inaccurate and

---

[96] ECF Nos. 238, 239.

[97] ECF No. 320.

[98] Plaintiffs' Exh. 36, Declaration of Peter Marinello ¶¶ 1–5, ECF No. 265-38.

[99] *See* Plaintiffs' Exh. 59, Marino Decl. at 3–4 & Exh C. Plaintiffs provided the audio recordings of the calls, Exh. C, to the court on a compact disc filed conventionally. ECF No. 268.

[100] Plaintiffs' Exh. 59, Marino Decl. at 3–4 & Exhs. A, B.

[101] ECF No. 287 at 56–58.

prejudicial due to the absence of summaries for long sections of the recordings, including those that are helpful to Defendants' arguments.[102]

Rule 37(c)(1) does not bar Plaintiffs from using the sample of telemarketing calls to support their motion for summary judgment. Rule 37(c)(1) states in relevant part that a party who fails to disclose information Rule 26 requires "is not allowed to use that information . . . to supply evidence on a motion . . . unless the failure was substantially justified or is harmless."[103] However, all Rule 26 required of Plaintiffs with regard to the telemarketing call recordings they obtained from the ERSP was that they provide Defendants with "a copy" or "description" of the recordings they "*may* use to support [their] claims."[104] It did not require Plaintiffs to identify the specific recordings they would use to support their motion for summary judgment.[105] Because Defendants do not claim that Plaintiffs failed to provide copies or access to the ERSP recordings from which the sample they use to support their motion was drawn, the sample does not, contrary to Defendants' assertions, constitute the type of "new evidence" Rule 37(c)(1) proscribes.[106]

---

[102] *Id.* at 63–64.

[103] Fed. R. Civ. P. 37(c)(1).

[104] Fed. R. Civ. P. 26(a)(1)(A)(ii). Although Rule 26(a) outlines three main types of disclosures parties are required to make—initial disclosures, disclosures of expert testimony, and pretrial disclosures—only the initial disclosure requirements are relevant here because the information Plaintiffs are accused of failing to disclose does not involve expert testimony and the time for pretrial disclosures has not yet arrived. *See* Fed. R. Civ. P. 26(a)(1)–(3). Rule 26(e) merely imposes on parties a duty to supplement or correct disclosures they later learn are incomplete or incorrect. Fed. R. Civ. P. 26(e).

[105] Plaintiffs would be expected to specifically identify which recordings they "expect[] to offer" at trial or "those [they] may offer if the need arises" as part of Rule 26's required pretrial disclosures, but, as already noted, the deadline for making pretrial disclosures has not yet arrived. *See* Fed. R. Civ. P. 26(a)(3).

[106] For this reason, the cases Defendants cite in support of their argument of exclusion under Rule 37(c)(1) are inapposite. *See Schaeffer v. JBS Carriers, Inc.*, No. 19-CV-01406-NYW, 2020 WL 7043867, at *16 (D. Colo. Dec. 1, 2020) (disregarding allegations made for the first time in response to a motion for summary judgment pursuant to Rule 37(c)(1)); *Zirk v. Nationstar Mortg.*, No. 16-CV-448-JDP, 2017 WL 3402970, at *4 (W.D. Wis. Aug. 8, 2017) (prohibiting a party from using notices and statements to support its opposition to a motion for summary judgment when they were not disclosed during discovery); *Kojima v. Lehi City*, No. 2:13-CV-000755-EJF, 2015 WL 4276399, at *7 (D. Utah July 14, 2015) (prohibiting, pursuant to Rule 37(c)(1), a plaintiff from making a material allegation that was made for the first time in an opposition to a motion for summary judgment and contradicted by prior disclosures).

Accordingly, there is no evidence Plaintiffs have failed to meet Rule 26's disclosure requirements, and Rule 37(c)(1) does not require that the sample be excluded.

Defendants' arguments that Plaintiffs' charts organizing and categorizing quotes from the 52 calls are not admissible under Rule 1006 are also unavailing. As noted above, Plaintiffs have submitted the entirety of the audio recordings to the court in support of their motion, and Defendants have not shown that the recordings are inadmissible. Because the charts are not needed "*to prove the content of*" the 52 recordings, and indeed do not appear to be submitted for that purpose, they are not subject to Rule 1006.[107]

Rather, they are more appropriately considered illustrative or demonstrative exhibits that show how the recordings support Plaintiffs' allegations in a simpler and more concise form.[108] Such illustrative and demonstrative exhibits are generally admissible as long as they "fairly and accurately summarize[] previously admitted competent evidence" and their probative value is not substantially outweighed by any danger of unfair prejudice, confusion, or propensity to mislead their admission would cause.[109] Defendants have made no argument that the recordings themselves are inadmissible, and the court has reviewed them and found Plaintiffs' quotations therefrom to be accurate.[110] Although Plaintiffs' charts, not surprisingly, contain only quotations that support their case, that does not render them unfairly prejudicial, confusing, or misleading. Defendants have access to the recordings and, in fact, submitted their own chart presenting

---

[107] *See* Fed. R. Evid. 1006 (emphasis added).

[108] *See United States v. Downen*, 496 F.2d 314, 321 (10th Cir. 1974) (acknowledging the admissibility of demonstrative and illustrative exhibits that put data contained in other admitted evidence into a "simpler" or more "concise form").

[109] *Dahlberg v. MCT Transp., LLC*, 571 F. App'x 641, 647 (10th Cir. 2014) (unpublished) (quoting *Wilson v. United States*, 350 F.2d 901, 907 (10th Cir. 1965)); *see also* Fed. R. Evid. 403.

[110] *See Wilson*, 350 F.2d at 907.

quotations therefrom that are helpful to their defense.[111] Additionally, as already noted, the recordings themselves stand as a check on any attempt by either party to present the contents of those recordings in a misleading manner. Therefore, the court will consider the sample of recordings and any charts summarizing their contents in ruling on the cross-motions for summary judgment.[112]

### 3.   Plaintiffs' Chart of Statements Made During Preview Events

As they did with their sample of Response's telemarketing calls, Plaintiffs have submitted a chart that organizes and categorizes statements made by presenters at six of Response's free preview events.[113] Defendants again argue that this chart is prejudicial and inadmissible under Rule 1006 because it does not present an accurate picture of everything that was said during preview events.[114]

For the reasons just discussed, Defendants' argument is meritless. Plaintiffs have provided both a recording and a transcript for every preview event from which the quotations in their chart are drawn.[115] Thus, the chart is merely an organizational device, not one being used to prove everything that was said during the six preview events. As such, it is not subject to Rule 1006's requirements.

### 4.   Alfred Touchet's Deposition Testimony

Finally, Defendants challenge the admissibility of the deposition testimony of Alfred Touchet, who worked for Response as a telemarketer.[116] Plaintiffs submitted Touchet's

---

[111] *See* Defendants' Opp. Exh. 14, ECF No. 287-4.

[112] The court makes no decision at this time as to whether any of the charts submitted would be admissible at trial.

[113] *See* Plaintiffs' Exh. 58, Hogan Decl., Exh. M.

[114] ECF No. 287 at 64 n.164.

[115] *See* Plaintiffs' Exh. 58, Hogan Decl., Exhs. A–L.

[116] ECF No. 287 at 23, 36–37, 50–53.

testimony to support their allegations regarding Response's telemarketing practices when selling their one-on-one coaching programs.[117]

Defendants argue that Touchet's testimony lacks foundation, and is therefore inadmissible, because Touchet primarily sold stock-related coaching programs, not real estate coaching programs.[118] They also argue that Touchet's testimony is not credible because of inconsistencies between his deposition testimony and a declaration he provided before this lawsuit commenced.[119] Specifically, Touchet gave inconsistent answers as to why he was fired from Response, whether Response prevented him from obtaining unemployment insurance, and whether Response's telemarketers had access to certain forms consumers filled out about their finances.[120] Defendants also challenge Touchet's credibility on grounds that he sought to be rehired by Response after providing his pre-lawsuit declaration to FTC, stated that Response was generally compliant with relevant laws and regulations, and threatened to report a subsequent employer who fired him to the FTC.[121]

Defendants' argument that Touchet's testimony lacks foundation is baseless. Even though he was assigned primarily to Response's telemarketing group for stock and options coaching, it is undisputed that Touchet did some work as a telemarketer for real estate coaching programs as well.[122] Additionally, Touchet has testified that even when he did not work with the real estate telemarketing group, he was able to observe and overhear the practices of the

---

[117] ECF No. 267 at 43–44.

[118] ECF No. 287 at 23.

[119] *Id.* at 36–37, 50–53.

[120] *Id.*

[121] *Id.*

[122] *See* Plaintiffs' Exh. 15, Deposition of Alfred Touchet Depo. at 27:11–21, ECF No. 265-17; Plaintiffs' Exh. 32, Declaration of Christopher Brown ¶ 10, ECF No. 265-34.

telemarketers who did.[123] Accordingly, Touchet's testimony was based on personal knowledge.[124]

As for Defendants' arguments regarding Touchet's credibility, such attacks are irrelevant at this stage of the case. The court's task on summary judgment is not to determine whether any witness's testimony is credible, but whether the non-moving parties have "offered any specific facts that demonstrate the existence of a material fact to be tried."[125] Further, although inconsistencies between a witness's declaration and deposition testimony can necessitate exclusion at the summary judgment stage in some circumstances,[126] the type of inconsistencies Defendants allege here go to the credibility of Touchet's testimony, not its admissibility.[127] In any event, none of Touchet's allegedly inconsistent statements relates to issues that are material to Plaintiffs' claims or the portions of testimony upon which Plaintiffs rely.[128] Therefore, the court will not disregard Touchet's testimony in ruling on the cross-motions for summary judgment.

---

[123] *See* Plaintiffs' Exh. 15, Touchet Depo. at 270:3–272:4. Defendants have not challenged the admissibility of Touchet's testimony on this point.

[124] *See Hansen v. PT Bank Negara Indonesia (Persero)*, 706 F.3d 1244, 1250 (10th Cir. 2013) (explaining that an affidavit is inadmissible due to lack of personal knowledge only "if the witness could not have actually perceived or observed that which he testifies to" (internal quotation marks omitted) (quoting *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006))).

[125] *See Nat'l Am. Ins. Co. v. Am. Re-Ins. Co.*, 358 F.3d 736, 742–43 (10th Cir. 2004) ("[O]n 'a motion for summary judgment [the court] cannot evaluate credibility nor can [it] weigh evidence.'" (quoting *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 533 (10th Cir. 1994))).

[126] Typically, this occurs only when a witness's affidavit submitted in opposition to a motion for summary judgment is inconsistent with or contradicts the witness's prior deposition testimony. *See Law Co., Inc. v. Mohawk Const. & Supply Co.*, 577 F.3d 1164, 1169 (10th Cir. 2009).

[127] *See id.* (noting that a witness's testimony may not be disregarded on a motion for summary judgment solely because it conflicts with prior sworn statements).

[128] *See Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1176 (10th Cir. 2005) (finding that allegations of perjury related to an immaterial fact do not "undermine[] the grant of summary judgment"); *Eke v. CaridianBCT, Inc.*, 490 F. App'x 156, 168 (10th Cir. 2012) (unpublished) ("[A]llegations of perjured testimony must relate to a material issue in order to undermine a grant of summary judgment.").

## B. Plaintiffs' Evidentiary Objections

Plaintiffs raise objections to two exhibits Defendants have submitted. First, they object to declarations Defendants obtained from its customers after this lawsuit began. Second, they object to one of Defendants' expert reports. The court will consider these objections in turn.

### 1. Declarations from Response Customers

Defendants have obtained over 2,800 declarations from Response customers since this lawsuit began.[129] Initially, Response employees obtained declarations by calling and interviewing customers about their experience, after which they would send draft declarations based on the interview to the customer for a signature.[130] This method yielded at least 69 declarations, which Defendants originally submitted with their opposition to Plaintiffs' motion for a preliminary injunction.[131] After that, Response employees continued to obtain declarations by asking its students if they would be willing to sign a sworn statement regarding their experience at the end of training meetings.[132] Those who were willing to do so received a draft declaration that they were asked to review, request modifications to, and sign once agreeable.[133] Defendants have submitted 81 of the declarations they obtained from Response customers in support of their motion for summary judgment[134] and a chart summarizing all 2,824 declarations along with its opposition to Plaintiffs' motion for summary judgment.[135]

---

[129] Defendants' Opp. Exh. 8, Nov. 2021 Declaration of Ryan Poelman ¶ 14, ECF No. 285-9.

[130] Defendants' Opp. Exh. 16, Declaration of Steve Liechty ¶¶ 10–11, ECF No. 285-17.

[131] *Id.*

[132] *Id.* ¶ 12.

[133] *Id.*

[134] *See* Defendants' Exhs. 16A–J, 44–50, ECF Nos. 270-17 to 270-27, 270-54 to 270-60. This number does not include duplicate or unsigned declarations in the exhibits. Defendants also submitted 12 declarations that the FTC obtained from Response customers. *See* Defendants' Exhs. 58–62, 67–73, ECF Nos. 270-68 to 270-72, 270-77 to 270-83.

[135] *See* Defendants' Opp. Exh. 11, Declaration of Jana Gibson, Exh. A, ECF No. 285-12.

Plaintiffs argue that these declarations and the chart summarizing them should be excluded because they are too unreliable.[136] Plaintiffs argue that the declarations contain largely identical, conclusory statements generated by software based on the customers' responses to certain yes or no questions and do not reflect the customers' actual experiences.[137] Plaintiffs also have provided some evidence that Response deliberately omitted negative feedback customers provided during interviews from the draft declarations subsequently sent to them and at times sent declarations to customers without first interviewing them about their experiences.[138] Plaintiffs also point out, and Defendants do not deny, that most, if not all, customers who provided declarations were not told that the declarations were being collected to assist Response in this lawsuit.[139] Relying on *Longcrier v. HL-A Co.*,[140] Plaintiffs argue that this deception renders the declarations so unreliable and lacking in probative value that they should be excluded.[141]

Although Plaintiffs' concerns about the substance of the declarations Defendants have submitted and the methods through which they were obtained are significant, such concerns go to the weight and credibility of the declarations rather than their admissibility. Rule 56 allows parties to use affidavits and declarations to support or oppose a motion for summary judgment as long as they are "made on personal knowledge, set out facts that would be admissible in

---

[136] ECF Nos. 294 at 12–13; 307 at 6 n. 11.

[137] ECF No. 294 at 12.

[138] *See* Plaintiffs' Exh. 19, Poppinga Depo. at 256:1–7; Plaintiffs' Exh. 40, Declaration of Consumer Judith Smith ¶ 46, ECF No. 265-42; Plaintiffs' Exh. 84, Supplemental Declaration of Michael Marino, Exh. H, ECF No. 294-1.

[139] ECF Nos. 294 at 12; 311 at 32–33.

[140] *Longcrier v. HL-A Co.*, 595 F. Supp. 2d 1218 (S.D. Ala. 2008).

[141] ECF No. 294 at 12.

evidence, and show that . . . declarant is competent to testify on the matters stated."[142] Plaintiffs have not argued that the declarations are deficient on any of these grounds.

Further, Plaintiffs' reliance on *Longcrier* as support for excluding the declarations because Defendants concealed the declarations' purpose from most declarants is misplaced for a few reasons. First, that case involved an employer obtaining declarations from employees that could have potentially waived their rights to join a class action against their employer or provided data that could be used against them and other class members in litigation.[143] Here, nothing the declarants stated or did could be construed as a waiver of any rights related to this case.

Second, the employer's actions in obtaining the declarations in *Longcrier* were not only deceptive but also coercive, as the employees were called in to provide declarations during an individual meeting with the employer's attorneys during work hours.[144] Here, most declarants were not told about this lawsuit, but providing a declaration was voluntary, and the declarants did not face the type of coercive and intimidating environment the presence of an employer-employee relationship caused in *Longcrier*.

Finally, the court excluded the declarations in *Longcrier* not because they were inadmissible under the Rules of Evidence, but because they constituted improper communications with a putative class member during a class action.[145] This case does not involve a class action, and thus the statutory provisions and rules of procedure upon which the *Longcrier* decision was based are irrelevant here.

---

[142] Fed. R. Civ. P. 56(c)(1), (4); *see also Hansen*, 706 F.3d at 1250 ("Although affidavits are entirely proper on summary judgment, the content or substance of the evidence contained therein must be admissible.").

[143] *Longcrier*, 595 F. Supp. 2d at 1227.

[144] *Id.* at 1227–28.

[145] *Id.* at 1227.

As a final note, Plaintiffs have not challenged the admissibility of Defendants' chart summarizing the declarations on any other grounds than those just addressed. As discussed above, parties may use a chart to prove the content of voluminous writings under Rule 1006 as long as the summaries are "accurate and nonprejudicial."[146] Because Plaintiffs have provided no evidence that Defendants' summaries of the declarations in its chart are inaccurate or prejudicial, the court will consider them. However, after reviewing the chart, it appears that approximately 522 of the declarants participated only in Response's stock investment training.[147] Those declarations are irrelevant to this case and will not be considered.

### 2.  Dr. Weiss's Report

Defendants have submitted a report from Dr. D. Mark Weiss to support their defenses related to the substance of Response's training programs.[148] Plaintiffs argue that Dr. Weiss's report should be excluded because he is not an experienced real estate expert and drew his conclusions primarily from interactions with consumers who attended Response events.[149] As already noted, the court must "determine whether an expert's testimony would be admissible at trial before considering that testimony on a motion for summary judgment."[150]

The court agrees that Dr. Weiss's report is not admissible as an expert report, at least not for the purposes for which Defendants have submitted it. Defendants rely on Dr. Weiss's report to support a single claim: that Response's real estate trainings provided substantial educational

---

[146] *See Daniel v. Ben E. Keith Co.*, 97 F.3d 1329, 1335 (10th Cir. 1996).

[147] The court reached this number by searching Defendants' chart summaries for the word "stock" and excluding those that did not also mention real estate investing. An additional 19 declarants participated in both the stock and real estate investment trainings. The court's findings regarding evidence submitted by the parties are for purposes of these motions only.

[148] *See* ECF No. 287 at 31 & n.9; Defendants' Opp. Exh. 10, Expert Report of D. Mark Weiss, ECF No. 285-11.

[149] ECF No. 307 at 10 n.24.

[150] *Powell*, 968 F.2d 21, at *3.

content and value to consumers.[151] However, there is no evidence Dr. Weiss has expert knowledge, skill, experience, training, or education with regard to real estate investing.[152] His expertise is in instructional design and technology.[153] Dr. Weiss is thus not qualified to provide expert opinion regarding "the extent to which Response's instructional content provides value to its customers," with "value" meaning that the content provided was "sufficient to meaningfully *increase the ability of students* who apply and use the content *to invest successfully in real estate*."[154] An expert on instructional design is no more qualified to say whether the substance of real estate training provided can help someone invest successfully in real estate than an expert real estate investor is qualified to say whether the methods used to teach real estate investment strategies are in line with well-accepted principles of instructional design. Accordingly, Dr. Weiss's opinions as to whether Response's training was valuable—that is, that it could meaningfully help customers learn how to invest successfully in real estate—are inadmissible.

In the absence of those opinions, Defendants have provided no grounds for finding that the remaining portions of Dr. Weiss's report should be considered in ruling on the cross-motions.[155] The report consists largely of Dr. Weiss's narratives and general impressions of what he saw and heard at various training events. However, what occurred at the training events he attended is not in dispute. The issue in dispute is whether the real estate training that was provided was indeed what Response represented it would be and whether that training was

---

[151] ECF No. 287 at 31, 44; Defendants' Opp. Exh. 10, Weiss Rpt. at 2.

[152] *See* Fed. R. Evid. 702.

[153] Defendants' Opp. Exh. 10, Weiss Rpt. at 1.

[154] *Id.* at 2 (emphasis added).

[155] *See Conroy v. Vilsack*, 707 F.3d 1163, 1168 (10th Cir. 2013) ("The proponent of the expert testimony bears the burden of showing that the testimony is admissible.").

valuable.[156] Thus, Dr. Weiss's narrative regarding what was taught at each training event is immaterial and inadmissible under Rule 702, as it does not "help [a] trier of fact to understand the evidence or to determine a fact in issue."[157]

Having resolved these evidentiary disputes, the court proceeds to the merits of the cross-motions for summary judgment.

## II.   FTC Act § 5 and UCSPA Claims

Section 5 of the FTC Act empowers the FTC to prevent individuals, partnerships, and corporations from engaging in "unfair or deceptive acts or practices in or affecting commerce."[158] To prove that a business entity engaged in a deceptive act or practice, the FTC must show that it made a material representation that was likely to mislead ordinary consumers acting reasonably under the circumstances.[159] A representation was material if it was "likely to affect a consumer's decision to buy a product or service."[160] And it was likely to mislead if the "net impression it [was] likely to make on the general populace"[161] was false, misleading, or

---

[156] *Compare* ECF No. 267 at 60–61, *with* ECF No. 287 at 43–45, 48–50.

[157] Fed. R. Evid. 702(a).

[158] 15 U.S.C. § 45(a).

[159] *See Fed. Trade Comm'n v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1202–03 (10th Cir. 2005); *Fed. Trade Comm'n v. LoanPointe, LLC*, 525 F. App'x 696, 700 (10th Cir. 2013) (unpublished); *see also Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009) ("An act or practice is deceptive if first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material." (internal quotation marks omitted) (quoting *Fed. Trade Comm'n v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001))). Unfair practices are governed by a different standard but need not be discussed further because Plaintiffs have alleged only deceptive acts and practices. *See Fed. Trade Comm'n v. Accusearch Inc.*, 570 F.3d 1187, 1193 (10th Cir. 2009) ("To be 'unfair,' a practice must be one that '[1] causes or is likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers themselves and [3] not outweighed by countervailing benefits to consumers or to competition.'" (alterations in original) (quoting 15 U.S.C. § 45(n))).

[160] *See Fed. Trade Comm'n v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 631 (6th Cir. 2014); *see also Freecom*, 401 F.3d at 1203 (finding a representation material when it "str[uck] at the heart of a consumer's purchasing decision").

[161] *Nat'l Bakers Servs., Inc. v. Fed. Trade Comm'n*, 329 F.2d 365, 367 (7th Cir. 1964); *see also Freecom*, 401 F.3d at 1202 ("[T]he 'cardinal factor' in determining whether an act or practice is deceptive under § 5 is the likely effect the promoter's handiwork will have on the mind of the ordinary consumer.").

unsubstantiated.[162] Determining a representation's net impression involves not only looking at what is literally represented, but also analyzing the representation in light of the context and circumstances in which it was made,[163] including any disclaimers or disclosures that accompanied it.[164]

Like § 5, the UCSPA prohibits "suppliers"[165] from knowingly or intentionally engaging in "[a] deceptive act or practice . . . in connection with a consumer transaction."[166] Because the Utah Legislature intended for the UCSPA to be liberally construed so as to harmonize "state regulation of consumer sales practices . . . with the policies of the [FTC] Act," the standards for analyzing deceptive act or practice claims under the UCSPA are generally the same as for misrepresentation claims under § 5.[167] Neither party has argued to the contrary.[168]

However, the UCSPA goes farther as it also prohibits suppliers from engaging in "unconscionable" acts or practices in connection with consumer transactions.[169] "The unconscionability of an act or practice is a question of law for the court," and "[i]n determining

---

[162] *See Fanning v. Fed. Trade Comm'n*, 821 F.3d 164, 170 (1st Cir. 2016); *POM Wonderful, LLC v. Fed. Trade Comm'n*, 777 F.3d 478, 490 (D.C. Cir. 2015).

[163] *Fed. Trade Comm'n v. Sterling Drug, Inc.*, 317 F.2d 669, 674 (2d Cir. 1963) ("It is . . . necessary in these cases to consider the advertisement in its entirety and not to engage in disputatious dissection. The entire mosaic should be viewed rather than each tile separately.").

[164] *See Removatron Int'l Corp. v. Fed. Trade Comm'n*, 884 F.2d 1489, 1497 (1st Cir. 1989).

[165] Defendants have not disputed that Response qualified as a "supplier" under the UCSPA. The UCSPA defines the term "supplier" as "a seller, lessor, assignor, offeror, broker, or other person who regularly solicits, engages in, or enforces consumer transactions" and "person," in turn, as "an individual, corporation, . . . partnership . . . or any other legal entity." Utah Code § 13-11-3.

[166] Utah Code § 13-11-4.

[167] Utah Code § 13-11-2(4); *see also id.* § 13-11-4(2) (providing a non-exclusive list of acts and practices that are "deceptive" under the UCSPA).

[168] *See* ECF Nos. 267 at 64; 270 at 17.

[169] Utah Code § 13-11-5(1).

whether an act or practice is unconscionable, the court shall consider circumstances which the supplier knew or had reason to know."[170]

Plaintiffs claim that Response violated § 5 and the UCSPA by making misrepresentations about the likely earnings of those who purchased its training programs (Counts I and VI), the nature and features of its training programs (Counts II and VII), and its reasons for collecting consumers' financial information and recommending third-party sources through which they could acquire more credit (Counts III and VIII).[171] The UDCP also claims that Response violated the UCSPA by engaging in an unconscionable act or practice (Count IX). The court will consider each claim, and the parties' arguments for summary judgment, separately.

### A. Misrepresentations Regarding Likely Earnings (Counts I and VI)

Plaintiffs claim that Response made representations when selling two of its training programs that were likely to mislead consumers with regard to how much they would likely earn if they participated in the programs.[172]

First, Plaintiffs claim that Response represented to consumers during its preview events that those who participated in its workshops would likely earn substantial income by completing at least a few wholesale flips, each of which would yield tens of thousands of dollars in profit. According to Plaintiffs, Response conveyed this representation by telling consumers that:

- wholesale flips could be completed without any prior real estate investment experience or money from their own pockets;

- its customers would have access to its funding network, tools, and strategies that could help them complete multiple deals;

- its customers had completed many deals;

---

[170] *Id.* § 13-11-5(2)–(3).

[171] ECF No. 173 at 62–64.

[172] *Id.* at 62.

- its "Success Audit" showed that as many as 67%–70% of its Advanced Training customers had completed a deal; and
- wholesale flips yield tens of thousands of dollars in profit.[173]

Second, Plaintiffs claim that Response's telemarketers represented to consumers that those who participated in a one-on-one coaching program would likely earn at least as much as they paid for it, if not more.[174] Plaintiffs assert that the telemarketers conveyed this representation by telling consumers that the coaching programs:

- were a unique opportunity to work with one of Response's real estate investment "experts" that was not offered to all of Response's customers;
- would enable them to complete real estate deals and make profits more quickly and safely;
- would essentially "pay for itself"; and
- had minimal risk because Response offered a satisfaction warranty.[175]

Plaintiffs contend that the net impression such statements created regarding the earnings Response's trainings would generate was likely to mislead ordinary consumers because few of Response's customers ever completed a transaction or made money, let alone in substantial amounts.[176] Plaintiffs assert that Response never sufficiently tracked whether its customers had success to substantiate its representations.[177] And, in any event, data from Plaintiffs' and Defendants' expert surveys, and Response itself, show that few of Response's customers ever completed a deal.[178]

---

[173] ECF Nos. 267 at 26–27, 58–60; 307 at 2–6.

[174] ECF Nos. 267 at 58–60; 307 at 2–3.

[175] ECF No. 267 at 59.

[176] ECF Nos. 267 at 59–60; 307 at 7–11.

[177] ECF Nos. 267 at 59; 307 at 7, 10–11.

[178] ECF Nos. 267 at 59–60; 307 at 7–10.

Defendants argue that they are entitled to summary judgment on these claims to the extent they are based on allegations that Response made "express earnings claims."[179] Defendants assert that Plaintiffs have produced no evidence that Response ever expressly and literally represented that its customers were "likely to earn substantial income" or "several thousand dollars monthly."[180] And to the extent Plaintiffs have produced evidence that Response made some express representations related to earnings, Defendants argue, it is insufficient for any reasonable trier of fact to find that express earnings claims were made.[181] In making this argument, Defendants essentially concede that whether Response implicitly made the alleged earnings representations, and whether they were likely to mislead ordinary consumers, are matters for the trier of fact.[182] They also do not dispute that such representations would have been material to consumers' decisions.[183]

Although it is true that Plaintiffs allege in their amended complaint that Response made earnings claims "directly or indirectly, expressly or by implication,"[184] they are not attempting to prove that Response expressly and literally told consumers that they would "likely earn substantial income" or "several thousand dollars monthly" if they purchased Response's training programs. Plaintiffs primarily argue that Response and its representatives made various

---

[179] ECF No. 270 at 19–20.

[180] *Id.*

[181] *Id.* at 20.

[182] Defendants made no argument on this issue in their motion for summary judgment, but they did argue that it is genuinely disputed in opposing Plaintiffs' motion. *See* ECF Nos. 270 at 19–20; 287 at 43–45.

[183] This is not surprising, as earnings claims are generally considered material because they "strike at the heart of a consumer's purchasing decision." *See Freecom*, 401 F.3d at 1203.

[184] ECF No. 173 at 62.

statements and representations that, collectively, created a net impression that was misleading.[185] Defendants acknowledged this in subsequent briefing.[186]

Further, in support of their claim that Response's telemarketers made representations that those who participate in one-on-one coaching would earn as much as, if not more, than they paid for it, Plaintiffs have produced evidence that some telemarketers expressly and literally talked about how a one-on-one coaching program would "pay for itself" or help consumers "recoup" their investment.[187] A reasonable trier of fact could find such statements created the net impression Plaintiffs allege. In any event, it is important to remember that although whether a representation was "express" or "implied" affects the ascertainment of its net impression,[188] the creation of a misleading net impression violates § 5 and the UCSPA regardless of whether it is done expressly or by implication. The same is true whether a single statement or many are involved. For these reasons, Defendants' motion for summary judgment on Counts I and VI must be denied.

Turning to Plaintiffs' motion for summary judgment, Plaintiffs have provided evidence from several of Response's preview events, and the advertisements leading up to them, that supports their claim that Response gave consumers the net impression that those who

---

[185] *See* ECF No. 294 at 58–64.

[186] ECF No. 287 at 41.

[187] *See generally* Plaintiffs' Exh. 59, Marino Decl., Exh. B.

[188] Representations are considered "express" when they are "directly" and explicitly stated to consumers. *In the Matter of Thompson Med. Co., Inc.*, 104 F.T.C. 648, 788 (1984). Implied representations, on the other hand, "arise[] from the sum total of not only what is said but also of all that is reasonably implied" by a seller's advertising efforts. *Aronberg v. Fed. Trade Comm'n*, 132 F.2d 165, 167 (7th Cir. 1942). Implied representations fall on a spectrum, "rang[ing] from claims that would be virtually synonymous with an express claim through language that literally says one thing but strongly suggests another to language which relatively few consumers would interpret as making a particular representation." *In the Matter of Thompson Med. Co.*, 104 F.T.C. at 789. When a representation is express, "the representation itself establishes its meaning," i.e., its net impression. *See In the Matter of Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 166 (1984). When a representation is implied, its net impression is determined by examining "the representation, including an evaluation of such factors as the entire document, the juxtaposition of various phrases in the document, the nature of the claim, and the nature of the transaction." *Id.*

participated in its workshops would likely earn substantial income by completing wholesale

flips. The record shows that Response told consumers that wholesale flips could be done with

little to no real estate investment experience,[189] that it would provide tools and strategies to help

them find properties at below-market-value prices,[190] and that its funding network would fund

their deals.[191] Response also told consumers that its customers had completed many deals,[192]

---

[189] Plaintiffs' Exh. 23, Habibi Rpt. ¶¶ 12, 17–19; Plaintiffs' Exh. 58, Hogan Decl., Exh. B at 26:24–29:19, 66:2–4; Plaintiffs' Exh. 59, Marino Decl., Exh. Q at 1.

[190] Plaintiffs' Exh. 58, Hogan Decl., Exh. D at 13 ("[I]f I had the ability . . . to help you get a property; commercial or residential, anywhere in the country at an incredibly reduced price below whole sale in this market, is that an advantage, yes or no? That's a huge advantage. That's what we . . . as a company do. I'm going to show you how we do it."); *id.*, Exh. F at 30:11–16 ("So part of what I have to do today is to teach you how to find the properties . . . that your typical investor doesn't even know exists. . . . We'll talk about how to do that here today."), 49:10–22 (explaining that Response's online tools would help customers "identify distressed sellers" and "cash buyers"); *id.*, Exh. H at 101:19–102:4 ("At the workshop, we'll show you how to have more cash buyers than you know what to do with. . . . Here's the unfair advantage that we're going to teach you. At the workshop, we will show you how to have multiple cash buyers, submit your deal to all of them, get them fighting over the deal, which drives up the price, puts more cash in your pocket."); *id.*, Exh. J at 59 ("How many of you want to do a [wholesale] flip deal without ever touching the property? How many of you liked it even better if you already have buyers for them? That's why it's our favorite type of deal. We've been doing it long enough. We already have the buyers. So we don't have to stress about that."); *id.*, Exh. L at 96:5–12 ("The focus of that three-day [workshop] . . . is teaching you and showing you the tools that we use to find that deals and start making offers. . . . You've got to find and have the tools and buy below market value.").

[191] *Id.*, Exh. B at 28:15–24 ("How many of you think you could even be more successful if I could provide funding to you from my network . . . . That's what we provide. It's what separates us. It's our competitive advantage that we're able to do."), 81:3–5 ("The whole purpose of the three-day [workshop] is so that once it's over, those of you that attended are now qualified to receive the funding from my network."); *id.*, Exh. D at 12 ("[W]e can put up the funding for you for any deal you want to do."); *id.*, Exh. H at 115:21–25 ("We brought together hundreds and hundreds and hundreds of lenders all across the country, and we got them to put up the cash. And this funding network is willing to fund our students' deals.").

[192] *Id.*, Exh. B at 27:17–24 ("I'm going to brag on our company. We have thousands upon thousands, if not tens of thousands, of documented testimonials. Students of ours all around the globe have said I have never done a real estate transaction in my life, and now I've got 20 flips, 30 rentals, whatever it happens to be."), 66:2–4 ("We've arranged funding for thousands of real estate transactions for students who said we just don't have the money."), 90–92 (telling story of a customer who had completed 178 flips in two years with Response's help); 94:18–19 ("My students are doing [wholesale flips] en masse."); *id.*, Exh. D at 30 (telling about customers who had repeatedly completed three flips that allowed them to purchase a rental property); *id.*, Exh. F at 39:13–18 ("Our funding network in just the last two years or so has funded over 13,000 real estate deals for our students. . . . [H]ow many of you in here would like to be a part of the next 13,000 properties our funding network funds?"); *id.*, Exh. H at 124–25 (Response speaker saying, after describing a wholesale deal netting $36,190 in profit, "My friends, that right there is why our students have so much success, because not only do they have the knowledge to do the deals . . . but they also have the cash."); *id.*, Exh. J at 65:13–16 ("You're going to hear from a student of ours here in a minute who paid for our training three years ago and has done deals since—every year since."); *id.*, Exh. L at 114:23–115:8 (The advisory board for our company, it is made up of people who have paid for our training and they're doing deals making money successfully. Right now, you could go look at the advisory board today, 2,316 individuals have put their name and a face behind it and said, hey, we paid for this training, we're doing deals, we're making money with it. And there's a lot of people who don't want to have their name and face on something. They're private. So there's

presented testimonials from customers who reported completing many deals each year,[193] and claimed that its "Success Audits" showed that as many as 67% of its Advanced Training customers had completed at least one deal.[194] Then, when discussing the mechanics of wholesale flips, Response presented hypothetical transactions in which investors made anywhere from $20,000 to $56,000 in profit[195] and suggested that completing three to five wholesale flips would yield enough profits to purchase a property, including rental properties, in cash.[196]

Dr. Isaacson's report also supports Plaintiffs' claim that such statements gave consumers the net impression that those who participated in Response's workshops would likely earn substantial income by completing wholesale flips. He reported that 86.7% of workshop participants surveyed responded that it was said or suggested to them that the training would give them the ability to make money in real estate.[197] He also reported that 92.8% of all Response customers surveyed responded that it was said or suggested to them that their earnings would exceed what they paid for Response's training.[198]

---

a lot more than that."); 126:17–20 ("I've yet to see a person do their first deal and then tell us, like, hey, you guys are great, high five, we're never going to do another one of those. Right? They always go on and do more.").

[193] *Id.*, Exh. B at 75 (customer stating that he had done "north of 60 deals . . . in three years"); *id.*, Exh. H at 109:17–110:5 (customer stating that he and his wife found their first property to flip within two weeks of the workshop and have kept doing it "again and again and again"); *id.*, Exh. J at 100 (customer stating that he was able to do his first deal within three weeks of attending a Response workshop and that he had done 61 total deals in 5 years); *id.*, Exh. L at 114 (speaker, after hearing customer testimonials, informed attendees that the customer had "done a lot more deals since" the first one).

[194] Plaintiffs' Exh. 52, Declaration of Consumer Sheena Holiday Exh. A, ECF No. 265-54 (2018 Preview Event Guide); Plaintiffs' Exh. 24, Isaacson Rpt. at 81 & n.152 (citing to 2015 Preview Event Guide); Defendants' Exh. 23, ECF No. 270-33 (2017 Preview Event Guide).

[195] Plaintiffs' Exh. 58, Hogan Decl., Exh B at 50–54 (profit of $56,000); *id.*, Exh. D at 19–20 (profit of $20,000); *id.*, Exh. F at 62–71, 80–83 (profits of $30,000 and $36,305); *id.*, Exh. H at 102–03, 123–24 (profits of $20–25 thousand and $36,190); *id.*, Exh. J at 76–78 (profit of $35,000); *id.*, Exh. L at 86–89, 104 (profit of $20–25,000).

[196] *Id.*, Exh. B at 96; *id.*, Exh. J at 53; *id.*, Exh. L at 106–07.

[197] Plaintiffs' Exh. 24, Isaacson Rpt. at 19, 36.

[198] *Id.* at 48.

Defendants argue that this evidence does not entitle Plaintiffs to summary judgment.[199] They argue that Plaintiffs' evidence from only six preview events is inadequate to show what happened in the more than 30,000 preview events Response has held and that Dr. Isaacson's survey results are unreliable.[200] Additionally, regardless of what was said during preview events, the disclaimers and disclosures Response provided during the events effectively gave consumers the net impression that investing is inherently risky and that, while consumers could make money using Response's training, their level of success would come down to their own efforts.[201] Defendants assert that the more than 2,000 customer declarations they have provided support this conclusion.[202]

Defendants' first two arguments do not show the presence of a genuine dispute as to any material issue. Even though Plaintiffs presented evidence from only six of Response's preview events, it appears undisputed that the events were scripted and largely the same, which, at the very least, renders the issue of whether they are representative of all other events one for the trier of fact.[203] In any event, although the number of times a misleading representation was made may affect whether the FTC and the UDCP are entitled to certain types of relief (a matter not adequately briefed by the parties),[204] it does not change the fact that a misleading representation

---

[199] ECF No. 287 at 41–43.

[200] *Id.* at 41, 46–47.

[201] *Id.* at 41–43.

[202] *Id.* at 42; *see also* Defendants' Opp. Exh. 11, Gibson Decl., Exh. A.

[203] *See* Plaintiffs' Exh. 12, Sanderson Depo. at 137:19–138:5; Plaintiffs' Exh. 59, Marino Decl., Exh. BA.

[204] *See Accusearch*, 570 F.3d at 1201 ("[T]he party seeking injunctive relief must demonstrate to the court 'that there exists some cognizable danger of recurrent violation . . . .'" (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953))); *Fed. Trade Comm'n v. LoanPointe, LLC*, No. 2:10-CV-225, 2011 WL 4348304, at *9 (D. Utah Sept. 16, 2011), *aff'd*, 525 F. App'x 696 (10th Cir. 2013) ("Whether there is a danger of a recurrent violation is determined by looking at two factors: 1) the deliberateness and seriousness of the present violation and 2) the violator's past record with respect to unfair advertising practices."); *Fed. Trade Comm'n v. DIRECTV, Inc.*, No. 15-CV-01129-HSG, 2018 WL 3911196, at *16 (N.D. Cal. Aug. 16, 2018) (finding, when the FTC sought "nearly $4 billion in restitution" due to the defendant's allegedly false advertisements, that the FTC did not "ha[ve] to introduce all of the more than 40,000 advertisements" in question into evidence, but it did "have to explain why conclusions

violates § 5 and the UCSPA regardless of whether it is made on one occasion or thousands.[205]

Further, Defendants' attack on the reliability of Dr. Isaacson's survey results is not a matter for

summary judgment, as already discussed.[206]

However, any disclosure or disclaimer Response made during preview events is relevant

to determining consumers' net impression of the presentation at the events. And Defendants have

provided evidence that Response provided some disclaimers and disclosures at various stages.

Response's preview event registration forms included bolded statements like:

- "[W]e do not guarantee your success.";
- "We do not make earnings claims . . . or claim that our training will make you any money."; and
- "Investing of any kind carries risk, and it is possible to lose some or all of your money."[207]

Verbal or written announcements near the beginning of preview events contained statements

such as:

- "We make no earnings or return on investment claims or guarantees.";
- "[C]ase studies or example transactions are hypothetical and are used for educational purposes only."; and
- "[T]he students we will feature in this presentation are some of the company's most successful students. Their earnings are not typical, and they purchased additional training. Most students that attend this introductory preview event do not make money."[208]

---

about a handful of advertisements can be applied to derive a uniform net impression" for such a large number of advertisements "that vary significantly in format, content and emphasis"); *see also Secs. & Exch. Comm'n v. Orton*, 100 F.3d 968, 1996 WL 639830 at *2 (10th Cir. 1996) (unpublished) (noting that "one of the factors that affects whether injunctive relief is warranted" in actions brought by administrative agencies under the SEC Act "is whether the misconduct is an isolated occurrence or recurrent").

[205] *See Fed. Trade Comm'n v. Johnson*, 96 F. Supp. 3d 1110, 1122 (D. Nev. 2015) (limiting its summary judgment ruling on net impression of the defendant's websites to those that were adequately documented in the record instead of the "larger universe of websites offered by the FTC").

[206] *See supra* Section I.A.1.a.

[207] *See, e.g.*, Defendants' Exh. 22 at 1, ECF No. 270-32.

[208] *See, e.g.*, Defendants' Exh. 24 at 7–8, ECF No. 270-34.

And Response's workshop registration forms included statements, in normal text, like:

- "The testimonials shared are from our top students . . . . Many do not apply the strategies employed by these students and do not have success."; and

- "[I]ndividuals who purchase our educational products and training may not make any money."[209]

Plaintiffs argue that such statements did not prevent Response's other representations from creating the net impression that its customers would likely earn substantial income by completing wholesale flips because they were too generalized and confusing.[210] They assert that some may have even played a role in creating that net impression by equating "successful students" with buying "additional training."[211] That may very well be the case. However, while that is one way this evidence can be interpreted, it is not the only way. Indeed, the approximately 2,300 summarized declarations Defendants have provided suggest that the disclaimers may have affected consumers' net impression. Most of the declarants stated that they remembered some type of disclaimer stating that Response did not provide a guaranteed money-making system and that they received no promises that they would earn substantial income if they purchased and used Response's training and products.[212]

Because Plaintiffs bear the ultimate burden of persuasion at trial, they are entitled to summary judgment on their claims only if they are able to show that "no reasonable trier of fact could find" for Defendants.[213] Defendants have produced evidence that Response's disclosures and disclaimers prevented some consumers from forming the impression that they were

---

[209] *See, e.g.*, Defendants' Exh. 29 at 1, ECF No. 270-39.

[210] ECF No. 307 at 5–6.

[211] *Id.*

[212] Based on the court's own review of the declaration summaries, after excluding declarations from customers who appear to have participated only in Response's stock investment training programs.

[213] *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (emphasis omitted) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)).

guaranteed or likely to earn substantial income by participating in Response's workshops. This evidence, especially when viewed in a light most favorable to Defendants as the non-moving parties on these allegations,[214] could lead a reasonable trier of fact to conclude that ordinary consumers were not likely to be misled with regard to their likely earnings. Accordingly, Plaintiffs are not entitled to summary judgment on these allegations.

For Plaintiffs' allegations regarding misleading earnings representations during Response's telemarketing calls, the outcome is the same.[215] It is undisputed that many of the telemarketing call recordings Plaintiffs have provided included statements like:

- "[W]e're trying to find some individuals out in your market, in your group, that we feel like we can create even better momentum with them by working with them on a much more personalized basis.";[216]

- "[W]e'll assign these students to work with one of our top investors to go out there and do this business with them . . . .";[217]

- "[This is] a unique opportunity where we're going to be taking some of these individuals from some of these workshops and actually assigning them to work with some of our top experts in a more one on one setting over the next year.";[218]

- "[W]e don't . . . offer this to everyone . . . .";[219]

- "[W]e're able to help you do a lot more a lot faster than you would on your own. Of course, you benefit there, eliminating all the trial and error, wasted time and research and getting out and doing deals a lot quicker and safer . . . .";[220]

---

[214] *See Otteson v. United States*, 622 F.2d 516, 519 (10th Cir. 1980) ("On a motion for summary judgment, . . . the pleadings and other documentary evidence must be construed in favor of the party opposing the motion.").

[215] ECF No. 267 at 59; Plaintiffs' Exh. 59, Marino Decl., Exh. Y.

[216] *See, e.g.*, Plaintiffs' Exh. 59, Marino Decl., Exh. C, Call to Consumer BB at 2:40–3:02; *see generally id.* Exh. B. The court has listened to the telemarketer call recordings Plaintiffs have provided to verify that the quoted excerpts in the exhibits accompanying Marino's Declaration are accurate. When citing to this evidence, the court will use the terminology and pseudonyms used by Plaintiffs.

[217] *See, e.g.*, *id.*, Exh. C, Call to Consumer DD at 8:08–8:40.

[218] *See, e.g.*, *id.*, Exh. C, Call to Consumer NN at 27:45–28:00.

[219] *See, e.g.*, *id.*, Exh. O at 36:8–22.

[220] *See, e.g.*, *id.*, Exh. C, Call to Consumer BB at 3:32–3:51.

- "There's an additional investment on top of what you've spent. It's a one-time, up-front investment, but I'm going to show you where it can, does, and will pay for itself, and you have to believe that or I don't want you to do it.";[221]

- "[I]f you keep your appointments, do your work, we do these offers, and at the end of it you weren't satisfied, we would refund every dime back to you.";[222]

- "I think [$200,000 on real estate by the time you retire is] a great goal. . . . I like the goals. I think they are very good. Very realistic.";[223]

- "I think [$60,000 per year is] a very good, realistic goal.";[224]

- "So I look at whatever a person goal is, an even if that goal is 5,000 a month personally you'd like to coming in above and beyond what you already have for you. . . . But we probably want you to be at least 4 or 5 times past that to see some lucrative, you know, and some cash you could put back into the business."[225]; and

- "I want you to envision . . . I'd love to get you in a position where we could be doing four, five, six of these wholesale deals a month with you . . . . [A Response employee] probably talked to you about some of the different averages that we make on those types of deals. . . . [Y]ou talk about $100,000 a month, I mean, I love that number, right, and why couldn't you get there if you did the right types of deals and you did it the right way."[226]

A reasonable trier of fact could find that such statements, standing alone, gave the net impression that those who participated in one-on-one coaching would earn as much as, if not more than, they paid for the program.

However, Defendants argue that when such statements are viewed in light of the disclosures made by Response's registration agents, they did not create the net impression

---

[221] *See, e.g.*, *id.*, Exh. C, Call 1 to Consumer ZZ at 1:09:24–1:09:35.

[222] *See, e.g.*, *id.* at 1:17:40–1:17:48.

[223] *See id.*, Exh. C, Call 1 to Consumer JJ at 27:32–30:12.

[224] *Id.*, Call to Consumer NN at 15:05–15:42.

[225] *Id.*, Call to Consumer VV at 33:35–35:33.

[226] *Id.*, Call to Consumer EE at 24:03–25:00. See generally *id.*, Exh. B for other similar and related representations Response made on this subject.

Plaintiffs allege.[227] It is undisputed that before completing any telemarketing sale, Response's registration agents told consumers that its coaching programs were just "an education and training program and as with all educations, businesses and investments the income you realize is entirely based on your own personal commitment."[228] They also asked consumers "to verify that no earning claims ha[d] been presented to [them]."[229] According to Defendants, this disclosure and question were sufficient to prevent consumers from having the impression that earnings were guaranteed in any way.[230]

However, in considering this evidence it is important to note that Response's registration agents made this disclosure and asked this question only to consumers who had decided to purchase one-on-one coaching, approximately 5,100 of over 30,000 consumers who collectively received more than 120,000 telemarketing calls from Response.[231] Indeed, of the 35 consumers in Plaintiffs' sample, 17 of them did not purchase one-on-one coaching and so never heard the disclosure nor were asked the earnings claim question. This raises some doubts regarding the evidentiary value and relevance of Response's disclosure and earnings claim question to the question of net impression. It goes without saying that the fact that some consumers heard a disclosure has no bearing on the net impression of others to whom that disclosure was never made.

However, the fact that each consumer who purchased one-on-one coaching was asked whether any earnings claims had been presented to them, and ostensibly *answered in the*

---

[227] ECF No. 287 at 60–61.

[228] *See* Defendants' Opp. Exh. 14 at 1–2, 4.

[229] *Id.*

[230] ECF No. 287 at 60–61.

[231] *See* Plaintiffs' Exh. 1, Defendants' First Amended Answer at 25; Defendants' Opp. Exh. 8, Poelman Nov. 2021 Decl. ¶¶ 9–10.

*negative*, may be significant in determining the net impression of Response's representations during telemarketing calls. According to Plaintiffs, Response's misleading earnings representations during telemarketing calls were widespread, which would suggest they were made to consumers who ultimately decided to purchase one-on-one coaching and those that did not.[232] Indeed, 18 of the 35 consumers in Plaintiffs' sample purchased one-on-one coaching after hearing the types of statements that allegedly created the net impression that those who participated in one-on-one coaching would earn as much as, if not more than, they paid for the program. Yet Defendants' evidence suggests that despite hearing such statements, consumers who made a purchase reported that no earnings claims had been made to them, which is pertinent to the question at hand.[233]

Of course, the significance of consumers' answers to this question depends on whether they understood what Response's registration agents meant by "earnings claim," or whether they would have considered any representation that one-on-one coaching would lead to profits that equaled or exceeded its costs to be an earnings claim. The record lacks evidence on these points for most consumers who were asked whether an earnings claim had been made to them.[234]

The definition Response provided to consumers who inquired about the meaning of "earnings claim"—that an earnings claim is a promise of a "specific amount of money . . . in a set amount of time"—also creates doubts as to whether consumers would have considered the

---

[232] ECF No. 267 at 56–57, 70.

[233] Plaintiffs' sample contains ten calls in which consumers spoke with Response's registration agents. *See* Defendants' Opp. Exh. 14 at 7, 9, 15, 18, 20, 24, 26, 33, 39, 43. When asked in these calls whether any earnings claims had been made to them, the consumers replied that no earnings claim had been made. *See id.* Neither party has raised any argument as to whether any consumer ever replied that an earnings claim had been made to them or what Response would have done had they done so.

[234] In two of the ten calls in which Response's registration agents asked consumers whether any earnings claims had been made to them, consumers asked questions or made statements that led the registration agents to provide Response's standard definition for an "earnings claim." *See id.* at 24, 43.

kinds of statements Plaintiffs have identified to be an earnings claim.[235] A representation that those who participated in one-on-one coaching would earn the same as, if not more than, they spent on it is not necessarily a promise of a specific amount of money in a set amount of time. Thus, it is certainly possible that consumers could have had the impression that they would earn more than they paid for one-on-one coaching yet truthfully responded that no earnings claim had been made to them.

Nevertheless, as the non-moving parties on these allegations, Defendants are entitled to have all facts, and the reasonable inferences that might be drawn from them, construed in their favor.[236] A reasonable trier of fact could infer that consumers would have considered any representation that they would earn as much from participating in a coaching program as they spent on it, if not more, to be an earnings claim. With that inference, the fact that some consumers responded that no earnings claim had been made to them becomes evidence that those consumers did not believe any such representation was made to them. And because over 5,100 consumers ostensibly reported that no earnings claim was made to them, a reasonable trier of fact could then conclude that the statements made by Response's telemarketers were not likely to create such an impression. Therefore, there is a genuine dispute regarding the net impression of Response's telemarketing calls.

In summary, because there is a genuine dispute regarding the net impression of Response's statements and representations during its preview events and telemarketing calls, Plaintiffs are not entitled to summary judgment on their earnings representation claims. There is

---

[235] *See id.*; *see also* Defendants' Opp. Exh. 15 at 2–3, 5, 7, ECF No. 285-16.

[236] *See Otteson v. United States*, 622 F.2d 516, 519 (10th Cir. 1980).

therefore no need to determine at this time whether those alleged representations were likely to mislead ordinary consumers.

### B. Misrepresentations Regarding Response's Training Programs (Counts II and VII)

Plaintiffs next claim that Response violated § 5 and the UCSPA by making various misrepresentations about the tools and services its trainings would provide or include.[237] According to Plaintiffs, these included representations related to providing:

(1) access to Response's "funding network," which would provide funding for consumers to complete real estate deals without using any of their own money;

(2) methods and tools to find and purchase properties at discounted or wholesale prices;

(3) cash buyers for wholesale transactions or methods and tools to find them;

(4) personalized assistance from Response's "experts" or "top investors" to complete real estate transactions; and

(5) access to "discounted" "rental rehabbed" and "cash flowing" properties as well as "low risk" trust deeds at Response's Investor Expos and Buying Summits.[238]

Defendants move for summary judgment on all of these allegations, while Plaintiffs move for summary judgment on only the first three. The court will address the parties' arguments for summary judgment on the alleged misrepresentations regarding each of these subjects separately.

### 1. Access to Response's Funding Network

The undisputed record shows that Response made various representations about how its customers would receive access to funding from its "network" with which they could complete

---

[237] ECF No. 267 at 60–61.

[238] ECF No. 173 at 62–63.

transactions without using any of their own money.[239] Response's infomercials and preview events included the following types of representations about its funding "network":

- "[Y]ou'll discover all kinds of ways to find deeply discounted properties . . . you can get for a fraction of their value, and flip for amazing profits—deals so good that [Yancey's] money partners will put up the money for you . . . .";[240]

- "For those of you that partner with our network today, we have a network of investors who are willing to put up 100 percent of the money that you need to buy these properties you want to flip. Now, listen to me. I want to say this boldly, not a penny will ever come out of your pocket.";[241]

- "[W]e as a company . . . have a lending network that will put up 100% of the capital . . . . [W]e can put up the funding for any real estate deal you want to do.";[242]

- "[Yancey and his wife] . . . brought together some of their very affluent partners, and they got them to put up the cash. And this funding network is willing to fund our students' deals.";[243]

- "We have a funding partner that funds our deals for us. We've been doing so for years and years. Students who do our training or our classes with us, they get to use our funding partner to fund those transactions.";[244]

- "We brought together hundreds and hundreds and hundreds of lenders all across the country, and we got them to put up the cash. . . . for our students' deals.";[245]

- "We've arranged funding for thousands of real estate transactions for student who said we just don't have the money. Yes, you do, you've got access to it with us.";[246] and

- "Our funding network in just the last two years or so has funded over 13,000 real estate deals for our students."[247]

---

[239] Nor do they dispute that such representations were material.

[240] Plaintiffs' Exh. 59, Marino Decl., Exh. Q at 1.

[241] Plaintiffs' Exh. 58, Hogan Decl., Exh. B at 81:3–18

[242] *Id.*, Exh. D at 26.

[243] *Id.*, Exh. F at 73:7–21.

[244] *Id.*, Exh. J at 26:20–24.

[245] *Id.*, Exh. H at 115:16–25.

[246] *Id.*, Exh. B at 66:2–5.

[247] *Id.*, Exh. F at 39:13–15.

At least in recent years, Response specifically advertised that its network would provide such funding for a fee of 1.65% of the amount borrowed, plus an additional fee, once the transaction was complete.[248] Response told consumers that it and its network were able to benefit from funding such transactions, even though the return of 1.65% was relatively small, because of the large number of deals that were funded for Response's students.[249]

Defendants do not dispute that Response made such representations or that such representations are material. Instead, they argue that that they are entitled to summary judgment with regard to these representations because Plaintiffs have failed to show that they were misleading.[250] According to Defendants, Response always provided what it promised.[251] From 2011 to 2016, Response's customers had access to no-money-down transactional funding for wholesale flips, as well as other types of loans, through an affiliate of BuyPD called "Insider's Cash."[252] And, beginning in 2016, Response gave its customers access to a "database" Response had a third party create that listed and provided information about over 300 lenders who provide transactional, hard money, and other types of loans.[253]

Plaintiffs do not dispute that Response's customers had access to Insider's Cash and the alleged "database" of lenders after participating in Response's workshops.[254] Instead, they argue that no reasonable trier of fact could find that either of these options constituted the type of special access to a unique "funding partner" or "network of lenders" that Response represented it

---

[248] *Id.*, Exh. B at 88:9–18; *id.*, Exh. D at 27; *id.*, Exh. F at 78:21–25; *id.*, Exh. H at 120:8–25; *id.*, Exh. L at 103:20–104:2.

[249] *Id.*, Exh. B at 108:23–109:4; *id.*, Exh. D at 28; *id.*, Exh. F at 79:1–20; *id.*, Exh. J at 61–62, 77–79, 82–83.

[250] ECF No. 270 at 21–22.

[251] *Id.*

[252] *Id.* at 11, 21–22.

[253] Defendants' Exh. 43, Declaration of Nathan Street ¶¶ 3–4, ECF No. 270-53.

[254] ECF Nos. 267 at 60; 294 at 64–65.

would provide.[255] Plaintiffs argue that Response's promise of access to no-money-down transactional funding was largely illusory because it was available only for wholesale flips that were difficult to complete and the record indicates that few of Response's customers ever used such funding.[256] Plaintiffs also argue the "database" Response provided beginning in 2016 was in no way its "own network."[257] They assert that the database was no more than a website that compiled and summarized information about lenders that was already available to the general public and with whom Response had no relationship whatsoever.[258] They assert that the same was true with regard to the lender Response specifically told consumers would provide 100% funding for a 1.65% fee—Plan D Investments, operating as BestTransactionFunding.com.[259]

Having reviewed the record, the court finds that Response's representations about providing access to "its funding network" were likely to mislead ordinary consumers acting reasonably under the circumstances. Response's presenters, speakers, and celebrity endorsers referred to the "funding network" in possessive terms such as "my network" or "our network"[260] and made various statements indicating that Response had a role in providing, and a financial interest in, its network's funding.[261] Indeed, as noted above, some of the infomercials involving Yancey went as far as to call the network Yancey's "money partners."[262] Such representations were likely to give the impression that Response had a special relationship with lenders, played a

---

[255] ECF Nos. 267 at 60; 294 at 64–65.

[256] ECF No. 294 at 65 & n.179; Plaintiffs' Exh. 34, Declaration of Duane Ortega ¶ 4, ECF No. 265-36.

[257] ECF Nos. 267 at 60; 294 at 38–39.

[258] ECF Nos. 267 at 60; 294 at 38–39.

[259] ECF Nos. 267 at 60; 294 at 38–39.

[260] Plaintiffs' Exh. 58, Hogan Decl., Exh. B at 28:15–24; *id.*, Exh. D at 26; *id.*, Exh. F at 39:13–15, 73:7–11; *id.*, Exh. H at 115:16–24.

[261] *Id.*, Exh. B at 83:1–11, 93:21–94:3, 108:23–109:2; *id.*, Exh. D at 30, 34–35; *id.*, Exh. H at 115:16–20, 120:15–18; *id.*, Exh. J at 61–62, 71, 88–89; *id.*, Exh. L at 92:18–94:6.

[262] Plaintiffs' Exh. 59, Marino Decl., Exh. Q at 1; *see also* Plaintiffs' Exh. 58, Hogan Decl., Exh. F at 73:7–21.

role in providing the funding, and received a financial benefit when its customer used its lending network. While there may be a genuine dispute as to whether Response's pre-2016 Insider's Cash program was consistent with this impression,[263] that is not the case for the "database" Response began providing in 2016.

The "database" was a website created and maintained for Response by a third party who contacted each lender on a monthly basis to update the terms, conditions, and requirements of the loans they offered.[264] But it did no more than list information about lenders, which could have been found on their websites, who *might* provide the type of funding about which Response taught consumers. Consumers who desired one of the loans listed had to apply and be approved through the lender's own website.[265] Response had no relationship or agreement with these lenders, financial or otherwise.[266] This meant that, contrary to its representations, Response played no direct role in providing the funding for its customers and derived no financial benefit if they received funds from these lenders and completed deals.

The same is generally true of Plan D's funding, which Response specifically advertised. Although Plan D offered Response customers 100% funding for the 1.65% fee as Response advertised, that was merely the rate Plan D offered to every person who was referred to its

---

[263] Insider's Cash was a subsidiary of BuyPD, which, as already noted, was affiliated with, and shared some common ownership with, Response.

[264] Defendants' Exh. 43, Street Decl. ¶¶ 7, 12.

[265] *Id.* ¶ 11.

[266] Defendants assert that over 300 lenders were part of Response's database and that the database's creator and manager, Nathan Street, had "pre negotiated loan terms for [Response's] students with some of [them]." ECF No. 287 at 31–32. However, the record evidence Defendants cite does not support that assertion. Lewis stated that he had been told that the database included lenders with whom special rates had been negotiated for Response's customers, but he could not identify any lenders that actually did. *See* Plaintiffs' Exh. 7, Lewis Depo. at 238:16–239:12. In any event, and as already noted, Street stated in his declaration that he did no more to maintain the database than "contact[] each [lender] on a monthly basis to ensure the information on the [network] Website [was] accurate and current." Defendants' Exh. 43, Street Decl. ¶ 7. And Sanderson testified during his deposition that he had no knowledge of any contractual relationship between Response and any lender in the database. Plaintiffs' Exh. 12, Sanderson Depo. at 50:22–25.

website, and only slightly lower than its standard 1.75% fee.[267] Response had no role in the ultimate decision of whether Plan D would provide funding and would receive no financial benefit from any funding that was provided.[268]

Representations Response made about consumers' ability to complete deals without using any of their own money, and about thousands of its customers doing just that, were equally likely to mislead. It is undisputed that Response's "network" offered no-money-down funding only in the form of transactional funding, "a type of short-term funding for only 'back-to-back' real estate closings where there are two almost simultaneous closings on the same property using the same title company or closing agent."[269] While it is true that Response's trainings focused primarily on a specific type of real estate transaction that requires this type of funding, wholesale flips,[270] at least some of Response's representations about access to no-money-down funding were not restricted to discussions about wholesale flips. In some preview events, Response introduced or spoke about its network's no-money-down funding in broad terms, stating that its funding network would provide no-money-down funding "for any real estate deal [its customers] want to do."[271] And although Response usually discussed the specifics of securing no-money-down transactional funding in the context of wholesale flips, particularly when discussing Plan

---

[267] Plaintiffs' Exh. 34, Ortega Decl. ¶¶ 3, 9.

[268] *See* Plaintiffs' Exh. 19, Poppinga Depo. at 51:22–52:14; Plaintiffs' Exh. 34, Ortega Decl. ¶¶ 3, 9.

[269] *See* Plaintiffs' Exh. 34, Ortega Decl. ¶ 3; Plaintiffs' Exh. 25, Report of Plaintiffs' Expert Teo Nicolais at 47–48, ECF No. 265-27.

[270] ECF No. 311 at 24–25.

[271] Plaintiffs' Exh. 58, Hogan Decl., Exh. D at 26; *see also id.*, Exh. B at 28:15–25, 80:20–24, 81:12–18; *id.*, Exh. D at 12; *id.*, Exh. J at 26–27.

D's funding,[272] it made minimal efforts, if any at all, to clarify that the funding available for other types of transactions was not no-money-down.[273]

As for Response's representations about how thousands of consumers without money for real estate deals had received funding through its network, Defendants argue that such representations were not misleading because "[a]pproximately 150 students took out short term loans and thousands took out two- or three-year loans from Insider's Cash directly."[274] However, as Plaintiffs have noted, the two- and three-year loans Insider's Cash offered are irrelevant to the representation at issue because they were not no-money-down options.[275] The same is true of the three-month loan offered through Insider's Cash, which was considered a "short-term loan" in calculating that 150 Response customers obtained short-term loans, though it is not clear how many of those 150 received transactional funding and how many received a three-month loan.[276] In any event, the 150 customers who possibly obtained transactional funding from Insider's Cash is insignificant, and does not support Response's representations regarding transactional funding, considering the undisputed fact that tens of thousands of consumers were given access to Response's "network."[277]

---

[272] *Id.*, Exh. B at 93:8–12; *id.*, Exh. D at 27–28; *id.*, Exh. F at 74:4–80:8; *id.*, Exh. L at 103:20–25, 105:19–106:10.

[273] *See, e.g.*, *id.*, Exh. H at 115:5–116:17 (presenter introduced the topic of no-money-down funding by saying that the funding network funds all types of deals before saying that he would focus only on wholesale transactional funding).

[274] *See* Defendants' Exh. 8, Undated Declaration of Ryan Poelman ¶ 29, ECF No. 270-9.

[275] *See* Defendants' Exh. 41, ECF No. 270-51.

[276] *Id.*

[277] *See* Plaintiffs' Exh. 31, Sanderson Decl. ¶ 43 (stating that over 54,000 consumers attended a workshop between June 2014 and June 2017 alone).

Representations that many customers had obtained funding during the time period Response offered its "database" of lenders were even more egregiously unsubstantiated.[278] Although Response's database was accessed by its customers over 130,000 times, Defendants have admitted that there is no evidence as to how many of those customers actually received funding through its database.[279] Additionally, although Plan D was not the only source of transactional funding about which Response informed its customers, it is undisputed that only three Response customers received transactional funding from Plan D from July 2018 until the commencement of this lawsuit.[280]

In short, the court finds that Response's representations regarding its funding "partner" or "network" were likely to mislead ordinary consumers acting reasonably under the circumstances. No reasonable jury could conclude otherwise. Therefore, Plaintiffs are entitled to summary judgment as to these representations.

### 2. Methods and Tools to Find Discounted Properties—Proof-of-Funds Letters and Software

The record shows that Response made the following types of representations about its tools and methods to find discounted properties in its advertisements and during its preview events:

- "At the [preview] event, you'll discover all kinds of ways to find deeply discounted properties like these in your area.";[281]
- "If I had the ability to . . . help you get a property . . . anywhere in the country at an incredibly reduced price below wholesale in this market, is that an

---

[278] As noted above, a presenter during a preview event in March 2018 stated that Response had provided funding for over 13,000 customers in the prior two years. *See* Plaintiffs' Exh. 58, Hogan Decl., Exh F at 39:12–18.

[279] ECF No. 287 at 32.

[280] *See* Plaintiffs' Exhibit 34, Ortega Decl. ¶¶ 13–14.

[281] Plaintiffs' Exh. 59, Marino Decl., Exh. Q at 1.

advantage, yes or no? . . . That's what we . . . as a company do. I'm going to show you how we do it.";[282]

- "[W]e have advantages, I challenge you to show me any other company doing what I'm about to do for you."[283]

- "[P]art of what I have to do today is to teach you how to find the properties . . . that your typical investor doesn't even know exists.";[284]

- "[I]f you do what everybody does, if you follow what I call the path of least resistance, you're not going to find the good deals, and you're definitely not going to find the great deals. And so part of what I have to do today is to teach you how to find the properties ahead of your competition and how to get them below wholesale.";[285]

- "[Y]ou need to have access to what [Graziosi] and I refer to as our private MLS. . . . [T]here is a myriad of different ways that we find distressed sellers, and we're going to talk about a couple of them here today . . . . [I]t gives you the ability to acquire properties below market value.";[286]

- "Let me be very clear. You are not going to find deals like this on MLS. That's why knowing how to find off-market deals is the most important— frankly the most valuable thing that we're going to teach you at the workshop.";[287] and

- "The focus [of Response's workshop] is teaching you and showing you the tools that we use to find the deals . . . the way that we get them. . . . You've got to find and have the tools and buy below market value. . . . [T]he majority of that [workshop] is showing you how to do exactly that. . . . This is one of the main things we're going to talk about there at the [workshop] that you're going to love, private MLS. It's our own thing. We've given it that name on our own. Private MLS is what we use, and the majority of it's online. The resources we use to buy below market value, off-market properties . . . ."[288]

Response told consumers that one way they could purchase properties at discounted prices, and have a competitive advantage over other buyers, was by buying properties with cash.[289]

---

[282] Plaintiffs' Exh. 58, Hogan Decl., Exh. D at 13.

[283] *Id.* at 17–18.

[284] *Id.*, Exh. F at 30:11–14.

[285] *Id.* at 13:17–23.

[286] *Id.*, Exh. H at 57:2–58:8.

[287] *Id.* at 121:22–122:2.

[288] *Id.*, Exh. L at 96:6–22.

[289] *Id.*, Exh. F at 41:19–42:2, 43:10–12, 63:3–15, 80:19–24; *id.*, Exh. H at 64:23–65:9, 96:6–97:7; *id.*, Exh. J at 25, 36–37; *id.*, Exh. L at 69:9–70:12.

Response represented that consumers would be able to do so with funds from its network of lenders and that the lenders would provide "proof-of-funds" letters to increase the likelihood that their offers would be accepted.[290] Response also taught that another way to purchase properties at discounted properties was to find distressed sellers.[291] Response represented that it had unique software—its "private MLS"—that would help consumers find such properties.[292]

Defendants argue that these representations were not misleading, and thus they are entitled to summary judgment, because Response provided the tools and methods it promised throughout the trainings it offered.[293] Defendants argue that many Response customers were able to use the proof-of-funds letters from its "lending network" to help complete their deals.[294] They also argue that consumers who purchased workshops and Advanced Training received access to various versions of software that Response licensed from third parties and that this software allowed users to search for and identify properties that appeared to be in distress.[295] As for any representations Response made regarding this software being unique, Defendants argue that such representations were isolated and amount to no more than non-actionable puffery.[296]

According to Plaintiffs, the tools and methods Response provided did not live up to Response's representations.[297] Plaintiffs argue that the proof-of-funds letters Response provided were merely loan pre-approval letters that could be obtained by anyone, in a matter of seconds,

---

[290] *Id.*, Exh. B at 98:4–100:9; *id.*, Exh. F at 80:16–81:23; *id.*, Exh. H at 121:15–123:4; *id.*, Exh. J at 30–31; *id.*, Exh. L at 82:20–83:17.

[291] *Id.*, Exh. D at 18; *id.*, Exh. F at 66:13–21, 80:19–81:4; *id.*, Exh. H at 57:20–58:8; *id.*, Exh. L at 70:12–23.

[292] *Id.*, Exh. F at 49:14–20; *id.*, Exh. L at 96:13–23; Plaintiffs' Exh. 59, Marino Decl., Exh. M at 1:31:59–1:32:15.

[293] ECF No. 270 at 22–23.

[294] *Id.* at 22.

[295] *Id.*

[296] ECF No. 311 at 27.

[297] ECF No. 267 at 60–61.

from the website Response showed its customers, BestTransactionFunding.com.[298] They did not

show that Response's customers could purchase a property with cash and, thus, were of no use

for making cash offers.[299] Plaintiffs also argue that all the ways Response taught its customers to

find discounted properties were not unique, contrary to Response's representations.[300] This

included the software Response licensed, which Plaintiffs assert was no different than a public

version the software licensor offered for a small fee.[301]

Both Plaintiffs and Defendants provided expert testimony regarding Response's proof-of-

funds letters. Plaintiffs' expert Teo Nicolais asserts in his reports that pre-approval letters and

proof-of-funds letters are two distinct types of documents used in real estate transactions: a pre-

approval letter is "[a] commitment from a lender to provide . . . home financing up to a certain

loan amount" while a proof-of-funds letter "is a document that proves the home buyer has

enough liquid cash to purchase a home."[302] According to Nicolais, the letters Response provided

were pre-approval letters—as they stated only that the buyer had a "proposed loan," "funding,"

or funds that were "subject to final underwriting"—and thus did not prove that Response's

customers had liquid cash funds for a transaction and provided little if any value in making "cash

offers."[303]

Unlike Nicolais, Defendants' expert Paul Habibi took no issue during his deposition with

Response calling the letter it provided a proof-of-funds letter.[304] However, he acknowledged that

---

[298] *Id.*

[299] *Id.*

[300] *Id.* at 61.

[301] *Id.*

[302] Plaintiffs' Exh. 25, Nicolais Rpt. at 51–52 (citing materials from the National Association of Realtors).

[303] *See id.* at 55–58; Plaintiffs' Exh. 26, Nicolais Supp. Rpt. at 94–96.

[304] Plaintiffs' Exh. 21, Habibi Depo. at 102:3–103:13, 104:20–105:18.

a proof-of-funds letter is usually "a redacted bank statement sent by the buyer" and that the letters Response provided showed only that the purchaser had access to third-party funding subject to certain conditions or underwriting requirements.[305] Most importantly, he also acknowledged that cash offers typically "do not have third-party financing" and that using Response's letters as part of a cash offer "would potentially be confusing because a cash offer usually means that the buyer has cash ready to tender for the transaction," not funding from "a third-party lender."[306]

In light of this expert evidence, the court finds that Response's representations about its proof-of-funds letters were likely to mislead an ordinary consumer. These representations included telling consumers that the letters would help consumers "pay cash for . . . properties" by showing "where the cash is coming from,"[307] show sellers "that you can actually pay cash for the property,"[308] and prove with "verifiable proof" that "we pay cash,"[309] all of which would give consumers "a competitive advantage" in securing discounted properties.[310] However, according to both Nicolais and Habibi, the proof-of-funds letters showed only that Response's customers were pre-approved for a conditional loan, not that they had cash ready to complete the transaction. And it appears that Response did not admit this until after consumers had paid for and attended its workshops.[311] Accordingly, it appears the letters were incapable of providing the

---

[305] *Id.* at 102:3–103:16, 104:20–23.

[306] *Id.* at 103:25–104:20.

[307] Plaintiffs' Exh. 58, Hogan Decl., Exh. F at 80:24–81:11.

[308] *Id.*, Exh. H at 122:10–24; *see also id.*, Exh. J at 30–31 ("Real estate proof of funds letter to strengthen that offer. . . . [I]t's basically a one-page document. They can call the bank . . . . verify that we can pay cash now.").

[309] *Id.*, Exh. L at 82:20–83:15.

[310] *Id.* at 83:9–17.

[311] *See* Plaintiffs' Exh. 78, Gonzalez Decl., Exh. C at 21 (workshop manual stated that proof-of-funds "[d]oes not guarantee funding").

benefits Response represented they could provide: helping its customers get properties at a discount by showing they had cash unconditionally available for the proposed transaction.

Defendants argue that there is nonetheless a genuine dispute as to whether Response's representations regarding proof-of-funds letters were likely to mislead because some of its customers found the letters valuable in completing deals.[312] However, this does not create a genuine dispute on the issue. The fact remains that Response misrepresented what the proof-of-funds letters were and what assistance they could provide. That some customers found the letters valuable despite Response's misleading representations does not change the fact that those misleading representations were made in violation of § 5 and UCSPA. Therefore, Plaintiffs are entitled to summary judgment with regard to Response's representations about its proof-of-funds letters.

With regard to whether Response made representations about its software that were likely to mislead ordinary consumers, the record shows that Response made some representations about its software being unique.[313] A preview event speaker stated that the software was Response's "own thing,"[314] and a workshop speaker stated that "[t]here's nothing like it that exists" and that he had "researched every single potential tool" and "never seen anything like it."[315]

It is clear from the record that Response did not create the software offered to its students, but licensed it from third parties who also offered their software products to the general

---

[312] ECF No. 287 at 17, 32, 49.

[313] According to Plaintiffs, Defendants do not dispute that their other methods for finding distressed sellers, apart from their software, were not unique. *See* ECF No. 307 at 18. However, Plaintiffs have produced no evidence that Response ever said those methods were unique.

[314] Plaintiffs' Exh. 58, Hogan Decl., Exh. L at 96:6–22.

[315] Plaintiffs' Exh. 59, Marino Decl., Exh. M at 1:31:59–1:32:15.

public.[316] Up until 2016, Response licensed a "white label" version—one that can be "branded with a different name" or "color scheme"—of software created by EquiMine.[317] After that point, Response licensed software from RealeFlow LLC, which utilized the elements of RealeFlow's software chosen by Response and was co-branded to include Response's logos and color schemes.[318]

Based on this evidence, Response's representations touting the software provided to its customers as its "own thing" may or may not have been misleading. Although the software clearly was not wholly its own, there is evidence in the record that Response had some say regarding not only the look of the software it licensed, but also the features and tools it included.[319] Whether these functional or operational alterations to the licensed products were substantial enough for the software to be considered Response's own product or unique is a question for the trier of fact.

However, no reasonable trier of fact could find based on this record that a statement like "there's nothing like [Response's software] that exists" was not likely to mislead consumers. Even if the version of software Response licensed was not the same as the versions the licensors sold to the general public, there is no dispute that they were similar in look and function.[320] Additionally, contrary to Defendants' assertion, such a statement was not non-actionable puffery. Non-actionable puffery is generally defined as "exaggerated advertising, blustering, and boasting

---

[316] Plaintiffs' Exh. 26, Nicolais Supp. Rpt. at 58–66.

[317] Plaintiffs' Exh. 35, Declaration of Nedal Makarem (Vice Pres. of EquiMine) ¶¶ 3, 17, ECF No. 265-37; *see also* Defendants' Exh. 14, Deposition of Kent North at 280:4–14, ECF No. 270-15.

[318] *See* ECF No. 294 at 43; Plaintiffs' Exh. 84, Marino Supp. Decl., Exh. JJ.

[319] *See* Plaintiffs' Exh. 35, Makarem Decl. ¶ 17; Defendants' Opp. Exh. 7, ECF No. 287-3.

[320] *See* Plaintiffs' Exh. 26, Nicolais Supp. Rpt. at 61–66.

upon which no reasonable buyer would rely."[321] However, representations that are "specific and measurable," or "that may be literally true or false," go beyond puffery.[322] The representation that "nothing like [Response's software] exists" falls into that category. Thus, although there is a genuine dispute as to whether all of the statements Response made about the uniqueness of its software were misleading, Plaintiffs have shown, as a matter of law, that Response made some that violated § 5 and the UCSPA.

In summary, Plaintiffs have shown that Response, in touting its program's ability to help consumers find discounted properties, made representations about its network's proof-of-funds letters and its software that were likely to mislead ordinary consumers acting reasonably. Therefore, Plaintiffs are entitled to summary judgment with regard to these representations.

### 3. Access to Cash Buyers

The record shows that Response made the following representations about providing access to, or teaching customers how to find, "cash buyers" for its customers' wholesale flips:

- "At the three-day class, we're going to literally show and teach you. . . . We're going to have a list of cash buyers already set up. Already set up. So that every time you get a property, you've immediately got someone to sell the property to who's a cash buyer.";[323]

- "[I]n the U.S., there are 1.3 million cash buyer investors. . . . [M]ore buyers than we've ever had before. Frankly, it's the easiest part of our [wholesale] transaction. I hate the word 'easy,' but it's the simplest part of our transaction.";[324]

- "At the workshop, we'll show you how to have more cash buyers than you know what to do with. . . . [W]e will show you how to have multiple cash

---

[321] *Fed. Trade Comm'n v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 11 (1st Cir. 2010) (*quoting Clorox Co. Puerto Rico v. Proctor & Gamble Comm. Co.*, 228 F.3d 24, 38 (1st Cir. 2000))).

[322] *Id.*

[323] Plaintiffs' Exh. 58, Hogan Decl., Exh. B at 100:10–20.

[324] *Id.*, Exh. F at 31:1–17.

buyers, submit your deal to all of them, get them fighting over the deal, which drives up the price, puts more cash in your pocket."[325];

- "That's why [wholesale flips are] our favorite type of deal. We've been doing it long enough. We already have the buyers. So we don't have to stress about that."[326];

- "The very first thing we show you at that training . . . is . . . how to use our buyer's system to locate and find five to 15 buyers in the market you want to invest in . . . ."[327]

- "[After] the three-day class . . . [y]ou will walk out with cash buyers. You will walk out with a plan."[328]

Response also told consumers that its software would help them identify cash buyers.[329]

Defendants argue that these representations were not misleading because Response taught its customers multiple ways to identify cash buyers during its trainings.[330] This included teaching customers how to use its software to perform searches that could identify cash buyers.[331]

Plaintiffs argue that Response's representations regarding "cash buyers" were misleading if not outright false.[332] Plaintiffs assert that Response never provided the names of known cash-buyer investors directly to any of its customers.[333] Plaintiffs also assert that all the methods for identifying cash buyers Response taught, including through using the software, had very low success rates and could not lead to the number of cash buyers Response represented its customers would be able to find.[334]

---

[325] *Id.*, Exh. H at 101:19–102:4.

[326] *Id.*, Exh. J at 59:14–24.

[327] *Id.*, Exh. J at 89–90.

[328] *Id.*, Exh. L at 119:21–120:3.

[329] *Id.*, Exh F at 49:13–20; Exh. J at 89–90.

[330] ECF No. 270 at 23.

[331] *Id.* Other methods included ghost ads, bandit signs, searching on Google, and networking at real estate events. ECF No. 267 at 40 ¶ 118.

[332] ECF No. 267 at 61.

[333] *Id.*

[334] *Id.*

Based on the undisputed evidence Plaintiffs have provided, Response made two different representations to consumers regarding "cash buyers": (1) that it would *teach* its customers how to find them, and (2) that it had them ready to *provide* to its customers. With regard to whether representing that Response would *teach* its customers to find cash buyers was likely to mislead ordinary consumers, the court finds a genuine dispute. That Response provided software, and other methods, through which it was possible to find cash buyers is undisputed.[335] However, it is also undisputed that Response's software only generated lists of properties purchased without a mortgage that may be owned by a cash-buyer investor, not lists of known cash-buyer investors.[336] It is also undisputed that the other methods Response taught have low success rates for finding cash-buyer investors.[337] Whether these methods and tools were capable of helping Response's customers find cash buyers in the way, and to the extent, Response represented they would is an issue for the trier of fact.

However, as for representations Response made about having or providing cash buyers who were ready to step into its customers' transactions, no reasonable trier of fact could find for Defendants. There is no evidence that Response ever had a list or database of known cash-buyer investors that it could give its customers or that it ever provided such a list or database to its customers if it did. Thus, any representation Response made about "already hav[ing] the buyers," was likely to mislead ordinary consumers acting reasonably. Accordingly, Plaintiffs' motion for summary judgment with regard to such representations is granted and Defendants' is denied.

---

[335] *See* ECF No. 294 at 45–46; Plaintiffs' Exh. 21, Habibi Depo. at 67:20–68:10; Plaintiffs' Exh. 25, Nicolais Rpt. at 37–39; Plaintiffs' Exh. 26, Nicolais Supp. Rpt. at 69–72.

[336] *See* Plaintiffs' Exh. 25, Nicolais Rpt. at 37–39; Plaintiffs' Exh. 26, Nicolais Supp. Rpt. at 69–72; Plaintiffs' Exh. 59, Marino Decl., Exh H at 27:06–27:25.

[337] *See* Plaintiffs' Exh. 21, Habibi Depo. at 68:11–79:9.

### 4. Personalized Assistance from Response's "Experts" or "Top Investors"

It is undisputed that Response represented that its Advanced Training and one-on-one coaching customers would receive personalized assistance from "experts" or "top investors" to complete real estate transactions. When selling one-on-one coaching to consumers, Response's telemarketers made representations such as:

- "[We're] looking for individuals who we'll end up working with on a personalized but . . . aggressive basis. So what we'll do is we'll assign these students to work with one of our top investors to go out there and do this business with them.";[338]

- "[T]he inner circle here is a division that actually takes the students like yourself and we'll kind of take a more proactive approach and partner you up with an expert, somebody to kind of lead, guide, and direct you through this process over an extended period of time.";[339]

- "[W]e're going to be taking some of these individuals from some of these workshops and actually assigning them to work with some of our top experts in a more one-on-one setting over the next year.";[340] and

- "[W]hat we're looking to do with a few students is we would like to pair up with them, put them in a student-teacher relationship [with] one of these senior investors . . . and let him kind of scoop you up, take you by the hand, and kind of lead you and guide you and walk you down the line step by step, get right in the trenches with you."[341]

Response also told its Advanced Training customers that they would receive access to an advisory hotline, personalized help from a trainer working with small groups of customers and, for those who purchased the most expensive packages, some onsite mentoring.[342]

---

[338] Plaintiffs' Exh. 59, Marino Decl., Exh. C, Call to Consumer DD at 8:00–8:15.

[339] *Id.*, Call to Consumer GG at 15:28–15:42.

[340] *Id.*, Call to Consumer NN at 27:48–27:59.

[341] *Id.*, Call 1 to Consumer ZZ at 23:21–23:41.

[342] *See* ECF No. 294 at 25–27.

Although Plaintiffs allege that these representations were false or misleading, they do not move for summary judgment.[343] Defendants do, however, claiming that Plaintiffs are unable to show that such representations were false or misleading.[344]

According to Defendants, Response provided various forms of personalized assistance to both its Advanced Training and one-on-one coaching customers.[345] Defendants assert that Response's Advanced Training programs included access to a hotline that was staffed with coaches six days a week and sessions with trainers that provided market-specific assistance in small groups or individually (depending on the package purchased).[346] Defendants also assert that customers who purchased one-on-one coaching were assigned a coach who would work personally with customers through weekly accountability and planning calls.[347]

Plaintiffs argue that Defendants are not entitled to summary judgment with regard to these representations because there is a genuine dispute as to whether they were likely to mislead ordinary consumers.[348] Plaintiffs assert that those who worked as "experts" and "coaches" for Response's Advanced Training programs, hotline, and one-on-one coaching actually had very little real estate investment experience when hired.[349] They also assert that there is evidence that Response's experts and coaches did not provide the type of individualized assistance that was promised and, even when they did, it was usually formulaic and basic, not personalized.[350]

---

[343] *Id.* at 38, 63; ECF No. 267 at 60 n.170.

[344] ECF No. 270 at 24–25.

[345] *Id.*

[346] *Id.*

[347] *Id.* at 25.

[348] ECF No. 294 at 68.

[349] *Id.*

[350] *Id.*

The court finds that there is a genuine dispute as to whether Response's representations about personalized assistance from its experts and coaches were likely to mislead ordinary consumers. Plaintiffs have provided evidence that the coaches for Response's hotline, Advanced Training programs, and one-on-one coaching programs were required only to have "two years of personal real estate investing experience" or "four years of industry-related experience" to be hired and, once hired, to submit evidence of recently completed deals from time to time.[351] A reasonable trier of fact could find that referring to these coaches as "top experts" or "top investors" was misleading, if not outright false. Further, Plaintiffs have submitted evidence from several former Response customers who claim that Response's "experts" did little more than repeat what had already been taught in its training programs.[352] Plaintiffs' showing is sufficient to create a genuine dispute as to whether Response's representations that its customers would receive personalized assistance from "top experts" or "top investors" were likely to mislead ordinary consumers, so Defendants are not entitled to summary judgment with regard to these representations.

### 5. Properties and Investments at Investor Expos and Buying Summits

The record shows that Response made the following representations about properties and other real estate investment opportunities being sold at certain Investor Expos and Buying Summits:

- "[W]e specialize in . . . finding property, buying it, fixing it up, getting it under property management and get it tenanted so it is cash flowing. . . . That's what we do. And we do it at wholesale. . . . [W]e buy wholesale, and we turn around and we sell it . . . at wholesale. . . . [T]he important thing is you understand our business model. We buy them at wholesale, we fix them

---

[351] Plaintiffs' Exh. 19, Poppinga Depo. at 167:5–168:25, 171:9–174:20, 208:14–209:15, 216:4–219:11.

[352] *See* ECF No. 294 at 25–28 nn.70–73.

up, we rehab them, we get them under contract, we put a renter in it . . . and then still turn around and sell it wholesale.";[353]

- "Every one of the properties have been rental rehabbed. . . . What that means is paint, carpet, . . . . mow the weeds down. . . . light fixtures have been put on the wall . . . Occasionally, . . . we might need to put a new toilet in or a new sink or something like that.";[354]

- "Are there discounts [on the properties]? . . . No! . . . [P]art of your training has been negotiating. Leave it in the room here. Don't beat [our sales consultants] up. It's already been discounted. Remember, we buy wholesale and sell wholesale. So they've already been discounted. Please, don't go and try to sit there and work over the consultants; they just don't have that ability.";[355] and

- "[W]hat I love about trust deeds is simply this: it is just the consistent, safe, secure income that we as real estate investors need to diversify some of our portfolio into . . . ."[356]

The record also contains a workbook from one Buying Summit in which Response labeled "trust deeds" as "Low Risk."[357]

Plaintiffs claim that these representations were both material and misleading.[358] They assert that Response failed to provide "rental rehabbed" and "cash flowing"[359] properties on numerous occasions.[360] They also assert that Response's representing trust deeds as "safe" or "low risk" was misleading because they are, in fact, not low risk.[361] However, Plaintiffs do not move for summary judgment.[362]

---

[353] Plaintiffs' Exh. 84, Marino Supp. Decl., Exh. DD at 00:14–1:09.

[354] *Id.*, Exh. EE at 00:36–01:35.

[355] *Id.* at 01:37–02:18.

[356] *Id.*, Exh. S at 19:38–19:52 (video recording).

[357] *Id.*, Exh. T at 31, ECF No. 294-2.

[358] ECF No. 173 at 63.

[359] Response's definition for "rental rehabbed" properties is included in the statements quoted above. *See supra* note 354 and accompanying text. It appears that any use of the term "cash flowing" by Response referred to a property having paying tenants already in place. *See* ECF No. 270 at 25, 27.

[360] ECF No. 173 at 63.

[361] ECF No. 294 at 29, 69.

[362] ECF No. 367 at 60 n.170.

Once again, only Defendants move for summary judgment with regard to these representations. They argue that any representations Response and BuyPD made about selling properties that were "rental rehabbed," "cash flowing," or "discounted" were not likely to mislead because Response did, in fact, sell such properties at its events.[363] They also argue that no reasonable jury could find that Response and BuyPD gave the net impression that trust deeds are low risk when all representations, disclaimers, and disclosures they made are taken into account.[364]

The court finds that Defendants are not entitled to summary judgment on these grounds. Plaintiffs have provided evidence from which a reasonable trier of fact could conclude that the properties sold at the Buying Summits and Investor expos often were not discounted, rental rehabbed, or cash flowing. Douglas Pollock, a real estate fraud expert retained by Plaintiffs, concluded after reviewing some of the sales BuyPD made to Response customers that the properties were sold at a markup.[365] Pollock also concluded that BuyPD sold some properties before it even had title to them, which suggests that not all properties had been "rental rehabbed" before being sold to consumers.[366] Plaintiffs have also provided notes from some of Response's meetings, and emails between Response and one of the primary sources for properties sold at Investor Expos and Buying Summits, that show that some properties were in need of major

---

[363] ECF No. 270 at 25–27. Defendants initially argued that Response never represented that properties at the events were "discounted" but apparently dropped that argument after seeing Plaintiffs' response and supporting evidence. *See id.* at 27–28; ECF No. 311 at 28–29.

[364] ECF No. 270 at 28–29.

[365] Plaintiffs' Exh. 71, Expert Report of Douglas F. Pollock ¶¶ 46–47, ECF No. 292-12; Plaintiffs' Exh. 72, Supplemental Expert Report of Douglas F. Pollock ¶¶ 20–21, ECF No. 292-13.

[366] Plaintiffs' Exh. 72, Pollock Supp. Rpt. ¶ 21.

renovations and did not even have the necessary certifications to have tenants (and thus be cash flowing).[367]

Defendants argue that Response never claimed that every property sold was discounted, rental rehabbed, and cash flowing,[368] but that misses the point. The fact is that Plaintiffs have shown that Response made representations about its properties at certain events that some evidence suggests may not have been true or accurate. When and how often such representations were made, and whether the characteristics of the properties sold at the events at which those representations were made rendered them false or misleading, are material issues for the trier of fact to resolve.

Further, although it is undisputed that Response and BuyPD made some disclaimers about the investment opportunities offered to consumers at their events,[369] whether those disclaimers were sufficient to prevent consumers from forming the net impression that trust deeds are "low risk" in light of the representations Plaintiffs have identified is an issue for the trier of fact. Accordingly, because Defendants have failed to show an absence of genuine dispute as to material facts, their motion for summary judgment with regard to these representations must be denied.

---

[367] *See* Plaintiffs' Exh. 84, Marino Supp. Decl., Exhs. U, V, W.

[368] ECF No. 311 at 28–29. Defendants assert that representing that a property is discounted and has been rental rehabbed would make no sense, as discounted properties are typically those that are in need of rental rehabbing. *Id.* at 29.

[369] These included statements such as "[i]t is possible to lose a portion or all of a purchase in real estate," "individual results will vary," and "you should consult your own . . . advisors to evaluate the risks, consequences and suitability of . . . transaction[s]." Plaintiffs' Exh. 84, Marino Supp. Decl., Exh. T at 1, 11, 15.

### C.  Misrepresentations about Requests for and Use of Consumers' Financial Information and Referrals to Third-Party Companies for Additional Credit (Counts III and VIII)

Plaintiffs' next claim is that Response made false representations about (1) its reasons for asking for consumers' financial information and how it would be used and (2) why it referred consumers to certain third-party companies who could help them access additional capital or credit.[370] Plaintiffs assert that Response told consumers that it needed their financial information to better advise them or determine whether they qualified for certain programs when, in fact, Response used this information to determine which training package to sell consumers based on how much they could afford.[371] They also assert that Response told consumers that the credit and capital available through certain third-party companies to which it referred them could help fund real estate transactions when, in fact, Response only wanted to ensure that its customers had funds to purchase additional training packages.[372]

Both parties move for summary judgment with regard to both alleged misrepresentations, which the court considers in turn.

### 1.  Misrepresentations About Requests For and Use of Consumers' Financial Information

It is undisputed that Response asked consumers about their finances when selling two of its training programs. First, until at least 2017, Response had consumers who attended its workshops fill out financial questionnaires or other forms that asked about the amount of money they had in their checking, savings, and retirement accounts as well as the amount of credit to

---

[370] ECF No. 173 at 63–64.

[371] *Id.*

[372] *Id.*

which they had access.[373] Second, in the initial calls to sell one-on-one coaching programs, Response's telemarketers asked consumers about their finances and access to credit.[374] The record shows that Response represented that the purpose of such questions during its workshops was to "help [Response] expand [its customers'] goals & opportunities in a customized fashion."[375] With regard to financial questions during telemarketing calls, it is undisputed that, at least on certain calls, Response's telemarketers explicitly "told consumers that their personal financial information would be used to assess whether they were an appropriate candidate for [a one-on-one coaching] program," which was "a unique or limited opportunity that was not available to everyone."[376]

The main issue in dispute here is whether these representations were pretextual and, as a result, likely to mislead ordinary consumers. Defendants argue that the stated purpose of Response's questionnaire was not misleading because understanding its customers' finances was critical to educating them about their "goals and opportunities," including additional training opportunities, and Response never represented that such information would not be used to help it choose which Advanced Training packages to offer.[377] Plaintiffs, on the other hand, argue that Response used financial information provided during workshops to steer consumers toward more

---

[373] Plaintiffs' Exh. 11, Finnegan Depo. at 181:5–184:2; Plaintiffs' Exh. 57, Larsen Decl., Exh. T; *see also* ECF No. 287 at 5.

[374] Plaintiffs' Exh. 7, Lewis Depo. at 149:20–150:13; Plaintiffs' Exh. 15, Touchet Depo. at 257:21–258:14; Plaintiffs' Exh. 16, C. Brown Depo. at 21:12–18; Plaintiffs' Exh. 17, Deposition of Randy Brown at 125:15–127:14, ECF No. 265-19; *see also* ECF No. 287 at 22.

[375] Plaintiffs' Exh. 57, Larsen Decl., Exh. T; *see also* Plaintiffs' Exh. 76, Declaration of Consumer John Enterline ¶ 10, ECF No. 292-17 ("During the three-day workshop, the speakers encouraged us to speak with a Performance Education representative about our personal finances. The speakers made it sound like they wanted to find out how serious we were about investing and that sharing our personal financial situation was just a part of their process.").

[376] ECF No. 287 at 22–23.

[377] *Id.* at 30; ECF No. 311 at 30; *see also* Plaintiffs' Exh. 11, Finnegan Depo. at 185:4–9 ("[W]e had . . . two reasons for asking for [financial] information. Number one was what funds they had available to invest in real estate . . . . And did they want additional training. Did they have funds available to buy ongoing training or not.").

expensive Advanced Training packages.[378] With regard to Response's financial questions during telemarketing calls, Defendants argue that the only evidence Plaintiffs have provided that Response used this information to determine which coaching package to offer comes from the deposition testimony of Alfred Touchet, which they assert is not credible for reasons already discussed above.[379] According to Plaintiffs, that Response used the financial information to determine how to price coaching packages is established not only by Touchet's testimony, but also by testimony from another Response telemarketer and by evidence showing that telemarketers gave consumers different prices for what they alleged to be Response's most commonly purchased one-on-one coaching package.[380]

After reviewing the record, the court finds a genuine dispute as to Response's representations. Defendants are not entitled to summary judgment with regard to Response's representations about the use of financial information obtained during workshops because Plaintiffs have provided sufficient evidence from which a reasonable trier of fact could find for them. There is evidence that the materials handed out during workshops advertised only the most expensive Advanced Training packages, that consumers were shown lower-priced packages during consultations only after they had declined to purchase the more expensive packages, that some consumers who purchased expensive packages were never told that these lower-priced packages were available, and that the price quoted for these lower-priced packages differed slightly across consumers.[381] Defendant Finnegan also confirmed during his deposition that

---

[378] ECF No. 294 at 71–72.

[379] ECF Nos. 278 at 50–52; 311 at 29–30; *see also supra* Section I.A.4.

[380] ECF Nos. 267 at 62–63; 294 at 70–71.

[381] *See* Plaintiffs' Exh. 40, Smith Decl. ¶¶ 15, 17 (consumer discovered, after putting money down on the most expensive advanced training package, that other consumers had purchased other much less expensive packages she had not been told about); Plaintiffs' Exh. 43, Declaration of Madeleine Lieberman ¶¶ 13–15, ECF No. 265-45 (same); Plaintiffs' Exh. 74, Albertson Decl. ¶¶ 11, 13–14, & Exhs. J, K (consumer, after declining to purchase the packages offered, was offered a less-expensive "Silver Plus Package" for $11,000, with the consultant saying that

having information about consumers' available credit "help[ed] consultants suggest a particular Response advanced training package" to them during consultations.[382]

However, this evidence is not such that no reasonable trier of fact could find for Defendants.[383] It is undisputed that Response presented at least some of its Advanced Training packages to all consumers at its workshops.[384] And although it is clear that Response's consultants offered lower-priced packages to some consumers but not others, it is unclear whether they did so based on the financial information those consumers provided or merely because the consumers declined to buy the more expensive packages first presented. In any event, there is a genuine dispute as to whether using the financial information consumers provided was truly inconsistent with consumers' net impression of the representation that the information would be used to "expand [their] goals & opportunities in a customized fashion."

As for Response's use of the financial information consumers provided during telemarketing calls, Defendants' only argument for summary judgment is that Plaintiffs' evidence is insufficient for a reasonable trier of fact to find for them. The court disagrees. Touchet testified that he and other Response telemarketers used the pretext of interviewing consumers about their finances to determine whether they were a good fit for Response's one-on-one coaching program in order to price the package and identify financial "pain triggers" to

---

doing so was "outside of the norm"); Plaintiffs' Exh. 78, Gonzalez Decl. ¶ 8 & Exhs. G, L (consumer offered a $11,997 "Silver" package after declining to purchase the more expensive ones initially offered).

[382] Plaintiffs' Exh. 11, Finnegan Depo. at 186:8–11.

[383] *See Leone*, 810 F.3d at 1153.

[384] Defendants have provided some evidence that all consumers were told about all Advanced Training packages. *See* Plaintiffs' Exh. 11, Finnegan Depo. at 185:15–19 ("[T]he way the presentations in the workshop would go is the packages, all the packages, would be presented to the whole workshop. If someone wanted to move forward, they purchased the program."). However, the materials handed out at some workshops presented only two or three of the Advanced Training packages Response offered. *See* Plaintiffs' Exh. 74, Albertson Decl., Exh. J; Plaintiffs' Exh. 78, Gonzalez Decl., Exh. G.

emphasize to help make a sale.[385] He also testified that the price, or range of prices, given to consumers was based on how much money they had available.[386] Touchet's testimony receives support from evidence showing that some of Response's telemarketers gave consumers different prices for what they said was the most common package.[387] Additionally, Randy Brown, another telemarketer at Response, testified that telemarketers used information consumers provided about credit cards "to give them [one-on-one coaching] options that were feasible."[388]

However, Plaintiffs rely primarily on Touchet's testimony to prove their allegations, and the fact remains that Defendants have raised concerns about his credibility.[389] As discussed above, credibility determinations are a matter reserved for the trier of fact.[390] Thus, the court has no grounds to determine whether Plaintiffs' evidence is sufficient to find that no reasonable trier of fact could find for Defendants,[391] so Plaintiffs' motion must be denied as well.

### 2. Misrepresentations about the Reasons for Referring Customers to Third-Party Companies for Additional Credit

It is undisputed that in workshops from 2016 through 2019, Response discussed and referred its customers to third-party companies such as Seed Capital (Seed) as sources for additional capital or credit.[392] However, in moving for summary judgment, the parties dispute

---

[385] Plaintiffs' Exh. 15, Touchet Depo. at 222:14–228:7, 252:12–253:5.

[386] *Id.* at 252:12–253:5.

[387] *See* Plaintiffs' Exh. 59, Marino Decl., Exh. C, Call to Consumer WW at 42:35–42:40 ("Most of our students in this type of environment . . . usually start out investing about $15,000 . . . ."); *id.*, Call Three to Consumer CD at 44:35–44:42 ("[M]ost of our students will invest anywhere from about 20 to about $24,000 . . . ."); *id.*, Exh. O at 124:3–6 ("Most people want all the education and training they can get. . . . If I did all four of those, you're looking at about [$]27,000.").

[388] Plaintiffs' Exh. 17, R. Brown Depo. at 45:3–9, 87:8–14.

[389] *See supra* Section I.A.4.

[390] *Anderson*, 477 U.S. at 255.

[391] *See Leone*, 810 F.3d at 1153.

[392] *See* ECF Nos. 267 at 22 ¶ 58; 287 at 7–8.

what representations Response made about this source of funding and whether those representations were likely to mislead ordinary consumers.

Defendants assert that Response told consumers that the companies provided unsecured lines of credit that could be used to purchase additional training or cover personal or business expenses in order to free up other capital for acquiring or flipping properties.[393] Defendants argue that because this representation was true, Plaintiffs' claim fails as a matter of law.[394]

To support their position, Defendants rely on deposition testimony from Defendant Sanderson.[395] When asked about Response's practice of referring its customers to companies like Seed, Sanderson testified initially that "credit cards from Seed Capital could be used as options for gap funding and other real estate transactions."[396] When pressed about whether credit cards can be used to buy real estate, Sanderson replied that "Response customers did not expect that they were going to buy real estate with a credit card," but they could use it "for gap funding."[397] According to Sanderson, gap funding in this context meant funds for covering unexpected costs that "come up in the process of doing a rehab" on a property.[398] Defendants also rely on deposition testimony from Erick Gantz, Seed's CEO.[399] Gantz has testified that any consumer who wanted to obtain funds through Seed had to speak with a representative from Seed's

---

[393] ECF No. 270 at 31.

[394] *Id.*

[395] *Id.*

[396] Defendants' Exh. 11, Sanderson Depo. at 210:9–18.

[397] *Id.* at 210:19–211:2.

[398] *Id.* at 144:18–145:17.

[399] *See* ECF No. 287 at 53 & n.29; Defendants' Opp. Exh. 2, Deposition of Erick Gantz, ECF No. 287-1.

compliance department who thoroughly explained Seed's program, which included telling consumers that the funding came through multiple lines of credit cards.[400]

On the other hand, Plaintiffs assert that Response told consumers that the credit offered by these companies could be used to directly fund their real estate transactions.[401] They have provided examples from one workshop in which Response's presenter recommended Seed's funding as a way to fund consumers' deals that was quicker than using Response's network and as an alternative to obtaining hard money loans.[402] The presenter stated that Seed offered "anywhere from 50 to 150 grand just based on credit," without specifying that the funding came through multiple credit cards, and suggested that consumers could "use [their] credit card to buy loans."[403] Plaintiffs have also shown that another workshop presenter referred to "gap funding" as one of only three ways to fund real estate transactions and that workshop materials listed companies like Seed as "Gap Funding Options" and credit cards as "Wealth Cards" for "Real Estate Transactions."[404] Plaintiffs argue that such representations were false or misleading because the credit cards obtained through Seed and similar companies could not be used for real estate transactions and because the real reason Response referred consumers to companies like Seed was to ensure that they had funds to pay for Response's more expensive training programs.[405]

---

[400] *See* Defendants' Opp. Exh. 2, Gantz Depo. at 52:2–53:9, 56:25–57:13.

[401] ECF No. 267 at 62.

[402] Plaintiffs' Exh. 83, Larsen Decl., Exh. S at 181:6–189:21, ECF No. 292-24.

[403] *Id.* at 185:16–23, 189:4–21.

[404] *See* Plaintiffs' Exh. 84, Marino Supp. Decl., Exh O at 13; Plaintiffs' Exh. 42, Declaration of Consumer Shirley Savage, Exh. E, ECF No. 265-44; Plaintiffs' Exh. 53, Declaration of Consumer Mitch Norris ¶ 10 & Exh. C at 28–29, ECF No. 265-55.

[405] ECF No. 267 at 61–62.

The parties' evidence shows that there is a genuine dispute as to what representations Response made about the funding provided by companies like Seed and consumers' net impression regarding the nature and uses of that funding. Although Sanderson testified that Response represented only that Seed provided access to funding through credit cards that could be used for "gap funding," which he defined as unexpected personal or business expenses, Plaintiffs have provided evidence to the contrary. A reasonable trier of fact could find that, at least in some workshops, Response told consumers that funding through Seed, whether called gap funding or not, could be used directly in real estate transactions.

However, the conversations that Seed's compliance department apparently had with consumers about the nature of Seed's services and funding sources raises questions about consumers' net impression of any representations Response made about them.[406] Indeed, the evidence in the record as to what consumers believed they were getting from companies like Seed is mixed: some knew they were getting credit cards[407] while others did not.[408]

There is also a genuine dispute as to whether Response's representations were likely to mislead. Defendants assert that Plaintiffs have failed to show a misrepresentation because Response told consumers that the funds from Seed could be used to purchase more training.[409] However, as just discussed, that is not the only representation a reasonable trier of fact could find Response made: the trier of fact could find that Response represented, and consumers were under the impression, that funds obtained through companies like Seed could be used for real estate

---

[406] *See* Defendants' Opp. Exh. 2, Gantz Depo. at 52:2–53:9, 56:25–57:13. Although Seed was not the only company to which Response referred its customers, it appears to be the main one. *See* ECF Nos. 267 at 23 ¶ 61; 287 at 33 ¶ 14.

[407] *See* Defendants' Opp. Exh. 12, Deposition of Consumer Richard Ruby at 87:14–22, ECF No. 285-13; Plaintiffs' Exh. 40, Smith Decl. ¶ 12.

[408] *See* Plaintiffs' Exh. 75, Declaration of Consumer Maria Sanchez Cortes ¶11, ECF No. 292-16.

[409] ECF No. 270 at 31.

transactions. Although Plaintiffs' argument that Response's motive for referring consumers to Response—that it only wanted to ensure that they had funds to purchase additional training it offered, not to help them fund their real estate transactions—is of no help in determining whether such a representation was true or false,[410] it appears undisputed that the funds could not be used in that way.[411] Thus, if the trier of fact were to find that consumers formed the net impression, based on Response's representations, that they could use funds obtained through companies like Seed for real estate transactions, the trier of fact could also find that such a representation was likely to mislead ordinary consumers.

Accordingly, because material facts related to this claim are genuinely disputed, neither party is entitled to summary judgment.

---

[410] The problem with Plaintiffs' argument is that Response's motive for referring consumers to companies like Seed has no effect on whether representations made about the funds they provided were true or false. In other words, the motives underlying a representation do not speak to its truth or falsity. The issue is not that Plaintiffs have failed to produce sufficient evidence to show that Response had such a motive; they have. *See* Plaintiffs' Exh. 15, Touchet Depo. at 57:16–58:22 (Touchet stated, after acknowledging that Response telemarketers knew whether consumers had worked with Seed, that :"[W]hen [consumers] get the credit cards [from Seed], we . . . call them back and sell them our services. Because a lot of these people that applied for [S]eed didn't have any capital to work with. That's why they got [S]eed. So then if they were waiting to be approved by Seed, then we would wait till they got their credit cards to then talk to them about the options . . . they can purchase."); Plaintiffs' Exh. 59, Marino Decl., Exh. O at 94:20–95:5 (a Response telemarketer, when discussing the cost of a one-on-one coaching program, stated: "Okay. Now, remember, I don't want this out of pocket or write a check, even if you could. We promote using [S]eed [C]apital. The reason we bring [S]eed in . . . is to set our students up so they could get funding to be able to do these things, whether it's education or deals."); *Id.*, Exh. AI (outline of a Response conference call from January 2019 stated: "Seed Capital: Perception issue that we are pressuring people into signing up for credit cards to pay for training. Position the credit cards as "gap funding". Seed should be talked about after the gap funding training. [S]eed is going to help students get access to capital to get RE deals."); *Id.*, Exh. AJ (Response telemarketer in an email to Gantz, Seed's CEO, stated: "[W]e have a client we are discussing moving forward with the Inner Circle at $25,995. They said they spoke with [a Seed employee] and asked her if the money that they've established with [S]eed [C]apital should be used for properties or training? And that [this employee] told them properties which conflicts with what we are doing (I don't necessarily think that is the case but rather they may be trying to procrastinate . . . ). Can you please make sure we are on the same page and if possible have [the employee] let them know what money to use to get started they may need to use a little of the cash they've pull from [credit cards]?"); *Id.* at AP (Response sales director, in a document summarizing sales made at a stock workshop, stated: "Many [consumers] had tapped out [third-party company] funding for [a real estate training] package. Would there be a way to qualify them for more w/ expectation of stock sell? (I'm assuming we qualify them for all we can.) Several had spent on [real estate training] exactly what they had approved for w/ [the third party company]. Also to encourage both husb[and]/wife to qualify separately so they have options/more financing avail[able] (I expect teams do this already)").

[411] *See* Plaintiffs' Exh. 12, Sanderson Depo. at 210:4–211:2.

### D.  Unconscionable Act or Practice Claim under the UCSPA (Count IX)

In Count IX of the amended complaint, the UDCP claims that Response engaged in an

unconscionable act or practice in violation of the UCSPA.[412] Specifically, the UDCP claims that

Response's practice of using financial information obtained from consumers through

misrepresentations to sell them certain training packages, and encouraging consumers to incur

significant debt or spend savings that Response knew, or should have known, they would never

be able to repay or recover, constitutes an unconscionable practice.[413]

Defendants argue that they are entitled to summary judgment on this claim because

Plaintiffs have done no more than repackage their deceptive act claims into an unconscionability

claim.[414] They assert that conduct is unconscionable only if it goes beyond deception and

includes elements of oppression, unfair surprise, or extreme unfairness that "shock the

conscience."[415]

Although "[t]he unconscionability of an act or practice is a question of law for the

court,"[416] it would be improper for the court to rule on this issue as a matter of law on the present

record. As is discussed throughout this opinion, most of the facts underlying Plaintiffs'

unconscionability claim are genuinely disputed, meaning they must be resolved by the trier of

fact. And Defendants are entitled to summary judgment only if, after showing "that *there is no*

*genuine dispute* as to any material fact," they are entitled to summary judgment as a matter of

law.[417] Because Defendants have failed to show the absence of genuinely disputed facts, their

---

[412] ECF No. 173 at 70–72.

[413] *Id.*

[414] ECF No. 270 at 37–40.

[415] *Id.*; ECF No. 311 at 44–45.

[416] Utah Code § 13-11-5(2).

[417] Fed. R. Civ. P. 56(a) (emphasis added).

motion for summary judgment must be denied, and the court will rule on Plaintiffs' unconscionability claim after the relevant disputed facts have been resolved by the trier of fact.[418]

## III.   Violations of the TSR and the TFPA (Counts IV and XII)

The FTC enacted the TSR pursuant to rulemaking power granted by Congress under the Telemarketing and Consumer Fraud and Abuse Act (TCFAA).[419] Among other things, the TSR makes it unlawful for sellers or telemarketers to engage in "deceptive telemarketing acts or practices."[420] A "seller" is "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration."[421] A "telemarketer" is "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor."[422] The TSR prohibits many deceptive acts and practices specifically, but the ones at issue here are "[m]isrepresenting, directly or by implication, in the sale of goods or services . . . [a]ny material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are

---

[418] *See Chadwick v. Bonneville Billing & Collections, Inc.*, No. 1:20-CV-132-TS, 2021 WL 1140206, at *3 (D. Utah Mar. 25, 2021) (dismissing the plaintiff's unconscionability claim when there was no dispute as to what the defendant did); *Morrison v. Clear Mgmt. Sols.*, No. 1:17-CV-51, 2019 WL 122905, at *10 (D. Utah Jan. 7, 2019) (finding that an unconscionability claim was a "repackaged" deceptive conduct claim on which the court had granted summary judgment in favor of the plaintiff); *Gallegos v. LVNV Funding LLC*, 169 F. Supp. 3d 1235, 1245 & n.1 (D. Utah 2016) (finding that the defendants' acts "were not unconscionable under the UCSPA" "based on undisputed facts."); *Martinez v. Johnson*, No. 2:11CV157-DN, 2013 WL 1031363, at *14 (D. Utah Mar. 14, 2013) (declining to rule on an unconscionability claim when there was a genuinely disputed fact when it involved a genuinely disputed fact).

[419] *See* 15 U.S.C. § 6102(a)(1); 16 C.F.R. § 310.1.

[420] 16 C.F.R. § 310.3(a).

[421] *Id.* § 310.2(dd). A "person" is defined as "any individual, group, unincorporated association, limited or general partnership, corporation, or other business entity." *Id.* § 310.2(y).

[422] *Id.* § 310.2(ff).

the subject of a sales offer," and "[m]aking a false or misleading statement to induce any person to pay for goods or services."[423]

Similar to the TSR, Utah's TFPA makes it unlawful for "any solicitor . . . to make or cause to be made any untrue material statement, or fail to disclose a material fact necessary to make any statement made not misleading, . . . in connection with a telephone solicitation."[424] A "solicitor" includes any "person, partnership, limited liability company, corporation, or other entity that . . . (a) makes a telephone solicitation; or (b) causes a telephone solicitation to be made."[425]

In Counts IV and XII, Plaintiffs claim that Response made two main representations about its one-on-one coaching programs during telemarketing calls that were false or misleading in violation of both the TSR and the TFPA.[426] Specifically, Plaintiffs argue that Response's telemarketers falsely represented to consumers that the one-on-one coaching program being offered:

1. was unique and available only to consumers who qualified or were selected to join; and

2. would help consumers make money more quickly and safely such that it would pay for itself.[427]

Plaintiffs move for summary judgment on both Counts IV and XII.[428]

---

[423] *Id.* § 310.3(a)(2)(iii), (4).

[424] Utah Code § 13-26-11(1)(c) (2019). The TFPA was amended in 2022, with the changes effective May 4, 2022. *See* Utah Code § 13-26-11 (2022). However, because all alleged violations of the TFPA occurred in 2019 or earlier, the court will cite to pre-2022 amendment statutes.

[425] *Id.* § 13-26-2(9).

[426] ECF Nos. 173 at 66; 267 at 62–64, 67–68.

[427] ECF No. 267 at 62–64, 67–68.

[428] *Id.*

Defendants move for summary judgment on only Count IV.[429] They do not dispute that Response was a "seller" or "telemarketer" for purposes of the TSR. However, they argue that Plaintiffs' deceptive telemarketing act claim under the TSR fails as a matter of law because Response's telemarketing calls were exempt from the TSR under its face-to-face exemption.[430]

The court will begin with Defendants' exemption argument before determining whether Plaintiffs are entitled to summary judgment with regard to the alleged misrepresentations.

## A. The TSR's Face-to-Face Exemption

The TSR specifically exempts several types of calls from its requirements.[431] Included among these is the face-to-face exemption, which exempts "[t]elephone calls in which the sale of goods or services . . . is not completed, and payment or authorization of payment is not required, until after a face-to-face sales . . . presentation by the seller."[432] The parties dispute whether this exemption applies to Response's telemarketing calls. In doing so, they interpret the exemption in two very different ways.

According to Defendants, the face-to-face exemption applies because Response's calls took place after consumers had multiple in-person interactions with Response involving sales presentations for other Response programs.[433] Defendants argue that these interactions constituted the type of direct and personal contact between seller and consumer that the

---

[429] ECF No. 270 at 32–33. Defendants do not move for summary judgment on the substance of the UDCP's allegations in Count XII, but they do argue for partial summary judgment on that count with regard to available remedies. *See id.* at 49–51. They do the same for the alleged violations of the UCSPA in Counts VI through VIII. *See id.* The court addresses those arguments in a later section. *See infra* Section V.B.

[430] ECF No. 270 at 32–33.

[431] *See* 16 C.F.R. § 310.6.

[432] 16 C.F.R. § 310.6(b)(3). However, this exemption does not apply to 16 C.F.R. §§ 310.4(a)(1), (a)(7), (b), and (c). *See id.*

[433] ECF No. 270 at 32–33.

exemption meant to capture.[434] The fact that the presentations preceded the telephone call does not matter.[435]

Plaintiffs disagree.[436] They argue that the face-to-face exemption applies only to telemarketing calls in which no sale of a good or service is complete, or payment required, until after there has been a face-to-face sales presentation about that particular good or service specifically.[437] Because the sales presentations that preceded Response's telemarketing sales of its one-on-one coaching programs were about other programs, the face-to-face exemption does not apply.[438]

Neither party cites any case law in support of its interpretation, suggesting that the interpretive issue at hand is one of first impression. To determine the proper interpretation of an agency regulation like the face-to-face exemption, the court obviously begins with the text.[439] If, after "exhaust[ing] all the 'traditional tools' of construction,"[440] the text's "meaning is clear," that is the end of the court's analysis.[441]

---

[434] *Id.*

[435] *Id.* To support this argument, Defendants cite to the guidance published on the FTC's website, which states that the face-to-face "exemption is for transactions that begin with a face-to-face sales presentation and are completed in a phone call, as well as those that begin with a phone call and are completed in a face-to-face sales presentation." *See* Complying with the Telemarketing Sales Rule, Federal Trade Comm'n, https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule. The FTC takes no position on that issue here, however.

[436] ECF No. 294 at 74–79.

[437] *Id.* at 74–75.

[438] *Id.*

[439] *Scalia v. Wynnewood Ref. Co., LLC*, 978 F.3d 1175, 1181 (10th Cir. 2020).

[440] *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) ("[O]nly when that legal toolkit is empty and the interpretive question still has no single right answer can a judge conclude that it is 'more [one] of policy than of law.' That means a court cannot wave the ambiguity flag just because it found the regulation impenetrable on first read. Agency regulations can sometimes make the eyes glaze over. But hard interpretive conundrums, even relating to complex rules, can often be solved. To make that effort, a court must 'carefully consider[ ]' the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on." (alterations in original) (citations omitted)).

[441] *Scalia*, 978 F.3d at 1181. Both parties argue that the text of the face-to-face exemption is unambiguous and supports their interpretation. *See* ECF Nos. 294 at 76 n.223; 311 at 40 n.119.

The main interpretive question here is the meaning of "after a face-to-face sales . . . presentation by the seller." Plaintiffs assert that the subject of the face-to-face sales presentation must be the same as the subject of the telemarketing call, while Defendants assert that any face-to-face presentation by the seller is sufficient, regardless of subject. Considering the phrase "after a face-to-face sales . . . presentation by the seller" in isolation, either interpretation appears reasonable. However, when considered with the remaining text of the regulation, and the TSR's overarching regulatory scheme, the meaning of "after a face-to-face sales . . . presentation" is clear because only one of the proposed definitions "produces a substantive effect that is compatible with the rest of the law."[442]

Telemarketing calls are exempted from the TSR by the face-to-face exemption only when they relate to a "sale" that is not completed, and for which no payment is required, until after the seller has made "a face-to-face sales . . . presentation."[443] The presence of the word "presentation" indicates that more than some type of de minimis or ancillary face-to-face contact or communication between the consumer and seller is required. A "presentation," as it is used here, is commonly understood[444] to mean "the action of presenting to sight or view, or that by which something is so presented," such as a "display, show, [or] exhibition";[445] "a demonstration or display of a product or idea";[446] or "something, such as a lecture or speech, that is set forth for

---

[442] *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme-because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." (citations omitted)).

[443] 16 C.F.R. § 310.6(b)(3).

[444] *See Usery v. Kennecott Copper Corp.*, 577 F.2d 1113, 1119 (10th Cir. 1977) ("In interpreting regulations, one must look at the plain meaning of the words used.").

[445] XII The Oxford English Dictionary at 399 (2d ed. 1989).

[446] The New Oxford American Dictionary at 1348 (2001).

an audience."[447] Clearly, there is some *thing* that must be presented, shown, displayed, or explained by the seller. In other words, a presentation must have a subject.

And that is the heart of the dispute here: What must the subject of the presentation be for the face-to-face exemption to apply? The regulation describes the required presentation as a "sales" presentation, but that alone provides no clarity. The adjective "sales" means only that the presentation must be "relat[ed] to[] or used in selling."[448] Determining what the subject must be requires looking to the remaining text of the exemption.

The TSR covers telemarketing: the use of telephone calls to make sales.[449] And the face-to-face exemption reveals one type of sale-related telephone call that is exempt from the TSR's requirements: calls that are part of a sale that is not completed until after a face-to-face sales presentation has been made by the seller. This suggests that the sales presentation that exempts a call from the TSR is both related to, and a prerequisite of, the specific "sale" at issue in that call. And because the telephone call and sales presentation are both part of a specific "sale"—namely, part of the same transaction[450]—they must both relate to the same subject: the goods or services and terms of a specific "sale." Interpreting the exemption in any other way seemingly would lead to absurd results that would be incompatible with the TSR.[451] It would mean that a telemarketer could violate the TSR with impunity so long as any misrepresentation-filled telephone call about

---

[447] The American Heritage Dictionary of the English Language at 1433 (3d ed. 1992).

[448] Webster's Third New Int'l Dictionary at 2003 (1971).

[449] *See* 16 C.F.R. § 310.2(gg) ("Telemarketing means a plan, program, or campaign which is conducted *to induce the purchase of goods or services* or a charitable contribution, by use of one or more telephones and which i*nvolves more than one interstate telephone call*." (emphasis added)).

[450] The FTC's published guidance refers to the telephone calls and sales presentations as part of a single transaction, regardless of the order in which they occur: "[The face-to-face] exemption is for transactions that begin with a face-to-face sales presentation and are completed in a phone call, as well as those that begin with a phone call and are completed in a face-to-face sales presentation." *See* Complying with the Telemarketing Sales Rule, Federal Trade Comm'n, https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule.

[451] *See United Sav. Ass'n of Texas*, 484 U.S. at 371.

one good or service was preceded or followed by a face-to-face sales presentation about any other good or service it offers.

Defendants contend that the several days of in-person interactions between Response and its customers before its telemarketing calls were sufficient for the face-to-face exemption to apply because, as the FTC has stated in its published guidance ("Guidance"), "[t]he key to the face-to-face exemption is the direct, substantive and personal contact between the consumer and seller."[452] Certainly, the fact that consumers had a relationship and interactions with Response before receiving the telemarketing calls at issue is not insignificant. This is clearly not a situation in which a seller has reached out across state lines without having any "direct contact with the consumer."[453]

However, the Guidance does not change the analysis. The Guidance also states that "[t]his exemption is for transactions that *begin* with a face-to-face sales presentation and are *completed* in a phone call" and vice versa."[454] In other words, the specific transaction starts with a face-to-face presentation and is completed on the phone: the seller begins the sale by meeting with the prospective buyer about the offered good or service and then completes the sale of that good or service on the phone (or vice versa). That is the exempted transaction. In contrast, a face-to-face meeting about a separate, earlier transaction that already has been completed (i.e., the purchase of some other good or service) does not somehow "begin" a later, separate transaction. Similarly, there is nothing left from the earlier transaction to "complete." The earlier transaction might be related in subject, but that does not shoehorn every succeeding transaction

---

[452] ECF No. 311 at 39 (quoting Complying with the Telemarketing Sales Rule, Federal Trade Comm'n, https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule.)

[453] *See* 15 U.S.C. § 6101(1).

[454] Complying with the Telemarketing Sales Rule, Federal Trade Comm'n, https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule (emphasis added).

into the regulatory exemption. Defendants' proposed reading would make the exemption elephantine: once a seller met with a prospective buyer in person about any transaction, all later transactions would then be exempted in perpetuity.

Defendants also contend that Response's one-on-one coaching programs were not actually a different product from those previously sold to consumers in person because they were a continuation of the training already provided and were, at most, an "upsell."[455] However, the TSR specifically states that an upsell "is a separate telemarketing transaction, not a continuation of the initial transaction."[456] And although Response's one-on-one coaching program was related to the training already provided, it was sold in a separate transaction with distinct terms and conditions and included services not previously available. The court finds that because the face-to-face sales presentation that exempts a telephone call from the TSR must relate to the same transaction at issue in that telephone call, Defendants' argument is meritless.

Defendants lastly contend that, at least since 2015, Response handed out information about its one-on-one coaching programs to consumers during certain in-person events.[457] To support this argument, Defendants have provided evidence that a welcome letter handed out at some events referenced the opportunity to participate in programs like Inner Circle and testimony from some consumers who were told that they would be called and invited to join such programs.[458] Setting aside the fact that Defendants raised this argument for the first time in their

---

[455] ECF Nos. 270 at 33; 311 at 37–39.

[456] 16 C.F.R. § 310.2(hh).

[457] ECF No. 311 at 36.

[458] *See* Defendants' Reply Exh. 15, ECF No. 309-16; Defendants' Exh. 60, Declaration of Consumer Ting-Ming Chen ¶ 20, ECF No. 270-70.

reply brief,[459] and the fact that there is evidence Response's telemarketers often told consumers that its one-on-one coaching programs were not discussed at previous events,[460] the evidence Defendants have provided does not show that Response made the type of sales *presentation* the face-to-face exemption requires. Indeed, the head of Response's coaching programs has testified that welcome letters about the one-on-one coaching programs were not "a pitch," but merely a way consumers were "introduced to it."[461] Because the sales presentation the exemption requires must be used in selling and about the "sale"—i.e., the good or service offered, its price, terms and conditions of the sale—not just a passing or ancillary introduction to a good or service offered, the face-to-face exemption still does not apply. Again, to allow otherwise would enable telemarketers to evade the TSR's requirements through minimal face-to-face interactions or advertisements.

For these reasons, Response's telemarketing calls did not fall within the TSR's face-to-face exemption. Defendants' motion for summary judgment on that basis must be denied.[462]

## B.  The Alleged Misrepresentations during Telemarketing Calls

As noted above, Plaintiffs claim that Response made two main false or misleading representations about its one-on-one coaching programs during telemarketing calls: (1) that they were unique and available only to consumers who qualified or were selected to join (selectivity

---

[459] "[T]he general rule in this circuit is that a party waives issues and arguments raised for the first time in a reply brief." *Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011) (alteration in original) (quoting *M.D. Mark, Inc. v. Kerr–McGee Corp.*, 565 F.3d 753, 768 n.7 (10th Cir. 2009)).

[460] *See* Defendants' Opp. Exh. 14 at 3, 5–6, 8, 16, 20, 23, 28–30, 37, 41.

[461] Defendants' Exh. 14, North Depo. at 47:13–48:18.

[462] Even if the court had found the face-to-face exemption ambiguous—that it was "reasonably susceptible" to either of the parties' interpretations, *Peabody Twentymile Mining, LLC v. Sec'y of Lab.*, 931 F.3d 992, 998 (10th Cir. 2019) (citation omitted)—the outcome would be the same. When an agency regulation is "genuinely ambiguous," courts typically defer to the agency's interpretation. *See Kisor*, 139 S. Ct. at 2412–13. Because Plaintiffs' proposed interpretation is not "plainly erroneous," "inconsistent with the regulations," or characterized by a lack of "fair and considered judgment on the matter," the court would defer to it here. *See Qwest Corp. v. Colorado Pub. Utilities Comm'n*, 656 F.3d 1093, 1098 (10th Cir. 2011) (citations omitted).

representations), and (2) that one-on-one coaching would help consumers make money more quickly and safely and would pay for itself (earnings representations).[463] The alleged earnings representations during telemarketing calls have been discussed at length above, where the court found a genuine dispute as to consumers' net impression of Response's representations.[464] Because of this genuine dispute, there is no need to discuss the earnings representations further in the context of Plaintiffs' TSR and TFPA claims.

The alleged selectivity representations were also discussed above, but only with regard to how they may have contributed to other representations regarding earnings and the use of consumers' financial information, not as standalone misrepresentations.[465] Therefore, the court now considers whether Response made any false or misleading representations about the selectivity of its one-on-one coaching programs in violation of the TSR and TFPA.

It is undisputed that, in at least some of the telemarketing calls Plaintiffs have provided, Response made representations like the following:

- "[This is] a unique opportunity where we're going to be taking some of these individuals from some of these workshops and actually assigning them to work with some of our top experts in a more one on one setting over the next year.";[466]

- "[W]e're not looking to work with everybody, nor can we. We don't talk about it at the show. We don't offer it to the public. It's done through an interview. It's got to be a win-win. I've got limited spots, limited coaching. Yes to you is no to somebody else, vice versa.";[467]

- "I'm going to shoot straight with you and tell you we're not looking to do this with every student. . . . [W]e know that that wouldn't be a win-win or a good fit to try and do this for everyone. In order for something like this to be

---

[463] ECF No. 267 at 62–64, 67–68. The descriptive categories are the court's own.

[464] *See supra* Section II.A

[465] *See supra* Sections II.A and III.C.1.

[466] *See, e.g.*, Plaintiffs' Exh. 59, Marino Decl., Exh. C, Call to Consumer NN at 27:45–28:00.

[467] *See, e.g.*, *id.*, Exh. O at 127:17–22.

effective [we] want to find the best students. . . . [S]tudents that are really motivated.";[468]

- "[W]e're not looking to work with everyone, nor can we. That's why we don't offer this publicly or talk about it at the seminar.";[469]

- "[The one-on-one approach] is unique . . . .[I]t's not something we can work with everybody on. It's something that we go through an interview process even on in the first place because we've got to make sure that this is not only going to pay for itself, but it's going to help you recoup [your previous investments.]";[470]

- "[U]s working with somebody hands on, long term, like this it's not something that we talk about at the events. We don't promote this to the general public or anything like that. We do this by interview only.";[471]

- "What we like to do periodically is reach out to *some* of our Diamond Students and look for . . . people that would really like the idea of creating a high level of success as an investor . . . .";[472] and

- "That's exactly why we like to make these calls when we do and do these interviews . . . . That's why we don't talk about this and offer it to the general public at the workshops . . . . With the names and faces, the reputations that have signed off on this, the Yancey's and other folks like that that have the big TV shows and all this kind of stuff, . . . we're going to make sure that we protect the integrity of the program . . . ."[473]

Plaintiffs argue that such statements were false or misleading because Response did not actually have requirements consumers had to meet to participate in one-on-one coaching or place limits on how many one-on-one coaching packages it would sell.[474]

Defendants argue that Plaintiffs are not entitled to summary judgment with regard to these selectivity representations for two reasons.[475] First, they argue that the selectivity

---

[468] *See id.*, Exh. C, Call to Consumer BB at 4:31–4:55.

[469] *See id.*, at 6:19–6:27.

[470] *See id.*, Call 2 to Consumer CC at 14:24–14:40.

[471] *Id.*, Call to Consumer DD at 8:42–8:56.

[472] *Id.*, Call to Consumer DE at 2:47–3:02.

[473] *Id.*, Call 1 to Consumer EE at 8:13–10:25. Other similar representations can be found throughout *id.*, Exh. B.

[474] ECF No. 267 at 62–63.

[475] ECF No. 287 at 59–60.

representations were too vague to mislead an ordinary consumer acting reasonably and amount to non-actionable puffery.[476] Second, they argue that the selectivity representations were true because Response's one-on-one coaching programs were available only to Advanced Training customers who were willing to put in the time and effort required.[477]

Both of these arguments are meritless and do not preclude entry of summary judgment for Plaintiffs. As noted above, puffery typically consists of "exaggerated advertising, blustering, and boasting."[478] Response told consumers that its one-on-one coaching programs required an interview, were selective, and had limited spots. Such statements were not simple boasts or vague exaggerations about the programs. They presented characteristics that were "measurable" and capable of being "literally true or false."[479] Indeed, characteristics that would entice consumers to make a purchase.

Additionally, Defendants have failed to provide any evidence that most of its selectivity representations could be found to be true. Although they have shown that some of the telemarketers in Plaintiffs' sample of calls told consumers that all Advanced Training customers were being called, not just a select few,[480] such statements are not evidence about whether the one-on-one coaching programs actually were selective or had limited spots. On the other hand, it is undisputed that Response's telemarketers attempted to achieve certain "dollar per lead"[481] sales targets set by Response, and their compensation was determined, at least in part, by

---

[476] *Id.*

[477] *Id.*

[478] *Direct Mktg. Concepts*, 624 F.3d at 11 (citation omitted).

[479] *Id.*

[480] *See* Defendants' Opp. Exh. 14 at 3, 10, 13–14, 17–18, 27, 31–32, 37, 41.

[481] "Dollars per lead" equaled the total amount of "sales made to a set number of consumer leads divided by the number of leads." *See* ECF Nos. 267 at 20; 287 at 6.

whether they met or exceeded those targets.[482] Indeed, telemarketers were incentivized to sell as many one-on-one coaching packages as possible, as their commission rates increased as they exceeded their "dollar per lead" targets.[483] Defendants have provided no evidence whatsoever that there was a set number of spots available in its one-on-one coaching programs or that any consumer who was interested and "interviewed" was ever determined not to be a good fit for Response's program. At most, its telemarketers' statements about looking for students who were willing to put in the work did no more than allow consumers to screen themselves. There is no evidence that Response has ever had any criteria or process it applied for determining who could join, let alone used one to exclude anyone from making a purchase.

Accordingly, Plaintiffs have shown, as a matter of law, that Response made representations about its one-on-one coaching programs that were false or misleading. Therefore, they are entitled to summary judgment with regard to their claims under the TSR and TFPA.

## IV. The UDCP's Claims under BODA (Counts X and XI)

The UDCP claims that Response violated Utah's BODA by failing to (1) submit certain annual filings (Count X) and (2) provide specific disclosures and warnings to consumers (Count XI).[484] The parties do not dispute that Response did not perform these actions, which BODA requires of those to whom it applies. They dispute only whether Response was subject to BODA in the first place.

BODA covers all persons and entities that sell "assisted marketing plan[s]."[485] An assisted marketing plan has the following transactional elements:

---

[482] *See* ECF Nos. 267 at 20–21; 287 at 6–7.

[483] *See* ECF Nos. 267 at 20–21; 287 at 6–7.

[484] ECF No. 173 at 73–74.

[485] Utah Code §§ 13-15-2, 13-15-4, 13-15-5. The Utah Legislature made significant amendments to BODA in 2022, with the changes effective May 4, 2022. *See* Utah Code § 13-15-101 *et seq.* (2022). However, because the BODA

the sale or lease of any products, equipment, supplies, or services that are sold to
the purchaser upon payment of an initial required consideration of $500 or more
for the purpose of enabling the purchaser to start a business.[486]

But such a transaction must also include one of four statutorily enumerated representations to

constitute an assisted marketing plan.[487] Here, Plaintiffs claim that Response made the following

representation:

(iv) that upon payment by the purchaser of a fee or sum of money, which exceeds
$500 to the seller, the seller will provide a sales program or marketing program
that will enable the purchaser to derive income from the assisted marketing plan
that exceeds the price paid for the marketing plan.[488]

The parties' arguments evince that whether Response sold assisted marketing plans, and

thus was subject to BODA, comes down to what it means to represent that a program "will

enable [consumers] to derive income . . . that exceeds the price paid for [it]."[489] Defendants

assert that no reasonable trier of fact could find such a representation was made because there is

no evidence Response guaranteed that its customers would make money, let alone an amount

exceeding the purchase price of its programs.[490] At most, Defendants argue, Response told

consumers that they *could* earn money using the methods and tools taught in its training

programs.[491]

violations the UDCP alleges occurred in 2019 or earlier, the court looks to the pre-amendment version of the statutes
to determine whether Response violated BODA.

[486] *Id.* § 13-15-2(1)(a).

[487] *Id.* § 13-15-2(1)(a)(i)–(iv).

[488] *Id.* § 13-15-2(1)(a)(iv).

[489] *See* Utah Code § 13-15-2(1)(a)(iv). Defendants do not appear to dispute that Response's training programs met
all other requirements of a "seller of an assisted marketing plan."

[490] ECF No. 270 at 39–40.

[491] *Id.* at 39. In their motion for summary judgment, Defendants also argued that Plaintiffs failed to provide evidence
that Response represented that it would provide "a sales program or marketing program." ECF No. 270 at 39–40.
However, after the UDCP presented evidence in support of its allegation that Response offered to provide a sales or
marketing program in its opposition to Defendants' motion, Defendants failed to address it, or further develop their
argument, in their reply. *See* ECF No. 294 at 83–85; *see generally* ECF No. 311. Additionally, Defendants did not
even raise this argument in its opposition to Plaintiffs' motion for summary judgment. ECF No. 287 at 71–72.
Therefore, the court deems the argument abandoned. In any event, the UDCP has met its burden of showing that

In contrast, the UDCP argues that based on the ordinary meaning of the word "enable," it need only show that Response represented that its training programs "would provide [consumers] with the means to make more money than the price paid," not that it guaranteed they would make that amount.[492] Thus, Defendants' assertion that Response did no more than tell consumers that they *could* make money through its programs is essentially an admission that the programs were assisted marketing plans.[493] However, even without that admission, the undisputed facts show that Response represented to consumers in various ways that its training programs would provide the means to earn income exceeding the price of its programs.[494]

---

Response told consumers that it would provide a program that would help them arrange and complete sales of real estate. *See, e.g.*, Plaintiffs' Exh. 58, Hogan Decl., Exh. H at 137:22–140:19 ("[H]ow many of you truly believe if you had the knowledge, tools, support, and the money, how many of you believe you can do a deal in the next three or four months? . . . [I]f you're serious, you need knowledge, tools, support, money, we provide all of the above, you just got to take action, okay?"); *id.*, Exh. J at 67 ("So they pay for the training. We show them how to find their first deal. They don't find it on their own, but we show them how to find their first deal, locate it, get the offer, get it under contract. . . . They still need a buyer. So they use our buyer system to get the buyer in place, which is very valuable to them. In the meantime, they call us 10 times a day, every day . . . . [H]ere's my point. We show them how to find it. We showed them how to do the whole thing. They called us 10 times a day every day. We helped them with the buyer. Do we deserve of slice of their profit?"); *id.* at 82–83 ("So a couple years ago our business strategy became this. We said, hey, we're going to do as many deals as we can handle, and we'll make money on those. But at the same time, we want to get a handful of you up and running. We want to show you how to do the exact same thing and give you access to the exact same tools. We just want to make a little bit of money on each one of those deals we help you with and fund them. How many of you agree that's a genius business strategy? It's awesome. Because it's win-win. The more deals you do, the more money we make, the more money you make."); *id.*, Exh. L at 96:5–9 ("[T]he focus [of the workshop] is teaching you and showing you the tools that we use to find deals and start making offers. We've got to show you how to find the deals the way that we get them."); Plaintiffs' Exh. 59, Marino Decl., Exh. P at 2–3 ("Scott's ready to show you how to cash in on today's market with his breakthrough, excuse-busting, financial freedom program, 'Power Flip.' . . . [Y]ou can get started with virtually zero experience, zero guesswork, and zero deal money out of pocket. . . . As part of [the] 'Power Flip' program, you're going to gain access to my power team of real estate professionals who can provide you with the help and the support and the tools you need to get started to make money in real estate.");

[492] ECF No. 294 at 85.

[493] ECF No. 307 at 40–41.

[494] ECF No. 267 at 64–66.

The court agrees with the UDCP. The ordinary meaning[495] of the word "enable" is "to make possible, practical, or easy"[496] or "to supply with the requisite means or opportunities to an end."[497] Thus, the question here becomes whether Response represented that its training programs would give consumers the requisite means or opportunity, or make it possible, to derive income exceeding the amount paid for them.[498] Understanding this, Defendants' argument that Response did not make the relevant representation because it did not guarantee that its customers would make any money is unavailing. Evidence of such a guarantee or promise certainly would be sufficient to show that the relevant representation was made, but it is not necessary to do so.[499]

The UDCP has produced abundant undisputed evidence in support of its claim that Response represented on various occasions that its programs would give consumers the means or

---

[495] *See Amparan v. Lake Powell Car Rental Cos.*, 882 F.3d 943, 947 (10th Cir. 2018) ("When the federal courts are called upon to interpret state law, the federal court must look to rulings of the highest state court, and, if no such rulings exist, must endeavor to predict how that high court would rule." (quoting *Stickley v. State Farm Mut. Auto. Ins. Co.*, 505 F.3d 1070, 1077 (10th Cir. 2007))). No Utah state court has interpreted the language from BODA at issue, so the court must interpret it as the Utah Supreme Court would, by beginning with the ordinary meaning of the statutory language. *See Marion Energy, Inc. v. KFJ Ranch Partnership*, 267 P.3d 863 (Utah 2011) ("The best evidence of the legislature's intent is the plain language of the statute itself. Thus, [w]hen interpreting a statute, we assume, absent a contrary indication, that the legislature used each term advisedly according to its ordinary and usually accepted meaning." (alteration in original) (internal quotation marks and citations omitted)).

[496] Webster's Third New Int'l Dictionary at 745.

[497] V The Oxford English Dictionary at 201.

[498] *See Roberts v. C.R. England, Inc.*, 318 F.R.D. 457, 497 (D. Utah 2017) ("UBODA merely requires a party to show that a seller represented that, on the payment of a threshold amount, it would provide the benefits of a program or plan relating to selling, leasing, or licensing goods or services, and that this plan or program *would permit the purchaser to derive income in excess of the price paid*." (emphasis added)).

[499] This conclusion is further supported by the fact that one of the other enumerated representations that creates an "assisted marketing plan" under BODA specifically covers circumstances in which sellers represent that they will provide a "guarantee that the purchaser will receive income . . . that exceeds the price paid." *See* Utah Code § 13-15-2(1)(a)(iii). The fact that the enumerated representation at issue does not include language about a "guarantee," while others do, is a strong indication that the term "enable" should not be interpreted as "guaranteeing." *See Marion Energy*, 267 P.3d at 866 ("We . . . give effect to omissions in statutory language by presuming all omissions to be purposeful.").

opportunity to derive income exceeding their purchase price. For example, Response's

infomercials and other advertisements included statements such as

- "I've never seen a way to profit in real estate like the Yancey way."[500];

- "[Yancey's] ready to show you how to cash in on today's market with his breakthrough . . . financial freedom program."[501]; and

- "So many people watching right now are barely getting by. . . . That's exactly why me and my team developed the "Power Flip" program . . . . We're providing you with the help you need to get started, the resources you need to find the deals, and even the money you'll need to help fund the deals. . . . You'll have the opportunity to create your own salary, your own income. You can secure your family's future."[502]

Response's preview events included various statements about how its programs provided the

knowledge, tools, and funding to make money in real estate.[503] Finally, Response's

telemarketing scripts in some years also included statements such as, "We help you locate,

evaluate and properly finance your investments by providing your business with a complete

system, current market-strategies and all the tools and resources you need to be successful."[504]

And, as already discussed above, telemarketers stated in at least some calls that Response's one-

on-one coaching program would "pay for itself."[505] Defendants have produced no evidence that

shows that there is a genuine dispute as to whether such statements gave consumers the net

---

[500] Plaintiffs' Exh. 59, Marino Decl., Exh. Q at 2.

[501] *Id.*, Exh. P at 2.

[502] *Id.* at 7.

[503] *See* Plaintiffs' Exh. 58, Hogan Decl., Exh. B at 10:20–11:2 ("[H]ow many of you are here to learn how to make some money in real estate? . . . That's what we're doing today, folks. We're going to reveal awesome real strategies on how to make money, okay? That's what today is all about."); *id.*, Exh. F at 85:3–13 ("[I]n my experience . . . the best way to create wealth is with real estate. And the best way for you to learn how to do this and to get access to the case is at our three-day real estate workshop."); *id.*, Exh. H at 125:10–126:6 ("I've been doing this long enough to know, some of you in this room have been thinking about doing real estate for decades . . . . We make money by doing it. And in our experience, the best way for you to learn how to do this and to get access to the case, the money to do the deals, is at our three-day workshop."); *id.*, Exh. L at 126:10–13 ("We want you to do more than one deal. And we found the minute we can show you how to do at least one and you actually make money, you're going to do more than just one."); *see also supra* notes 189–96.

[504] Plaintiffs' Exh. 57, Larsen Decl., Exh. D; *see also* ECF No. 287 at 21–22.

[505] *See supra* notes 187, 221, and 470 and accompanying text.

impression that Response's programs would provide the requisite means or opportunity to derive income exceeding the amount paid for them.[506] It is not possible to "profit," achieve "financial freedom," or "secure your family's future," without making more income than the amount paid.

Accordingly, that Response sold an "assisted marketing plan" and was subject to BODA is not genuinely disputed. And because it is undisputed that Response did not fulfill BODA's requirements, the UDCP is entitled to summary judgment on its claims under BODA (Counts X and XI).

## V.    Remedies Issues

Having found that Plaintiffs are entitled to summary judgment on some of their claims (Counts II, IV, VII, and XII on some allegations and Counts X and XI on all), and with others to be decided by the ultimate trier of fact (Counts I, III, VI, VIII, IX), the court must now address some disputes regarding remedies.

Plaintiffs claim that Response's violations entitle them to various forms of relief. The FTC contends that it is entitled to permanent injunctive relief under § 13(b)[507] of the FTC Act for Response's violations of § 5 of the FTC Act and the TSR.[508] The FTC also contends that Response's violation of the TSR entitles it to consumer redress under § 19 of the FTC Act.[509] The UDCP contends that it is entitled to injunctive relief, damages, consumer redress, fines, and

---

[506] Of course, finding that such statements constitute a representation that Response's programs would provide the means to earn income exceeding their purchase price does not change the fact that, as discussed above, there is a genuine dispute as to whether such statements gave the net impression that an earnings claim, promise, or guarantee had been made. As just discussed above, these are two different representations.

[507] 15 U.S.C § 53(b).

[508] ECF No. 267 at 52–53.

[509] *See* ECF No. 267 at 52–53. Section 19 is codified at 15 U.S.C. § 57b.

fees and costs under the UCSPA,[510] injunctive relief under BODA,[511] and civil penalties under the TFPA.[512]

There are only two disputes regarding these remedies currently at issue. First, the parties dispute whether the FTC is entitled to consumer redress under § 19 of the FTC Act. Second, they dispute whether a one-year statute of limitations applies to the UDCP's claims for disgorgement, civil penalties, and fines. The court addresses these issues separately.

## A. Consumer Redress

Section 19 of the FTC Act states that when a corporation has violated an FTC rule "respecting unfair deceptive acts or practices," the court may "grant such relief as the court finds necessary to redress injury to consumers or other persons . . . resulting from the rule violation," including but not limited to "rescission or reformation of contracts, the refund of money or return of property, the payment of damages, and public notification respecting the rule violation or the unfair or deceptive act or practice."[513] Because relief under § 19 is limited to redressing consumers' actual injuries, "proof of consumer reliance . . . is necessary to establish the right to consumer redress."[514] However, consumer reliance can be presumed if the FTC is able to show that "(1) the business entity made material misrepresentations likely to deceive consumers, (2)

---

[510] Utah Code §§ 13-11-17, 13-11-17.5.

[511] *Id.* § 13-15-6(3). The court already granted summary judgment for Defendants as to the UDCP's claims for penalties and fines under BODA because the UDCP did not issue any cease and desist orders before commencing this action. *See* ECF No. 254 at 4–8.

[512] Utah Code § 13-26-8(2).

[513] 15 U.S.C. § 57b(a)(1), (b). There is no dispute that violations of the TSR fall within the scope of § 19 of the FTC Act. The TCFAA declares violations of rules related to deceptive telemarketing acts and practices to be a rule violation under § 18 of the FTC Act. *See* 15 U.S.C. § 6102(a)(1), (c)(1); *see also id.* § 57a.

[514] *Freecom*, 401 F.3d at 1205. Although *Freecom* discussed consumer redress in the context of § 13(b) rather than § 19, its reasoning was largely based on a case that applied the same standards to § 19. *See Fed. Trade Comm'n v. Figgie Int'l, Inc.*, 994 F.2d 595, 606 (9th Cir. 1993).

those misrepresentations were widely disseminated, and (3) consumers purchased the entity's products."[515]

Here, the issue in dispute is whether the FTC is entitled to a presumption of reliance. Specifically, the parties disagree whether the FTC has shown that Response's misrepresentations during telemarketing calls were "widely disseminated."

Defendants argue that the FTC has failed to show any misrepresentation during telemarketing calls was widely disseminated because they have produced evidence from only 52 telemarketing calls out of tens of thousands that were made, and those calls involved only 18 consumers who actually purchased one-on-one coaching from Response.[516] Because each call was unique, the FTC's sample is not statistically representative of all the calls Response made as a matter of law.[517] In support of this argument, Defendants rely on an expert report from Dr. Brian Cadman. In his report, Dr. Cadman calculated that, under certain assumptions, a sample of at least 196 consumers would be necessary to make any inferences as to what occurred in telemarketing calls with other consumers who purchased a one-on-one coaching package.[518]

For its part, the FTC argues that it has shown Response's misrepresentations were widely disseminated as a matter of law because its sample is statistically representative of what occurred during Response's telemarketing calls, and misrepresentations were made in almost every call in the sample.[519]

---

[515] *Freecom*, 401 F.3d at 1206.

[516] ECF Nos. 287 at 61–62; 311 at 41.

[517] ECF Nos. 287 at 61–62; 311 at 41.

[518] *See* ECF No. 327 at 8–9.

[519] ECF Nos. 267 at 46–47, 70–71; 307 at 36 n.114, 39–40.

The court disagrees with both of these arguments. The fact that most of the calls in the FTC's sample included statements representing Response's one-on-one coaching program as exclusive and selective suggests that such statements may have been widely disseminated.[520] For example, at least 24 of the 35 consumers in Plaintiffs' sample (69%) were specifically told, among other things, that they would essentially need to pass an interview to join the program.[521] And the telemarketing scripts Response used as "outlines"[522] during calls contain many of the type of selectivity and exclusivity representations already discussed, further suggesting that such statements were a common feature of Response's telemarketing calls.[523]

Although Dr. Cadman's report suggests that a larger sample is needed to draw any inferences from the FTC's sample, his conclusions ultimately go to the weight that should be given to the FTC's sample. Indeed, another of Defendants' experts stated in deposition testimony that although "sample sizes below 30 are too unstable for statistical purpose," sample sizes "above 30 or so . . . start to stabilize," and it just depends "how much margin of error . . . the researcher [is] willing and able to accept."[524] Further, Dr. Cadman's calculation required an assumption about the very question in dispute: how often did Response make its misrepresentations.[525] And he admitted during his deposition that changing this assumption could significantly alter the size of sample needed to draw inferences about other calls, possibly

---

[520] *See* Plaintiffs' Exh. 59, Marino Decl., Exh. B.

[521] *See id.*

[522] *See* ECF No. 287 at 21.

[523] *See* Plaintiffs' Exh. 57, Larsen Decl., Exh. B (scripts containing statements such as "I will need to conduct a two way interview," "my job is . . . about keeping the wrong people away," and "to ensure the people we select are going to think and act like we do, I have you go through a two-part interview")

[524] Plaintiffs' Exh. 20, Deposition of Dr. Brian Sowers at 25:6–11, ECF No. 265-22.

[525] *See id.* Dr. Cadman's calculation assumed that misrepresentations were made 60% of the time. *See id.*

to as low as 30 to 35 calls.[526] Therefore, the evidence Defendants have produced does no more than show that the question whether Response's misrepresentations were widely disseminated is for the trier of fact.

Accordingly, both parties' motions for summary judgment with regard to the availability of consumer redress for Response's violations of the TSR must be denied.

### B. Statute of Limitations for Disgorgement, Civil Penalties, and Fines under the UCSPA and TFPA

Defendants argue that, as a matter of law, the UDCP's claims for disgorgement, civil penalties, and fines for Response's violations of the UCSPA and TFPA are barred with regard to any wrongful conduct that occurred prior to May 8, 2017.[527] They note that prior to May 8, 2018, a one-year statute of limitation applied to actions brought "upon a statute for a penalty or forfeiture."[528] Although the Utah legislature enacted a new and longer statute of limitations for claims under the UCSPA and TFPA beginning on May 8, 2018, Defendants argue that the new statute of limitations did not revive causes of action that were already time-barred by the previous one-year statute of limitations.[529] Accordingly, because the statute of limitations for any claim under the UCSPA or TFPA based on conduct that occurred before May 8, 2017, had run by the effective date of the new statute of limitations, the statute of limitations for those claims had run and was not revived by the new statute of limitations.[530]

The UDCP does not refute that any claim for disgorgement, penalties, or fines based on unlawful conduct before May 8, 2017, is barred by the previous statute of limitations, but it

---

[526] *See* Plaintiffs' Exh. 64, Deposition of Dr. Brian Cadman at 58:6–61:25, ECF No. 292-5.

[527] ECF No. 270 at 49–51.

[528] *Id.* at 49 (quoting Utah Code § 78B-2-302(2).

[529] *Id.* at 49 & n.211.

[530] *Id.* at 49–51.

argues that it is nonetheless entitled to monetary relief for such conduct on three grounds.[531] First, it argues that it can seek not only disgorgement, fines, and penalties for violations of the UCSPA and TFPA, but also damages, which is not a penalty or forfeiture that was subject to the previous one-year statute of limitations.[532] Second, it argues that it also has unjust enrichment claims against Response as a basis for recovering damages, which has a longer statute of limitations.[533] Lastly, it argues that even if its claims based on conduct prior to May 8, 2017, are time-barred, such conduct is still relevant in determining what fines to impose for Response's violations that occurred after that date.[534]

The UDCP's first argument is correct, but it is of limited effect here and does not preclude a grant of summary judgment for Defendants. Section 13-11-17(1)(c) of the Utah Code allows the UDCP to "recover . . . actual damages," but only "on behalf of consumers who complained to the [UDCP] within a reasonable time after it instituted" an action.[535] The court previously analyzed and denied the parties' cross-motions for summary judgment proposing various cutoff events which would extinguish claims as a matter of law.[536] A "reasonable time" suggests that the inquiry is fact-bound and case-specific. Because the required facts have not been briefed, the issue will not be analyzed further here.

The UDCP's second argument is without merit. Utah Code § 13-11-17 permits the UDCP to bring two types of actions to enforce statutes like the UCSPA and TFPA: an enforcement

---

[531] ECF No. 294 at 92–93.

[532] *Id.*

[533] *Id.*

[534] *Id.*

[535] Utah Code § 13-11-17(1)(c).

[536] *See* ECF Nos. 234, 236.

action under § 13-11-17(1) or a class action under § 13-11-17(2).[537] The UDCP states in the amended complaint that this action was brought pursuant to § 13-11-17, but nowhere does it claim that the action is brought on behalf of a class.[538] Nor has it gone through any of the procedural requirements to have such a class certified. Indeed, until now, the UDCP requested only the relief available for enforcement actions under § 13-11-17(1).[539] Because the unjust enrichment provision under which the UDCP now seeks to recover is available only for class actions, not enforcement actions, it has no valid claim to unjust enrichment damages.

Finally, although the UDCP's claims to monetary remedies based on unlawful conduct that occurred before May 8, 2017, are clearly time-barred, the court agrees with the UDCP that such conduct is nonetheless relevant in determining fines for any unlawful conduct that occurred after that date. Section 13-11-17(1)(d) of the Utah Code permits the UDCP to "obtain a fine in an amount determined" by the court based on specific factors,[540] one of which is "the seriousness, nature, circumstances, *extent, and persistence* of the conduct constituting the violation."[541] Thus, although the UDCP cannot recover fines or penalties for any unlawful conduct Response engaged in before May 8, 2017, any fine given for unlawful conduct that occurred after that date may and must take into account whether that conduct also occurred before that date.

In summary, the UDCP may not recover fines, penalties, or other monetary relief for any violation of the UCSPA or TFPA Response committed before May 8, 2017, only actual damages

---

[537] *See* Utah Code § 13-11-17(1), (2); *see also Workman v. Nagle Const., Inc.*, 802 P.2d 749, 752 (Utah Ct. App. 1990) ("The Division is enabled by Utah Code Ann. § 13-11-17 (1986) to bring essentially two types of actions for the recovery of damages compensating consumers, an action under section 13-11-17(1)(c) 'to recover . . . on behalf of consumers who complained to the [Division] within a reasonable time after it instituted proceedings under this chapter,'" or a class action under section 13-11-17(2) on behalf of consumers." (alterations in original)).

[538] *See generally* ECF No. 173.

[539] *See id.* at 7.

[540] Utah Code § 13-11-17(1)(d).

[541] *Id.* § 13-11-17(6).

for "consumers who complained to the [UDCP] within a reasonable time after it instituted" this litigation. However, any violation Response committed before May 8, 2017, remains relevant to determining fines for violations that occurred after that date to the extent they are based on the same conduct. Accordingly, Defendants' motion for summary judgment on this issue will be granted.

## VI.   Liability of Remaining Defendants

As a final matter, because Plaintiffs' claims are based on Response's actions and practices, the court must determine whether, or to what extent, the remaining Defendants can be held liable. Plaintiffs argue that the remaining Corporate Defendants (BuyPD and Nudge) are jointly and severally liable with Response because they were part of a common enterprise with Response.[542] Plaintiffs also argue that the Individual Response Defendants are personally liable for Response's violations because they had authority and control over Response and knowledge of its violations.[543] Finally, as an independent claim under the TSR, Plaintiffs argue that Defendants Graziosi and Yancey are liable under the TSR because they provided substantial assistance to Response even though they knew, or consciously avoided knowing, that Response was engaged in practices that violated the TSR.[544]

Plaintiffs move for summary judgment on each of these liability issues, while Defendants move for summary judgment on only some. The court addresses these issues, and the parties' related summary judgment arguments, in turn.

---

[542] ECF No. 267 at 68.

[543] *Id.*

[544] *Id.* at 71–72.

## A.  Liability of the Other Corporate Defendants

Defendants offer no opposition to Plaintiffs' argument that BuyPD and Nudge are jointly liable with Response because they are a common enterprise. Nevertheless, Plaintiffs are entitled to this finding, only if they meet their burden of showing that no reasonable trier of fact could find that these Defendants were not engaged in a common enterprise.[545] Having reviewed the record, the court finds Plaintiffs have satisfied that burden.

As the court noted previously, "members of a common enterprise 'are liable for injunctive relief and, jointly and severally, for monetary relief.'"[546] A common enterprise exists when, "for example, businesses (1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing."[547]

The undisputed facts show that the Corporate Defendants shared many of these features in common. Each were owned and operated by a common group of individuals.[548] BuyPD and Response operated Buying Summits and Investor Expos together and even operated out of the same building for a time.[549] And Nudge provided consulting, payroll, and benefit services to Response and BuyPD.[550] Without a doubt, the Corporate Defendants were "integrated business

---

[545] See Leone, 810 F.3d at 1153.

[546] Fed. Trade Comm'n v. Nudge, LLC, 430 F. Supp. 3d 1230, 1241 (D. Utah 2019) (quoting LoanPointe, 2011 WL 4348304, at *10); see also E.M.A. Nationwide, Inc., 767 F.3d at 636 ("[E]ach of these corporations is to be held jointly and severally liable as they are part of a common enterprise . . . ."); Fed. Trade Comm'n v. Bay Area Bus. Council, Inc., 423 F.3d 627, 635 (7th Cir. 2005) ("The corporate defendants do not dispute the district court's conclusion that they operated as a 'common enterprise' such that they are jointly and severally liable for the injuries caused by their violations of the FTC Act . . . .").

[547] E.M.A. Nationwide, 767 F.3d at 637 (quoting Fed. Trade Comm'n v. Washington Data Res., 856 F. Supp. 2d 1247, 1271 (M.D. Fla. 2012), aff'd sub nom. Fed. Trade Comm'n v. Washington Data Res., Inc., 704 F.3d 1323 (11th Cir. 2013)).

[548] See ECF Nos. 267 at 10–13; 287 at 3–4.

[549] See ECF Nos. 267 at 10–13; 287 at 3–4.

[550] See ECF Nos. 267 at 10–13; 287 at 3–4.

entities" that operated as a "common enterprise" and, as such, may be held jointly and severally liable for each other's actions.[551] Therefore, BuyPD and Nudge are jointly and severally liable for all violations Response has been, or may be, found to have committed.

### B. Personal Liability of the Individual Response Defendants

Plaintiffs argue that the Individual Response Defendants are each personally liable for all of Response's violations.[552] The Individual Response Defendants disagree but raise arguments with regard to only some violations and remedies. With regard to FTC Act violations, they argue that Defendant Sanderson cannot be held personally liable for any violation of the TSR because he did not have any authority or control over Response's telemarketing activities.[553] Defendants also argue that they cannot be held liable for any consumer redress that is awarded for a violation of the TSR because they did not have actual knowledge of Response's deceptive conduct.[554] With regard to State law violations, the Individual Response Defendants argue that they cannot be held liable because the relevant statutes do not provide for corporate officer liability and the UDCP has failed to show that they participated in any deceptive conduct.[555]

### 1. Personal Liability for FTC Act Violations

Individuals can be held personally liable for a business entity's violations of the FTC Act,[556] at least when it comes to injunctive relief, if they "participated directly in the business entity's deceptive acts or practices, or had the authority to control such acts or practices."[557] An

---

[551] *See E.M.A. Nationwide*, 767 F.3d at 637.

[552] ECF No. 267 at 68–70.

[553] ECF No. 270 at 41–43.

[554] *Id.* at 43–47.

[555] *Id.* at 47–48.

[556] As noted above, a violation of the TSR constitutes a rule violation under the FTC Act. *See supra* note 513.

[557] *Freecom*, 401 F.3d at 1204 (emphasis omitted).

individual has directly participated in a deceptive act or practice when he or she "developed or created, altered and disseminated the deceptive marketing materials" or "[a]ctive[ly] supervis[ed]" the employees and sales related to the deceptive acts.[558] Whether an individual had authority to control a business entity, on the other hand, generally depends on "an individual's assumption of duties as a corporate officer, involvement in business affairs, or role in the development of corporate policies."[559]

Personal liability for remedies beyond injunctive relief, such as consumer redress, requires a greater showing.[560] The FTC must show that the individual with authority to control a business entity "had or should have had knowledge or awareness of [the business entity's] misrepresentations."[561] This can be done by "showing the individual had 'actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth.'"[562] However, the FTC need not show that the individual had the "intent to defraud."[563]

There does not appear to be any genuine dispute as to whether the Individual Response Defendants can be held personally liable in connection for any violation of § 5 of the FTC Act, or whether the Response Partners can be held liable for violations of the TSR, at least with

---

[558] *See Fed. Trade Comm'n v. Ross*, 897 F. Supp. 2d 369, 383 (D. Md. 2012), *aff'd*, 743 F.3d 886 (4th Cir. 2014); *see also Fed. Trade Comm'n v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989), *overruled on other grounds by Fed. Trade Comm'n v. Credit Bureau Ctr., LLC*, 937 F.3d 764 (7th Cir. 2019) ("Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer.").

[559] *Ross*, 897 F. Supp. 2d at 382.

[560] *Freecom*, 401 F.3d at 1207.

[561] *Id.*

[562] *Id.* (quoting *Amy Travel*, 875 F.2d at 574).

[563] *Id.*

regard to injunctive relief. Although Defendants claim that there is a genuine dispute regarding these issues, they have made no specific argument as to why Plaintiffs' evidence is insufficient or produced any of their own to contradict it.[564] Defendants have raised arguments only as to whether Sanderson can be held personally liable for Response's violations of the TSR and whether all of the Individual Response Defendants can be held liable for any consumer redress awarded for such violations.

### a. Sanderson's Liability for TSR Violations

The parties dispute whether Sanderson had sufficient authority to control Response's telemarketing practices to be held liable for its violations of the TSR. Defendants argue that although Sanderson was the President and CEO of Response, he had no authority to control Response's telemarketing practices because he did not have an ownership interest in any of the Corporate Defendants, and his responsibilities related primarily to Response's live sales events, such as preview events and workshops. Plaintiffs, on the other hand, argue that Sanderson's authority to control Response's telemarketing is evidenced not only by his position in the company, but also by the fact that he worked with the Response Partners on all areas of Response's business on a weekly basis.[565]

Based on the record evidence, there is a genuine dispute as to whether Sanderson had authority to control Response's telemarketing practices sufficient to be held liable for its TSR violations. Poelman, in a Rule 30(b)(6) deposition, testified that Sanderson "was largely not involved with respect to the telemarketing that took place," and "spent his time and energy in the

---

[564] *See* ECF No. 270 at 43–44. "The nonmoving party must be specific to satisfy its burden, either by 'citing to particular parts of materials in the record' or by showing that the moving party has relied on insufficient or inadmissible evidence." *Ezell v. BNSF Ry. Co.*, 949 F.3d 1274, 1278 (10th Cir. 2020).

[565] ECF No. 294 at 88–89.

. . . live events business and efforts."[566] However, that statement arose in a discussion regarding compensation the Individual Response Defendants received from Response North, Response's subsidiary over its telemarketing efforts.[567] It is not necessarily dispositive as to whether Sanderson had any authority or influence over Response's telemarketing practices. Further, Sanderson himself has declared and testified that he was "responsible for the day-to-day operations and process and system integration across *all* departments," and reported on Response's operations, systems, and processes during his weekly meetings with the Response Partners.[568] These meetings also included discussions about "any compliance issues that had arisen through *any* marketing or sales channel of the business" and "coordinat[ing] *all* areas of the business."[569] A reasonable trier of fact could conclude from such evidence that Sanderson played a sufficiently large role in monitoring, carrying out, and shaping Response's business affairs and policies to find that he had authority to control its telemarketing practices. Accordingly, whether Sanderson can be held personally liable for Response's TSR violations is genuinely disputed.

### b.  Individual Response Defendants' Liability for Consumer Redress

The parties dispute whether the Individual Response Defendants were sufficiently aware of the deceptive conduct that violated the TSR to be held personally liable. That is, whether they had actual knowledge of Response's misrepresentations during telemarketing calls, were recklessly indifferent to the truth or falsity of such misrepresentations, or were aware of a high probability that misrepresentations were being made but intentionally avoided learning the truth.

---

[566] Defendants' Exh. 63, Rule 30(b)(6) Deposition of Response at 125:23–126:7, ECF No. 270-73.

[567] *See id.* at 125:3–126:7; *see also* ECF Nos. 270 at 15 ¶ 80; 294 at 56–57.

[568] Plaintiffs' Exh. 12, Sanderson Depo. at 36:6–19; Plaintiffs' Exh. 31, Sanderson Decl. ¶ 4 (emphasis added).

[569] Plaintiffs' Exh. 12, Sanderson Depo. at 36:6–19, 39:14–21 (emphasis added).

Of course, resolving this dispute is necessary only if an award of consumer redress is a proper remedy for Response's TSR violations, which, as discussed above, is a matter for the ultimate trier of fact.[570] However, because the trier of fact could find that a consumer redress award is warranted, the court finds it prudent to resolve the parties' arguments as to whether liability for such an award may extend to the Individual Response Defendants.

The Individual Response Defendants argue that they are entitled to summary judgment on this issue primarily because of their extensive compliance efforts and meetings with government officials.[571] They assert that they helped found the ERSP, through which companies like Response were able to police and regulate their own legal compliance.[572] They assert that Response submitted recordings of all telemarketing sales calls to and received feedback from the ERSP, which they allegedly implemented.[573] They also assert that they implemented and monitored Response's own compliance program and interacted with Utah state and federal regulators in order to find ways to improve it.[574] According to them, such extensive efforts to comply with the law show that they did not have actual knowledge that misrepresentations were being made, were not recklessly indifferent to whether misrepresentations were made, and did not avoid learning the truth in light of a high possibly Response was engaged in deceptive conduct.[575]

The FTC argues that Response's compliance efforts are irrelevant to the issue at hand, because they do not provide the Individual Response Defendants with a safe harbor from liability

---

[570] *See supra* Section V.A.

[571] ECF No. 270 at 43–47.

[572] *Id.* at 43–44.

[573] *Id.* at 45.

[574] *Id.* at 45–46.

[575] ECF No. 311 at 49.

for deceptive conduct.[576] It argues that the Individual Response Defendants had knowledge of Response's deceptive telemarketing practices because they oversaw and coordinated them.[577] It also argues that the Individual Response Defendants' knowledge is evident from the fact that they received warnings from multiple sources about actual or possible deceptive sales practices and consumers' dissatisfaction with Response's program.[578]

Contrary to the FTC's assertions, any evidence regarding the efforts the Individual Response Defendants made to comply with applicable laws is not irrelevant, as it is probative of their knowledge of Response's practices as well as whether they were recklessly indifferent toward or intentionally ignorant of any misrepresentations that Response made. The fact that Response developed a compliance department that created and provided some disclosures before selling one-on-one coaching programs suggests that the Individual Response Defendants were not indifferent to whether misrepresentations were made. Additionally, the fact that Response allowed its telemarketing calls to be reviewed by an external source, the ERSP, to obtain feedback could suggest that the Individual Response Defendants either lacked actual knowledge of, or were not recklessly indifferent to, whether Response made misrepresentations to consumers during those calls. In short, these actions are not irrelevant.

However, the record also contains evidence that these compliance efforts may not have been what the Individual Response Defendants contend they were. As already discussed, the effectiveness of the disclosures created and provided by Response's compliance department for telemarketing calls is genuinely disputed.[579] Additionally, the Individual Response Defendants'

---

[576] ECF No. 294 at 87.

[577] ECF No. 267 at 68–70.

[578] *Id.*

[579] *See supra* Section II.A.

alleged engagement with the FTC and Utah regulators regarding their compliance efforts does not appear to have been particularly substantial. Their interactions with the FTC consisted of attending a yearly meeting with the FTC, arranged by the ERSP, along with all of its other participants.[580] And their interactions with Utah regulators consisted of a meeting with Utah Attorney General Sean Reyes, about which he recalled only "generally talking about" the ERSP and walking away "with a very positive impression," and brief conversations with Reyes at his fundraising events or other events he also attended.[581] Although Reyes commended Response's relationship with the ERSP "publicly on a number of occasions,"[582] it is undisputed that the Individual Response Defendants' meetings with the FTC and Reyes did not include a review of any of Response's marketing or telemarketing practices and in no way amounted to a "signing off or giving a seal of approval to Response's program."[583]

The record also suggests that the monitoring and supervision provided by the ERSP, which no longer exists,[584] may not have been as thorough or comprehensive as the Individual Response Defendants suggest. The ERSP's due diligence review for companies seeking admission to its review program consisted of no more than a "general internet search" about the company.[585] Additionally, the ERSP did not follow up with the Utah Better Business Bureau after it informed the ERSP that Response's rating had been suspended in light of concerning

---

[580] Plaintiffs' Exh. 65, Deposition of Lois Greisman (FTC Associate Director) at 37:17–42:17, ECF No. 292-6.

[581] Defendants' Exh. 12, Deposition of Utah Attorney General Sean Reyes at 10:15–12:13, ECF No. 270-13; Defendants' Exh. 13, Declaration of William Knowlton ¶¶ 4–12, ECF No. 270-14.

[582] Defendants' Exh. 12, Reyes Depo. at 12:5–13.

[583] Defendants' Exh. 3, Deposition of Phil Smith at 73:11–75:1, ECF No. 270-4; *see also* Defendants' Exh. 12, Reyes Depo. at 15:3–16:10.

[584] *See* ECF Nos. 267 at 46 ¶ 140; 287 at 25.

[585] Plaintiffs' Exh. 68, Deposition of Peter Marinello (ERSP Director) at 213:4–214:16, ECF No. 292-9.

reports.[586] And the Director of the ERSP, Peter Marinello, could not recall reviewing any of Response's telemarketing calls from 2017 to 2019 or the last time he did so.[587] In fact, the ERSP primarily used a third-party vendor to monitor its participants' telemarketing calls.[588]

Even more importantly, there is evidence that guidance and feedback the ERSP did provide to Response and the Individual Response Defendants may not have been implemented. A 2014 ERSP assessment of Response and its predecessor's telemarketing practices indicated that although Response had made some progress in eliminating earnings and selectivity representations from its telemarketing calls, some were still being made.[589] And Marinello continued to warn Response about the illegality of making unsubstantiated earnings and selectivity representations through emails in 2017 and 2018.[590] Despite these warnings, a third-party vendor who reviewed Response' telemarketing calls in 2018 reported that 44% of the calls included selectivity representations.[591] It is an open question whether the Individual Response Defendants were aware of these results.[592]

As a whole, the record evinces a genuine dispute as to whether the Individual Response Defendants had actual knowledge of Response's misrepresentations during telemarketing calls, were recklessly indifferent to those misrepresentations, or intentionally avoided learning whether misrepresentations were made. The court has already found, as a matter of law, that Response made selectivity misrepresentations during some calls, and whether others were also made is

---

[586] *Id.* at 284:21–287:2.

[587] *Id.* at 247:5–19.

[588] *Id.* at 243:10–245:2.

[589] *See* Plaintiffs' Exh. 84, Marino Supp. Decl., Exh. C at 4–5.

[590] *Id.*, Exhs. D, E.

[591] *Id.*, Exh. F.

[592] Plaintiffs' Exh. 68, Marinello Depo. at 265:11–267:14.

genuinely disputed. But if the trier of fact finds that the misrepresentations were widely disseminated, that each of the Individual Response Defendants apparently was involved in reviewing and coordinating all areas of Response's business is highly suggestive that they would have, or should have, been aware that those widely disseminated misrepresentations were being made.[593] And while the Individual Response Defendants' efforts to utilize compliance programs both within Response and without may be enough to show otherwise, the record also suggests that those efforts may have been insincere or ineffective and that they knew Response's telemarketers were making the very types of misrepresentations at issue here and failed to stop them.

Accordingly, whether the Individual Response Defendants can be held liable for any award of consumer redress is a matter for the trier of fact. As such, the parties' motions for summary judgment on this issue are denied.

### 2. Personal Liability under the UCSPA, TFPA, and BODA

The parties disagree both about whether, and under what standard, officers or directors can be held liable for a corporation's violations of the UCSPA, TFPA, and BODA.

The UDCP argues that the Individual Response Defendants are liable for Response's violations of the UCSPA, TFPA, and BODA in two ways. First, it argues that they are liable under these statutes for the same reasons they are liable for violating the FTC Act: because they had knowledge of, and the ability to control, Response's deceptive practices.[594] Second, the UDCP argues that they are liable because they meet the definition of "suppliers," "sellers," and "solicitors" under the UCSPA, BODA, and TFPA respectively.[595]

---

[593] *See Amy Travel*, 875 F.2d at 574 ("[T]he degree of participation in business affairs is probative of knowledge.").

[594] ECF Nos. 267 at 68–69; 294 at 86–89.

[595] ECF No. 294 at 89–91.

The Individual Response Defendants dispute liability on both grounds. They argue that they cannot be held liable because they do not fall within the statutory definitions of the UCSPA, BODA, and TFPA, and those statutes lack provisions extending a corporation's liability to its officers.[596] In the absence of such provisions, Defendants argue, the Individual Response Defendants cannot be held liable because Utah law extends liability to directors and officers of a corporation only if they participated in the unlawful conduct.[597]

At the outset, it is important to note that the parties' dispute speaks to two different types of liability. Arguments about whether the Individual Response Defendants meet the definition of "supplier," "seller," and "solicitor" under the respective statutes are arguments about *direct* liability, as those statutes establish liability only for those whose actions constitute the violation. That is, it is the "supplier," "seller," or "solicitor" who must perform the prohibited act to be held liable under the respective statutes.[598]

The parties' other arguments, by contrast, relate to *vicarious* liability. If the Individual Response Defendants can be held vicariously liable for Response's state law violations, it makes no difference whether they meet the aforementioned statutory definitions or actually performed the prohibited conduct. Because the UCSPA, BODA, and TFPA contain no provision regarding vicarious liability, for corporate officers and directors or otherwise, the Individual Response Defendants can be held liable for Response's violations of those statutes only if there is another legal basis for doing so.

---

[596] ECF No. 270 at 47.

[597] *Id.* at 47–48.

[598] *See* Utah Code §§ 13-11-4(1), 13-15-6(1), 13-26-11(1). Of course, a corporation or other legal entity acts through its employees or other representatives.

With regard to the parties' direct liability arguments, it is clear that the Individual Response Defendants cannot be held directly liable for violating the UCSPA or BODA. The UCSPA prohibits deceptive acts or practices "*by* a supplier"[599] and a violation of BODA occurs when "a seller fails to file" what is required.[600] Because it is undisputed that the Individual Response Defendants did not personally make the misrepresentations that violated the UCSPA, or fail to file what BODA requires, it makes no difference whether they meet the definition of supplier and seller under the UCSPA and BODA respectively. If liability is to attach to them, it must arise on different grounds.

However, the TFPA presents a different situation. It states in relevant part that "it is unlawful for any solicitor . . . to make or *cause to be made any untrue material statement*," and defines "solicitor" as any person or entity that either "makes a telephone solicitation" or "*causes a telephone solicitation to be made*."[601] This means that the TFPA envisions liability not only for any person or entity that makes the call that includes an untrue material statement, but also any person or entity that causes both the call and untrue material statement to be made. Whether the individual defendants can be held liable under the TFPA, then, depends on whether they could be found to have *caused* Response's telemarketers to make the telephone calls and the untrue statements. The court finds that there is sufficient evidence in the record from which a reasonable jury could find that they did.

To "cause" something means "to bring about or effect."[602] However, because Utah typically utilizes a "substantial-cause test," an individual need not be the "only identifiable

---

[599] Utah Code § 13-11-4(1) (emphasis added).

[600] Utah Code § 13-15-6(1).

[601] Utah Code §§ 13-26-2, 13-26-11(1)(c).

[602] *Cause*, Black's Law Dictionary (11th ed. 2019, Westlaw).

cause" or reason something is brought about.[603] It is enough if he or she was "an important or significant contributor" in bringing it about.[604]

The record contains evidence from which a reasonable trier of fact could find that each of the Individual Response Defendants were "solicitors" for purposes of the TFPA, that each was an important or significant contributor in bringing about Response's telemarketing calls to consumers. All but Sanderson had a financial interest in Response, and each held some type of senior management or advisory position.[605] And even though Response's telemarketing operations were overseen primarily by Smith, each of the Individual Response Defendants took part in weekly sales and "partner" meetings that touched upon all aspects of Response's operations.[606] A reasonable trier of fact could find that the Individual Response Defendants were an important or significant contributor to the untrue statements that were made to consumers in Response's telemarketing calls for the same reasons. Therefore, the Individual Response Defendants could be held directly liable for violating the TFPA.

Turning to the question of whether an individual can be held vicariously liable for a corporation's violations of the UCSPA, BODA, and TFPA, it is clear that there must be independent grounds for doing so under Utah law, as those statutes do not provide for it. In addition to any personal liability for corporate actions that arises by means of piercing the corporate veil, which is not at issue here, Utah law permits an officer or director of a corporation

---

[603] *Gardner v. Gardner*, 452 P.3d 1134, 1142 (Utah 2019); *see also McCorvey v. Utah State Dep't of Transp.*, 868 P.2d 41, 45 (Utah 1993) ("[T]here can be more than one proximate cause or, more specifically, substantial causative factor . . . .").

[604] *See Gardner*, 452 P.3d at 1142.

[605] ECF Nos. 267 at 11–13 ¶¶ 5–14; 287 at 3–4.

[606] ECF Nos. 267 at 12–13, 20 ¶¶ 8, 12, 49–50; 287 at 3.

to be held personally liable for the corporation's torts under certain circumstances.[607] Because the UCSPA and TFPA cover conduct that is tortious in nature—fraud and misrepresentations—an officer or director of a corporation who violates them can be held liable when those circumstances are present.

However, that is not the case for violations of BODA. BODA imposes certain filing and disclosure requirements, and a violation of BODA is an administrative or civil violation, not a tort.[608] Neither of the parties has identified, nor has the court been able to find, any grounds for holding a corporate director or officer liable for a corporation's administrative or civil violations in the absence of a statutory provision extending such liability. Thus, if the proper standard is met, the Individual Response Defendants could be held vicariously liable for Response's violations of the UCSPA and TFPA, but not BODA.

Under Utah law, "[a]n officer or director of a corporation is not personally liable for torts of the corporation or of its other officers and agents merely by virtue of holding corporate office, but can only incur personal liability by participating in the wrongful activity."[609] When the corporation's unlawful activity includes fraudulent or deceptive acts, an officer or director "is individually liable for fraudulent acts or false representations of his own or in which he participates."[610]

The Individual Response Defendants argue that they did not "participate" in Response's violations of the UCSPA or TFPA because none of them actually made any of the

---

[607] *See Armed Forces Ins. Exch. v. Harrison*, 70 P.3d 35, 41 (Utah 2003); *Jones & Trevor Mktg., Inc. v. Lowry*, 233 P.3d 538, 543 (Utah Ct. App. 2010), *aff'd*, 284 P.3d 630 (Utah 2012).

[608] Utah Code §§ 13-15-6, 13-15-7.

[609] *Armed Forces*, 70 P.3d at 41.

[610] *Id.* (emphasis omitted).

misrepresentations at issue during Response's training programs or telemarketing calls.[611]
However, this application of the term "participate" is too narrow. The Individual Response
Defendants essentially argue that they did not participate in the violations because they did not
perform the acts that constituted the violation, namely, making the misrepresentations. But the
standard is that they can be held liable for deceptive acts they personally committed *or* in which
they participated.[612] This means that "participation" in a corporation's deceptive act must include
a broader range of conduct than merely the commission of the deceptive acts that render the
corporation liable.

The Utah Supreme Court's decision in *Armed Forces Insurance Exchange v. Harrison*
helps clarify what kind of conduct constitutes "participation" for purposes of holding officers or
directors liable for a corporations fraudulent or deceptive acts.[613] The court reiterated in that case
that a defendant's "position as a corporate officer whose duties generally included overseeing the
business activities of the corporation does not alone establish facts supporting a claim that she
[or he] is *personally* liable for fraud."[614] However, the court held that officers and directors are
not liable for fraudulent or deceptive acts "committed by other agents of the corporation or by
the corporation itself" if they "*did not know of or participate in*" them.[615] This indicates that
corporate officers' knowledge that the corporation is engaging in deceptive conduct is a factor to
consider in determining whether liability extends to them. The court also noted that directing

---

[611] ECF No. 270 at 48.

[612] *Armed Forces*, 70 P.3d at 41.

[613] *See id.*

[614] *Id.*

[615] *Id.* (emphasis added).

others within the corporation to make misrepresentations would render an officer jointly liability with the corporation.[616]

Understanding this, the court finds that there is a genuine dispute as to whether the Individual Response Defendants participated in Response's violations sufficient to be held jointly liable. As discussed above, there is a genuine dispute as to whether, or to what extent, the Individual Response Defendants knew misrepresentations were being made in Response's trainings and telemarketing calls.[617] And even if they did not direct Response's presenters and telemarketers to make these misrepresentations, the fact that they had the ability to prevent the misrepresentations from being made could be enough to hold them liable if they knew about them and did nothing to stop them. Accordingly, the Individual Response Defendants' motion for summary judgment with regard to whether they can be held personally liable for violations of the UCSPA, TFPA, and BODA is granted only for the UDCP's claims under BODA, and the UDCP's motion for summary judgment on the same issue is denied.

### C. Substantial Assistance Claim against Graziosi and Yancey (Count V)

To be clear, unlike the other liability issues just discussed, Plaintiffs' claim against Defendants Graziosi and Yancey is not one of joint or vicarious liability. The TSR makes it unlawful "to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates" the TSR.[618] Thus, the FTC asserts Graziosi and Yancey are liable for an independent and distinct violation of the TSR.

---

[616] *See id.*

[617] *See supra* Section VI.B.1.b.

[618] 16 C.F.R § 310.3(b).

The first issue in dispute is whether Graziosi and Yancey provided "substantial assistance or support" to Response. It is undisputed that Graziosi and Yancey were two of the main "celebrity draws" or brands for Response since 2012.[619] They appeared in advertisements for its Preview Events, recorded videos to be shown at the events, and sometimes attended them.[620] In return, they received a percentage of all training and coaching sales related to the brands and programs they endorsed, and each has received over $10 million from Response.[621]

Plaintiffs have also provided evidence that Graziosi and Yancey played a role in helping Response shape the online reputation and image of its training programs, particularly those that they endorsed. Graziosi discussed negative reviews related to his endorsed programs and search engine optimization (SEO) strategies with Defendant Finnegan and other Response employees, who in turn informed Graziosi of their own efforts to counter negative reviews related to him.[622] There is also evidence that at least one third-party service Graziosi used to counter negative reviews submitted fake reviews to do so.[623] Yancey also reached out to Response about negative reviews about his brand and was aware of their SEO efforts to make positive reviews more prominent.[624] As part of Response's efforts, Yancey recorded a video in which he talked about

---

[619] ECF Nos. 267 at 13 ¶ 17; 287 at 3–4.

[620] ECF Nos. 267 at 14 ¶¶ 22–23; 287 at 4; 311 at 53.

[621] ECF Nos. 267 at 14 ¶¶ 20–21; 287 at 4.

[622] Plaintiffs' Exh. 59, Marino Decl., Exhs. CA, CB.

[623] Graziosi received an email from Cyberactive Consulting, which was forwarded to those managing SEO operations at Response, stating that it "ha[d] started posting to consumer affairs and will schedule out at least 2 reviews per day over the next 72 hours and adjust posting volume based on how quickly they approve them." Plaintiffs' Exh. 59, Marino Decl., Exh. CB. Cyberactive Consulting also requested that Dean and Response send it "sample transaction/order numbers," "seminar/private training invoices/receipts," and "a list of seminars/locations that were held over the past 3-6 months" to use "just in case consumer affairs decides to audit any of the reviews because of a jump in review activity." *Id.*

[624] Plaintiffs' Exh. 14, Deposition of Scott Yancey at 145:3–149:5, ECF No. 265-16; Plaintiffs' Exh. 59, Marino Decl., Exhs. CC, CD, CE.

various real estate scams, which was shortly thereafter uploaded to YouTube and became the top search result for the words "Yancey" and "scam."[625]

Graziosi and Yancey argue that the FTC has failed to show they provided substantial assistance to Response, as a matter of law, because the undisputed facts and evidence do not show a direct link between their work for Response and Response's TSR violations.[626] However, as the court noted previously in this case,[627] the Tenth Circuit has rejected the very type of argument Graziosi and Yancey now make.[628] The substantial assistance provided need not necessarily be "directly connected to the misrepresentations made to consumers."[629] It must only be more than "casual or incidental."[630]

The undisputed facts and evidence provided by the FTC suggests that Graziosi's and Yancey's work with Response was far beyond casual or incidental. They were the celebrity endorsers most often used to market its programs, and they received millions of dollars for their efforts from sales related to their endorsed programs. They also worked closely with Response to monitor and improve its, and their, online reputation. Graziosi and Yancey have produced nothing that suggests their assistance to Response and its marketing efforts was anything less than substantial. Thus, a reasonable trier of fact could certainly find for the FTC on this issue.

The next issue is whether Graziosi and Yancey provided this assistance knowing, or consciously avoiding knowing, that Response engaged in acts or practices that violated the TSR. Graziosi and Yancey have made no argument regarding their knowledge in arguing for summary

---

[625] ECF Nos. 267 at 51 ¶ 152; 287 at 29.

[626] ECF No. 270 at 35.

[627] *See* ECF No. 240 at 7–10.

[628] *See Fed. Trade Comm'n v. Chapman*, 714 F.3d 1211, 1216 (10th Cir. 2013).

[629] *Id.*

[630] *Id.*

judgment or in opposing the FTC's motion for summary judgment. The FTC argues that Graziosi and Yancey knew or consciously avoided knowing about Response's violations because they continued to work with Response despite receiving multiple red flags regarding its practices and programs.[631]

As already noted, the FTC has provided evidence that Graziosi and Yancey were aware of complaints about Response's programs and practices and engaged in efforts to downplay them. Indeed, it is undisputed that Graziosi stopped working as a celebrity endorser for Response in 2013 due in part to concerns about the effect Response's negative reviews would have on his reputation and brand but resumed working as a endorser in 2017.[632] Graziosi also received an email in 2015, which he forwarded to Response, in which he was told that Response's telemarketers had told an elderly consumer that its one-on-one coaching program "select[ed] only the chosen few students who show potential."[633] The telemarketers had also asked the consumer how much money she had available, including on credit cards, and sold her a package for that specific amount, $6,500.[634] As for Yancey, it is undisputed that he was named as a defendant in two lawsuits filed in 2016 that claimed fraudulent conduct by Response, one of which contained allegations related to telemarketing specifically.[635]

From this evidence, a reasonable trier of fact could also conclude that Graziosi and Yancey knew or consciously avoided knowing that Response was engaged in practices that violated the TSR. It is not so definitive or overwhelming that no reasonable trier of fact could

---

[631] ECF No. 267 at 72.

[632] *Id.*

[633] Plaintiffs' Exh. 59, Marino Decl., Exh. BL.

[634] *Id.*

[635] *See* ECF Nos. 267 at 14 ¶ 19; 287 at 4; Plaintiffs' Exh. 59, Marino Decl., Exh. R at 4.

find otherwise, but it is certainly enough to get the FTC's claim to trial. Accordingly, the parties' motions for summary judgment on this issue must both be denied.

## VII.   Relief

Plaintiffs have proven, as a matter of law, that Response committed some violations of state and federal law. However, because several issues remain for the trier of fact, including just how prevalent and persistent Response's violations were, the court will refrain from further analyzing relief until those issues are resolved.

## ORDER

For the reasons stated herein, the court orders as follows:

Plaintiffs' Motion for Summary Judgment[636] is GRANTED IN PART and DENIED IN PART. Summary judgment is GRANTED with regard to Counts X and XI and Plaintiffs' claim that Nudge and BuyPD can be held jointly liable with Response. Summary judgment is GRANTED IN PART and DENIED IN PART with regard to Counts II, IV, VII, and XII. Summary judgment is DENIED with regard to Counts I, III, V, VI, VIII, and the issue of whether the Individual Response Defendants can be held personally liable.

Defendants' Motion for Summary Judgment[637] is GRANTED IN PART and DENIED IN PART. Summary judgment is GRANTED with regard to Defendants' claims that the Individual Response Defendants cannot be held liable for Response's BODA violations and that a one-year statute of limitations applies to the UDCP's claims under Utah law. Summary judgment is DENIED on all other grounds.

---

[636] ECF No. 265.

[637] ECF No. 270.

Signed June 14, 2022.

BY THE COURT

_____
David Barlow
United States District Judge