# EXHIBIT 2

PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY OF HOWARD BEALES

Transcript of Deposition of Dr. J. Howard Beales With Exhibits 1, 2, and 3

# In the Matter of:

# FTC v. Nudge, LLC, et al.

*August 17, 2021*
*Howard Beales*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**1**

```
 1           IN THE UNITED STATES DISTRICT COURT
 2         FOR THE DISTRICT OF UTAH, CENTRAL DIVISION
 3
 4   FEDERAL TRADE COMMISSION, and  )
 5   UTAH DIVISION OF CONSUMER       )
 6   PROTECTION,                     )  Case No.
 7          Plaintiffs,              )  2:19-CV-00867-DBB-DAO
 8      vs.                          )
 9   NUDGE, LLC; RESPONSE            )
10   MARKETING GROUP, LLC; BUYPD,    )
11   LLC; BRANDON B. LEWIS; RYAN     )
12   C. POELMAN; PHILLIP W. SMITH;   )
13   SHAWN L. FINNEGAN; and CLINT    )
14   R. SANDERSON.                   )
15          Defendants.              )
16   ------------------------------)
17              Tuesday, August 17, 2021
18                 Zoom Videoconference
19
20       The above-entitled matter came on for the
21   deposition, pursuant to notice, at 10:00 a.m., Eastern
22   Standard Time, for the testimony of:
23              HOWARD BEALES
24
25   Reported by:  Deborah Wehr, RPR
```

**2**

```
 1   APPEARANCES:
 2
 3   ON BEHALF OF THE FEDERAL TRADE COMMISSION:
 4          DARREN LUBETZKY, ESQUIRE
 5          Federal Trade Commission
 6          1 Bowling Green
 7          Suite 318
 8          New York, New York  10004
 9          (212) 607-2804
10          dlubetzky@ftc.gov
11
12
13   ON BEHALF OF DEFENDANTS:
14          ALEXANDRA MEGARIS, ESQUIRE
15          Venable, LLP
16          Rockefeller Center
17          1270 Avenue of the Americas, 24th Floor
18          New York, New York  10020
19          (212) 370-6252
20          amegaris@venable.com
21
22
23
24
25   (Appearances continued on next page.)
```

**3**

```
 1   (Appearances continued.)
 2
 3   ON BEHALF OF GRAZIOSI AND YANCEY:
 4          GREGORY CHRISTIANSEN, ESQUIRE
 5          Guardian Law, LLC
 6          3459 North Triumph Boulevard
 7          Lehi, Utah  84043
 8          (844) 409-1122
 9
10
11   ALSO PRESENT:
12          JONI OSTLER, UTAH ATTORNEY GENERAL'S OFFICE
13          RYAN POELMAN
14          SHAWN FINNEGAN
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
 1                   I N D E X
 2
 3   EXAMINATION BY:                          PAGE
 4   Mr. Lubetzky                               5
 5   Ms. Ostler                               113
 6
 7
 8   EXHIBITS        DESCRIPTION              PAGE
 9   No. 1           Report                     5
10   No. 2           Documents relied on        5
11   No. 3           Event guide                5
12   No. 4           Georgia event transcript  79
13   No. 5           Idaho event transcript    79
14   No. 6           Colorado v College America 106
15
16
17
18
19
20
21
22
23
24
25
```

FTC v. Nudge, LLC, et al.                                                    8/17/2021

---

5

1          P R O C E E D I N G S
2              - - - - -
3       (Beales Deposition Exhibit Numbers 1 through 3
4    were premarked for identification.)
5              STIPULATION:
6    All counsel present stipulate that the witness shall be
7          sworn remotely by the court reporter.
8              - - - - -
9    Whereupon --
10             HOWARD BEALES,
11   a witness, called for examination, having been first
12   duly sworn, was examined and testified as follows:
13             EXAMINATION
14   BY MR. LUBETZKY:
15       Q. Good morning, Dr. Beales. I don't believe
16   we've ever met, so let me introduce myself. My name is
17   Darren Lubetzky. I'm one of the staff attorneys for
18   the plaintiff, Federal Trade Commission, in this case.
19   And let me give the opportunity for the others
20   attending the deposition to put their names on the
21   record.
22       MS. MEGARIS: Alexandra Megaris representing
23   the defendants in this matter. I'm joined by Ryan
24   Poelman, one of the individual defendants, and Shawn
25   Finnegan, also one of the individual defendants.

---

6

1       MS. OSTLER: Joni Ostler from the Utah Attorney
2    General's Office representing plaintiff, the Utah
3    Division of Consumer Protection.
4       MR. CHRISTIANSEN: Greg Christiansen
5    representing defendants Scott Yancy and Dean Graziosi.
6       BY MR. LUBETZKY:
7       Q. Dr. Beales, can you take a look at what's been
8    marked as Exhibit 1, and is this the report that you
9    are submitting in this case?
10      A. Yes, it is.
11      Q. Are you offering any other opinions in this
12   case that are not included in this report?
13      A. No.
14      Q. If I could turn your attention to paragraph 4,
15   page 2 of your report, under the header of Scope of
16   Engagement, you state that you were asked to evaluate
17   whether there are earnings claims in the preview events
18   for real estate training. Do you see that?
19      A. Yes.
20      Q. Okay. Have you been asked to examine or
21   evaluate any other topics in this case?
22      A. I have not -- I have seen other materials. I
23   have not examined any other topics.
24      Q. What other materials have you seen that you
25   have not examined?

---

7

1       A. I have seen advertisements, excerpts of
2    transcripts from the infomercials. I have seen
3    workshop transcripts. I have seen the Isaacson expert
4    report and the rebuttal reports, I believe. I have
5    seen the -- some of the papers on the TRO. I don't
6    remember exactly which ones. A variety of other
7    materials.
8       Q. You mentioned ads. Can you identify which ads
9    you have seen that you have not evaluated?
10      A. There were direct mail pieces. I don't recall
11   much about them other than that.
12      Q. You mentioned excerpts for infomercials. Do
13   you recall which infomercials the excerpts related to?
14      A. No, I don't.
15      Q. Do you know how many infomercials you saw?
16      A. I didn't see any. There may have been only
17   one. There may have been more than one. I'm not sure.
18      Q. You may have seen excerpts of only one
19   infomercial; is that right?
20      A. Yes.
21      Q. How many direct mail ads did you see?
22      A. I'm not sure. What I recall is two, but there
23   may have been others.
24      Q. You mentioned workshop transcripts; is that
25   right?

---

8

1       A. Yes, for the three-day event.
2       Q. How many transcripts for how many workshops?
3       A. Just one.
4       Q. And which one was that?
5       A. I don't recall which one it was.
6       Q. Did you read the entire transcript?
7       A. I believe I did, yes.
8       Q. Do you know who the speaker was for the
9    transcript of the workshop you read?
10      A. I don't recall.
11      Q. You mentioned rebuttal reports. Were these
12   rebuttal reports submitted by defendants?
13      A. Yeah, I think there was a rebuttal report to
14   the Isaacson report. I think that's the only rebuttal
15   report I read, but there might have been others.
16      Q. Was there more than one rebuttal report that
17   you saw?
18      A. I don't recall specifically any others. I
19   remember that one. There may have been others.
20      Q. Who submitted the expert report that you saw?
21      A. It was the Isaacson, the FTC's expert.
22      Q. Who submitted the rebuttal report? Was it
23   Isaacson that submitted the rebuttal report?
24      A. No. It was the defendants' rebuttal report to
25   Isaacson. I don't remember who it was.

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Beales

FTC v. Nudge, LLC, et al.                                                                 8/17/2021

---

9

1  Q. And you mentioned TRO papers. Can you be more
2  specific which TRO papers you saw?
3  A. I saw the Plaintiffs' motion and I saw, I
4  believe it was the Defendants' response. And I think
5  that's all.
6  Q. Did you see any of the exhibits that were
7  submitted along with the Plaintiffs' TRO motion?
8  A. They may have been in the document. I don't
9  remember. I don't remember spending any time with any
10 of the exhibits.
11 Q. Did you see any exhibits that were submitted
12 along with Defendants' response to the Plaintiffs' TRO
13 motion?
14 A. The same answer, they may have been included in
15 the document. I don't know what all was in the
16 document, but I didn't specifically focus on any of the
17 exhibits.
18 Q. Did you review any of these materials before
19 you submitted your expert report?
20 A. Yes.
21 Q. Did you review all of these materials before
22 you submitted your expert report?
23 A. I'm sorry, I didn't quite catch the question.
24 Q. Did you review all the materials that we just
25 went over before you submitted your expert report in

---

10

1  this case?
2  A. Yes.
3  Q. Have you performed any other work since you
4  filed your report?
5  A. No.
6  Q. In paragraph 5 of your report, you quote two
7  allegations from the first amended complaint in which
8  Plaintiffs allege that Defendants made certain earnings
9  representations. Do you see that?
10 A. Yes.
11 Q. Do you understand that the alleged earnings
12 representations are not the only alleged
13 misrepresentations in the complaint?
14 A. Yes.
15 MS. MEGARIS: Objection. Foundation.
16 BY MR. LUBETZKY:
17 Q. And you are not giving any opinion regarding
18 the other alleged misrepresentations in the complaint
19 beyond the earnings statements you referenced in your
20 report; is that correct?
21 A. That's correct.
22 Q. Sir, if you could take a look at what's been
23 marked as Exhibit 2, and let me know when you have that
24 in front of you.
25 A. This is the documents relied on?

---

11

1  Q. Correct.
2  A. Yes.
3  Q. And this is actually also Exhibit 2 to your
4  report; is that correct?
5  A. Yes.
6  Q. And are these a list of materials that you
7  relied on to form the opinions included in your report?
8  A. Yes, it is.
9  Q. And is this a complete list of documents that
10 you relied on in forming the opinions stated in your
11 report?
12 A. Yes.
13 Q. And you'll see on the bottom of Exhibit 2 you
14 list transcripts for two preview events. Do you see
15 that?
16 A. Yes.
17 Q. And one event was in Sandy Springs, Georgia; is
18 that right?
19 A. Yes.
20 Q. And the other event was in Twin Falls, Idaho,
21 correct?
22 A. Yes.
23 Q. Okay. You reviewed no other preview events in
24 forming your opinions; is that right?
25 A. These are the ones I relied on. I think I

---

12

1  reviewed, at least in part, a total of five preview
2  events, but these are the ones that I focused on. The
3  ones that I received and reviewed, at least some were,
4  it was my understanding, all of the ones that the
5  Plaintiffs have cited in this case.
6  Q. Who told you that?
7  A. Counsel.
8  Q. Which one?
9  A. Alexandra Megaris.
10 Q. So what three other preview events did you see
11 materials from?
12 A. I don't remember specifically who they were or
13 where they were.
14 Q. Do you remember the speakers?
15 A. No.
16 Q. Did you, for those three other reports that are
17 not listed in Exhibit 2, did you review the
18 transcripts?
19 A. Yes. I would say more I skimmed the
20 transcripts.
21 Q. How long did it take you to skim the
22 transcripts for the three events that you have not
23 listed in Exhibit 2?
24 A. For the ones that are not listed in Exhibit 2,
25 I don't know.

---

3 (Pages 9 to 12)

Case 2:19-cv-00867-DBB    Document 379-3    Filed 02/01/23    PageID.32902    Page 6 of 88
Beales
FTC v. Nudge, LLC, et al.                                                         8/17/2021

13

1    Q.  Less than an hour?
2    A.  Probably more than an hour, but I just don't
3  know.
4    Q.  More than three hours?
5    A.  Could be.
6    Q.  More than five hours?
7    A.  Pretty unlikely.
8    Q.  Other than the transcripts for the five preview
9  events, the two that are listed in Exhibit 2 and the
10  three others that you mentioned, did you review any
11  audio recordings for any of them?
12    A.  I have audio recordings for some of them and I
13  sampled them, but I did not listen to anything all the
14  way through or even any substantial fraction of
15  anything.  And as I think about it, I'm not sure
16  whether they were recordings of the events or of a
17  workshop -- of a preview event or a workshop.  Is
18  workshop the right terminology for the three-day
19  events?  I don't want to confuse you or me.
20    Q.  For purposes of today, I think, is it okay if
21  we refer to the three-day events as the workshops?
22    A.  That's fine with me.  That's what I was doing.
23  I just wanted to make sure we were on the same page in
24  what we were talking about.
25    Q.  We are on the same page.  So as you sit here

14

1  today, Dr. Beales, are you able to say for certain
2  whether or not you reviewed audio recordings for any
3  preview events?
4    A.  I'm not certain, no.
5    Q.  How did you choose the two preview events that
6  you relied on listed in Exhibit 2?
7    A.  They are -- the spokespeople are two of, I
8  believe, three of the top, three most-used
9  spokespeople.  And one of them was early -- relatively
10  early.  It was in 2017, and the other one was late.  It
11  was one of the last events, as I understand it.
12    I chose one of them because it was the one that
13  the Utah investigator went to.  The other one, I
14  believe, is cited, and I may have chosen it out of the
15  five because it was the top of the list.  I don't know.
16  I did check that it was two of the three most-used
17  speakers.
18    Q.  Who told you that the events that you selected
19  involved two of the most-used speakers?
20    A.  Counsel provided me with a list of the number
21  of events for each spokesperson.  It was a spreadsheet,
22  and I just looked at it.
23    MR. LUBETZKY:  Ms. Megaris, have we received
24  that list?
25    MS. MEGARIS:  It's the list that we provided

15

1  you all to select from the preview events.
2    MR. LUBETZKY:  So that list has been produced?
3    MS. MEGARIS:  I can give you the Bates number.
4    MR. LUBETZKY:  That's fine.
5    BY MR. LUBETZKY:
6    Q.  And Dr. Beales, you mentioned that one of the
7  events was, I think, the event where the investigator
8  from the Utah Division of Consumer Protection attended;
9  is that right?
10    A.  Yes.
11    Q.  You understand that to be the Twin Falls, Idaho
12  event?
13    A.  Yes.
14    Q.  And who was the speaker for that event?
15    A.  I think that one was Wayne Johnson.  Is that
16  the right last name?  I don't remember.
17    Q.  You don't remember who were the speakers for
18  the two events; is that fair?
19    A.  That's fair.  I would have to look at the
20  transcript or my notes to tell you who was the speaker.
21    Q.  Did you take notes as you were reviewing the
22  transcripts?
23    A.  No.
24    Q.  What notes are you referring to that you would
25  take a look at to refresh your recollection?

16

1    A.  Well, I'm not actually sure whether there are
2  any notes that I could look to.  I mean, the place I
3  would look is the transcripts to see who they were.
4  It's possible they are cited in my report.  I don't
5  remember whether the names are in there or not.
6    Q.  Focusing on the two transcripts that are listed
7  in Exhibit 2 of the preview events, as you read through
8  them, did you make any notes or highlightings?
9    A.  Yes.
10    Q.  And do you know whether the two preview events
11  from which you base your opinions that are listed in
12  Exhibit 2 here are typical of the presentations given
13  by defendants at the preview events?
14    A.  They seem certainly -- and that was the reason
15  for looking at the other three.  They seem to have a
16  great deal in common.  They are obviously not
17  identical.  And obviously, none of us have reviewed all
18  of the transcripts or recordings of all of the preview
19  events.
20    Q.  I'm sorry.  Go ahead, Dr. Beales.
21    A.  I think the ones I reviewed were reasonably
22  representative of what the preview events looked like.
23  And as I say, the two speakers were two of the three
24  most frequent presenters.
25    Q.  What did you notice they had in common?

4 (Pages 13 to 16)

Beales

FTC v. Nudge, LLC, et al.                                                8/17/2021

---

17

1    A. They didn't have earnings claims. They talk
2  about various approaches, techniques that you can use
3  in real estate investing. The early one and the late
4  one differ some in what events they talk about, I
5  believe. Although, I would have to look back at them
6  because I wasn't really focused on the -- what they
7  were trying to teach. They have in common a fair
8  amount of what I would characterize as motivational
9  speaking: You can do this if you put your mind to it.
10  They have in common that they make clear that this is
11  training and substantial effort is required on your
12  part.
13    Q. Anything else?
14    A. Not that comes to mind.
15    Q. What were the specific differences that you
16  said that you noticed between the two events that you
17  relied on?
18    A. I didn't notice any differences that I thought
19  were material to my opinion. There were -- I believe
20  they talked about different approaches. I think one
21  talked about investing in tax liens and one did not.
22  They both talked about flipping as a strategy, as I
23  recall. One of them, or this might have been one of
24  the other ones that I looked at, also talked about
25  rehabilitation and rent. So there were certainly

---

18

1  differences among them in exactly what the content is.
2    Q. As you sit here today, can you identify any
3  other differences beyond what you just mentioned?
4    A. Not specifically, no.
5    Q. Or generally?
6    A. None that come to mind. I don't want to say
7  that that is an exhaustive list of the differences,
8  because I haven't tried to think of an exhaustive list
9  of the differences.
10    Q. Did you recognize any sales techniques used in
11  either event?
12    A. I'm not sure what you mean by sales techniques.
13    Q. That's not a term that you are familiar with?
14    A. Well, I'm familiar with sales techniques. I
15  don't know what you mean by it.
16    Q. What do you mean by sales techniques?
17    A. I would think of sales techniques as probably
18  at a higher level than the question you are asking
19  because I think of sales techniques as things like
20  advertising. In the context of advertising,
21  advertising strategies, use of endorsements, use of
22  testimonials, use of humor. I mean, all of those could
23  be thought of as sales techniques.
24    Q. Did you see any of those sales techniques
25  employed at either of the two events?

---

19

1    A. There were certainly testimonials in some of
2  them. I cite testimonials in some of them.
3    Q. Was that the only sales technique that you saw
4  or recognized in either event?
5    MS. MEGARIS: Objection. Ambiguous.
6    THE WITNESS: I'm not sure what you are asking
7  me.
8    BY MR. LUBETZKY:
9    Q. I'm asking you -- I'm sorry, the whole thing
10  was what?
11    A. The whole thing was a sales pitch. There's no
12  doubt about that.
13    Q. And did you recognize any sales techniques
14  other than you mentioned the use of endorsements --
15    MS. MEGARIS: Objection. Vague -- sorry.
16    BY MR. LUBETZKY:
17    Q. -- at either event?
18    MS. MEGARIS: Objection. Vague.
19    THE WITNESS: I wasn't focused on what are the
20  sales techniques. I was focused on earnings claims. I
21  was focused on my assignment.
22    BY MR. LUBETZKY:
23    Q. Regardless of what your focus was, do you
24  recall recognizing any other sales techniques when you
25  went through the transcripts for the two events beyond

---

20

1  what you just listed?
2    MS. MEGARIS: Objection. Vague.
3    THE WITNESS: I'm sure if I went through the
4  transcripts looking for sales techniques, there are
5  other sales techniques I could point to, but I don't
6  recall others.
7    BY MR. LUBETZKY:
8    Q. So sitting here today, the only sales technique
9  that you can point to is the use of endorsements for
10  the two events?
11    A. I would say it's more testimonials than
12  endorsements, but they both used that.
13    Q. That's the only sales technique, sitting here
14  today, that you can point to?
15    A. That I think of as a sales technique. I'm
16  still not sure what you think of as a sales technique.
17    Q. I'm using your definition of a sales technique.
18  So with that caveat, I'm using your definition that you
19  just mentioned of how do you view sales techniques.
20  Can you point to any other sales technique the way you
21  understand it beyond the use of testimonials at either
22  event?
23    A. Not off the top of my head, no.
24    Q. Did you review the entire transcript for both
25  events?

---

5 (Pages 17 to 20)

FTC v. Nudge, LLC, et al.                                                                    8/17/2021

---

21

1    A. Yes.
2    Q. How many times did you read the entire
3    transcript for each event?
4    A. I probably only read the entire transcript
5    through, beginning to end, once each. I referred back
6    to them on numerous occasions. I have no idea how
7    many.
8    Q. How much time did you spend reviewing the
9    transcript, let's say for the first event, the Idaho
10   event, which is the earlier event?
11   A. I would say probably about three hours.
12   Q. And how much time did you spend reviewing the
13   transcript for the second event, the Georgia event?
14   A. About the same.
15   Q. So in total you spent about six hours reviewing
16   the transcripts for those two events?
17   A. In the initial read. In going back to them, I
18   have no idea how much time I spent in going back to
19   them subsequently as I prepared a report.
20   Q. So going back to Exhibit 2 of your report,
21   which is the documents relied on, you cite to the
22   transcripts for the two preview events that we've
23   discussed and you cite to the event guide for the Sandy
24   Springs event. Do you see that?
25   A. Yes.

---

22

1    Q. And how did you identify that event or that
2    document?
3    A. When counsel provided me with the transcript,
4    that document was part of the package, and so I looked
5    at it. I believe there was also the questionnaire form
6    at the end of the workshop was part of that package but
7    was not something I relied on. And this was the only
8    one -- the others, just the transcript came. There
9    weren't any other documents with them.
10   Q. How did you choose this particular document,
11   the event guide, to base your opinion on?
12   MS. MEGARIS: Objection. Vague.
13   THE WITNESS: I knew about the Sandy Springs
14   event, and so I looked at it and pointed to it in
15   places in the report.
16   BY MR. LUBETZKY:
17   Q. And did you review the entire document, the
18   entire event guide document that's cited in Exhibit 2?
19   A. Yes.
20   Q. And you also cite to testimony given by a
21   consumer, Richard Ruby. Do you see that?
22   A. Yes.
23   Q. Both testimony given at an investigational
24   hearing and at his deposition; is that right?
25   A. Yes.

---

23

1    Q. How did you choose that particular testimony
2    from that particular consumer?
3    A. I chose him based on the excerpts in the FTC's
4    TRO motion in describing the claims.
5    Q. And did you have any understanding of whether
6    or not Plaintiffs have submitted testimony from other
7    consumers beyond Mr. Ruby?
8    A. I'm sure they have. There's others that are
9    cited in the TRO motion that I did not point to and did
10   not review other than the excerpts that are in the TRO
11   motion.
12   Q. How did you decide to pick Mr. Ruby and not
13   other consumers?
14   A. It was clear in what I point to in the report,
15   he clearly didn't think there was an earnings claim
16   even though I think the TRO was trying to cite him for
17   the proposition that there was an earnings claim. And
18   he clearly understood that what he was signing up for
19   was training.
20   Q. Any other reason why you decided to select
21   Mr. Ruby and no other consumers?
22   A. No.
23   Q. When were you retained in this case?
24   A. I'm not sure exactly. Early pandemic, I
25   believe.

---

24

1    Q. And who retained you?
2    A. Venable.
3    Q. Which lawyer had reached out to you initially?
4    A. I don't remember whether I first talked with
5    Alexandra or Len Gordon, but I talked to both of them
6    fairly early on.
7    Q. Have you communicated with any other lawyers
8    from Venable with regard to this matter?
9    A. Not to my knowledge, no.
10   Q. Have you had communications with any of the
11   defendants or anyone who worked with the defendants
12   about this matter?
13   A. No.
14   Q. From the time of your engagement through the
15   time that you submitted your report, how many hours
16   have you worked on this case?
17   A. In the vicinity of 60.
18   Q. And to be clear, that is about 60 hours from
19   the time that you were first retained through up to the
20   time that you submitted your report; is that right?
21   A. That's right.
22   Q. Not including any prep that you have done for
23   this deposition today, have you worked on this case
24   after you submitted your report?
25   MS. MEGARIS: Objection. Asked and answered.

---

6 (Pages 21 to 24)

FTC v. Nudge, LLC, et al.                                                            8/17/2021

---

25

1    THE WITNESS:  No, I haven't done anything else.
2    BY MR. LUBETZKY:
3    Q.  How much have you been paid to date for your
4    work in this case?
5    A.  About 60 hours times 1150.
6    Q.  And is 1150 your standard rate for providing
7    testimony?
8    A.  It was at the time we started this.  I have
9    raised it since.
10   Q.  What is your standard rate now?
11   A.  $1,200 an hour.
12   Q.  Is Venable the entity that's paying you for
13   your work in this case?
14   A.  No.  The checks do not come from Venable, but I
15   would have to look to see whose name is on the check.
16   Q.  Is it an individual name or an entity?
17   A.  It's an entity.
18   Q.  Did you work with anyone to prepare your
19   report?
20   A.  I'm sorry, I didn't quite catch the question.
21   Q.  Did you work with anyone else to prepare your
22   report?
23   A.  No.
24   Q.  Did you prepare for today's deposition?
25   A.  Yes.

---

26

1    Q.  And what did you do to prepare?
2    A.  I talked to Ms. Megaris for a little bit less
3    than an hour.  I reviewed my report.  I looked back
4    briefly at some of the transcripts that I had reviewed,
5    and that was about it.
6    Q.  And the transcripts, you are referring to the
7    transcript of the two preview events that are cited in
8    Exhibit 2 of your report?
9    A.  Well, actually, I looked at least a little at
10   all of the transcripts of the five events that I saw
11   some of.
12   Q.  The five preview events?
13   A.  Yes.  All preview events, yes.
14   Q.  Sir, if you could go back to your report which
15   has been marked as Exhibit 1, and I would like to refer
16   you to paragraph 24, which is page 9 of your report.
17   Let me know when you are there.
18   A.  I'm there.
19   Q.  And this paragraph states your conclusion; is
20   that right?
21   A.  Yes.
22   Q.  Your conclusion is that the preview events do
23   not make earnings claims; is that right?
24   A.  That's correct.
25   Q.  And you state that "based on my review of a

---

27

1    selection of Response preview event materials and other
2    materials", do you see that?
3    A.  Yes.
4    Q.  The reference to the preview event materials,
5    those are, again, the materials that are listed in
6    Exhibit 2 that we went through, the transcripts of the
7    two preview events, the event guide and the testimony
8    from one consumer, Richard Ruby; is that right?
9    A.  Yeah, the transcripts of the two events and the
10   event guide.
11   Q.  And you say "and other materials".  What are
12   the other materials?
13   A.  I think I'm referring to the other things I saw
14   but that aren't in the list of things that we relied
15   on, the things that I relied on.
16   Q.  So the only things that you relied on that have
17   you been produced in this case are transcripts of two
18   preview events and the event guide and testimony of one
19   consumer, Richard Ruby; is that right?
20   A.  And the deposition of Richard Ruby, that's
21   right.
22   Q.  And that's it, correct?
23   A.  Correct.
24   Q.  How did you arrive at your conclusion that the
25   preview events did not make earnings claims?

---

28

1    A.  I reviewed the transcript of the events looking
2    for earnings claims.
3    Q.  Is that all you did?
4    A.  Yes.  I'm not sure what -- I'm not sure what
5    else one could do to look for earnings claim other than
6    read and look for earnings claims.
7    Q.  You didn't do any economic study or analysis in
8    this case; is that right?
9    A.  That's right.
10   Q.  You didn't conduct a survey; is that right?
11   A.  That's correct.
12   Q.  You didn't analyze any surveys conducted by the
13   parties in this case; is that right?
14   A.  As I said, I did see and read the Isaacson
15   report and the critique of it, but that's not
16   particularly relevant to my opinion, I don't think.
17   Q.  And you didn't conduct any empirical analysis
18   or study of how consumers themselves interpreted
19   defendants' sales presentations at the preview events,
20   right?
21   A.  I did not.
22   Q.  Did you take any steps or make any efforts to
23   look into what defendants intended to convey at the
24   preview sales presentations?
25   MS. MEGARIS:  Objection.  Vague.

---

7 (Pages 25 to 28)

Beales

FTC v. Nudge, LLC, et al.                                    8/17/2021

---

29

1    THE WITNESS: I have always thought of
2  deception as a strict liability issue and never looked
3  into intent.
4    BY MR. LUBETZKY:
5    **Q. So let me repeat my question and see if you can**
6  **answer it. Did you make any efforts to look into what**
7  **defendants intended to convey during the preview**
8  **presentations?**
9    A. Beyond the content of the presentations, no. I
10 don't believe they are relevant.
11   **Q. I'm not asking you whether or not you think**
12 **it's relevant. I'm asking whether or not you took any**
13 **steps or made any efforts to look into what defendants**
14 **intended to convey, what messages they tried to convey**
15 **in their sales pitch at the preview events.**
16   A. I did not look into their intent because it is
17 irrelevant.
18   **Q. And did you make any efforts or look into**
19 **whether or not defendants targeted their sales pitch to**
20 **a specific audience?**
21   A. I did not look at the marketing of the preview
22 events themselves. They obviously targeted their pitch
23 to the people who are willing to come to the preview
24 events, but I did not look at the marketing of the
25 preview events to see who they were trying to reach.

---

30

1    **Q. Yeah, and I'm just asking you beyond -- I know**
2  **you didn't look at the marketing for the preview**
3  **events, but did you take any steps or make any efforts**
4  **to inquire whether the defendants targeted their sales**
5  **pitch to a specific audience?**
6    A. They obviously targeted their sales pitch to a
7  specific audience. I did not take any steps to
8  identify that specific audience.
9    **Q. Is that irrelevant in your view, what their**
10 **specific target audience is?**
11   MS. MEGARIS: Objection. Vague.
12   THE WITNESS: I didn't see anything in the
13 preview events that could be an earnings claim to any
14 reasonable member of any reasonable target audience.
15   BY MR. LUBETZKY:
16   **Q. So that inquiry of whether defendants targeted**
17 **a sales pitch to a specific audience at the preview**
18 **presentations, that's irrelevant, in your view or in**
19 **your analysis; is that right?**
20   A. It can be relevant. I don't see it's relevant
21 here.
22   **Q. How are you defining earnings claim in your**
23 **report?**
24   A. I was looking for the kind of claim that the
25 complaint alleges, and I didn't see it.

---

31

1    **Q. I'm asking how do you define earnings claim?**
2    A. And I'm saying I define it the way you did, a
3  claim that consumers are likely to earn substantial
4  income and that consumers who purchase the workshops or
5  the advanced training are likely to earn several
6  thousand dollars monthly.
7    **Q. So your opinion is that when you say the**
8  **preview events did not make earnings claims, you are**
9  **limiting earnings claims to the statement that you just**
10 **read?**
11   A. The preview events do not make earnings claims
12 as alleged in the complaint. They do not make the
13 claims alleged in the complaint.
14   **Q. Is it your opinion that -- is it your opinion,**
15 **sir, that moving away from what you think the complaint**
16 **says, you are not a lawyer, are you, sir?**
17   A. No.
18   **Q. You are not holding yourself out to be a**
19 **lawyer?**
20   A. Nope.
21   **Q. Okay.**
22   A. I never have.
23   **Q. Leaving aside what you think the complaint**
24 **says, do you have a view of whether or not the**
25 **defendants made earnings claims, any earnings claims at**

---

32

1  the two preview events that you cite in your report?
2    A. I don't know what you mean by earnings claims
3  in that context. They clearly talk about money. They
4  clearly say you can make money in real estate. That's
5  not the earnings claim alleged in the complaint. And I
6  don't have another definition other than the
7  complaint's definition of here is the claim we think is
8  deceptive.
9    **Q. Do you understand under FTC law what**
10 **representations can constitute earnings claims?**
11   MS. MEGARIS: Objection. Calls for a legal
12 conclusion.
13   THE WITNESS: You can make earnings claims in a
14 nearly infinite variety of ways. There are obviously
15 other ways to do it. The earnings claim that this
16 complaint alleges isn't there in the preview events.
17   BY MR. LUBETZKY:
18   **Q. I'm not asking for your legal arguments,**
19 **Dr. Beales. I'm just --**
20   A. It's not a legal argument. It's a factual one.
21   **Q. I know you have done a lot of these expert**
22 **depositions, and we'll get into your background, but I**
23 **would like you to try to answer my questions. So I**
24 **want you to listen to my question and I would like you**
25 **to try to answer it and not argue with me.**

---

8 (Pages 29 to 32)

Beales

FTC v. Nudge, LLC, et al.                                                    8/17/2021

---

33

1       My question is, do you consider yourself an
2   expert on what representations can constitute an
3   earnings claim under FTC law?
4       A. Yes, I consider myself an expert in what kinds
5   of claims can constitute earnings claims under FTC law.
6   I don't see -- there's certainly not the claims alleged
7   in the complaint, and I don't see anything else that
8   would qualify in my understanding as an earnings claim
9   in those preview events.
10      Q. Sir, do you have any view as to whether or not
11  the two speakers at the two events that you rely your
12  opinion on make any representations about anticipated
13  income or potential earnings from purchasing
14  defendants' own training program?
15      A. I don't believe they do, no.
16      Q. Your view is that defendant speakers make no
17  representations expressly or impliedly about
18  anticipated income or potential earnings consumers can
19  make from purchasing defendants' own training programs?
20      MS. MEGARIS: Objection. Mischaracterizes
21  previous testimony.
22      THE WITNESS: They make no representation about
23  either the likelihood or the amount of money that
24  anybody might make in real estate as a result of their
25  training.

---

34

1       BY MR. LUBETZKY:
2       Q. Do you have any understanding as to whether
3   defendants represented to consumers during the preview
4   events that most of its students have done at least one
5   deal or one real estate transaction after they
6   purchased defendants' training?
7       A. I don't have an opinion, as I sit here, about
8   whether that specific claim is there or not. That
9   wasn't what I was looking at.
10      Q. I'm just --
11      A. Doing a deal is not a representation about, as
12  you characterized it, I believe, as to how much you are
13  likely to make.
14      Q. So listen to my question. Do you understand
15  whether defendants made representations to consumers
16  during the preview events that most of its students
17  have done at least one real estate transaction? Do you
18  know that one way or the other, yes or no?
19      A. I don't recall whether in the two preview
20  events that -- they certainly talked about students
21  have done deals. I don't recall any characterization
22  of how many.
23      Q. You don't know whether or not defendants told
24  students during the preview events that most of its
25  students -- strike that.

---

35

1       You don't know whether or not, as you sit here
2   today, whether defendants told the attendees at the
3   preview events that most of the students who purchased
4   their training did at least one real estate
5   transaction? Do you know that, yes or no?
6       MS. MEGARIS: Objection. Asked and answered.
7       THE WITNESS: I do not recall whether they said
8   anything about the number of students who had done a
9   deal.
10      BY MR. LUBETZKY:
11      Q. Or that most of its students have done a deal?
12      A. I see that as a number claim. I don't recall
13  there being a claim about the quantity or the relative
14  quantity.
15      Q. Sir, let me refer you to what's been marked as
16  Exhibit 3. Let me know when you are there.
17      A. The event guide, yes.
18      Q. And this is one of the documents that you
19  relied on in forming the opinions in your report,
20  correct?
21      A. Yes.
22      Q. And we can go to your exhibit, but I'll
23  represent to you in paragraph 10 of your report that
24  you say the printed event guide distributed to each
25  attendee at the Sandy Springs preview event also

---

36

1   includes an explanation of the event. And you quote a
2   couple statements on page 3 of the event -- of the
3   event guide about who we are and what we do; is that
4   right?
5       A. Yes.
6       Q. And you state that the preview attendees had
7   time to read the event guide before the actual program
8   began; is that right?
9       A. I believe so. At least one of the events they
10  said it was on your chair when you got there.
11      Q. That's the basis for you making that statement?
12      A. Yes.
13      Q. And so if you go two pages down, on page 5 of
14  the event guide that you've cited in Exhibit 2 of your
15  report, let me know when you are there.
16      A. I'm there.
17      Q. You'll see on top it says in bold letters, "We
18  help regular people reach their goals." Do you see
19  that?
20      A. Yes.
21      Q. And then in the middle of the page, it says,
22  "We conducted an audit with our advanced training
23  students." Do you see that?
24      A. Yes.
25      Q. Okay. Did you review this page, by the way?

---

FTC v. Nudge, LLC, et al.                                                    8/17/2021

---

37

1    A. I did. I was not asked to address this claim
2  at all, and I didn't.
3    Q. What claim are you referring to, by the way,
4  when you say this claim?
5    A. I know, and I'm not quite sure how I know,
6  there's an allegation that this is misleading because
7  of the way the survey was done. And it's just not
8  something that I looked into.
9    Q. This claim that you look at, when it says of
10  those students, 67 percent have done a deal, you didn't
11  evaluate; is that right?
12    A. That's correct.
13    Q. Do you have any understanding of whether or not
14  that claim that 60 percent of the people or 60 percent
15  of those advanced training students surveyed had done a
16  deal is true or false?
17    A. I have not evaluated that claim or its truth or
18  falsity.
19    Q. You have no idea, right?
20    MS. MEGARIS: Objection. Argumentative.
21    BY MR. LUBETZKY:
22    Q. You have no idea whether or not that's false,
23  do you?
24    A. I do not know how many people have done a deal.
25    Q. You have no idea whether or not that claim is

---

38

1  true, right?
2    MS. MEGARIS: Objection. Argumentative. Asked
3  and answered.
4    THE WITNESS: I do not know how many people
5  have done a deal.
6    BY MR. LUBETZKY:
7    Q. And therefore, you don't know whether or not
8  that claim is false, correct?
9    A. I don't know whether that claim is true or
10  false because it depends on how many people have done a
11  deal. And I have said a couple of times, I have no
12  idea how many people have done a deal.
13    Q. Would the falsity of that claim be of any
14  interest to you in your analysis?
15    MS. MEGARIS: Objection. Vague.
16    THE WITNESS: In thinking about whether there's
17  an earnings claim, not necessarily, because this
18  doesn't even say the deals are profitable.
19    BY MR. LUBETZKY:
20    Q. So the fact that consumers were given materials
21  that falsely state a percentage of students who did a
22  deal would be, in your view, not relevant to your
23  analysis?
24    MS. MEGARIS: Objection. Foundation.
25  Argumentative.

---

39

1    THE WITNESS: I am not opining about that claim
2  or its presence or its truth or falsity. I'm saying
3  that is not a claim that -- an earnings claim as set
4  forth in the complaint. It's not a claim that
5  consumers are likely to earn substantial income and
6  it's not a claim that consumers who purchased the
7  workshop or advanced trainings are likely to earn
8  several thousand dollars monthly.
9    BY MR. LUBETZKY:
10    Q. Isn't that something you would want to know,
11  sir, whether or not consumers are given materials that
12  falsely stated the percentage of students who did a
13  deal? You wouldn't want to know a that?
14    A. If I was evaluating the whole case, I would
15  want to know that. I'm looking at a very narrow
16  question, and it's all I looked at.
17    Q. Sir, what specialized knowledge do you have
18  that will help the Court discern whether or not
19  statements -- strike that.
20    What specialized knowledge do you have, sir, to
21  help the Court discern whether speakers at preview
22  events made claims about income potential or earnings
23  that are exaggerated or not the norm of defendants'
24  students?
25    A. I'm sorry, I got the specialized knowledge

---

40

1  about what? I didn't understand the question.
2    Q. Let me repeat it. What specialized knowledge
3  do you have to help the Court discern whether speakers
4  at the preview events made claims about income
5  potential or earnings that are exaggerated or not the
6  norm of their students?
7    A. I have extensive experience reviewing and
8  evaluating marketing materials to assess the likelihood
9  of deception in the context of literally hundreds of
10  FTC investigations.
11    Q. Is there anything else?
12    A. I'm trained as an economist. I have done a lot
13  of work in survey research and consumer behavior. All
14  of those are relevant to the interpretation of what the
15  speaker had to say.
16    Q. Anything else?
17    A. There is marketing literature about -- that I'm
18  also familiar with, and I'm familiar with the basis --
19  for the evidentiary basis for the FTC's testimonial
20  guides.
21    Q. Anything else?
22    A. Not that comes to mind.
23    Q. Would you agree with me, sir, that to discern
24  the likelihood of deception, it's important to look at
25  the entire course of conduct? Is that a fair

---

10 (Pages 37 to 40)

Beales

FTC v. Nudge, LLC, et al.                                              8/17/2021

---

41

1    statement?
2         MS. MEGARIS:  Objection.  Calls for a legal
3    conclusion.
4         THE WITNESS:  It depends on the claim.  The
5    preview events are the first time consumers are being
6    asked to put up money.  Everything before that is free.
7    I don't think the course of dealing after that is
8    relevant to the interpretation of the claim at that
9    point.  But in general, you have to look at the entire
10   course of conduct.
11        BY MR. LUBETZKY:
12        Q.  You didn't do that in this case, correct?
13        A.  Not in detail, no.  I looked at the claims that
14   were -- I looked at the claims that are purportedly, in
15   the FTC's view, why consumers were actually buying the
16   workshops.
17        Q.  You didn't look at any sales interactions that
18   occurred after the preview events made by defendants,
19   correct?
20        A.  I did not.
21        Q.  And you didn't analyze any marketing or
22   advertising materials made to consumers before they
23   attended the preview events; is that correct?
24        A.  I did not.
25        Q.  Would you agree with me, sir, that one should

---

42

1    not emphasize isolated words or phrases in a sales
2    pitch that is apart from a context?
3         A.  I would certainly agree with that.
4         Q.  Would you agree with me, sir, that a company
5    cannot insulate itself from making deliberately false
6    statements by simply inserting disclaimers in their
7    marketing materials?
8         A.  The question about any disclaimer is what
9    message do consumers receive.
10        Q.  So would you agree with me that a company
11   cannot insulate itself from making deceptive --
12   deliberately deceptive false statements by simply
13   inserting disclaimers in their marketing materials?  Do
14   you agree with that or not?
15        A.  It depends on the context.  I mean, there's a
16   lot of advertising that is puffery and clearly
17   exaggerated.  I'm sorry the GEICO does not do some of
18   those things, but that's not the message that consumers
19   take.  The question is what messages do consumers take
20   both from what's said and from the disclaimer.
21        Q.  So --
22        A.  The disclaimer is not a magic bullet.  I
23   certainly agree with that.
24        Q.  So you would agree, leaving aside puffery or
25   humor statements, a company can't deliberately lie

---

43

1    about essential characteristics of what it's selling
2    and then put in a disclaimer of its marketing materials
3    that says essentially don't necessarily trust us or
4    believe anything we told you.  Is that fair?
5         A.  Again, it depends on context.  There was a --
6    in the energy crisis in the 1970s, there was a series
7    of advertisements for Subaru, the Subaru Sipper, and
8    they had a spokesperson whose name was Joe-something, I
9    don't remember Joe's last name, who in the audio
10   portion of the television ad, told outrageous lies
11   about Subaru's gas mileage that were disclaimed in the
12   video overlay.  And it seemed to me and everybody else
13   at the Commission at the time that it was incredibly
14   unlikely that anybody would take those false statements
15   as real.  The question is what message is conveyed and
16   not is the statement false and not is there a
17   disclaimer.
18        Q.  Does it matter in the analysis, in your view,
19   whether or not a message is material to consumers if
20   whether the company intentionally intends to lie to
21   them, their intent?
22        A.  I did not look at materiality here.  There is
23   language in the deception policy statement that says if
24   this is the message you intended to convey, that that
25   is presumptively material, but it's not -- but it's a

---

44

1    presumption.  It can be rebutted.  And I have not
2    opined about materiality here.
3         Q.  Well, let me stick to that statement you just
4    referenced from the deception statement about
5    intentional statements are presumed material.  Is that
6    a statement that you generally agree with?
7         A.  Yes.
8         (A recess was taken.)
9         BY MR. LUBETZKY:
10        Q.  Dr. Beales, what did you understand defendants
11   were trying to sell consumers at the preview events?
12        A.  Training.
13        Q.  And was that all that defendants represented to
14   consumers that they would get?
15        A.  I didn't look at what else they might have
16   represented.  I looked at whether there were earnings
17   claims.
18        Q.  Well, when you read through the transcripts of
19   the two preview events, did you identify any
20   representations as to what consumers would receive if
21   they purchased a training package at the preview event?
22        A.  I did not evaluate what claims were made about
23   the specific content.  I evaluated whether there were
24   claims about earnings.
25        Q.  I know that you have a limited focus in your

---

11 (Pages 41 to 44)

Beales

FTC v. Nudge, LLC, et al.                                                        8/17/2021

---

45

1    report, but I'm just asking if you know what defendants
2    represented to consumers would be included in the
3    training package sold at the two preview events you
4    looked at?
5         A.  There are a variety of statements in the
6    preview event transcripts about what's in the training.
7    I did not evaluate what messages those statements were
8    likely to convey to consumers.  I evaluated whether
9    there were claims about the earnings that would result
10   from purchasing the training.
11        Q.  I understand that, sir.  I'm just asking you if
12   you know, leaving aside whether or not you evaluated or
13   analyzed, but do you know what defendants told
14   consumers at the two preview events what would be
15   included as part of the training packages they
16   purchased?
17        A.  There are statements about the content of the
18   training packages that I did not evaluate.
19        Q.  So you don't know what -- as you sit here
20   today, you are not -- you don't know what defendants
21   told consumers would be included in the training
22   packages they were offering to sell; is that right?
23        A.  I don't know what messages consumers likely
24   took about exactly what was in the training packages
25   they were purchasing.

---

46

1         Q.  I'm not asking about messages.  I'm just asking
2    you, do you recall defendants' speakers at the two
3    preview events you listened to telling consumers here
4    is what's included in the training package besides
5    training?
6         A.  There are statements like that.  I did not
7    evaluate and I couldn't give you a list of those
8    statements.
9         Q.  As you sit here today, leaving aside whether or
10   not you evaluated it or not, can you identify any other
11   components that were included in the training packages
12   that are offered at the two preview events you
13   analyzed?
14        A.  Not off the top of my head, no.
15        Q.  And leaving aside whether or not you evaluated
16   this or not, do you recall whether defendants' speakers
17   at the two preview events you listened to discussed any
18   purported advantages that consumers would get if they
19   purchased the training packages offered for sale at the
20   preview events?
21             MS. MEGARIS:  Objection.  Vague.
22             THE WITNESS:  They certainly made statements
23   about advantages.  I did not evaluate the claims.  I
24   was looking for claims about results in the form of
25   earnings.

---

47

1             BY MR. LUBETZKY:
2         Q.  Right.  So you recall the defendants' speakers
3    making representations or statements about advantages;
4    is that right?
5         A.  There are such statements, yes.
6         Q.  And what were the advantages that they
7    represented during the two previews that you listened
8    to, or excuse me, that you reviewed?
9         A.  That was not my focus, and without looking back
10   at the transcripts, I couldn't tell you.
11        Q.  Okay.  So as part of informing your opinions
12   that are listed in the report, you didn't consider
13   whether or not defendants misrepresented what consumers
14   would actually receive as part of the package they
15   purchased at the preview event; is that right?
16        A.  I did not evaluate claims about what they would
17   receive.  I was looking for claims about results in the
18   form of earnings.
19        Q.  And you didn't consider, in forming your
20   opinions in your report, whether or not the defendants
21   misrepresented the claimed advantages that consumers
22   would get by purchasing the training program offered at
23   the preview events; is that right?
24        A.  I did not evaluate whether they would
25   actually -- whether they claimed advantages or whether

---

48

1    consumers would receive those advantages.  As I said, I
2    was looking for claims about results in the form of
3    earnings.
4         Q.  And you didn't consider, in forming your
5    opinions in your report, whether or not defendants
6    misrepresented the connection of the sponsoring
7    celebrity to defendants' training program; is that
8    right?
9         A.  I did not consider the connection of the
10   celebrity to the program.
11        Q.  What was the cost of the training package
12   offered at the two preview events that you reviewed?
13        A.  One of them was $1,147.  I don't recall whether
14   the other one was the same or different, but same order
15   of magnitude.
16        Q.  And do you know what defendants offered to
17   consumers to purchase if they attended the workshop
18   event?
19        A.  I'm sorry, I don't understand the question.
20        Q.  Okay.  Let me try to rephrase it.  So if a
21   consumer purchased the training package at the one of
22   the two preview events that you listened to, did you
23   understand that they would then get a ten-day workshop
24   event?
25        A.  Yes.

---

12 (Pages 45 to 48)

FTC v. Nudge, LLC, et al.                                        8/17/2021

---

49

1    Q. And do you know what defendants sold at the
2  workshop events?
3    A. My understanding, based largely on the
4  complaint, is that they sold additional training, but I
5  did not evaluate what they were selling in the
6  workshops in any detail at all.
7    Q. Do you know what was included in the training
8  packages that the defendants sold at the workshop
9  events?
10    A. Not in detail, no.
11    Q. Or just in general at any level of detail, do
12  you know what defendants sold to consumers at the
13  workshops?
14    A. At the workshops, no, I don't know what they
15  sold. Other than more training, no.
16    Q. Do you know what the cost of the training
17  packages or products was that defendants sold at the
18  workshops?
19    A. No.
20    Q. Do you know if it was --
21    A. There's something in the complaint about the
22  price, but that's -- I think that's all I know about
23  it. There might have been mention in the one workshop
24  I looked at of the price of what comes next, but I
25  don't remember whether that was there or not.

---

50

1    Q. Earlier I think you indicated you view yourself
2  as an expert in what constitutes an earnings claim
3  under FTC law. Is that fair?
4    A. I mean, without offering a legal opinion, yeah,
5  I'm an expert on the application of FTC law to earnings
6  claims and other places.
7    Q. So under FTC law, can an earnings claim, in
8  your view, be made either expressly or impliedly?
9    A. Sure, any claim can be made expressly or
10  impliedly.
11    Q. Is there any legal significance, in your view,
12  if a defendant makes an earnings claim expressly versus
13  impliedly?
14    MS. MEGARIS: Objection. Asking for a legal
15  opinion.
16    THE WITNESS: In general, no, although there
17  may be a difference when it comes to a presumption of
18  materiality.
19    BY MR. LUBETZKY:
20    Q. In your view, can you make -- can a seller make
21  an earnings claim without using the word "guarantee"?
22    A. Sure.
23    Q. In your view, can a seller make an earnings
24  claim without specifying a certain amount that its
25  customers will likely obtain?

---

51

1    A. That's a different kind of earnings claim, but
2  sure, you could make general earnings claims that don't
3  have a specific dollar amount.
4    Q. Would you agree that -- do you agree that the
5  following statement or representation would constitute
6  earnings claims: That after you attend our paid
7  training, you'll likely make $100,000?
8    A. Depending on the context, that by itself sounds
9  like an earnings claim.
10    Q. Okay. What about: After you attend our
11  training, you will likely do two or three real estate
12  deals where the average profit is $20,000 on each deal,
13  is that an earnings claim?
14    A. In isolation, it likely is. Context is
15  everything. As you asked me before, you can't take
16  isolated statements by themselves.
17    Q. What about the statement: After you attend our
18  paid training, you will likely do enough real estate
19  deals to pay off your debts, is that an earnings
20  statement?
21    A. By itself, that's an earnings statement.
22    Q. What about: After you attend our training,
23  you'll likely do enough deals to achieve financial
24  independence, is that an earnings claim, in your view?
25    A. In isolation, that's an earnings claim.

---

52

1    Q. What about the statement: The training program
2  we are selling will likely pay for itself from your
3  future earnings in real estate investments, is that an
4  earnings claim, in your view?
5    A. Again, in isolation, that's an earnings claim.
6    Q. What about the representation: The training
7  program we are selling will likely enable you to
8  achieve your earnings goals, is that an earnings claim,
9  in your view?
10    A. Again, in isolation, it likely is.
11    Q. What about the statement: The training program
12  we are selling will likely enable you to pay off your
13  existing debts, is that an earnings claim, in your
14  view?
15    A. Again, in isolation, it likely is.
16    Q. What about the statement: The training program
17  we are selling will likely enable you to no longer live
18  paycheck to paycheck, is that an earnings claim, in
19  your view?
20    A. That one is a little bit more uncertain. It
21  is -- I'm not sure quite what it means without the
22  context of living paycheck to paycheck.
23    Q. Would it matter or would it help -- in order to
24  analyze whether or not that claim was an earnings claim
25  or that statement was an earnings claim, would it help

---

13 (Pages 49 to 52)

Beales

FTC v. Nudge, LLC, et al.                                      8/17/2021

---

53

1    to understand the target population that that
2    representation was made to?
3        A.  It could.  I'm not sure that it matters very
4    much.  I think the context that's around it matters
5    much more.  I mean, that's one where I think context is
6    really crucial.  The others, I'm happy to say, all by
7    itself the statements you've given me were earnings
8    claims.  But this one in isolation, it's far less clear
9    what it means.
10       Q.  Is it relevant whether or not that
11   representation was made to consumers who were surveyed
12   and indicated they were attending the event because
13   they did not want to live paycheck to paycheck anymore?
14   Would that be a relevant fact?
15       A.  It could be.  The context of what's around it
16   matters more.  I mean, we've agreed you can't do this
17   in isolation.
18       Q.  I understand that, sir.  I'm just asking you,
19   but in terms of context and one factor is to analyze
20   the target population that the message was conveyed to;
21   isn't that correct?
22       A.  The only reason the target population matters
23   is if it affects the likely interpretation of the
24   claim.  But the context of the claim matters more than
25   the identity of the recipients.

---

54

1        Q.  But the identity of the recipient matters;
2    isn't that right?
3        A.  It could.
4        Q.  Well, the representation that if you pay for
5    our training, you won't have to live paycheck to
6    paycheck, in order to analyze that statement, would it
7    matter whether or not the representation was made to
8    consumers who were surveyed and indicated they were
9    looking to no longer live paycheck to paycheck?
10   Wouldn't that be relevant in the analysis?
11       A.  It could be.  I would have to see the survey.
12       Q.  Assuming that the survey was -- there was no
13   problems with the survey, let's assume that.
14       A.  Well, I have a problem, I think, with the
15   question that asks are you here because you want to
16   live -- you don't want to live paycheck to paycheck.  I
17   mean, that's certainly a very unconventional way to
18   phrase the question.
19       Q.  What if the survey asked why did you attend the
20   event and consumers indicated that one of the primary
21   motivations was for piece of mind and not to live
22   paycheck to paycheck, okay, and assuming there are no
23   problems with the survey?
24       A.  Those are two different things, peace of mind
25   and paycheck to paycheck.

---

55

1        Q.  But assuming that fact scenario, wouldn't that
2    be a relevant factor?
3        MS. MEGARIS:  Objection.  Vague.
4        THE WITNESS:  If I were opining about whether
5    this, in that context, was an earnings claim, I would
6    certainly look at that.  But in that sense, it's a
7    relevant factor.  But does that make this into an
8    earnings claim?  No, not necessarily.
9        BY MR. LUBETZKY:
10       Q.  Sir, you are not living paycheck to paycheck,
11   are you?
12       A.  I mean, in some sense, everybody is living
13   paycheck to paycheck, which is part of what makes it a
14   screwy question.
15       Q.  Are you worried about paying off your debts?
16       A.  I am not.
17       Q.  In general, do you think you may view a
18   statement about earnings potential differently than
19   someone who is actually worried about paying off their
20   debts and living paycheck to paycheck?
21       A.  I have never held my interpretation as the
22   standard of what's the claim that a reasonable consumer
23   would take.  My interpretation, especially as an
24   economist, is likely quite different.
25       Q.  How about someone who does not have to worry

---

56

1    about paying off their debts and is not living paycheck
2    to paycheck, would they view a statement about earnings
3    potential differently than someone who is worried about
4    paying off their debts and living paycheck by paycheck?
5        A.  Would they view a statement about earnings
6    potential differently?
7        Q.  Yeah.
8        A.  I don't quite know why.  They might be more
9    interested in it, but I don't know why they would
10   interpret it differently.
11       Q.  They may be more susceptible to it?
12       A.  It's either -- and your earlier examples don't
13   have that problem.  It doesn't matter if you say you
14   are going to -- if the specific statement is you are
15   going to make enough to pay for the cost of the
16   training, the interpretation is not any different.
17       Q.  Would they be more susceptible to a statement
18   about earnings potential, someone who is living
19   paycheck to paycheck and not being able to pay off
20   their debt than someone who is in your economic status
21   who does not have to worry about paying off their debts
22   and is not living paycheck to paycheck?
23       A.  I don't know that they are more
24   susceptible.  They would be more interested in the
25   claim.  I think that's likely, but I don't know why

---

14 (Pages 53 to 56)

Beales

FTC v. Nudge, LLC, et al.                                                    8/17/2021

57

1    that -- that doesn't make them into idiots who can't
2    understand what's being said.
3        Q. What about the statement: The training program
4    we are selling will likely enable you to make more
5    money from real estate deals than what you pay us, is
6    that an earnings claim, in your view?
7        A. In isolation, I think that's an earnings claim.
8        Q. What about the statement: The training programs
9    we are selling will likely enable you to complete real
10   estate deals faster, is that an earnings claim, in your
11   view?
12       A. I don't think so, no. Even in isolation,
13   that's a claim about the time to do a deal and not
14   about the results of the deal.
15       Q. What about: The training program we are selling
16   will likely enable you to complete profitable real
17   estate deals faster, is that an earnings claim, in your
18   view?
19       A. Not necessarily. And the issue there, I think,
20   is if that's something I'm already doing, is making
21   profitable real estate deals, then this is just a claim
22   about time. You wouldn't think that claim would be
23   substantiated by the amount of money people made if it
24   took longer. It's a claim about time. Not about
25   money.

58

1        Q. If the claim is made to someone who has not
2    done any real estate deals, would that make that
3    statement an earnings claim, in your view?
4        A. I think it's a claim about time. Not money.
5    The claim that this will enable you to make profitable
6    deals in isolation is a earnings claim. The claim
7    that you can do it faster is not.
8        Q. You don't think the claim of doing deals faster
9    to someone who doesn't have -- has not done a deal
10   necessarily implies that they will be doing deals?
11       MS. MEGARIS: Objection. Asked and answered.
12   Argumentative.
13       BY MR. LUBETZKY:
14       Q. Is that what you are saying?
15       A. I'm saying it's two separate claims. And in
16   some sense, the faster claim is obviously true for
17   somebody who does no deals because right now my time --
18   if I do no deals, my time to do a deal is infinite, and
19   doing it is going to be in some finite time, and that's
20   going to be faster.
21       Q. So --
22       A. I see it as two distinct dimensions, one of
23   which goes to earnings and the other of which does not.
24   It's the profitable deal that is the earnings part of
25   it.

59

1        Q. So let's do this. There's a representation
2    that the training programs we are selling will likely
3    enable you to do real estate deals and complete them
4    faster. Is that an earnings claim?
5        A. No, it's not. It says nothing about the
6    results of the deal.
7        Q. If I insert the word "profitable" into that,
8    profitable real estate deals and do them faster, would
9    that be an earnings claim, in your view?
10       A. Likely an earnings claim.
11       Q. Sir, can we go back to your report, which is
12   Exhibit 1, and go to page 1. In paragraph 5 you
13   indicate or you state that the preview events cast the
14   entire event as well as the workshop as training
15   events. Do you see that?
16       A. Yes.
17       Q. What is the significance of that?
18       A. What they are selling is knowledge and skills
19   that can be applied -- the next sentence, can be
20   applied to yield a return. But training itself implies
21   that consumers will have to take the necessary steps to
22   apply what's been learned.
23       Q. Does it matter at all if they are selling more
24   than just training? They are selling access to funding
25   and software products, does that matter, in your view?

60

1        A. It doesn't matter to whether they are making an
2    earnings claim about the results of those other
3    components, and that's what I was looking at, earnings
4    claim in the sense of claims about the results.
5        Q. And then you write, "Training itself implies
6    that consumers will have to take the necessary steps to
7    apply what has been learned." Do you see where I'm
8    reading from, paragraph 5?
9        A. Yes.
10       Q. What are the necessary steps here that
11   defendants' customers have to apply?
12       A. I don't -- I mean, in general, for the kinds of
13   events -- the kinds of strategies that they talk about
14   in the preview events, you would have to find a
15   property. You would have to find and think about
16   flipping in particular. You would have to find a
17   property. You would have to find financing. You would
18   have to find a buyer. Those are all necessary steps.
19       Q. Any other steps?
20       A. No. You are going to have to have an agent to
21   close the deal. I mean, there's a lot of other steps.
22   I cannot enumerate all of the components of a real
23   estate transaction.
24       Q. Tell me the other stuff besides that you have
25   mentioned that you are aware of.

15 (Pages 57 to 60)

Beales

FTC v. Nudge, LLC, et al.                                              8/17/2021

---

61

1     A. There's a settlement agent. There's a mortgage
2  application or a loan application of some sort. You
3  may have to deal with a real estate agent. In some of
4  the flipping strategies they talk about, you got to do
5  rehab and figure out what you are going to do and what
6  improvements to make. You might want to worry about
7  staging the property in order to get a better price. I
8  mean, there's a host of steps.
9     Q. Anything else? Any other steps, as you sit
10 here today beyond what you just said?
11    A. As I sit here today, no. I don't know that I
12 would ever try to develop a comprehensive list of all
13 of the things, all of the steps of conducting a real
14 estate transaction.
15    Q. Are you a real estate investor?
16    A. We own real estate, yes.
17    Q. What real estate do you own?
18    A. A home, a condo, some REITs.
19    Q. Do you own any investment properties?
20    A. Well, REITs are investment properties. The
21 condo is an investment property in some sense.
22    Q. You rent out the condo?
23    A. No, we don't, but we certainly hope its price
24 goes up.
25    Q. Do you have any rental properties?

---

62

1     A. No --
2     Q. Have you ever flipped a house --
3     A. -- other than through REITs.
4     Q. Have you ever flipped a property?
5     A. No.
6     Q. Do you know what wholesaling is?
7     A. Wholesaling has a lot of different contexts.
8     Q. Wholesaling as it's described in the two
9  preview events you have looked at, have you ever done
10 that?
11    A. I mean, what I took them to mean in wholesaling
12 in the preview events was trying to buy below market.
13 No, I have never done that. I mean, I guess in some
14 sense I have always tried to buy below market in
15 choosing a home or a condo, but no, not in a sense of
16 an investment strategy.
17    Q. You mentioned -- excuse me, in paragraph 5, you
18 list, I believe, four what you say are essential
19 points, A, B, C, D, in reaching your conclusion?
20    A. Yes.
21    Q. Are each of those points essential to your
22 conclusion?
23    A. Are each of those points essential? Not
24 necessarily. I would have to think about which point
25 sales -- I think all four points are true, and that

---

63

1  leads to my conclusion. If we posit that one of them
2  is not true, I haven't thought through what my
3  conclusion would be, and it depends on which one is not
4  true and why, I think.
5     Q. Is one more important than the others?
6     A. The question is always, and all four are
7  relevant to what message are consumers likely to take.
8  It's our paycheck to paycheck discussion, context
9  matters.
10    Q. Did you primarily rely on one point more than
11 the others in reaching your conclusion?
12    A. I evaluated the preview events as a whole. I
13 did not try to break them down sentence by sentence or
14 element by element. I examined the entire mosaic and
15 not each tile separately.
16    Q. On subpart -- strike that.
17       Subpart B, your second point, you write that
18 claims that the company only is providing transaction
19 disclosures of both risk and the need for effort are
20 embedded throughout the preview event. Do you see
21 where I read from?
22       MS. MEGARIS: Objection. Darren, you misread
23 the document.
24       BY MR. LUBETZKY:
25    Q. I'm sorry. Let me try that again. You write

---

64

1  in point subpart B in paragraph 5, "Rather than relying
2  solely on the express disclaimers, claims that the
3  company only is providing training and disclosures of
4  both risk and the need for effort are embedded
5  throughout the preview events." Did I read that
6  correctly?
7     A. I think so. I heard it correctly anyway.
8     Q. On the phrase "disclosure of risk", can you be
9  any more specific as to the risk level that you believe
10 was disclosed to attendees at the two preview events
11 you reviewed?
12    A. I don't think there was a quantitative
13 disclosure of risk level. There was clearly a
14 disclosure that you may end up with something that you
15 don't want, and I think the example I point to is a
16 gator farm.
17    Q. With regard to the tax lien?
18    A. Yes.
19    Q. Are you able to identify any risk disclosure
20 beyond the generality that all investments have risk
21 and investing in real estate is a risk?
22    A. There are others. I would have to go -- I may
23 point to some others in the report, some other examples
24 of risk disclosures. I'm pretty sure there are others
25 that I didn't cite, but I would have to go back to the

---

16 (Pages 61 to 64)

Beales

FTC v. Nudge, LLC, et al.                                                        8/17/2021

65

1   transcripts.
2      Q. In your report, can you identify any
3   disclosures of risk that go beyond just a generality
4   that all investments have risk and investing in real
5   estate is a risk?
6      A. Well, the gator farm disclosure goes beyond
7   that.
8      Q. Beyond the gator farm one?
9      A. That's what I'm saying, I can't think of
10  another example right now. I'm pretty sure there are
11  other examples in the previews, but I would have to
12  look back at the transcripts.
13     Q. Don't all investments have risk, sir?
14     A. Yes.
15     Q. I mean, U.S. Treasury Bond investments,
16  although considered safe, have risk, don't they?
17     A. They actually in, finance, they are considered
18  the risk-free asset. There's literature built on the
19  notion that the risk-free asset is really crucial.
20     Q. Isn't there risk to inflation and rise of
21  interest rates?
22     A. There is.
23     Q. Do you consider that investment risk?
24     A. Of course it's investment risk.
25     Q. So U.S. Treasury Bonds have an investment risk;

66

1   is that right?
2      A. In that sense they do. They are widely
3   considered in the economics and finance literature to
4   be a risk-free asset. If you hold it to maturity,
5   you'll get your money back. And that takes care of the
6   interest rate risk too.
7      Q. The disclosure of need for effort that you
8   refer to in your second point, can you be more specific
9   as to what level of effort is disclosed at the two
10  preview events you referenced in your report?
11     A. Well, I'm not sure what you mean by a level of
12  effort. Again, there's certainly nothing quantitative
13  about the level of effort you are going to have to
14  make. There are a number of general statements that
15  you are going to have work at this.
16     Q. Anything beyond that you are going to have to
17  work at doing a real estate investment?
18     A. I would -- again, I would have to look for
19  other specific examples. There aren't any off the top
20  of my head.
21     Q. Well, are there any that you can identify in
22  your report?
23     A. I'm just looking at my report to see whether
24  there's something else.
25     Q. Take your time, sir.

67

1      A. The paragraph 14, the presenter discusses the
2   need for effort as well: I never use the word easy, but
3   if you put the time into it, you still do deals, you
4   just do less deals. I can't guarantee how much money
5   you'll make or how big the deals will be or how fast
6   they'll come to you.
7      Q. And that's the most specific example you could
8   identify from your report?
9      A. It's the one I have gotten to. I would regard
10  this as one: What we are doing here today is not
11  providing the secret sauce to everybody. That's not
12  what this is. What we are providing are the proven
13  tools.
14     Q. Those are the most specific examples you can
15  identify?
16     A. Those are the most specific examples in the
17  report.
18     Q. I take it in drafting and preparing the report,
19  you tried to find your best examples; is that fair?
20     A. I try to find examples. I don't recall looking
21  for specifically an effort example, which is what you
22  are asking about. I focus more on the risk examples,
23  and it may be there's more of the risk examples than of
24  the effort examples.
25     Q. In drafting your report, you were trying to

68

1   find the best illustrative risk examples; is that fair?
2      A. I was just trying to find the best examples to
3   illustrate the message I think consumers are likely to
4   take. I think that's the same thing, but I'm not
5   completely sure what you are asking.
6      Q. In drafting your report, you were trying to
7   find the best examples to support your opinion; is that
8   fair?
9      A. In drafting a report, I mean, I'm trying to
10  come to an objective conclusion here about how this is
11  likely to be interpreted. And I'm selecting examples
12  to best explain my reasoning in coming to that
13  conclusion.
14     Q. These are the examples that best support your
15  conclusion; fair?
16     A. These are the examples that best explain my
17  reasoning and support my conclusion, yes.
18     Q. Okay. I want to go to your first point -- I
19  think we have got some background. I'm getting
20  background noise.
21     A. Yeah, I'm only getting it when you speak.
22     MS. MEGARIS: I don't hear it.
23     BY MR. LUBETZKY:
24     Q. So I would like to talk about your first point
25  about express disclaimers. And are the express

17 (Pages 65 to 68)

FTC v. Nudge, LLC, et al.                                        8/17/2021

---

69

1  disclaimers that you are relying on contained in your
2  paragraphs 6 to 11 of your report?
3      A. I don't think I quoted the whole thing, so but
4  yes, those are the ones that I'm referring to.
5      Q. And how did you identify these statements that
6  you refer to as express disclaimers in your report?
7      A. They are express because they are express
8  statements. They are disclaimers because they are
9  trying to say what your thinking may be different. I
10  don't know what you mean how do I identify them as
11  express disclaimers.
12      Q. How did you select these particular statements
13  to put into your report here?
14      A. These are the disclaimers at the beginning of
15  the event and that are about sort of what the event is
16  about. They are important in thinking about what
17  message the event is likely to convey to consumers.
18      Q. Did defense counsel help you identify any of
19  these statements?
20      A. No. I read the transcript and said, gee, this
21  is an express disclaimer. It's an express statement in
22  the transcript.
23      Q. There are a lot of statements in the
24  transcripts. I'm just trying to figure out how you
25  selected these particular statements.

---

70

1      A. I think I selected them because they clearly
2  state the nature and limitations of the event.
3      Q. How does the quotation from Teddy Roosevelt,
4  The credit belongs to the man who is actually in the
5  arena, whose face is marred by dust and sweat and
6  blood, who strives valiantly, who errs, who comes short
7  again and again because there's no effort without error
8  and shortcomings but who does not actually strive to do
9  the deeds. It's a good quote, but how did you select
10  that as one of the few express disclaimers you
11  reference in the report?
12      A. I wouldn't call that an express disclaimer.
13  And thank you for pointing that out, because I think
14  that is -- and the two testimonials, that's an example
15  of an integrated disclosure of effort and the need for
16  effort, that this isn't going to happen without working
17  at it and testimonials that emphasize the importance of
18  working hard. No, that's not the express disclaimer.
19      I mean, what I'm trying to say in paragraph 7
20  is these statements are not -- the statements in
21  paragraph 8 are not at the very beginning of the event.
22  There's something before them. I'm trying to describe
23  what's happening in this event, and it's the
24  motivational speakers before even playing the
25  disclosure, as I say at the beginning of paragraph 7.

---

71

1      Q. So paragraph 7, you cite to several statements
2  that are included in what you describe as a
3  motivational presentation at the beginning of the
4  event; is that right?
5      A. Yes.
6      Q. And so you write, "Before even playing the
7  disclosure, the Sandy Springs, Georgia preview event
8  includes a motivational presentation featuring a dozen
9  unidentified speakers and two testimonials who
10  emphasize the importance of working hard", and you cite
11  to a section, a page in the transcript. Do you see
12  that footnote 3?
13      MS. MEGARIS: Darren, I don't think he heard
14  you.
15      THE WITNESS: I'm sorry, I see that, yes.
16  That's all I heard.
17      BY MR. LUBETZKY:
18      Q. Is that an express disclaimer, the importance
19  of working hard?
20      A. Now I would say that's more of an integrated
21  disclosure, is -- the express disclaimer is the --
22  what's quoted in paragraph 8.
23      Q. Is there any other express disclaimers that are
24  cited in your report other than the disclaimer
25  mentioned in paragraph 8?

---

72

1      A. The event guide is sort of both, express
2  disclaimer, there's a footnote, and integrated claims.
3  The Idaho event also has similar disclaimers that I
4  didn't quote.
5      Q. So other than the express disclaimer that is
6  referenced in paragraph 8, the event guide disclaimer
7  that's referenced in paragraph 10, and then the Idaho
8  disclaimer in paragraph 11, are there any other express
9  disclaimers that you are relying on?
10      A. I don't think there's anything else that I
11  would call an express disclaimer as opposed to a claim
12  that includes the limitations. To me what makes it a
13  disclaimer is that it's sort of separate from the
14  claims that are elsewhere as opposed to integrated with
15  the claims about what the training is. And I'm not
16  sure the distinction between express and integrated is
17  in any way essential. But some of the disclaimers, if
18  you will, are part of the claim and presented with the
19  claim, and some of them are separate. And that's --
20  these are the only ones that I would say, yeah, those
21  examples that you pointed to are the only ones that I
22  would say, yeah, this is a separate disclosure separate
23  from the claims.
24      Q. So in paragraph 7, you cite to five clips or
25  statements that are in the motivational presentation

---

18 (Pages 69 to 72)

Beales

FTC v. Nudge, LLC, et al.                                          8/17/2021

---

73

1    before the event speakers begin their presentation; is
2    that right?
3        A. Yes. And I would say those are not express
4    disclaimers. Those are more integrated claims about
5    what the training is because they are part of the
6    description of the event as opposed to paragraph 8,
7    which is what the event is not.
8        Q. The Teddy Roosevelt quote that you include in
9    paragraph 7 and cite to footnote 4, how is that --
10   explain to me how that is an integrated disclaimer.
11       A. You got to do the work.
12       Q. Anything beyond that?
13       A. No. This is about effort and about taking
14   risks. You have to take risks and be willing to fail.
15       Q. And --
16       A. There's no effort without error and
17   shortcoming. Those who always actually strive but who
18   does always actually strive to do the deeds.
19       Q. Anything else?
20       A. Anything else what?
21       Q. My question was for your explanation of how
22   Teddy Roosevelt's quote is an integrated disclaimer,
23   and you answered, but I want to make sure that was a
24   fulsome answer. Do you have anything else to add to
25   that?

---

74

1        A. Not to that specific quote, no. The next
2    speaker that's cited is another integrated -- you know,
3    you'll fail often; there's risk here. The testimonials
4    emphasize training. Not earnings. That's -- those are
5    integrated claims about what it is you are going to
6    get.
7        Q. Sir, going to paragraph 9 of your report, you
8    write that the disclosure at the beginning of the
9    presentation is likely to set attendees' expectation as
10   they hear other information during the course of the
11   event. Do you see where I read from?
12       A. Yes.
13       Q. The disclosure to begin the presentation, does
14   that refer to the statement you quoted from in
15   paragraph 8?
16       A. Yes, and the motivational introduction, both of
17   them.
18       Q. What is the basis for your statement that the
19   motivational presentation and the disclaimer at the
20   beginning of the presentation, is, quote, likely to set
21   attendees' expectations? What is your basis for saying
22   that?
23       A. Having done many presentations, you usually
24   start out trying to set the frame of reference for your
25   audience about what you are going to talk about. I

---

75

1    mean, that's the way presentations are typically
2    structured and for that reason, you want to tell people
3    what's coming.
4        For the motivational speaker, which the
5    motivational introduction, I mean, you could make an
6    argument that the disclaimer quoted in 8 is the lawyers
7    getting in the way. You can't make that argument about
8    the motivational introduction that's clearly trying to
9    set the tone for the event. I mean, that's their
10   choice as to how the design the event, to get people to
11   buy their product.
12       Q. Who is making that motivational presentation,
13   the statements in paragraph 7?
14       A. A dozen unidentified speakers. I don't know.
15       Q. Do you understand whether or not that's a
16   prerecorded statement or not?
17       A. It wasn't clear to me. I thought it might be a
18   prerecorded statement, but it wasn't clear from the
19   transcript.
20       Q. Did you listen to the audio of the recording to
21   assess how that was --
22       A. I did not try to answer that specific question,
23   no.
24       Q. Is it your belief that the preview attendees
25   were able to hear and pay attention to the motivational

---

76

1    statements and introductory disclaimer that you
2    reference in paragraph 9? The introductory disclaimer,
3    I'm referring to the one in paragraph 8.
4        A. It was clear enough to transcribe, including in
5    the one -- in the recording there's -- where it was
6    clear enough to transcribe and that's clearly got some
7    significance is the Idaho event because it was the
8    investigator's recording, it appears. And there is
9    cross talk. I don't remember specifically whether they
10   have any of the motivational speaker stuff at the
11   beginning of that event or not. I would have to look
12   back at the transcript. But yeah, I assumed consumers
13   could see and hear this. I actually assumed that about
14   the entire event. And if we assume they didn't see or
15   hear anything, then I'm not quite sure what this case
16   is about.
17       Q. Sir, I'm trying to get before -- you understand
18   that the entirety of paragraph 7 and 8, the
19   motivational presentation and the introductory
20   disclaimer was done before the main event speakers ever
21   take the stage. Do you understand that or no?
22       A. I understand that it's before the main speaker
23   takes the stage.
24       Q. Okay. And your basis or assumption that the
25   preview attendees were able to hear the motivational

---

19 (Pages 73 to 76)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Beales

FTC v. Nudge, LLC, et al.                                                            8/17/2021

---

77

1    presentation and introductory disclaimer that you read
2    in the transcript before an event speaker starts
3    speaking is based solely on the fact that it was
4    transcribed or able to be transcribed; is that right?
5        A.  In the Idaho event, yes.
6        Q.  Okay.  And --
7        A.  It was heard enough to record it and to have it
8    be transcribed.
9        Q.  And the investigator you are referring to is
10   the investigator from the division of the -- excuse me,
11   the Utah Division of Consumer Protection?
12       A.  Yes.  That transcript is just identified as
13   investigator, I think.
14       Q.  And do you know whether or not the investigator
15   submitted a sworn statement about whether or not the
16   preview attendees could actually hear the introductory
17   disclaimer which you cite in your report?
18       A.  I don't know.
19       Q.  Well, he did submit a sworn statement in this
20   case, sir, that states the Idaho event that we are
21   discussing, that the attendees did not end their
22   conversation when that disclaimer was made, and that a
23   large portion of this claim was overwhelmed by the
24   noise.  You didn't know that, did you?
25       A.  I didn't know that.

78

1        Q.  Do you have any basis to believe that the
2    investigator's statement is false or inaccurate?
3        A.  Well, that's his opinion.  But he's opining
4    about what other people could hear when he clearly
5    heard some of it.
6        Q.  Okay.  Do you have any basis to believe that
7    Mr. Larson's statement was false or inaccurate?
8        A.  No, I don't.
9        Q.  Sir, I would like to go the second point, your
10   second essential point, which I believe is discussed
11   starting in paragraph 12.
12       A.  Yes.
13       Q.  And I believe --
14       A.  I'm sorry, I just wanted to ask about lunch.  I
15   don't know if you have a long series of questions about
16   this section or a short series.  I'm happy to go for a
17   little longer, but it also struck me as a convenient
18   stopping place.
19       Q.  Sure.
20       (Whereupon, at 12:20 p.m., a lunch recess was
21   taken.)
22
23
24
25

79

1                  AFTERNOON SESSION
2                     (1:03 p.m.)
3        (Beales Deposition Exhibit Numbers 4 and 5 were
4    marked for identification.)
5        BY MR. LUBETZKY:
6        Q.  Dr. Beales, I have marked two more exhibits.
7    Exhibit 4 should be the transcript for the Georgia
8    event preview that's referenced in your Exhibit 2 to
9    your report.
10       A.  Okay.
11       Q.  And Exhibit 5 is the transcript to the Idaho
12   preview event that's referenced in your report.  I
13   think we'll probably refer to one or both of those
14   exhibits in a little while.  Okay?
15       A.  Okay.
16       Q.  Dr. Beales, would you agree that an earnings
17   claim can be any representation, either express or
18   implied, about past, present or future income, profit
19   or appreciation that is made in connection with the
20   marketing, sale or offering for sale of any good or
21   service?
22       A.  I'm not quite sure how past fits unless what
23   that's envisioning is a claim about here is what our
24   graduates did.
25       Q.  Other than the word "past", would you agree

80

1    with that statement?
2        A.  That sounds reasonable.
3        Q.  And in your view, Dr. Beales, do defendants or
4    did defendants represent in the two previews you
5    analyzed that their training program can reduce real
6    estate investment risk for novice investors?
7        A.  There's a statement that I quote at some point
8    in my report about rookies make mistakes, that
9    knowledge can help you in this endeavor.  I'm not sure
10   I would characterize that as reducing the risks of real
11   estate investment, but it certainly reduces the risk of
12   mistakes.
13       Q.  So I guess going back to my question, do you
14   agree with the statement that defendants represented to
15   consumers at either preview you listened to that their
16   training can reduce real estate investment risk to
17   novice investors?
18       A.  I don't think I saw anything that would
19   constitute a representation that it's going to reduce
20   real estate investment risk to anybody.
21       Q.  Okay.  Let me go to your report now and to
22   paragraph 2, which I think is under the header
23   Integrated Training Claims, which is the second point,
24   your second essential point.  Let me know when you are
25   there.

Beales

FTC v. Nudge, LLC, et al.                                                                                    8/17/2021

---

81

1      A. Paragraph 2?
2      Q. Twelve, I'm sorry.
3      A. That's where I was, but then I went to look at
4   paragraph 2. Okay, I'm there.
5      Q. In paragraph 12, you write, "At the Idaho
6   preview event, for example, the presenter discusses
7   barriers to moving forward in real estate investing and
8   states that 'our number one reason is lack of
9   knowledge'." Do you see that?
10      A. Yes.
11      Q. And then you write, "and goes on to explain
12   that 'we as a company, we offer training and education.
13   We offer classes.'" Do you see where I read from?
14      A. Yes, I do.
15      Q. What is the significance of these two
16   statements you highlighted to your conclusion?
17      A. These are examples of claims integrated into
18   the presentation as opposed to something that's
19   separate -- that's a separate pitch, that's a separate
20   disclaimer.
21      Q. What are the -- what claims are made from these
22   statements that you are highlighting?
23      A. That we are going to provide training.
24      Q. And how is "we are going to provide training"
25   significant to your conclusion?

---

82

1      A. It is -- and I explain in a later paragraph,
2   there's a distinction between the training claim and an
3   earnings claim.
4      Q. And explain --
5      A. We already looked at. I don't remember exactly
6   where it is in the report.
7      Q. So explain that distinction. You said you are
8   trying to distinguish between a trainings claim and an
9   earnings claim.
10      A. An earnings claim is a claim about results,
11   what you are going to accomplish as a result of the
12   training. They don't make those kinds of claims. A
13   training claim is we are going to teach you certain
14   things and you are going to do with them what you will.
15   It is not a claim about results other than you are
16   going to acquire some knowledge.
17      Q. And your position is that the two preview --
18   during the two preview events you analyzed, defendants
19   do not make any claims about results?
20      A. That's correct. They don't make any claims in
21   the sense of claims about the results that consumers
22   are actually going to experience.
23      Q. Or likely to experience, correct?
24      A. Or likely to experience, correct.
25      Q. And they don't make that, in your view,

---

83

1   expressly or impliedly, correct?
2      A. Correct.
3      Q. In paragraph 12, you referred to there's
4   discussion of barriers moving forward and you mentioned
5   the number one reason, the lack of knowledge. What is
6   the second barrier that they mention?
7      A. I'm not sure. I would want to look back. It
8   may be lack of money, but I'm not certain of that.
9      Q. That's important to know, correct, for context,
10   true?
11      A. I don't know that it's important for what I'm
12   trying to draw from this statement.
13      Q. Is it at all relevant to context, for context?
14      A. Sure. I read the context. I read the whole
15   transcript. I didn't think whatever they had to say
16   about reason number 2 would affect the message
17   consumers would take from reason number 1, we are going
18   to provide knowledge.
19      Q. Did you look into what the defendants' purpose
20   or intent was of making the statements that you
21   highlighted in paragraph 12?
22      A. I have already said I did not look at their
23   intent for any of the statements.
24      Q. So I think, sir, the statements that are quoted
25   in paragraph 12 of your report are in Exhibit 5, which

---

84

1   is the transcript of the Idaho event, and page 26, I
2   believe. That's page 26 of the PDF and there should be
3   a page 26 in the upper right.
4      A. Okay. I'm there.
5      Q. And if you see the first full paragraph,
6   line 5, "My focus here today" --
7      A. Yes.
8      Q. -- "is to talk about the knowledge issue or the
9   money issue." Do you see that?
10      A. Yes.
11      Q. And then on line 10, I think that's where it
12   states "But we as a company, we offer training and
13   education. We offer classes." Do you see that?
14      A. Yes.
15      Q. And those are the -- that's the phrase that you
16   quote in paragraph 12 of your report, correct?
17      A. Yes.
18      Q. What you did not quote is the following
19   sentence about we literally show you how to do these
20   deals. Do you see that?
21      A. Yes.
22      Q. And then it goes on to say, "And the reason why
23   we do that is when we show others how to do it, we like
24   to do a few deals together with them so that we make
25   more money in the long run." Do you see that?

---

21 (Pages 81 to 84)

Beales

FTC v. Nudge, LLC, et al.                                                    8/17/2021

---

85

1    A. I do.
2    Q. And did you consider in your analysis whether
3  or not these statements were true or false, what I just
4  read?
5    A. I did not evaluate those claims, no.
6    Q. And then this goes on to state line 15, the
7  speaker says, "And I'm very direct about that purpose.
8  That's the reason why we have that training and that
9  education, classes, whatever you want to call them.
10     "A lot of you don't know this one, though,
11 about the money issue. We have a funding partner that
12 funds our deals for us. We have been doing so for
13 years and years. Students who do our training or our
14 classes with us, they get to use our funding partner to
15 fund those transactions. It's really cool." Do you
16 see where I read from?
17   A. I do.
18   Q. In forming your opinions, did you consider
19 whether or not anything I just read was true or false?
20   A. I did not.
21   Q. If you skip ahead to page 82 of this exhibit
22 and go to line 22, the speaker says, "So a couple years
23 ago our business strategy became this. We said, hey,
24 we are going to do as many deals as we can handle" --
25   A. I'm sorry, I'm not in the right place.

---

86

1    Q. Let me know when you are on page 82.
2    A. 82, I'm sorry. I went to 62. Okay. And
3  line 22 you say? Okay. I see it.
4    Q. So line 22, page 82, "So a couple years ago our
5  business strategy became this. We said, hey, we are
6  going to do as many deals as we can handle, and we'll
7  make money on those. But at the same time, we want to
8  get a handful of you", continuing to page 83, "up and
9  running. We want to show you how to do the exact same
10 thing and give you access to the exact same tools. We
11 just want to make a little bit of money on each one of
12 those deals we help you with and fund them." Do you
13 see where I read from on page 82, continuing to
14 page 83?
15   A. Yes, I do.
16   Q. Did you consider, in forming your analysis,
17 whether anything I just read was true or false?
18   A. I did not evaluate those claims.
19   Q. Going back to your report, sir, paragraph 13,
20 where it starts, "Statements about investment risk and
21 the need for effort are also embedded throughout the
22 preview events", do you see where I read from?
23   A. Yes, I do.
24   Q. And you quote several phrases from the Sandy
25 Springs, Georgia event: Rookies make mistakes. Do you

---

87

1  see that?
2    A. Yes, I do.
3    Q. And before that, every investment entails risk.
4  Do you see that?
5    A. Yes.
6    Q. Do you know what the context for those two
7  phrases are made?
8    A. I don't recall it sitting here today. I would
9  have to look back at the transcript.
10   Q. Okay. So let's do that. Let's go to
11 Exhibit 4, which is the transcript of the Sandy
12 Springs, Georgia event. And if you go to page 12,
13 you'll see in brackets there's a timer, the time stamp
14 of 1 hour and 5 seconds.
15   A. Yes.
16   Q. There's no line entry, so it's a little
17 difficult, but in the middle of that paragraph --
18   MS. MEGARIS: Which paragraph?
19   BY MR. LUBETZKY:
20   Q. Where it starts, "Now, flip the coin." And
21 you'll see seven lines down where it says, "We will not
22 make real estate better than it is. Number one is
23 this, every investment entails risk." Do you see that?
24   A. Yes.
25   Q. That's the phrase you quote from in

---

88

1  paragraph 13; is that right?
2    A. I think so. He may actually say it other
3  places too, but it's the same phrase.
4    Q. Right. And you can continue reading, but if
5  you go down four lines down, he says, "I promise you
6  this. Rookies make mistakes." Do you see that?
7    A. I'm sorry, it was like four lines down, you
8  said?
9    Q. Five lines down. Well, from the investment
10 risk, it's four lines down.
11   A. There we go. I see it, okay.
12   Q. So rookies make mistakes, that's the phrase
13 that you quote in slide 2 on paragraph 13 of your
14 report, correct?
15   A. Yes.
16   Q. So let's put this in context, shall we. The
17 preceding sentence says, "Most of the people that've
18 joined us over the last 14 years have told us, we have
19 never done a real estate deal other than what we did
20 with your company. If you do this by yourself, I
21 promise you this. Rookies make mistakes. Does that
22 make sense?" Do you see that?
23   A. Yes.
24   Q. So, if you join us, do what we tell you to do.
25 This is an industry we know inside and outside. Do you

---

22 (Pages 85 to 88)

Beales

FTC v. Nudge, LLC, et al.                                                        8/17/2021

89

1   see that?
2       A. Yes.
3       Q. Does the surrounding sentences around the
4   phrase "rookies make mistakes" add any context to that
5   phrase, in your view?
6       A. Well, I think this reinforces the claim this is
7   about knowledge and training: This is an industry we
8   know inside and out; do what we tell you.
9       Q. Do what we tell you to do, and do you believe
10  that that sentence, which is not in your report, is
11  relevant context for the phrase "rookies make
12  mistakes"?
13      A. Sure, it's relevant context. But I don't think
14  it changes what I'm pointing to "rookies make mistakes"
15  for. This is a claim about knowledge.
16      Q. Do you know whether or not the intended message
17  being conveyed here is that real estate is risk and
18  rookies can make mistakes, but our program, if you
19  follow what we tell you, can reduce those risks and
20  mistakes?
21      A. I think it's clearly an implication that we can
22  reduce the risks if you follow our -- I'm sorry, that
23  you can reduce the mistakes if you follow our
24  knowledge. I don't think there's anything in here
25  about reducing the risk.

90

1       Q. You can reduce the mistakes if you what?
2       A. The knowledge they are offering can help you
3   avoid rookie mistakes.
4       Q. The message is that you can reduce mistakes if
5   you pay for their training; isn't that right?
6       A. The message is that their training will give
7   you the knowledge to avoid mistakes, yes.
8       Q. Is that any different than the message saying
9   you can reduce your mistakes if you pay for our
10  training?
11      A. Well, you obviously have to use the training in
12  order to reduce the mistakes. You have to do
13  something.
14      Q. In order to use the training, you have to pay
15  for it, right?
16      A. Among other things, you have to pay for it and
17  then you have to apply it.
18      Q. So is the message, in your view, that you can
19  reduce the risks -- excuse me, reduce the mistakes if
20  you pay for and use our training?
21      A. They are clearly selling training. That's my
22  point. And training can help you reduce mistakes, but
23  paying doesn't reduce mistakes unless you do something
24  with it.
25      Q. Again, do you agree that the message is that

91

1   rookies make mistakes; you can reduce the mistakes if
2   you pay and use our training? Do you agree with that
3   simple statement or no?
4       A. I agree with that simple statement. Although I
5   would note the pay is not in there. It comes from the
6   context of the whole event, which is buy our training.
7       Q. In paragraph 13 of your report, you say in that
8   paragraph, and I'm reading from your report, "In
9   discussing a flipping deal, the presenter states that
10  'nobody gets rich on this. This is not about -- get
11  rich quick does not work in any investment. I have
12  never found get rich quick that works'." Do you see
13  that?
14      A. I do.
15      Q. And what is the significance of this phrase
16  that you are quoting from?
17      A. I see it as a claim about the need for effort.
18  You are going to have to work at this as opposed to
19  getting rich quick.
20      Q. What does rich quick mean to you, in your view?
21      A. A lot of money in a short period of time.
22      Q. How do you define a lot of money?
23      A. I don't.
24          MS. MEGARIS: Objection.
25          BY MR. LUBETZKY:

92

1       Q. Well, does in the --
2       A. I think this is a lot clearer than paycheck to
3   paycheck, to tell you the truth.
4       Q. What is a lot clearer?
5       A. I think an ordinary person understands get rich
6   quick a lot more clearly than they understand -- and
7   what it means, than they understand paycheck to
8   paycheck.
9       Q. Well, then why don't you enlighten us,
10  Dr. Beales, and explain what does an ordinary consumer
11  understand when the speaker says nobody gets rich on
12  this?
13      A. The context matters. It goes on. This is not
14  a get-rich quick scheme. And to me the ordinary
15  reasonable consumer listening to that would understand
16  this is going to take some work.
17      Q. Can you provide any more specifics on what an
18  ordinary consumer would understand what rich means and
19  what quick means? Can you provide any specificity on
20  those terms?
21      A. No.
22      Q. Can you provide any context around the phrase
23  that you plucked out of the transcript and put into
24  paragraph 13?
25      A. Not off the top of my head. We can look at the

23 (Pages 89 to 92)

Beales

FTC v. Nudge, LLC, et al.                                                        8/17/2021

---

93

1    transcript if you want.
2         Q. Bear with me a second. Let me get to it. Sir,
3    if you would go to page 19 of Exhibit 4.
4         A. Okay.
5         Q. If you go to the last line on page 19 where at
6    the end of that line says "Nobody gets rich on this",
7    and if you continue to page 20, "This is not about --
8    get rich quick does not work in any investment. I have
9    never found get rich quick that works." That's the
10   quote that you plucked and put into paragraph 13,
11   right?
12        A. Yes.
13        Q. And before that quote, the speaker refers to a
14   situation where someone makes 20 or 30,000. Do you see
15   that?
16        A. I see that.
17        Q. Okay. And the speaker is discussing an example
18   where somebody, to be more specific, makes 20 or 30,000
19   on what they call a quick flip transaction, right?
20        A. In a hypothetical, yes.
21        Q. And then he says "But nobody gets rich on
22   this", correct?
23        A. That's what he says.
24        Q. This being the 20 or 30,000 on one real estate
25   transaction, correct?

---

94

1         A. Correct.
2         Q. And then he says, after the quote that you
3    copied, How many of you would agree even if you
4    are the busiest person in this room tonight, if you
5    only did this three or four times a year, you are not
6    going to get rich, but -- there's a but, right?
7         A. Yes.
8         Q. But it would solve some problems, do you see
9    that?
10        A. Would it solve some problems, yes.
11        Q. Yeah. He puts it in a question, right, rather
12   than a declarative statement, correct?
13        A. Yes.
14        Q. What is the "it"? What is "it" would solve
15   some problems?
16        A. It's the quick flip deal three or four times a
17   year.
18        Q. In your view, does that provide any more
19   context than the phrase that you quoted from on
20   paragraph 13?
21        A. Of course it provides more context.
22        Q. Is there a reason why you did not include the
23   surrounding statements around what you did quote, that
24   nobody gets rich on this?
25        A. I didn't see them as relevant to my point that

---

95

1    this is a claim that you are going to have to make some
2    effort at doing this, which is the point I cite it for.
3         Q. And what about when the speaker, and speaker is
4    Wayne Gray, states, This is all about freedom to do
5    what we make, do you see that?
6         A. To do what make.
7         Q. "To do what make", do you see that?
8         A. Yeah.
9         Q. And he talks about what money can do for you,
10   correct?
11        A. I don't know. That's what I'm reading. He
12   talks about how you spend your time.
13        Q. And what you can do with the money, right? You
14   can travel, help your kids out, give to charity,
15   correct?
16        A. Yeah.
17        Q. And is any of this relevant or did you consider
18   this statement or these statements or discussion in
19   forming your opinions?
20        A. I certainly considered them in forming my
21   opinion. This is not a claim of here is what's going
22   to happen if you buy our training.
23        Q. And your basis for that is solely reading the
24   transcript, correct?
25        A. Correct.

---

96

1         Q. Dr. Beales, I want to go into some of your
2    background that you list in your CV.
3         A. Okay.
4         Q. Have you ever been retained by any federal or
5    state law enforcement agency to provide expert
6    testimony in a case?
7         A. To provide expert testimony, no.
8         Q. Exhibit 1 is your expert report, and at the end
9    there's a section called Prior Testimony Via Trial
10   Testimony Or Deposition.
11        A. Yes.
12        Q. Did you testify -- in all those cases that you
13   listed, were you retained by the defendants in each
14   case?
15        A. No.
16        Q. Which cases were you retained by the plaintiff?
17        A. I don't actually remember whether I was
18   plaintiff or defendant in Euro-Pro versus Dyson. I'm
19   sorry, the one I was thinking of was -- okay. I was
20   thinking of a different case. It wasn't testimony or
21   deposition but was an expert report. But therefore,
22   it's not on the list. It was a -- it was the plaintiff
23   in a private action on a Made in America claim.
24        Q. Okay.
25        A. It wasn't Made in America. It was original

---

24 (Pages 93 to 96)

Beales

FTC v. Nudge, LLC, et al.                                                8/17/2021

---

97

1  equipment manufacturing.  It was a replacement break
2  from China that didn't meet OEM specs.
3       Q.  And who retained you in that case?
4       A.  The law firm was Hunton & Williams.  I have
5  forgotten the name of the manufacturer of brake rotors.
6  I don't know.
7       Q.  So a company, it was a company that was the
8  plaintiff?
9       A.  Yes.
10      Q.  And who was the defendant in that case?
11      A.  I don't remember.  It was a different
12  manufacturer that didn't meet OEM specs but said it
13  did.  It was -- actually, I guess it was somebody who
14  was importing the parts, because my recollection is the
15  parts that were said to be OEM but didn't meet the
16  standard came from China.  But I'm not sure who the
17  other company was.
18      Q.  Was this a dispute involving two competitors?
19      A.  Yes.
20      Q.  And then the one case that I believe you said
21  you weren't sure if you represented the plaintiff or
22  the defendant, was that the Euro-Pro Operating case?
23      A.  Yes.
24      Q.  And what was that case about?
25      A.  This was a dispute between two manufacturers of

---

98

1  vacuum cleaners about substantiation for their claims.
2       Q.  Have you ever offered your expert services --
3  strike that.
4       Have you ever provided your expert services to
5  consumers or groups of consumers who allege they have
6  been injured by deceptive marketing or advertising
7  practices?
8       A.  I have never --
9       MS. MEGARIS:  Objection.  Vague.
10      THE WITNESS:  -- offered to anybody.
11      BY MR. LUBETZKY:
12      Q.  Have you ever provided expert testimony on
13  behalf of consumers or a group of consumers that allege
14  they have been injured by deceptive marketing
15  practices?
16      A.  No, I don't believe I have ever been approached
17  to do that.
18      Q.  In your CV, you list, I believe, seven cases
19  which you provided testimony or trial testimony, the
20  State of Oregon versus Living Essentials, the CFPB
21  versus CashCall, State of Washington versus Living
22  Essentials, FTC versus DIRECTV, State of Colorado
23  versus Center For Excellence, State of Vermont versus
24  Living Essentials and State of Hawaii versus Living
25  Essentials.  Do you see that?

---

99

1       A.  Yes.
2       Q.  In each of those cases you represented the
3  defendant, correct?
4       A.  Yes.
5       Q.  In your CV, you mentioned you are a consultant
6  for R.J. Reynolds?
7       A.  Yes.
8       Q.  When were you a consultant for R.J. Reynolds?
9       A.  Late '80s, mostly in connection with Joe Camel.
10      Q.  That's the cartoon marketing campaign run by
11  R.J. Reynolds?
12      A.  Yes.
13      Q.  And how many years did you provide or were you
14  retained as a consultant for R.J. Reynolds?
15      A.  I don't know.  I did a lot of work with
16  Reynolds' principal FTC law firm at the time which was
17  Collier Shannon and Scott, and on any number of matters
18  over a period from '89 to probably 2000, if they had an
19  FTC issue, I was probably involved in it.
20      MS. MEGARIS:  Howard, I would just advise you
21  not to disclose anything confidential about those
22  matters.  I don't know anything about your confidential
23  obligations, but you do.
24      THE WITNESS:  Understood.  I appreciate that.
25  The only specific matter I can talk about is Joe Camel,

---

100

1  I think, as that is on the public record.
2       BY MR. LUBETZKY:
3       Q.  How long did you work on advertising issues
4  related to the Joe Camel marketing campaign?
5       A.  The work was probably spread out over a year
6  and a half, maybe two years, because there were two
7  separate FTC investigations, one that was closed, and
8  then eventually the FTC brought a lawsuit which
9  eventually it dismissed.
10      Q.  What work did you -- were you paid to do as a
11  consultant for R.J. Reynolds with regard to the Joe
12  Camel campaign?
13      A.  I did an analysis of advertising data and
14  consumer survey data about kids who started to -- who
15  smoked and who didn't, matched the advertising data
16  with the consumer responses and was -- did econometric
17  analysis to determine whether there was a relationship
18  between exposure to advertising and Camel advertising
19  in particular and the decision to smoke.
20      Q.  Did you do any other work with regard to the
21  Joe Camel campaign?
22      A.  Not that I recall.
23      Q.  Did you give media interviews that discussed
24  the Joe Camel advertising campaign?
25      A.  I don't believe so.  Certainly not that I

---

25 (Pages 97 to 100)

FTC v. Nudge, LLC, et al.                                          8/17/2021

---

101

1  recall.
2      Q.  Did you ever speak to NPR reporters about the
3  Joe Camel campaign?
4      A.  Not that I recall.  I might have, but I don't
5  remember it.
6      Q.  Do you recall that R.J. Reynolds entered into a
7  settlement around 1997 that as part of that settlement
8  agreed to stop using the Joe Camel campaign?
9      A.  Yes.
10     Q.  Did your consulting work stop around that time
11 of the settlement?
12     A.  I don't remember.  I think my consulting work
13 essentially ended when the FTC dismissed its case.  My
14 belief is that a little bit after the settlement, but I
15 don't remember the timing all that clearly.  There was
16 another multistate agreement with the state AGs on
17 advertising restrictions, and I don't know whether
18 banning Joe Camel was part of that or not, because I
19 wasn't involved in anything except the FTC case.
20     Q.  Were you involved in a private lawsuit in
21 California regarding the Joe Camel campaign?
22     A.  I don't believe so.  I certainly didn't testify
23 in it.  A lot of the work I did as the statistical
24 analysis that I did was public.  So it's not
25 inconceivable that I talked to somebody about what I

---

102

1  had done, but I didn't have any client in any private
2  tobacco litigation in California.
3      Q.  Were you hired to respond to studies published
4  by the Journal of American Medical Association
5  concerning Joe Camel's advertising campaign?
6      A.  Yes.  That was part of the whole Joe Camel
7  engagement.
8      Q.  Were you involved in helping R.J. Reynolds
9  respond to the American Medical Association's request
10 that R.J. Reynolds pull the Joe Camel campaign because
11 it was targeting children?
12     A.  No, I was not.
13     Q.  You did, though, author articles critical of
14 the Journal of America Medical Association's studies
15 claiming that the Joe Camel campaign was targeting
16 children, correct?
17     A.  My complaint was about whether it was causing
18 kids to smoke.  I don't remember ever talking about
19 whether it did or didn't target children.  My focus was
20 always does this have any influence on the decision to
21 smoke.
22     Q.  Do you recall whether the Journal of American
23 Medical Association published a study that showed that
24 by age 6 nearly as many children could correctly
25 respond that Joe Camel was associated with cigarettes

---

103

1  as they could respond to Mickey Mouse?
2      A.  I vaguely remember that, but I was not involved
3  in -- I don't remember doing anything specifically with
4  that.
5      Q.  Your testimony is that you weren't involved in
6  the effort to try to undermine that study?
7      A.  That study -- what I was involved in is whether
8  that kind of exposure has any relationship to decisions
9  to smoke.  And I was saying the evidence doesn't
10 support that based on my analysis of various papers, I
11 don't remember all of them, whether that was one of
12 them or not, by various authors in various journals and
13 based on my own statistical analysis of the California
14 tobacco survey and the advertising exposure data.
15     Q.  Were you authoring articles taking a position
16 that it doesn't matter if 6-year-olds could recognize
17 Joe Camel as they could Mickey Mouse, that was no
18 problems from that?
19     A.  Not to my knowledge.
20     Q.  You did author articles that were favorable to
21 R.J. Reynolds' interests, correct?
22     A.  I authored articles that said exposure to
23 advertising does not lead kids to smoke.
24     Q.  On page 17 of your CV, there's a list of
25 articles, and in the middle of the page, there's an

---

104

1  article that you listed, The Determinants of Teenage
2  Smoking Behavior, from 1996.  Do you see that?
3      A.  Yes.
4      Q.  Did that article relate to your consulting work
5  for R.J. Reynolds?
6      A.  That article grew out of a statistical analysis
7  I did for R.J. Reynolds.
8      Q.  And two articles down, The Advertising and
9  Determinants of Teenage Smoking Behavior, that could be
10 related, but that also relates to or grew out of your
11 consulting work for R.J. Reynolds?
12     A.  Correct.  It grew out of the same statistical
13 analysis.
14         (A recess was taken.)
15         BY MR. LUBETZKY:
16     Q.  Dr. Beales, you testified in a civil law
17 enforcement action brought by the Attorney General of
18 Colorado; is that right?
19     A.  Is that this College America?
20     Q.  Correct.
21     A.  Yes.
22     Q.  And that case involved a for-profit college
23 called colloquially College of America; is that fair?
24     A.  It was originally a for-profit, and by the time
25 I got involved in it, it was reorganized as a

---

26 (Pages 101 to 104)

Beales

FTC v. Nudge, LLC, et al.                                                          8/17/2021

105

1    not-for-profit.
2        **Q. And it was referred to as College America?**
3        A. Yeah.  Yeah, that was the school that was --
4    and the nonprofit was the Center For Excellence in
5    Higher Education.
6        **Q. And the Colorado Attorney General's Office sued**
7    **College America under Colorado State Consumer**
8    **Protection statutes; is that right?**
9        A. Correct.
10       **Q. And the Colorado Attorney General's Office**
11   **alleged that College America's marketing practices were**
12   **deceptive; true?**
13       A. That's my recollection, yes.
14       **Q. And did you testify at the trial in that case?**
15       A. I did.
16       **Q. Before a state court judge?**
17       A. I believe so.
18       **Q. Was there a jury involved in that case or was**
19   **it just before the judge?**
20       A. I believe it was just the judge.
21       **Q. You testified in November 2017?**
22       A. Yes, November 1st.
23       **Q. And what was the gist of your opinion in that**
24   **case?**
25       A. Colorado was challenging as an earnings claim a

106

1    claim that I thought was a perfectly accurate
2    presentation of the returns to education generally, and
3    Colorado was trying to argue that that was a claim
4    about the results that would accrue to students in any
5    program that said that.
6        **Q. And the Court in that case issued a judgment**
7    **for the Colorado Attorney General's Office, correct?**
8        A. I do not know.  I testified -- I talked
9    actually to somebody on the board two years after the
10   testimony and there still hadn't been a decision.  I
11   don't know what happened.
12       **Q. So is it your understanding that the Court**
13   **never issued a judgment in that case?**
14       A. I don't know what the Court ultimately did.  I
15   just don't know.
16           (Beales Deposition Exhibit Number 6 was marked
17   for identification.)
18   BY MR. LUBETZKY:
19       **Q. Dr. Beales, what I have marked as Exhibit 6 is**
20   **a document entitled Findings of Fact, Conclusions of**
21   **Law, and Judgment from that case.  I take it you have**
22   **never seen this document before?**
23       A. I have never seen that document before.
24       **Q. Do you recognize from the caption this is the**
25   **case that you testified in?**

107

1        A. I do.
2        **Q. No one ever told you that the Court in this**
3    **case disregarded your opinion or testimony?**
4        A. I don't believe --
5           MS. MEGARIS:  Objection.  Foundation.
6           BY MR. LUBETZKY:
7        **Q. My question is did anyone ever tell you that**
8    **the Court in this case disregarded your testimony and**
9    **opinions?**
10          MS. MEGARIS:  Same objection.
11          THE WITNESS:  Not that I know of.
12          BY MR. LUBETZKY:
13       **Q. My question is did anyone tell you?  Did anyone**
14   **tell you that?**
15       A. Not that I recall.
16       Q. Okay.
17       A. I do not know if anyone told me that.
18       **Q. So why don't we turn to page 16, paragraph 50.**
19   **Let me know when you are there, sir.**
20       A. Okay.
21       **Q. The Court states, "Dr. Beales offered the**
22   **opinion that College America advertisements that**
23   **mention national average wages are not misleading, even**
24   **assuming College America graduates' wages are**
25   **significantly lower than those national average**

108

1    **numbers." Do you see that?**
2        A. I do.
3        **Q. Is that an accurate portrayal of your opinion?**
4        A. I believe so, yes.
5        **Q. And further down in paragraph 50, "Dr. Beales**
6    **testified that the message of the College America**
7    **advertisements is that 'Education is good.  Education**
8    **pays.  There's a return to investment in education.**
9    **And we provide education'."  Do you see that?**
10       A. Yes.
11       **Q. Is that a fair characterization of your**
12   **testimony?**
13       A. I don't have any reason to question it.
14       **Q. Okay.  And then if you go to page 120 -- excuse**
15   **me, 119.  I apologize.  This is my highlighting, by the**
16   **way.**
17          MS. MEGARIS:  Sorry, 119?
18          BY MR. LUBETZKY:
19       **Q. Page 119, paragraph 585.  Let me know when you**
20   **are there, Dr. Beales.**
21       A. Okay.  I'm there.
22       **Q. And you'll see the Court writes, "The Court**
23   **finds and concludes that Defendants engaged in a**
24   **deceptive trade practice by knowingly making false and**
25   **misleading representations about the potential wages**

27 (Pages 105 to 108)

FTC v. Nudge, LLC, et al.                                                    8/17/2021

---

109

1   and types of employment that a consumer can expect to
2   obtain after completing a College America degree
3   program."  Do you see where I'm reading from?
4       A.  Yes.
5       Q.  The Court continues to go on, "Defendants made
6   these representations with the intent to induce
7   consumers, many of whom were struggling financially,
8   into a transaction involving tens of thousands of
9   dollars, in the form of taking out federal student and
10  EduPlan loans."  Do you see that?
11      A.  I do.
12      Q.  You weren't aware that the Court made this
13  finding?
14      A.  I was not.
15      Q.  Go to page 122, paragraph 602.  Let me know
16  when you are there, Dr. Beales.
17      A.  Okay.
18      Q.  The Court writes, "The Court was not persuaded
19  by the testimony of defense expert Dr. Howard Beales,
20  who considered only a portion of Defendant's marketing
21  scheme, those being its advertisements."  Do you see
22  where I'm reading from?
23      A.  I do.
24      Q.  "In reaching his conclusions that Defendant's
25  wage advertisements are not misleading, Dr. Beales did

---

110

1   not consider whether the specific population of College
2   America students would be more susceptible to high wage
3   claims in advertisements about employment, even though
4   such consideration is required by the FTC Policy
5   Statement on Deception that he applied."  Do you see
6   that?
7       A.  I do.  I think that does mischaracterize my
8   testimony.
9       Q.  Okay.
10      A.  My testimony was that this is a population that
11  thinks -- and it was quite specific to the population.
12  This is a population that is not particularly aware of
13  the value of education, that had made a decision not to
14  go to college right out of high school because, in
15  part, they thought it wasn't worth it and that it was
16  especially important for them to know that there are
17  significant returns to investments in education.
18      Q.  Do you agree with the Court's statement that
19  you failed to consider the entire marketing scheme of
20  defendants?
21      A.  I'm sorry, I'm not seeing that one right this
22  second.
23      Q.  It's the first sentence, "The Court was not
24  persuaded by the testimony of defense expert Dr. Howard
25  Beales, who considered only a portion of Defendants'

---

111

1   marketing scheme."  Do you see that?
2       A.  I agree that I considered only a portion of the
3   marketing.  I only looked at the advertisements that
4   used the national wage data, and I really only talked
5   about the use of the national data on returns to
6   education.
7       Q.  If you go further in the paragraph, it goes,
8   "Nor did Dr. Beales consider Defendants' intent in
9   advertising earnings".  Do you see that?
10      A.  I see that.  And I think the next part of that
11  sentence mischaracterizes the deception statement.
12      Q.  Leaving aside what you think the deception
13  statement calls for, did you consider Defendants'
14  intent in advertising earnings in this case?
15      A.  I don't think it is relevant.
16      Q.  You failed to consider defendants' intent in
17  the College America case, correct?
18      A.  I failed to consider many irrelevant factors.
19      Q.  One of the factors you failed to consider was
20  defendants' intent, correct?
21      A.  Among many other irrelevant factors, I failed
22  to consider it.
23      Q.  And another factor you failed to consider is
24  the defendants' entire marketing scheme in College
25  America, correct?  You failed to do that, right?

---

112

1       A.  I focused on a particular part of the marketing
2   scheme.  In that sense he is correct.  I considered
3   only a portion of the marketing scheme.
4       Q.  And then the Court notes that "Instead, he",
5   that's you, Dr. Beales, "adopted defense counsel's view
6   and did not consider internal documents from the
7   Defendants that illustrate their purpose and design to
8   entice consumers with high wages."  Do you see where
9   I'm reading from?
10      A.  I do.
11      Q.  Do you agree with that statement that you
12  failed to consider internal documents from the
13  defendants that illustrate their purpose and design of
14  their marketing?
15      A.  I agree that I did not consider the irrelevant
16  factor of their intent in designing the marketing.  I
17  never saw those documents.
18      Q.  So to sum up, you didn't consider in that case
19  defendants' entire marketing scheme, correct?
20          MS. MEGARIS:  Objection.  Asked and answered.
21          THE WITNESS:  I considered only the
22  advertisements using the national -- using the national
23  returns to education.
24          BY MR. LUBETZKY:
25      Q.  And you didn't consider defendants' intent in

---

Beales

FTC v. Nudge, LLC, et al.                                                          8/17/2021

---

113

1   their advertising in the College America case, correct?
2           MS. MEGARIS:  Objection.  Asked and answered.
3           THE WITNESS:  I did not consider many
4   irrelevant factors, including the defendants' intent.
5           BY MR. LUBETZKY:
6       Q.  And you didn't consider or review any of
7   defendants' internal documents in that case, correct?
8           MS. MEGARIS:  Objection.  Asked and answered.
9           THE WITNESS:  I didn't review any documents
10  about intent.  I don't remember for sure whether I
11  reviewed any internal documents or not, which was your
12  question.
13          MR. LUBETZKY:  Thank you, Dr. Beales.  I have
14  no further questions at this time.  Ms. Ostler, do you?
15          MS. OSTLER:  I just have a couple of questions.
16                   EXAMINATION
17          BY MS. OSTLER:
18      Q.  Hi, Dr. Beales.  My name is Joni Ostler.  I'm
19  an attorney for the Utah Division of Consumer
20  Protection.
21      A.  Nice to meet you.
22      Q.  You too.  Are you offering any opinion on the
23  applicability of Utah's Business Opportunity Disclosure
24  Act to the defendants' products and services in this
25  case?

---

114

1       A.  No.
2           MS. OSTLER:  Thank you.  That's all I have.
3           MR. LUBETZKY:  Alex, do you have anything?
4           MS. MEGARIS:  I do not.
5           MR. LUBETZKY:  All right.  I think we're done.
6           (Reading and signature not waived.)
7           (Whereupon, the proceedings at 2:06 p.m., were
8   concluded.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

115

1       C E R T I F I C A T I O N   O F   R E P O R T E R
2   CASE NUMBER: 2:19-CV-00867-DBB-DAO
3   CASE TITLE:  FTC v. NUDGE, LLC, et al.
4   DATE:  AUGUST 17, 2021
5
6           I HEREBY CERTIFY that the transcript contained
7   herein is a full and accurate transcript of the notes
8   taken by me at the hearing on the above cause before
9   the FEDERAL TRADE COMMISSION to the best of my
10  knowledge and belief.
11
12          DATED:  August 31, 2021
13
14          s/Deborah Wehr
15          DEBORAH WEHR, RPR
16
17
18
19
20
21
22
23
24
25

---

116

1               CERTIFICATE OF WITNESS
2
3           I hereby certify that I have read and examined
4   the foregoing transcript, and the same is a true and
5   accurate record of the testimony given by me.
6
7           Any additions or corrections that I feel are
8   necessary, I will attach on a separate sheet of paper
9   to the original transcript.
10
11          I hereby certify, under penalty of perjury,
12  that I have affixed my signature hereto
13  on the date so indicated.
14
15
16          DATED:
17
18
19
20          _____
21          HOWARD BEALES
22
23
24
25

---

29 (Pages 113 to 116)

Beales

FTC v. Nudge, LLC, et al.                                          8/17/2021

117

```
 1    WITNESS:  HOWARD BEALES
 2    DATE:  AUGUST 17, 2021
 3    CASE:  FTC v. NUDGE, LLC, ET AL.
 4    Please note any errors and the corrections thereof on
 5    this errata sheet.  The rules require a reason for any
 6    change or correction.  It may be general, such as "To
 7    correct stenographic error," or "To clarify the
 8    record," or "To conform with the facts."
 9    PAGE LINE    CORRECTION   REASON FOR CHANGE
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**FTC v. Nudge, LLC, et al.**

**8/17/2021**

[118]

## A

**a.m** 1:21
**able** 14:1 56:19
    64:19 75:25 76:25
    77:4
**above-entitled** 1:20
**access** 59:24 86:10
**accomplish** 82:11
**accrue** 106:4
**accurate** 106:1
    108:3 115:7 116:5
**achieve** 51:23 52:8
**acquire** 82:16
**Act** 113:24
**action** 96:23 104:17
**actual** 36:7
**ad** 43:10
**add** 73:24 89:4
**additional** 49:4
**additions** 116:7
**address** 37:1
**adopted** 112:5
**ads** 7:8,8,21
**advanced** 31:5
    36:22 37:15 39:7
**advantages** 46:18
    46:23 47:3,6,21,25
    48:1
**advertisements** 7:1
    43:7 107:22 108:7
    109:21,25 110:3
    111:3 112:22
**advertising** 18:20
    18:20,21 41:22
    42:16 98:6 100:3
    100:13,15,18,18
    100:24 101:17
    102:5 103:14,23
    104:8 111:9,14
    113:1
**advise** 99:20
**affect** 83:16
**affixed** 116:12
**AFTERNOON** 79:1
**age** 102:24
**agency** 96:5

**agent** 60:20 61:1,3
**ago** 85:23 86:4
**agree** 40:23 41:25
    42:3,4,10,14,23,24
    44:6 51:4,4 79:16
    79:25 80:14 90:25
    91:2,4 94:3 110:18
    111:2 112:11,15
**agreed** 53:16 101:8
**agreement** 101:16
**AGs** 101:16
**ahead** 16:20 85:21
**al** 115:3 117:3
**Alex** 114:3
**Alexandra** 2:14
    5:22 12:9 24:5
**allegation** 37:6
**allegations** 10:7
**allege** 10:8 98:5,13
**alleged** 10:11,12,18
    31:12,13 32:5 33:6
    105:11
**alleges** 30:25 32:16
**Ambiguous** 19:5
**amegaris@venabl...**
    2:20
**amended** 10:7
**America** 4:14 96:23
    96:25 102:14
    104:19,23 105:2,7
    107:22,24 108:6
    109:2 110:2
    111:17,25 113:1
**America's** 105:11
**American** 102:4,9
    102:22
**Americas** 2:17
**amount** 17:8 33:23
    50:24 51:3 57:23
**analysis** 28:7,17
    30:19 38:14,23
    43:18 54:10 85:2
    86:16 100:13,17
    101:24 103:10,13
    104:6,13
**analyze** 28:12 41:21
    52:24 53:19 54:6

**analyzed** 45:13
    46:13 80:5 82:18
**answer** 9:14 29:6
    32:23,25 73:24
    75:22
**answered** 24:25
    35:6 38:3 58:11
    73:23 112:20
    113:2,8
**anticipated** 33:12
    33:18
**anybody** 33:24
    43:14 80:20 98:10
**anymore** 53:13
**anyway** 64:7
**apart** 42:2
**apologize** 108:15
**Appearances** 2:1,25
    3:1
**appears** 76:8
**applicability** 113:23
**application** 50:5
    61:2,2
**applied** 59:19,20
    110:5
**apply** 59:22 60:7,11
    90:17
**appreciate** 99:24
**appreciation** 79:19
**approached** 98:16
**approaches** 17:2,20
**arena** 70:5
**argue** 32:25 106:3
**argument** 32:20
    75:6,7
**Argumentive** 37:20
    38:2,25 58:12
**arguments** 32:18
**arrive** 27:24
**article** 104:1,4,6
**articles** 102:13
    103:15,20,22,25
    104:8
**aside** 31:23 42:24
    45:12 46:9,15
    111:12
**asked** 6:16,20 24:25

    35:6 37:1 38:2
    41:6 51:15 54:19
    58:11 112:20
    113:2,8
**asking** 18:18 19:6,9
    29:11,12 30:1 31:1
    32:18 45:1,11 46:1
    46:1 50:14 53:18
    67:22 68:5
**asks** 54:15
**assess** 40:8 75:21
**asset** 65:18,19 66:4
**assignment** 19:21
**associated** 102:25
**Association** 102:4
    102:23
**Association's** 102:9
    102:14
**assume** 54:13 76:14
**assumed** 76:12,13
**assuming** 54:12,22
    55:1 107:24
**assumption** 76:24
**attach** 116:8
**attend** 51:6,10,17,22
    54:19
**attended** 15:8 41:23
    48:17
**attendee** 35:25
**attendees** 35:2 36:6
    64:10 75:24 76:25
    77:16,21
**attendees'** 74:9,21
**attending** 5:20
    53:12
**attention** 6:14 75:25
**attorney** 3:12 6:1
    104:17 105:6,10
    106:7 113:19
**attorneys** 5:17
**audience** 29:20 30:5
    30:7,8,10,14,17
    74:25
**audio** 13:11,12 14:2
    43:9 75:20
**audit** 36:22
**August** 1:17 115:4

    35:6 37:1 38:2

**B**

**B** 1:11 62:19 63:17
    64:1
**back** 17:5 21:5,17
    21:18,20 26:3,14
    47:9 59:11 64:25
    65:12 66:5 76:12
    80:13 83:7 86:19
    87:9
**background** 32:22
    68:19,20 96:2
**banning** 101:18
**barrier** 83:6
**barriers** 81:7 83:4
**base** 16:11 22:11
**based** 23:3 26:25
    49:3 77:3 103:10
    103:13
**basis** 36:11 40:18,19
    74:18,21 76:24
    78:1,6 95:23
**Bates** 15:3
**Beales** 1:23 5:3,10
    5:15 6:7 14:1 15:6
    16:20 32:19 44:10
    79:3,6,16 80:3
    92:10 96:1 104:16
    106:16,19 107:21
    108:5,20 109:16
    109:19,25 110:25
    111:8 112:5
    113:13,18 116:21
    117:1
**Bear** 93:2

**analyzed** 45:13

**115:**12 117:2
**author** 102:13
    103:20
**authored** 103:22
**authoring** 103:15
**authors** 103:12
**Avenue** 2:17
**average** 51:12
    107:23,25
**avoid** 90:3,7
**aware** 60:25 109:12
    110:12

**began** 36:8
**beginning** 21:5
  69:14 70:21,25
  71:3 74:8,20 76:11
**behalf** 2:3,13 3:3
  98:13
**behavior** 40:13
  104:2,9
**belief** 75:24 101:14
  115:10
**believe** 5:15 7:4 8:7
  9:4 14:8,14 17:5
  17:19 22:5 23:25
  29:10 33:15 34:12
  36:9 43:4 62:18
  64:9 78:1,6,10,13
  84:2 89:9 97:20
  98:16,18 100:25
  101:22 105:17,20
  107:4 108:4
**belongs** 70:4
**best** 67:19 68:1,2,7
  68:12,14,16 115:9
**better** 61:7 87:22
**beyond** 10:19 18:3
  19:25 20:21 23:7
  29:9 30:1 61:10
  64:20 65:3,6,8
  66:16 73:12
**big** 67:5
**bit** 26:2 52:20 86:11
  101:14
**blood** 70:6
**board** 106:9
**bold** 36:17
**Bond** 65:15
**Bonds** 65:25
**bottom** 11:13
**Boulevard** 3:6
**Bowling** 2:6
**brackets** 87:13
**brake** 97:5
**BRANDON** 1:11
**break** 63:13 97:1
**briefly** 26:4
**brought** 100:8
  104:17

**built** 65:18
**bullet** 42:22
**busiest** 94:4
**business** 85:23 86:5
  113:23
**buy** 62:12,14 75:11
  91:6 95:22
**buyer** 60:18
**buying** 41:5
**BUYPD** 1:10

**C**

**C** 1:12 5:1 62:19
  115:1,1
**California** 101:21
  102:2 103:13
**call** 70:12 72:11
  85:9 93:19
**called** 5:11 96:9
  104:23
**calls** 32:11 41:2
  111:13
**Camel** 99:9,25
  100:4,12,18,21,24
  101:3,8,18,21
  102:6,10,15,25
  103:17
**Camel's** 102:5
**campaign** 99:10
  100:4,12,21,24
  101:3,8,21 102:5
  102:10,15
**caption** 106:24
**care** 66:5
**cartoon** 99:10
**case** 1:6 5:18 6:9,12
  6:21 10:1 12:5
  23:23 24:16,23
  25:4,13 27:17 28:8
  28:13 39:14 41:12
  76:15 77:20 96:6
  96:14,20 97:3,10
  97:20,22,24
  101:13,19 104:22
  105:14,18,24
  106:6,13,21,25
  107:3,8 111:14,17

112:18 113:1,7,25
  115:2,3 117:3
**cases** 96:12,16 98:18
  99:2
**CashCall** 98:21
**cast** 59:13
**catch** 9:23 25:20
**cause** 115:8
**causing** 102:17
**caveat** 20:18
**celebrity** 48:7,10
**Center** 2:16 98:23
  105:4
**CENTRAL** 1:2
**certain** 10:8 14:1,4
  50:24 82:13 83:8
**certainly** 16:14
  17:25 19:1 33:6
  34:20 42:3,23
  46:22 54:17 55:6
  61:23 66:12 80:11
  95:20 100:25
  101:22
**CERTIFICATE**
  116:1
**certify** 115:6 116:3
  116:11
**CFPB** 98:20
**chair** 36:10
**challenging** 105:25
**change** 117:6,9
**changes** 89:14
**characteristics** 43:1
**characterization**
  34:21 108:11
**characterize** 17:8
  80:10
**characterized** 34:12
**charity** 95:14
**check** 14:16 25:15
**checks** 25:14
**children** 102:11,16
  102:19,24
**China** 97:2,16
**choice** 75:10
**choose** 14:5 22:10
  23:1

**choosing** 62:15
**chose** 14:12 23:3
**chosen** 14:14
**Christiansen** 3:4 6:4
  6:4
**cigarettes** 102:25
**cite** 19:2 21:21,23
  22:20 23:16 32:1
  64:25 71:1,10
  72:24 73:9 77:17
  95:2
**cited** 12:5 14:14
  16:4 22:18 23:9
  26:7 36:14 71:24
  74:2
**civil** 104:16
**claim** 23:15,17 28:5
  30:13,22,24 31:1,3
  32:5,7,15 33:3,8
  34:8 35:12,13 37:1
  37:3,4,9,14,17,25
  38:8,9,13,17 39:1
  39:3,3,4,6 41:4,8
  50:2,7,9,12,21,24
  51:1,9,13,24,25
  52:4,5,8,13,18,24
  52:24,25 53:24,24
  55:5,8,22 56:25
  57:6,7,10,13,17,21
  57:22,24 58:1,3,4
  58:5,6,6,8,16 59:4
  59:9,10 60:2,4
  72:11,18,19 77:23
  79:17,23 82:2,3,8
  82:9,10,10,13,15
  89:6,15 91:17 95:1
  95:21 96:23
  105:25 106:1,3
**claimed** 47:21,25
**claiming** 102:15
**claims** 6:17 17:1
  19:20 23:4 26:23
  27:25 28:2,6 31:8
  31:9,11,13,25,25
  32:2,10,13 33:5,5
  33:6 39:22 40:4
  41:13,14 44:17,22

44:24 45:9 46:23
  46:24 47:16,17
  48:2 50:6 51:2,6
  53:8 58:15 60:4
  63:18 64:2 72:2,14
  72:15,23 73:4 74:5
  80:23 81:17,21
  82:12,19,20,21
  85:5 86:18 98:1
  110:3
**clarify** 117:7
**classes** 84:13 85:9
  85:14
**classes.'** 81:13
**cleaners** 98:1
**clear** 17:10 23:14
  24:18 53:8 75:17
  75:18 76:4,6
**clearer** 92:2,4
**clearly** 23:15,18
  32:3,4 42:16 64:13
  70:1 75:8 76:6
  78:4 89:21 90:21
  92:6 101:15
**client** 102:1
**CLINT** 1:13
**clips** 72:24
**close** 60:21
**closed** 100:7
**coin** 87:20
**college** 4:14 104:19
  104:22,23 105:2,7
  105:11 107:22,24
  108:6 109:2 110:1
  110:14 111:17,24
  113:1
**Collier** 99:17
**colloquially** 104:23
**Colorado** 4:14
  98:22 104:18
  105:6,7,10,25
  106:3,7
**come** 18:6 25:14
  29:23 67:6 68:10
**comes** 17:14 40:22
  49:24 50:17 70:6
  91:5

Beales

FTC v. Nudge, LLC, et al.                                                8/17/2021

[120]

coming 68:12 75:3
Commission 1:4 2:3
   2:5 5:18 43:13
   115:9
common 16:16,25
   17:7,10
communicated 24:7
communications
   24:10
company 42:4,10,25
   43:20 63:18 64:3
   81:12 84:12 88:20
   97:7,7,17
competitors 97:18
complaint 10:7,13
   10:18 30:25 31:12
   31:13,15,23 32:5
   32:16 33:7 39:4
   49:4,21 102:17
complaint's 32:7
complete 11:9 57:9
   57:16 59:3
completely 68:5
completing 109:2
components 46:11
   60:3,22
comprehensive
   61:12
concerning 102:5
concluded 114:8
concludes 108:23
conclusion 26:19,22
   27:24 32:12 41:3
   62:19,22 63:1,3,11
   68:10,13,15,17
   81:16,25
conclusions 106:20
   109:24
condo 61:18,21,22
   62:15
conduct 28:10,17
   40:25 41:10
conducted 28:12
   36:22
conducting 61:13
confidential 99:21
   99:22

conform 117:8
confuse 13:19
connection 48:6,9
   79:19 99:9
consider 33:1,4
   47:12,19 48:4,9
   65:23 85:2,18
   86:16 95:17 110:1
   110:19 111:8,13
   111:16,18,19,22
   111:23 112:6,12
   112:15,18,25
   113:3,6
consideration 110:4
considered 65:16,17
   66:3 95:20 109:20
   110:25 111:2
   112:2,21
constitute 32:10
   33:2,5 51:5 80:19
constitutes 50:2
consultant 99:5,8,14
   100:11
consulting 101:10
   101:12 104:4,11
consumer 1:5 6:3
   15:8 22:21 23:2
   27:8,19 40:13
   48:21 55:22 77:11
   92:10,15,18
   100:14,16 105:7
   109:1 113:19
consumers 23:7,13
   23:21 28:18 31:3,4
   33:18 34:3,15
   38:20 39:5,6,11
   41:5,15,22 42:9,18
   42:19 43:19 44:11
   44:14,20 45:2,8,14
   45:21,23 46:3,18
   47:13,21 48:1,17
   49:12 53:11 54:8
   54:20 59:21 60:6
   63:7 68:3 69:17
   76:12 80:15 82:21
   83:17 98:5,5,13,13
   109:7 112:8

contained 69:1
   115:6
content 18:1 29:9
   44:23 45:17
context 18:20 32:3
   40:9 42:2,15 43:5
   51:8,14 52:22 53:4
   53:5,15,19,24 55:5
   63:8 83:9,13,13,14
   87:6 88:16 89:4,11
   89:13 91:6 92:13
   92:22 94:19,21
contexts 62:7
continue 88:4 93:7
continued 2:25 3:1
continues 109:5
continuing 86:8,13
convenient 78:17
conversation 77:22
convey 28:23 29:7
   29:14,14 43:24
   45:8 69:17
conveyed 43:15
   53:20 89:17
cool 85:15
copied 94:3
correct 10:20,21
   11:1,4,21 26:24
   27:22,23 28:11
   35:20 37:12 38:8
   41:12,19,23 53:21
   82:20,23,24 83:1,2
   83:9 84:16 88:14
   93:22,25 94:1,12
   95:10,15,24,25
   99:3 102:16
   103:21 104:12,20
   105:9 106:7
   111:17,20,25
   112:2,19 113:1,7
   117:7
correction 117:6,9
corrections 116:7
   117:4
correctly 64:6,7
   102:24
cost 48:11 49:16

56:15
counsel 5:6 12:7
   14:20 22:3 69:18
counsel's 112:5
couple 36:2 38:11
   85:22 86:4 113:15
course 40:25 41:7
   41:10 65:24 74:10
   94:21
court 1:1 5:7 39:18
   39:21 40:3 105:16
   106:6,12,14 107:2
   107:8,21 108:22
   108:22 109:5,12
   109:18,18 110:23
   112:4
Court's 110:18
credit 70:4
crisis 43:6
critical 102:13
critique 28:15
cross 76:9
crucial 53:6 65:19
customers 50:25
   60:11
CV 96:2 98:18 99:5
   103:24

─────── D ───────

D 4:1 5:1 62:19
Darren 2:4 5:17
   63:22 71:13
data 100:13,14,15
   103:14 111:4,5
date 25:3 115:4
   116:13 117:2
DATED 115:12
   116:16
deal 16:16 34:5,11
   35:9,11 37:10,16
   37:24 38:5,11,12
   38:22 39:13 51:12
   57:13,14 58:9,18
   58:24 59:6 60:21
   61:3 88:19 91:9
   94:16
dealing 41:7

deals 34:21 38:18
   51:12,19,23 57:5
   57:10,17,21 58:2,6
   58:8,10,17,18 59:3
   59:8 67:3,4,5
   84:20,24 85:12,24
   86:6,12
Dean 6:5
Deborah 1:25
   115:15
debt 56:20
debts 51:19 52:13
   55:15,20 56:1,4,21
deception 29:2 40:9
   40:24 43:23 44:4
   110:5 111:11,12
deceptive 32:8
   42:11,12 98:6,14
   105:12 108:24
decide 23:12
decided 23:20
decision 100:19
   102:20 106:10
   110:13
decisions 103:8
declarative 94:12
deeds 70:9 73:18
defendant 33:16
   50:12 96:18 97:10
   97:22 99:3
Defendant's 109:20
   109:24
defendants 1:15
   2:13 5:23,24,25
   6:5 8:12 10:8
   16:13 24:11,11
   28:23 29:7,13,19
   30:4,16 31:25 34:3
   34:15,23 35:2
   41:18 44:10,13
   45:1,13,20 47:13
   47:20 48:5,16 49:1
   49:8,12,17 80:3,4
   80:14 82:18 96:13
   108:23 109:5
   110:20 112:7,13
defendants' 8:24 9:4

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

9:12 28:19 33:14
33:19 34:6 39:23
46:2,16 47:2 48:7
60:11 83:19
110:25 111:8,13
111:16,20,24
112:19,25 113:4,7
113:24
**defense** 69:18
109:19 110:24
112:5
**define** 31:1,2 91:22
**defining** 30:22
**definition** 20:17,18
32:6,7
**degree** 109:2
**deliberately** 42:5,12
42:25
**Depending** 51:8
**depends** 38:10 41:4
42:15 43:5 63:3
**deposition** 1:21 5:3
5:20 22:24 24:23
25:24 27:20 79:3
96:10,21 106:16
**depositions** 32:22
**describe** 70:22 71:2
**described** 62:8
**describing** 23:4
**description** 4:8 73:6
**design** 75:10 112:7
112:13
**designing** 112:16
**detail** 41:13 49:6,10
49:11
**Determinants** 104:1
104:9
**determine** 100:17
**develop** 61:12
**differ** 17:4
**difference** 50:17
**differences** 17:15,18
18:1,3,7,9
**different** 17:20
48:14 51:1 54:24
55:24 56:16 62:7
69:9 90:8 96:20

97:11
**differently** 55:18
56:3,6,10
**difficult** 87:17
**dimensions** 58:22
**direct** 7:10,21 85:7
**DIRECTV** 98:22
**discern** 39:18,21
40:3,23
**disclaimed** 43:11
**disclaimer** 42:8,20
42:22 43:2,17
69:21 70:12,18
71:18,21,24 72:2,5
72:6,8,11,13 73:10
73:22 74:19 75:6
76:1,2,20 77:1,17
77:22 81:20
**disclaimers** 42:6,13
64:2 68:25 69:1,6
69:8,11,14 70:10
71:23 72:3,9,17
73:4
**disclose** 99:21
**disclosed** 64:10 66:9
**disclosure** 64:8,13
64:14,19 65:6 66:7
70:15,25 71:7,21
72:22 74:8,13
113:23
**disclosures** 63:19
64:3,24 65:3
**discussed** 21:23
46:17 78:10
100:23
**discusses** 67:1 81:6
**discussing** 77:21
91:9 93:17
**discussion** 63:8 83:4
95:18
**dismissed** 100:9
101:13
**dispute** 97:18,25
**disregarded** 107:3,8
**distinct** 58:22
**distinction** 72:16
82:2,7

**distinguish** 82:8
**distributed** 35:24
**DISTRICT** 1:1,2
**division** 1:2,5 6:3
15:8 77:10,11
113:19
**dlubetzky@ftc.gov**
2:10
**document** 9:8,15,16
22:2,4,10,17,18
63:23 106:20,22
106:23
**documents** 4:10
10:25 11:9 21:21
22:9 35:18 112:6
112:12,17 113:7,9
113:11
**doing** 13:22 34:11
57:20 58:8,10,19
66:17 67:10 85:12
95:2 103:3
**dollar** 51:3
**dollars** 31:6 39:8
109:9
**doubt** 19:12
**dozen** 71:8 75:14
**Dr** 5:15 6:7 14:1
15:6 16:20 32:19
44:10 79:6,16 80:3
92:10 96:1 104:16
106:19 107:21
108:5,20 109:16
109:19,25 110:24
111:8 112:5
113:13,18
**drafting** 67:18,25
68:6,9
**draw** 83:12
**duly** 5:12
**dust** 70:5
**Dyson** 96:18

───────────────
**E**
───────────────
**E** 4:1 5:1,1 115:1,1,1
**earlier** 21:10 50:1
56:12
**early** 14:9,10 17:3

23:24 24:6
**earn** 31:3,5 39:5,7
**earnings** 6:17 10:8
10:11,19 17:1
19:20 23:15,17
26:23 27:25 28:2,5
28:6 30:13,22 31:1
31:8,9,11,25,25
32:2,5,10,13,15
33:3,5,8,13,18
38:17 39:3,22 40:5
44:16,24 45:9
46:25 47:18 48:3
50:2,5,7,12,21,23
51:1,2,6,9,13,19
51:21,24,25 52:3,4
52:5,8,8,13,18,24
52:25 53:7 55:5,8
55:18 56:2,5,18
57:6,7,10,17 58:3
58:6,23,24 59:4,9
59:10 60:2,3 74:4
79:16 82:3,9,10
105:25 111:9,14
**Eastern** 1:21
**easy** 67:2
**econometric** 100:16
**economic** 28:7
56:20
**economics** 66:3
**economist** 40:12
55:24
**education** 81:12
84:13 85:9 105:5
106:2 108:7,7,8
110:13,17 111:6
112:23
**education'** 108:9
**EduPlan** 109:10
**effort** 17:11 63:19
64:4 66:7,9,12,13
67:2,21,24 70:7,15
70:16 73:13,16
86:21 91:17 95:2
103:6
**efforts** 28:22 29:6
29:13,18 30:3

**either** 18:11,25 19:4
19:17 20:21 33:23
50:8 56:12 79:17
80:15
**element** 63:14,14
**embedded** 63:20
64:4 86:21
**emphasize** 42:1
70:17 71:10 74:4
**empirical** 28:17
**employed** 18:25
**employment** 109:1
110:3
**enable** 52:7,12,17
57:4,9,16 58:5
59:3
**endeavor** 80:9
**ended** 101:13
**endorsements** 18:21
19:14 20:9,12
**energy** 43:6
**enforcement** 96:5
104:17
**engaged** 108:23
**engagement** 6:16
24:14 102:7
**enlighten** 92:9
**entails** 87:3,23
**entered** 101:6
**entice** 112:8
**entire** 8:6 20:24
21:2,4 22:17,18
40:25 41:9 59:14
63:14 76:14
110:19 111:24
112:19
**entirety** 76:18
**entitled** 106:20
**entity** 25:12,16,17
**entry** 87:16
**enumerate** 60:22
**envisioning** 79:23
**equipment** 97:1
**errata** 117:5
**error** 70:7 73:16
117:7
**errors** 117:4

errs 70:6
especially 55:23
  110:16
ESQUIRE 2:4,14
  3:4
essential 43:1 62:18
  62:21,23 72:17
  78:10 80:24
essentially 43:3
  101:13
Essentials 98:20,22
  98:24,25
estate 6:18 17:3 32:4
  33:24 34:5,17 35:4
  51:11,18 52:3 57:5
  57:10,17,21 58:2
  59:3,8 60:23 61:3
  61:14,15,16,17
  64:21 65:5 66:17
  80:6,11,16,20 81:7
  87:22 88:19 89:17
  93:24
et 115:3 117:3
Euro-Pro 96:18
  97:22
evaluate 6:16,21
  37:11 44:22 45:7
  45:18 46:7,23
  47:16,24 49:5 85:5
  86:18
evaluated 7:9 37:17
  44:23 45:8,12
  46:10,15 63:12
evaluating 39:14
  40:8
event 4:11,12,13 8:1
  11:17,20 13:17
  15:7,12,14 18:11
  19:4,17 20:22 21:3
  21:9,10,10,13,13
  21:23,24 22:1,11
  22:14,18 27:1,4,7
  27:10,18 35:17,24
  35:25 36:1,2,3,7
  36:14 44:21 45:6
  47:15 48:18,24
  53:12 54:20 59:14

63:20 69:15,15,17
  70:2,21,23 71:4,7
  72:1,3,6 73:1,6,7
  74:11 75:9,10 76:7
  76:11,14,20 77:2,5
  77:20 79:8,12 81:6
  84:1 86:25 87:12
  91:6
events 6:17 11:14,23
  12:2,10,22 13:9,16
  13:19,21 14:3,5,11
  14:18,21 15:1,7,18
  16:7,10,13,19,22
  17:4,16 18:25
  19:25 20:10,25
  21:16,22 26:7,10
  26:12,13,22 27:7,9
  27:18,25 28:1,19
  29:15,22,24,25
  30:3,13 31:8,11
  32:1,16 33:9,11
  34:4,16,20,24 35:3
  36:9 39:22 40:4
  41:5,18,23 44:11
  44:19 45:3,14 46:3
  46:12,17,20 47:23
  48:12,22 49:2,9
  59:13,15 60:13,14
  62:9,12 63:12 64:5
  64:10 66:10 82:18
  86:22
eventually 100:8,9
everybody 43:12
  55:12 67:11
evidence 103:9
evidentiary 40:19
exact 86:9,10
exactly 7:6 18:1
  23:24 45:24 82:5
exaggerated 39:23
  40:5 42:17
examination 4:3
  5:11,13 113:16
examine 6:20
examined 5:12 6:23
  6:25 63:14 116:3
example 64:15

65:10 67:7,21
  70:14 81:6 93:17
examples 56:12
  64:23 65:11 66:19
  67:14,16,19,20,22
  67:23,24 68:1,2,7
  68:11,14,16 72:21
  81:17
Excellence 98:23
  105:4
excerpts 7:1,12,13
  7:18 23:3,10
excuse 47:8 62:17
  77:10 90:19
  108:14
exhaustive 18:7,8
exhibit 5:3 6:8 10:23
  11:3,13 12:17,23
  12:24 13:9 14:6
  16:7,12 21:20
  22:18 26:8,15 27:6
  35:16,22 36:14
  59:12 79:3,7,8,11
  83:25 85:21 87:11
  93:3 96:8 106:16
  106:19
exhibits 4:8 9:6,10
  9:11,17 79:6,14
existing 52:13
expect 109:1
expectation 74:9
expectations 74:21
experience 40:7
  82:22,23,24
expert 7:3 8:20,21
  9:19,22,25 32:21
  33:2,4 50:2,5 96:5
  96:7,8,21 98:2,4
  98:12 109:19
  110:24
explain 68:12,16
  73:10 81:11 82:1,4
  82:7 92:10
explanation 36:1
  73:21
exposure 100:18
  103:8,14,22

express 64:2 68:25
  68:25 69:6,7,7,11
  69:21,21 70:10,12
  70:18 71:18,21,23
  72:1,5,8,11,16
  73:3 79:17
expressly 33:17 50:8
  50:9,12 83:1
extensive 40:7

F

F 115:1,1
face 70:5
fact 38:20 53:14
  55:1 77:3 106:20
factor 53:19 55:2,7
  111:23 112:16
factors 111:18,19,21
  113:4
facts 117:8
factual 32:20
fail 73:14 74:3
failed 110:19 111:16
  111:18,19,21,23
  111:25 112:12
fair 15:18,19 17:7
  40:25 43:4 50:3
  67:19 68:1,8,15
  104:23 108:11
fairly 24:6
Falls 11:20 15:11
false 37:16,22 38:8
  38:10 42:5,12
  43:14,16 78:2,7
  85:3,19 86:17
  108:24
falsely 38:21 39:12
falsity 37:18 38:13
  39:2
familiar 18:13,14
  40:18,18
far 53:8
farm 64:16 65:6,8
fast 67:5
faster 57:10,17 58:7
  58:8,16,20 59:4,8
favorable 103:20

featuring 71:8
federal 1:4 2:3,5
  5:18 96:4 109:9
  115:9
feel 116:7
figure 61:5 69:24
filed 10:4
finance 65:17 66:3
financial 51:23
financially 109:7
financing 60:17
find 60:14,15,16,17
  60:18 67:19,20
  68:1,2,7
finding 109:13
Findings 106:20
finds 108:23
fine 13:22 15:4
finite 58:19
Finnegan 1:13 3:14
  5:25
firm 97:4 99:16
first 5:11 10:7 21:9
  24:4,19 41:5 68:18
  68:24 84:5 110:23
fits 79:22
five 12:1 13:6,8
  14:15 26:10,12
  72:24 88:9
flip 87:20 93:19
  94:16
flipped 62:2,4
flipping 17:22 60:16
  61:4 91:9
Floor 2:17
focus 9:16 19:23
  44:25 47:9 67:22
  84:6 102:19
focused 12:2 17:6
  19:19,20,21 112:1
Focusing 16:6
follow 89:19,22,23
following 51:5 84:18
follows 5:12
footnote 71:12 72:2
  73:9
for-profit 104:22,24

foregoing 116:4
forgotten 97:5
form 11:7 22:5
 46:24 47:18 48:2
 109:9
forming 11:10,24
 35:19 47:19 48:4
 85:18 86:16 95:19
 95:20
forth 39:4
forward 81:7 83:4
found 91:12 93:9
Foundation 10:15
 38:24 107:5
four 62:18,25 63:6
 88:5,7,10 94:5,16
fraction 13:14
frame 74:24
free 41:6
freedom 95:4
frequent 16:24
front 10:24
FTC 32:9 33:3,5
 40:10 50:3,5,7
 98:22 99:16,19
 100:7,8 101:13,19
 110:4 115:3 117:3
FTC's 8:21 23:3
 40:19 41:15
full 84:5 115:7
fulsome 73:24
fund 85:15 86:12
funding 59:24 85:11
 85:14
funds 85:12
further 108:5 111:7
 113:14
future 52:3 79:18

G

G 5:1
gas 43:11
gator 64:16 65:6,8
gee 69:20
GEICO 42:17
general 41:9 49:11
 50:16 51:2 55:17

60:12 66:14
 104:17 117:6
General's 3:12 6:2
 105:6,10 106:7
generality 64:20
 65:3
generally 18:5 44:6
 106:2
Georgia 4:12 11:17
 21:13 71:7 79:7
 86:25 87:12
get-rich 92:14
getting 68:19,21
 75:7 91:19
gist 105:23
give 5:19 15:3 46:7
 86:10 90:6 95:14
 100:23
given 16:12 22:20
 22:23 38:20 39:11
 53:7 116:5
giving 10:17
go 16:20 26:14
 35:22 36:13 59:11
 59:12 64:22,25
 65:3 68:18 78:9,16
 80:21 85:22 87:10
 87:12 88:5,11 93:3
 93:5 96:1 108:14
 109:5,15 110:14
 111:7
goals 36:18 52:8
goes 58:23 61:24
 65:6 81:11 84:22
 85:6 92:13 111:7
going 21:17,18,20
 56:14,15 58:19,20
 60:20 61:5 66:13
 66:15,16 70:16
 74:5,7,25 80:13,19
 81:23,24 82:11,13
 82:14,16,22 83:17
 85:24 86:6,19
 91:18 92:16 94:6
 95:1,21
good 5:15 70:9
 79:20 108:7

Gordon 24:5
gotten 67:9
graduates 79:24
graduates' 107:24
Gray 95:4
Graziosi 3:3 6:5
great 16:16
Green 2:6
Greg 6:4
GREGORY 3:4
grew 104:6,10,12
group 1:10 98:13
groups 98:5
guarantee 50:21
 67:4
Guardian 3:5
guess 62:13 80:13
 97:13
guide 4:11 21:23
 22:11,18 27:7,10
 27:18 35:17,24
 36:3,7,14 72:1,6
guides 40:20

H

half 100:6
handful 86:8
handle 85:24 86:6
happen 70:16 95:22
happened 106:11
happening 70:23
happy 53:6 78:16
hard 70:18 71:10,19
Hawaii 98:24
head 20:23 46:14
 66:20 92:25
header 6:15 80:22
hear 68:22 74:10
 75:25 76:13,15,25
 77:16 78:4
heard 64:7 71:13,16
 77:7 78:5
hearing 22:24 115:8
held 55:21
help 36:18 39:18,21
 40:3 52:23,25
 69:18 80:9 86:12

90:2,22 95:14
helping 102:8
hereto 116:12
hey 85:23 86:5
Hi 113:18
high 110:2,14 112:8
higher 18:18 105:5
highlighted 81:16
 83:21
highlighting 81:22
 108:15
highlightings 16:8
hired 102:3
hold 66:4
holding 31:18
home 61:18 62:15
hope 61:23
host 61:8
hour 13:1,2 25:11
 26:3 87:14
hours 13:4,6 21:11
 21:15 24:15,18
 25:5
house 62:2
Howard 1:23 5:10
 99:20 109:19
 110:24 116:21
 117:1
humor 18:22 42:25
hundreds 40:9
Hunton 97:4
hypothetical 93:20

I

Idaho 4:13 11:20
 15:11 21:9 72:3,7
 76:7 77:5,20 79:11
 81:5 84:1
idea 21:6,18 37:19
 37:22,25 38:12
identical 16:17
identification 5:4
 79:4 106:17
identified 77:12
identify 7:8 18:2
 22:1 30:8 44:19
 46:10 64:19 65:2

66:21 67:8,15 69:5
 69:10,18
identity 53:25 54:1
idiots 57:1
illustrate 68:3 112:7
 112:13
illustrative 68:1
implication 89:21
implied 79:18
impliedly 33:17
 50:8,10,13 83:1
implies 58:10 59:20
 60:5
importance 70:17
 71:10,18
important 40:24
 63:5 69:16 83:9,11
 110:16
importing 97:14
improvements 61:6
inaccurate 78:2,7
include 73:8 94:22
included 6:12 9:14
 11:7 45:2,15,21
 46:4,11 49:7 71:2
includes 36:1 71:8
 72:12
including 24:22
 76:4 113:4
income 31:4 33:13
 33:18 39:5,22 40:4
 79:18
inconceivable
 101:25
incredibly 43:13
independence 51:24
indicate 59:13
indicated 50:1 53:12
 54:8,20 116:13
individual 5:24,25
 25:16
induce 109:6
industry 88:25 89:7
infinite 32:14 58:18
inflation 65:20
influence 102:20
infomercial 7:19

infomercials 7:2,12
7:13,15
information 74:10
informing 47:11
initial 21:17
initially 24:3
injured 98:6,14
inquire 30:4
inquiry 30:16
insert 59:7
inserting 42:6,13
inside 88:25 89:8
insulate 42:5,11
integrated 70:15
71:20 72:2,14,16
73:4,10,22 74:2,5
80:23 81:17
intended 28:23 29:7
29:14 43:24 89:16
intends 43:20
intent 29:3,16 43:21
83:20,23 109:6
111:8,14,16,20
112:16,25 113:4
113:10
intentional 44:5
intentionally 43:20
interactions 41:17
interest 38:14 65:21
66:6
interested 56:9,24
interests 103:21
internal 112:6,12
113:7,11
interpret 56:10
interpretation 40:14
41:8 53:23 55:21
55:23 56:16
interpreted 28:18
68:11
interviews 100:23
introduce 5:16
introduction 74:16
75:5,8
introductory 76:1,2
76:19 77:1,16
investigational

22:23
investigations 40:10
100:7
investigator 14:13
15:7 77:9,10,13,14
investigator's 76:8
78:2
investing 17:3,21
64:21 65:4 81:7
investment 61:19,20
61:21 62:16 65:23
65:24,25 66:17
80:6,11,16,20
86:20 87:3,23 88:9
91:11 93:8 108:8
investments 52:3
64:20 65:4,13,15
110:17
investor 61:15
investors 80:6,17
involved 14:19
99:19 101:19,20
102:8 103:2,5,7
104:22,25 105:18
involving 97:18
109:8
irrelevant 29:17
30:9,18 111:18,21
112:15 113:4
Isaacson 7:3 8:14,21
8:23,25 28:14
isolated 42:1 51:16
isolation 51:14,25
52:5,10,15 53:8,17
57:7,12 58:6
issue 29:2 57:19
84:8,9 85:11 99:19
issued 106:6,13
issues 100:3

J
Joe 99:9,25 100:4,11
100:21,24 101:3,8
101:18,21 102:5,6
102:10,15,25
103:17
Joe's 43:9

Joe-something 43:8
Johnson 15:15
join 88:24
joined 5:23 88:18
Joni 3:12 6:1 113:18
Journal 102:4,14,22
journals 103:12
judge 105:16,19,20
judgment 106:6,13
106:21
jury 105:18

K
kids 95:14 100:14
102:18 103:23
kind 30:24 51:1
103:8
kinds 33:4 60:12,13
82:12
knew 22:13
know 7:15 8:8 9:15
10:23 12:25 13:3
14:15 16:10 18:15
26:17 30:1 32:2,21
34:18,23 35:1,5,16
36:15 37:5,5,24
38:4,7,9 39:10,13
39:15 44:25 45:1
45:12,13,19,20,23
48:16 49:1,7,12,14
49:16,20,22 56:8,9
56:23,25 61:11
62:6 69:10 74:2
75:14 77:14,18,24
77:25 78:15 80:24
83:9,11 85:10 86:1
87:6 88:25 89:8,16
95:11 97:6 99:15
99:22 101:17
106:8,11,14,15
107:11,17,19
108:19 109:15
110:16
knowingly 108:24
knowledge 24:9
39:17,20,25 40:2
59:18 80:9 82:16

83:5,18 84:8 89:7
89:15,24 90:2,7
103:19 115:10
knowledge' 81:9

L
L 1:13
lack 81:8 83:5,8
language 43:23
large 77:23
largely 49:3
Larson's 78:7
late 14:10 17:3 99:9
law 3:5 32:9 33:3,5
50:3,5,7 96:5 97:4
99:16 104:16
106:21
lawsuit 100:8
101:20
lawyer 24:3 31:16
31:19
lawyers 24:7 75:6
lead 103:23
leads 63:1
learned 59:22 60:7
leaving 31:23 42:24
45:12 46:9,15
111:12
legal 32:11,18,20
41:2 50:4,11,14
Lehi 3:7
Len 24:5
let's 21:9 54:13 59:1
87:10,10 88:16
letters 36:17
level 18:18 49:11
64:9,13 66:9,11,13
LEWIS 1:11
liability 29:2
lie 42:25 43:20
lien 64:17
liens 17:21
lies 43:10
likelihood 33:23
40:8,24
limitations 70:2
72:12

limited 44:25
limiting 31:9
line 84:6,11 85:6,22
86:3,4 87:16 93:5
93:6 117:9
lines 87:21 88:5,7,9
88:10
list 11:6,9,14 14:15
14:20,24,25 15:2
18:7,8 27:14 46:7
61:12 62:18 96:2
96:22 98:18
103:24
listed 12:17,23,24
13:9 14:6 16:6,11
20:1 27:5 47:12
96:13 104:1
listen 13:13 32:14
34:14 75:20
listened 46:3,17
47:7 48:22 80:15
listening 92:15
literally 40:9 84:19
literature 40:17
65:18 66:3
litigation 102:2
little 26:2,9 52:20
78:17 79:14 86:11
87:16 101:14
live 52:17 53:13
54:5,9,16,16,21
55:20 56:1,4,18
56:22 98:20,21,24
98:24
LLC 1:9,10,11 3:5
115:3 117:3
LLP 2:15
loan 61:2
loans 109:10
long 12:21 78:15
84:25 100:3
longer 52:17 54:9
57:24 78:17
look 6:7 10:22 15:19
15:25 16:2,3 17:5
25:15 28:5,6,23

29:6,13,16,18,21
29:24 30:2 37:9
40:24 41:9,17
43:22 44:15 55:6
65:12 66:18 76:11
81:3 83:7,19,22
87:9 92:25
**looked** 14:22 16:22
17:24 22:4,14 26:3
26:9 29:2 37:8
39:16 41:13,14
44:16 45:4 49:24
62:9 82:5 111:3
**looking** 16:15 20:4
28:1 30:24 34:9
39:15 46:24 47:9
47:17 48:2 54:9
60:3 66:23 67:20
**lot** 32:21 40:12
42:16 60:21 62:7
69:23 85:10 91:21
91:22 92:2,4,6
99:15 101:23
**lower** 107:25
**Lubetzky** 2:4 4:4
5:14,17 6:6 10:16
14:23 15:2,4,5
19:8,16,22 20:7
22:16 25:2 29:4
30:15 32:17 34:1
35:10 37:21 38:6
38:19 39:9 41:11
44:9 47:1 50:19
55:9 58:13 63:24
68:23 71:17 79:5
87:19 91:25 98:11
100:2 104:15
106:18 107:6,12
108:18 112:24
113:5,13 114:3,5
**lunch** 78:14,20

**M**

**magic** 42:22
**magnitude** 48:15
**mail** 7:10,21
**main** 76:20,22

**making** 36:11 42:5
42:11 47:3 57:20
60:1 75:12 83:20
108:24
**man** 70:4
**manufacturer** 97:5
97:12
**manufacturers**
97:25
**manufacturing** 97:1
**marked** 6:8 10:23
26:15 35:15 79:4,6
106:16,19
**market** 62:12,14
**marketing** 1:10
29:21,24 30:2 40:8
40:17 41:21 42:7
42:13 43:2 79:20
98:6,14 99:10
100:4 105:11
109:20 110:19
111:1,3,24 112:1,3
112:14,16,19
**marred** 70:5
**matched** 100:15
**material** 17:19
43:19,25 44:5
**materiality** 43:22
44:2 50:18
**materials** 6:22,24
7:7 9:18,21,24
11:6 12:11 27:1,2
27:4,5,11,12 38:20
39:11 40:8 41:22
42:7,13 43:2
**matter** 1:20 5:23
24:8,12 43:18
52:23 54:7 56:13
59:23,25 60:1
99:25 103:16
**matters** 53:3,4,16
53:22,24 54:1 63:9
92:13 99:17,22
**maturity** 66:4
**mean** 16:2 18:12,15
18:16,22 32:2
42:15 50:4 53:5,16

54:17 55:12 60:12
60:21 61:8 62:11
62:11,13 65:15
66:11 68:9 69:10
70:19 75:1,5,9
91:20
**means** 52:21 53:9
92:7,18,19
**media** 100:23
**Medical** 102:4,9,14
102:23
**meet** 97:2,12,15
113:21
**Megaris** 2:14 5:22
5:22 10:15 12:9
14:23,25 15:3 19:5
19:15,18 20:2
22:12 24:25 26:2
28:25 30:11 32:11
33:20 35:6 37:20
38:2,15,24 41:2
46:21 50:14 55:3
58:11 63:22 68:22
71:13 87:18 91:24
98:9 99:20 107:5
107:10 108:17
112:20 113:2,8
114:4
**member** 30:14
**mention** 49:23 83:6
107:23
**mentioned** 7:8,12,24
8:11 9:1 13:10
15:6 18:3 19:14
20:19 60:25 62:17
71:25 83:4 99:5
**message** 42:9,18
43:15,19,24 53:20
63:7 68:3 69:17
83:16 89:16 90:4,6
90:8,18,25 108:6
**messages** 29:14
42:19 45:7,23 46:1
**met** 5:16
**Mickey** 103:1,17
**middle** 36:21 87:17
103:25

**mileage** 43:11
**mind** 17:9,14 18:6
40:22 54:21,24
**mischaracterize**
110:7
**mischaracterizes**
33:20 111:11
**misleading** 37:6
107:23 108:25
109:25
**misread** 63:22
**misrepresentations**
10:13,18
**misrepresented**
47:13,21 48:6
**mistakes** 80:8,12
86:25 88:6,12,21
89:4,12,14,18,20
89:23 90:1,3,4,7,9
90:12,19,22,23
91:1,1
**money** 32:3,4 33:23
41:6 57:5,23,25
58:4 66:5 67:4
83:8 84:9,25 85:11
86:7,11 91:21,22
95:9,13
**monthly** 31:6 39:8
**morning** 5:15
**mortgage** 61:1
**mosaic** 63:14
**most-used** 14:8,16
14:19
**motion** 9:3,7,13
23:4,9,11
**motivational** 17:8
70:24 71:3,8 72:25
74:16,19 75:4,5,8
75:12,25 76:10,19
76:25
**motivations** 54:21
**Mouse** 103:1,17
**moving** 31:15 81:7
83:4
**multistate** 101:16

**N**

**N** 4:1 5:1 115:1
**name** 5:16 15:16
25:15,16 43:8,9
97:5 113:18
**names** 5:20 16:5
**narrow** 39:15
**national** 107:23,25
111:4,5 112:22,22
**nature** 70:2
**nearly** 32:14 102:24
**necessarily** 38:17
43:3 55:8 57:19
58:10 62:24
**necessary** 59:21
60:6,10,18 116:8
**need** 63:19 64:4
66:7 67:2 70:15
86:21 91:17
**never** 29:2 31:22
55:21 62:13 67:2
88:19 91:12 93:9
98:8 106:13,22,23
112:17
**New** 2:8,8,18,18
**Nice** 113:21
**noise** 68:20 77:24
**nonprofit** 105:4
**Nope** 31:20
**norm** 39:23 40:6
**North** 3:6
**not-for-profit** 105:1
**note** 91:5 117:4
**notes** 15:20,21,24
16:2,8 112:4 115:7
**notice** 1:21 16:25
17:18
**noticed** 17:16
**notion** 65:19
**November** 105:21
105:22
**novice** 80:6,17
**NPR** 101:2
**NUDGE** 1:9 115:3
117:3
**number** 14:20 15:3
35:8,12 66:14 81:8
83:5,16,17 87:22

99:17 106:16
115:2
**numbers** 5:3 79:3
108:1
**numerous** 21:6

**O**

**O** 5:1 115:1,1,1
**objection** 10:15 19:5
19:15,18 20:2
22:12 24:25 28:25
30:11 32:11 33:20
35:6 37:20 38:2,15
38:24 41:2 46:21
50:14 55:3 58:11
63:22 91:24 98:9
107:5,10 112:20
113:2,8
**objective** 68:10
**obligations** 99:23
**obtain** 50:25 109:2
**obviously** 16:16,17
29:22 30:6 32:14
58:16 90:11
**occasions** 21:6
**occurred** 41:18
**OEM** 97:2,12,15
**offer** 81:12,13 84:12
84:13
**offered** 46:12,19
47:22 48:12,16
98:2,10 107:21
**offering** 6:11 45:22
50:4 79:20 90:2
113:22
**Office** 3:12 6:2
105:6,10 106:7
**okay** 6:20 11:23
13:20 31:21 36:25
47:11 48:20 51:10
54:22 68:18 76:24
77:6 78:6 79:10,14
79:15 80:21 81:4
84:4 86:2,3 87:10
88:11 93:4,17 96:3
96:19,24 107:16
107:20 108:14,21

109:17 110:9
**once** 21:5
**ones** 7:6 11:25 12:2
12:3,4,24 16:21
17:24 69:4 72:20
72:21
**Operating** 97:22
**opined** 44:2
**opining** 39:1 55:4
78:3
**opinion** 10:17 17:19
22:11 28:16 31:7
31:14,14 33:12
34:7 50:4,15 68:7
78:3 95:21 105:23
107:3,22 108:3
113:22
**opinions** 6:11 11:7
11:10,24 16:11
35:19 47:11,20
48:5 85:18 95:19
107:9
**opportunity** 5:19
113:23
**opposed** 72:11,14
73:6 81:18 91:18
**order** 48:14 52:23
54:6 61:7 90:12,14
92:18
**ordinary** 92:5,10,14
92:18
**Oregon** 98:20
**original** 96:25 116:9
**originally** 104:24
**Ostler** 3:12 4:5 6:1,1
113:14,15,17,18
114:2
**outrageous** 43:10
**outside** 88:25
**overlay** 43:12
**overwhelmed** 77:23

**P**

**P** 5:1 115:1
**p.m** 78:20 79:2
114:7
**package** 22:4,6
44:21 45:3 46:4

47:14 48:11,21
**packages** 45:15,18
45:22,24 46:11,19
49:8,17
**page** 2:25 4:3,8 6:15
13:23,25 26:16
36:2,13,21,25
59:12 71:11 84:1,2
84:3 85:21 86:1,4
86:8,13,14 87:12
93:3,5,7 103:24,25
107:18 108:14,19
109:15 117:9
**pages** 36:13
**paid** 25:3 51:6,18
100:10
**pandemic** 23:24
**paper** 116:8
**papers** 7:5 9:1,2
103:10
**paragraph** 6:14
10:6 26:16,19
35:23 59:12 60:8
62:17 64:1 67:1
70:19,21,25 71:1
71:22,25 72:6,7,8
72:24 73:6,9 74:7
74:15 75:13 76:2,3
76:18 78:11 80:22
81:1,4,5 82:1 83:3
83:21,25 84:5,16
86:19 87:17,18
88:1,13 91:7,8
92:24 93:10 94:20
107:18 108:5,19
109:15 111:7
**paragraphs** 69:2
**part** 12:1 17:12 22:4
22:6 45:15 47:11
47:14 55:13 58:24
72:18 73:5 101:7
101:18 102:6
110:15 111:10
112:1
**particular** 22:10
23:1,2 60:16 69:12
69:25 100:19

112:1
**particularly** 28:16
110:12
**parties** 28:13
**partner** 85:11,14
**parts** 97:14,15
**pay** 51:19 52:2,12
54:4 56:15,19 57:5
75:25 90:5,9,14,16
90:20 91:2,5
**paycheck** 52:18,18
52:22,22 53:13,13
54:5,6,9,9,16,16
54:22,22,25,25
55:10,10,13,13,20
55:20 56:1,2,4,4
56:19,19,22,22
63:8,8 92:2,3,7,8
**paying** 25:12 55:15
55:19 56:1,4,21
90:23
**pays** 108:8
**PDF** 84:2
**peace** 54:24
**penalty** 116:11
**people** 29:23 36:18
37:14,24 38:4,10
38:12 57:23 75:2
75:10 78:4 88:17
**percent** 37:10,14,14
**percentage** 38:21
39:12
**perfectly** 106:1
**performed** 10:3
**period** 91:21 99:18
**perjury** 116:11
**person** 92:5 94:4
**persuaded** 109:18
110:24
**PHILLIP** 1:12
**phrase** 54:18 64:8
84:15 87:25 88:3
88:12 89:4,5,11
91:15 92:22 94:19
**phrases** 42:1 86:24
87:7
**pick** 23:12

**piece** 54:21
**pieces** 7:10
**pitch** 19:11 29:15,19
29:22 30:5,6,17
42:2 81:19
**place** 16:2 78:18
85:25
**places** 22:15 50:6
88:3
**plaintiff** 5:18 6:2
96:16,18,22 97:8
97:21
**Plaintiffs** 1:7 10:8
12:5 23:6
**Plaintiffs'** 9:3,7,12
**playing** 70:24 71:6
**Please** 117:4
**plucked** 92:23 93:10
**Poelman** 1:12 3:13
5:24
**point** 20:5,9,14,20
23:9,14 41:9 62:24
63:10,17 64:1,15
64:23 66:8 68:18
68:24 78:9,10 80:7
80:23,24 90:22
94:25 95:2
**pointed** 22:14 72:21
**pointing** 70:13
89:14
**points** 62:19,21,23
62:25
**policy** 43:23 110:4
**population** 53:1,20
53:22 110:1,10,11
110:12
**portion** 43:10 77:23
109:20 110:25
111:2 112:3
**portrayal** 108:3
**posit** 63:1
**position** 82:17
103:15
**possible** 16:4
**potential** 33:13,18
39:22 40:5 55:18
56:3,6,18 108:25

practice 108:24
practices 98:7,15
  105:11
preceding 88:17
premarked 5:4
prep 24:22
prepare 25:18,21,24
  26:1
prepared 21:19
preparing 67:18
prerecorded 75:16
  75:18
presence 39:2
present 3:11 5:6
  79:18
presentation 71:3,8
  72:25 73:1 74:9,13
  74:19,20 75:12
  76:19 77:1 81:18
  106:2
presentations 16:12
  28:19,24 29:8,9
  30:18 74:23 75:1
presented 72:18
presenter 67:1 81:6
  91:9
presenters 16:24
presumed 44:5
presumption 44:1
  50:17
presumptively
  43:25
pretty 13:7 64:24
  65:10
preview 6:17 11:14
  11:23 12:1,10 13:8
  13:17 14:3,5 15:1
  16:7,10,13,18,22
  21:22 26:7,12,13
  26:22 27:1,4,7,18
  27:25 28:19,24
  29:7,15,21,23,25
  30:2,13,17 31:8,11
  32:1,16 33:9 34:3
  34:16,19,24 35:3
  35:25 36:6 39:21
  40:4 41:5,18,23

44:11,19,21 45:3,6
  45:14 46:3,12,17
  46:20 47:15,23
  48:12,22 59:13
  60:14 62:9,12
  63:12,20 64:5,10
  66:10 71:7 75:24
  76:25 77:16 79:8
  79:12 80:15 81:6
  82:17,18 86:22
previews 47:7 65:11
  80:4
previous 33:21
price 49:22,24 61:7
  61:23
primarily 63:10
primary 54:20
principal 99:16
printed 35:24
Prior 96:9
private 96:23
  101:20 102:1
probably 13:2 18:17
  21:4,11 79:13
  99:18,19 100:5
problem 54:14
  56:13
problems 54:13,23
  94:8,10,15 103:18
proceedings 114:7
produced 15:2
  27:17
product 75:11
products 49:17
  59:25 113:24
profit 51:12 79:18
profitable 38:18
  57:16,21 58:5,24
  59:7,8
program 33:14 36:7
  47:22 48:7,10 52:1
  52:7,11,16 57:3,15
  80:5 89:18 106:5
  109:3
programs 33:19
  57:8 59:2
promise 88:5,21

properties 61:19,20
  61:25
property 60:15,17
  61:7,21 62:4
proposition 23:17
Protection 1:6 6:3
  15:8 77:11 105:8
  113:20
proven 67:12
provide 81:23,24
  83:18 92:17,19,22
  94:18 96:5,7 99:13
  108:9
provided 14:20,25
  22:3 98:4,12,19
provides 94:21
providing 25:6
  63:18 64:3 67:11
  67:12
public 100:1 101:24
published 102:3,23
puffery 42:16,24
pull 102:10
purchase 31:4 48:17
purchased 34:6 35:3
  39:6 44:21 45:16
  46:19 47:15 48:21
purchasing 33:13
  33:19 45:10,25
  47:22
purported 46:18
purportedly 41:14
purpose 83:19 85:7
  112:7,13
purposes 13:20
pursuant 1:21
put 5:20 17:9 41:6
  43:2 67:3 69:13
  88:16 92:23 93:10
puts 94:11

Q

qualify 33:8
quantitative 64:12
  66:12
quantity 35:13,14
question 9:23 18:18

25:20 29:5 32:24
  33:1 34:14 39:16
  40:1 42:8,19 43:15
  48:19 54:15,18
  55:14 63:6 73:21
  75:22 80:13 94:11
  107:7,13 108:13
  113:12
questionnaire 22:5
questions 32:23
  78:15 113:14,15
quick 91:11,12,19
  91:20 92:6,14,19
  93:8,9,19 94:16
quite 9:23 25:20
  37:5 52:21 55:24
  56:8 76:15 79:22
  110:11
quotation 70:3
quote 10:6 36:1 70:9
  72:4 73:8,22 74:1
  74:20 80:7 84:16
  84:18 86:24 87:25
  88:13 93:10,13
  94:2,23
quoted 69:3 71:22
  74:14 75:6 83:24
  94:19
quoting 91:16

R

R 1:14 5:1 115:1,1,1
  115:1
R.J 99:6,8,11,14
  100:11 101:6
  102:8,10 103:21
  104:5,7,11
raised 25:9
rate 25:6,10 66:6
rates 65:21
reach 29:25 36:18
reached 24:3
reaching 62:19
  63:11 109:24
read 8:6,9,15 16:7
  21:2,4,17 28:6,14
  31:10 36:7 44:18

63:21 64:5 69:20
  74:11 77:1 81:13
  83:14,14 85:4,16
  85:19 86:13,17,22
  116:3
reading 60:8 88:4
  91:8 95:11,23
  109:3,22 112:9
  114:6
real 6:18 17:3 32:4
  33:24 34:5,17 35:4
  43:15 51:11,18
  52:3 57:5,9,16,21
  58:2 59:3,8 60:22
  61:3,13,15,16,17
  64:21 65:4 66:17
  80:5,10,16,20 81:7
  87:22 88:19 89:17
  93:24
really 17:6 53:6
  65:19 85:15 111:4
reason 16:14 23:20
  53:22 75:2 81:8
  83:5,16,17 84:22
  85:8 94:22 108:13
  117:5,9
reasonable 30:14,14
  55:22 80:2 92:15
reasonably 16:21
reasoning 68:12,17
rebuttal 7:4 8:11,12
  8:13,14,16,22,23
  8:24
rebutted 44:1
recall 7:10,13,22 8:5
  8:10,18 17:23
  19:24 20:6 34:19
  34:21 35:7,12 46:2
  46:16 47:2 48:13
  67:20 87:8 100:22
  101:1,4,6 102:22
  107:15
receive 42:9 44:20
  47:14,17 48:1
received 12:3 14:23
recess 44:8 78:20
  104:14

Beales

FTC v. Nudge, LLC, et al.

8/17/2021

[128]

recipient 54:1
recipients 53:25
recognize 18:10
  19:13 103:16
  106:24
recognized 19:4
recognizing 19:24
recollection 15:25
  97:14 105:13
record 5:21 77:7
  100:1 116:5 117:8
recording 75:20
  76:5,8
recordings 13:11,12
  13:16 14:2 16:18
reduce 80:5,16,19
  89:19,22,23 90:1,4
  90:9,12,19,19,22
  90:23 91:1
reduces 80:11
reducing 80:10
  89:25
refer 13:21 26:15
  35:15 66:8 69:6
  74:14 79:13
reference 27:4
  70:11 74:24 76:2
referenced 10:19
  44:4 66:10 72:6,7
  79:8,12
referred 21:5 83:3
  105:2
referring 15:24 26:6
  27:13 37:3 69:4
  76:3 77:9
refers 93:13
refresh 15:25
regard 24:8 64:17
  67:9 100:11,20
regarding 10:17
  101:21
Regardless 19:23
regular 36:18
rehab 61:5
rehabilitation 17:25
reinforces 89:6
REITs 61:18,20

62:3
relate 104:4
related 7:13 100:4
  104:10
relates 104:10
relationship 100:17
  103:8
relative 35:13
relatively 14:9
relevant 28:16
  29:10,12 30:20,20
  38:22 40:14 41:8
  53:10,14 54:10
  55:2,7 63:7 83:13
  89:11,13 94:25
  95:17 111:15
relied 4:10 10:25
  11:7,10,25 14:6
  17:17 21:21 22:7
  27:14,15,16 35:19
rely 33:11 63:10
relying 64:1 69:1
  72:9
remember 7:6 8:19
  8:25 9:9,9 12:12
  12:14 15:16,17
  16:5 24:4 43:9
  49:25 76:9 82:5
  96:17 97:11 101:5
  101:12,15 102:18
  103:2,3,11 113:10
remotely 5:7
rent 17:25 61:22
rental 61:25
reorganized 104:25
repeat 29:5 40:2
rephrase 48:20
replacement 97:1
report 4:9 6:8,12,15
  7:4 8:13,14,15,16
  8:20,22,23,24 9:19
  9:22,25 10:4,6,20
  11:4,7,11 16:4
  21:19,20 22:15
  23:14 24:15,20,24
  25:19,22 26:3,8,14
  26:16 28:15 30:23

32:1 35:19,23
  36:15 45:1 47:12
  47:20 48:5 59:11
  64:23 65:2 66:10
  66:22,23 67:8,17
  67:18,25 68:6,9
  69:2,6,13 70:11
  71:24 74:7 77:17
  79:9,12 80:8,21
  82:6 83:25 84:16
  86:19 88:14 89:10
  91:7,8 96:8,21
Reported 1:25
reporter 5:7
reporters 101:2
reports 7:4 8:11,12
  12:16
represent 35:23
  80:4
representation
  33:22 34:11 51:5
  52:6 53:2,11 54:4
  54:7 59:1 79:17
  80:19
representations
  10:9,12 32:10 33:2
  33:12,17 34:15
  44:20 47:3 108:25
  109:6
representative
  16:22
represented 34:3
  44:13,16 45:2 47:7
  80:14 97:21 99:2
representing 5:22
  6:2,5
request 102:9
require 117:5
required 17:11
  110:4
research 40:13
respond 102:3,9,25
  103:1
response 1:9 9:4,12
  27:1
responses 100:16
restrictions 101:17

result 33:24 45:9
  82:11
results 46:24 47:17
  48:2 57:14 59:6
  60:2,4 82:10,15,19
  82:21 106:4
retained 23:23 24:1
  24:19 96:4,13,16
  97:3 99:14
return 59:20 108:8
returns 106:2
  110:17 111:5
  112:23
review 9:18,21,24
  12:17 13:10 20:24
  22:17 23:10 26:25
  36:25 113:6,9
reviewed 11:23 12:1
  12:3 14:2 16:17,21
  26:3,4 28:1 47:8
  48:12 64:11
  113:11
reviewing 15:21
  21:8,12,15 40:7
Reynolds 99:6,8,11
  99:14 100:11
  101:6 102:8,10
  104:5,7,11
Reynolds' 99:16
  103:21
rich 91:10,11,12,19
  91:20 92:5,11,18
  93:6,8,9,21 94:6
  94:24
Richard 22:21 27:8
  27:19,20
right 7:19,25 11:18
  11:24 13:18 15:9
  15:16 22:24 24:20
  24:21 26:20,23
  27:8,19,21 28:8,9
  28:10,13,20 30:19
  36:4,8 37:11,19
  38:1 45:22 47:2,4
  47:15,23 48:8 54:2
  58:17 65:10 66:1
  71:4 73:2 77:4

84:3 85:25 88:1,4
  90:5,15 93:11,19
  94:6,11 95:13
  104:18 105:8
  110:14,21 111:25
  114:5
rise 65:20
risk 63:19 64:4,8,9
  64:13,19,20,21,24
  65:3,4,5,13,16,20
  65:23,24,25 66:6
  67:22,23 68:1 74:3
  80:6,11,16,20
  86:20 87:3,23
  88:10 89:17,25
risk-free 65:18,19
  66:4
risks 73:14,14 80:10
  89:19,22 90:19
Rockefeller 2:16
rookie 90:3
rookies 80:8 86:25
  88:6,12,21 89:4,11
  89:14,18 91:1
room 94:4
Roosevelt 70:3 73:8
Roosevelt's 73:22
rotors 97:5
RPR 1:25 115:15
Ruby 22:21 23:7,12
  23:21 27:8,19,20
rules 117:5
run 84:25 99:10
running 86:9
Ryan 1:11 3:13 5:23

─────────────

S

S 5:1
s/Deborah 115:14
safe 65:16
sale 46:19 79:20,20
sales 18:10,12,14,16
  18:17,19,23,24
  19:3,11,13,20,24
  20:4,5,8,13,15,16
  20:17,19,20 28:19
  28:24 29:15,19

30:4,6,17 41:17
42:1 62:25
**sampled** 13:13
**SANDERSON** 1:14
**Sandy** 11:17 21:23
22:13 35:25 71:7
86:24 87:11
**sauce** 67:11
**saw** 7:15 8:17,20 9:2
9:3,3 19:3 26:10
27:13 80:18
112:17
**saying** 31:2 39:2
58:14,15 65:9
74:21 90:8 103:9
**says** 31:16,24 36:17
36:21 37:9 43:3,23
59:5 85:7,22 87:21
88:5,17 92:11 93:6
93:21,23 94:2
**scenario** 55:1
**scheme** 92:14
109:21 110:19
111:1,24 112:2,3
112:19
**school** 105:3 110:14
**Scope** 6:15
**Scott** 6:5 99:17
**screwy** 55:14
**second** 21:13 63:17
66:8 78:9,10 80:23
80:24 83:6 93:2
110:22
**seconds** 87:14
**secret** 67:11
**section** 71:11 78:16
96:9
**see** 6:18 7:16,21 9:6
9:11 10:9 11:13,14
12:10 16:3 18:24
21:24 22:21 25:15
27:2 28:14 29:5,25
30:12,20,25 33:6,7
35:12 36:17,18,23
54:11 58:22 59:15
60:7 63:20 66:23
71:11,15 74:11

76:13,14 81:9,13
84:5,9,13,20,25
85:16 86:3,13,22
87:1,4,13,21,23
88:6,11,22 89:1
91:12,17 93:14,16
94:8,25 95:5,7
98:25 104:2 108:1
108:9,22 109:3,10
109:21 110:5
111:1,9,10 112:8
**seeing** 110:21
**seen** 6:22,24 7:1,2,3
7:5,9,18 106:22,23
**select** 15:1 23:20
69:12 70:9
**selected** 14:18 69:25
70:1
**selecting** 68:11
**selection** 27:1
**sell** 44:11 45:22
**seller** 50:20,23
**selling** 43:1 49:5
52:2,7,12,17 57:4
57:9,15 59:2,18,23
59:24 90:21
**sense** 55:6,12 58:16
60:4 61:21 62:14
62:15 66:2 82:21
88:22 112:2
**sentence** 59:19
63:13,13 84:19
88:17 89:10
110:23 111:11
**sentences** 89:3
**separate** 58:15
72:13,19,22,22
81:19,19,19 100:7
116:8
**separately** 63:15
**series** 43:6 78:15,16
**service** 79:21
**services** 98:2,4
113:24
**SESSION** 79:1
**set** 39:3 74:9,20,24
75:9

**settlement** 61:1
101:7,7,11,14
**seven** 87:21 98:18
**Shannon** 99:17
**Shawn** 1:13 3:14
5:24
**sheet** 116:8 117:5
**short** 70:6 78:16
91:21
**shortcoming** 73:17
**shortcomings** 70:8
**show** 84:19,23 86:9
**showed** 102:23
**signature** 114:6
116:12
**significance** 50:11
59:17 76:7 81:15
91:15
**significant** 81:25
110:17
**significantly** 107:25
**signing** 23:18
**similar** 72:3
**simple** 91:3,4
**simply** 42:6,12
**Sipper** 43:7
**sir** 10:22 26:14
31:15,16 33:10
35:15 39:11,17,20
40:23 41:25 42:4
45:11 53:18 55:10
59:11 65:13 66:25
74:7 76:17 77:20
78:9 83:24 86:19
93:2 107:19
**sit** 13:25 18:2 34:7
35:1 45:19 46:9
61:9,11
**sitting** 20:8,13 87:8
**situation** 93:14
**six** 21:15
**skills** 59:18
**skim** 12:21
**skimmed** 12:19
**skip** 85:21
**slide** 88:13
**SMITH** 1:12

**smoke** 100:19
102:18,21 103:9
103:23
**smoked** 100:15
**Smoking** 104:2,9
**software** 59:25
**sold** 45:3 49:1,4,8,12
49:15,17
**solely** 64:2 77:3
95:23
**solve** 94:8,10,14
**somebody** 58:17
93:18 97:13
101:25 106:9
**sorry** 9:23 16:20
19:9,15 25:20
39:25 42:17 48:19
63:25 71:15 78:14
81:2 85:25 86:2
88:7 89:22 96:19
108:17 110:21
**sort** 61:2 69:15 72:1
72:13
**sounds** 51:8 80:2
**speak** 68:21 101:2
**speaker** 8:8 15:14
15:20 40:15 74:2
75:4 76:10,22 77:2
85:7,22 92:11
93:13,17 95:3,3
**speakers** 12:14
14:17,19 15:17
16:23 33:11,16
39:21 40:3 46:2,16
47:2 70:24 71:9
73:1 75:14 76:20
**speaking** 17:9 77:3
**specialized** 39:17,20
39:25 40:2
**specific** 9:2 17:15
29:20 30:5,7,8,10
30:17 34:8 44:23
51:3 56:14 64:9
66:8,19 67:7,14,16
74:1 75:22 93:18
99:25 110:1,11
**specifically** 8:18

9:16 12:12 18:4
67:21 76:9 103:3
**specificity** 92:19
**specifics** 92:17
**specifying** 50:24
**specs** 97:2,12
**spend** 21:8,12 95:12
**spending** 9:9
**spent** 21:15,18
**spokespeople** 14:7,9
**spokesperson** 14:21
43:8
**sponsoring** 48:6
**spread** 100:5
**spreadsheet** 14:21
**Springs** 11:17 21:24
22:13 35:25 71:7
86:25 87:12
**staff** 5:17
**stage** 76:21,23
**staging** 61:7
**stamp** 87:13
**standard** 1:22 25:6
25:10 55:22 97:16
**start** 74:24
**started** 25:8 100:14
**starting** 78:11
**starts** 77:2 86:20
87:20
**state** 6:16 26:25
36:6 38:21 59:13
70:2 85:6 96:5
98:20,21,22,23,24
101:16 105:7,16
**stated** 11:10 39:12
**statement** 31:9
36:11 41:1 43:16
43:23 44:3,4,6
51:5,17,20,21 52:1
52:11,16,25 54:6
55:18 56:2,5,14,17
57:3,8 58:3 69:21
74:14,18 75:16,18
77:15,19 78:2,7
80:1,7,14 83:12
91:3,4 94:12 95:18
110:5,18 111:11

111:13 112:11
statements 10:19
  36:2 39:19 42:6,12
  42:25 43:14 44:5
  45:5,7,17 46:6,8
  46:22 47:3,5 51:16
  53:7 66:14 69:5,8
  69:12,19,23,25
  70:20,20 71:1
  72:25 75:13 76:1
  81:16,22 83:20,23
  83:24 85:3 86:20
  94:23 95:18
states 1:1 26:19
  77:20 81:8 84:12
  91:9 95:4 107:21
statistical 101:23
  103:13 104:6,12
status 56:20
statutes 105:8
stenographic 117:7
steps 28:22 29:13
  30:3,7 59:21 60:6
  60:10,18,19,21
  61:8,9,13
stick 44:3
stipulate 5:6
STIPULATION 5:5
stop 101:8,10
stopping 78:18
strategies 18:21
  60:13 61:4
strategy 17:22 62:16
  85:23 86:5
strict 29:2
strike 34:25 39:19
  63:16 98:3
strive 70:8 73:17,18
strives 70:6
struck 78:17
structured 75:2
struggling 109:7
student 109:9
students 34:4,16,20
  34:24,25 35:3,8,11
  36:23 37:10,15
  38:21 39:12,24

40:6 85:13 106:4
  110:2
studies 102:3,14
study 28:7,18
  102:23 103:6,7
stuff 60:24 76:10
Subaru 43:7,7
Subaru's 43:11
submit 77:19
submitted 8:12,20
  8:22,23 9:7,11,19
  9:22,25 23:6 24:15
  24:20,24 77:15
submitting 6:9
subpart 63:16,17
  64:1
subsequently 21:19
substantial 13:14
  17:11 31:3 39:5
substantiated 57:23
substantiation 98:1
sued 105:6
Suite 2:7
sum 112:18
support 68:7,14,17
  103:10
sure 7:17,22 13:15
  13:23 16:1 18:12
  19:6 20:3,16 23:8
  23:24 28:4,4 37:5
  50:9,22 51:2 52:21
  53:3 64:24 65:10
  66:11 68:5 72:16
  73:23 76:15 78:19
  79:22 80:9 83:7,14
  89:13 97:16,21
  113:10
surrounding 89:3
  94:23
survey 28:10 37:7
  40:13 54:11,12,13
  54:19,23 100:14
  103:14
surveyed 37:15
  53:11 54:8
surveys 28:12
susceptible 56:11,17

56:24 110:2
sweat 70:5
sworn 5:7,12 77:15
  77:19

_____

T

T 115:1,1,1
take 6:7 10:22 12:21
  15:21,25 28:22
  30:3,7 42:19,19
  43:14 51:15 55:23
  59:21 60:6 63:7
  66:25 67:18 68:4
  73:14 76:21 83:17
  92:16 106:21
taken 44:8 78:21
  104:14 115:8
takes 66:5 76:23
talk 17:1,4 32:3
  60:13 61:4 68:24
  74:25 76:9 84:8
  99:25
talked 17:20,21,22
  17:24 24:4,5 26:2
  34:20 101:25
  106:8 111:4
talking 13:24
  102:18
talks 95:9,12
target 30:10,14 53:1
  53:20,22 102:19
targeted 29:19,22
  30:4,6,16
targeting 102:11,15
tax 17:21 64:17
teach 17:7 82:13
technique 19:3 20:8
  20:13,15,16,17,20
techniques 17:2
  18:10,12,14,16,17
  18:19,23,24 19:13
  19:20,24 20:4,5,19
Teddy 70:3 73:8,22
Teenage 104:1,9
television 43:10
tell 15:20 47:10
  60:24 75:2 88:24

89:8,9,19 92:3
  107:7,13,14
telling 46:3
ten-day 48:23
tens 109:8
term 18:13
terminology 13:18
terms 53:19 92:20
testified 5:12 104:16
  105:21 106:8,25
  108:6
testify 96:12 101:22
  105:14
testimonial 40:19
testimonials 18:22
  19:1,2 20:11,21
  70:14,17 71:9 74:3
testimony 1:22
  22:20,23 23:1,6
  25:7 27:7,18 33:21
  96:6,7,9,10,20
  98:12,19,19 103:5
  106:10 107:3,8
  108:12 109:19
  110:8,10,24 116:5
thank 70:13 113:13
  114:2
that've 88:17
thereof 117:4
thing 19:9,11 68:4
  69:3 86:10
things 18:19 27:13
  27:14,15,16 42:18
  54:24 61:13 82:14
  90:16
think 8:13,14 9:4
  11:25 13:15,20
  15:7,15 16:21
  17:20 18:8,17,19
  20:15,16 23:15,16
  27:13 28:16 29:11
  31:15,23 32:7 41:7
  49:22 50:1 53:4,5
  54:14 55:17 56:25
  57:7,12,19,22 58:4
  58:8 60:15 62:24
  62:25 63:4 64:7,12

64:15 65:9 68:3,4
  68:19 69:3 70:1,13
  71:13 72:10 77:13
  79:13 80:18,22
  83:15,24 84:11
  88:2 89:6,13,21,24
  92:2,5 100:1
  101:12 110:7
  111:10,12,15
  114:5
thinking 38:16 69:9
  69:16 96:19,20
thinks 110:11
thought 17:18 18:23
  29:1 63:2 75:17
  106:1 110:15
thousand 31:6 39:8
thousands 109:8
three 12:10,16,22
  13:4,10 14:8,8,16
  16:15,23 21:11
  51:11 94:5,16
three-day 8:1 13:18
  13:21
tile 63:15
time 1:22 9:9 21:8
  21:12,18 24:14,15
  24:19,20 25:8 36:7
  41:5 43:13 57:13
  57:22,24 58:4,17
  58:18,19 66:25
  67:3 86:7 87:13
  91:21 95:12 99:16
  101:10 104:24
  113:14
timer 87:13
times 21:2 25:5
  38:11 94:5,16
timing 101:15
TITLE 115:3
tobacco 102:2
  103:14
today 13:20 14:1
  18:2 20:8,14 24:23
  35:2 45:20 46:9
  61:10,11 67:10
  84:6 87:8

today's 25:24
told 12:6 14:18
  34:23 35:2 43:4,10
  45:13,21 88:18
  107:2,17
tone 75:9
tonight 94:4
tools 67:13 86:10
top 14:8,15 20:23
  36:17 46:14 66:19
  92:25
topics 6:21,23
total 12:1 21:15
trade 1:4 2:3,5 5:18
  108:24 115:9
trained 40:12
training 6:18 17:11
  23:19 31:5 33:14
  33:19,25 34:6 35:4
  36:22 37:15 44:12
  44:21 45:3,6,10,15
  45:18,21,24 46:4,5
  46:11,19 47:22
  48:7,11,21 49:4,7
  49:15,16 51:7,11
  51:18,22 52:1,6,11
  52:16 54:5 56:16
  57:3,8,15 59:2,14
  59:20,24 60:5 64:3
  72:15 73:5 74:4
  80:5,16,23 81:12
  81:23,24 82:2,12
  82:13 84:12 85:8
  85:13 89:7 90:5,6
  90:10,11,14,20,21
  90:22 91:2,6 95:22
trainings 39:7 82:8
transaction 34:5,17
  35:5 60:23 61:14
  63:18 93:19,25
  109:8
transactions 85:15
transcribe 76:4,6
transcribed 77:4,4,8
transcript 4:12,13
  8:6,9 15:20 20:24
  21:3,4,9,13 22:3,8

26:7 28:1 69:20,22
71:11 75:19 76:12
77:2,12 79:7,11
83:15 84:1 87:9,11
92:23 93:1 95:24
115:6,7 116:4,9
transcripts 7:2,3,24
  8:2 11:14 12:18,20
  12:22 13:8 15:22
  16:3,6,18 19:25
  20:4 21:16,22 26:4
  26:6,10 27:6,9,17
  44:18 45:6 47:10
  65:1,12 69:24
travel 95:14
Treasury 65:15,25
trial 96:9 98:19
  105:14
tried 18:8 29:14
  62:14 67:19
Triumph 3:6
TRO 7:5 9:1,2,7,12
  23:4,9,10,16
true 37:16 38:1,9
  58:16 62:25 63:2,4
  83:10 85:3,19
  86:17 105:12
  116:4
trust 43:3
truth 37:17 39:2
  92:3
try 32:23,25 48:20
  61:12 63:13,25
  67:20 75:22 103:6
trying 17:7 23:16
  29:25 44:11 62:12
  67:25 68:2,6,9
  69:9,24 70:19,22
  74:24 75:8 76:17
  82:8 83:12 106:3
Tuesday 1:17
turn 6:14 107:18
Twelve 81:2
Twin 11:20 15:11
two 7:22 10:6 11:14
  13:9 14:5,7,16,19
  15:18 16:6,10,23

16:23 17:16 18:25
19:25 20:10 21:16
21:22 26:7 27:7,9
27:17 32:1 33:11
33:11 34:19 36:13
44:19 45:3,14 46:2
46:12,17 47:7
48:12,22 51:11
54:24 58:15,22
62:8 64:10 66:9
70:14 71:9 79:6
80:4 81:15 82:17
82:18 87:6 97:18
97:25 100:6,6
104:8 106:9
types 109:1
typical 16:12
typically 75:1

_____

**U**

U.S 65:15,25
ultimately 106:14
uncertain 52:20
unconventional
  54:17
undermine 103:6
understand 10:11
  14:11 15:11 20:21
  32:9 34:14 40:1
  44:10 45:11 48:19
  48:23 53:1,18 57:2
  75:15 76:17,21,22
  92:6,7,11,15,18
understanding 12:4
  23:5 33:8 34:2
  37:13 49:3 106:12
understands 92:5
understood 23:18
  99:24
unidentified 71:9
  75:14
UNITED 1:1
upper 84:3
use 17:2 18:21,21,22
  19:14 20:9,21 67:2
  85:14 90:11,14,20
  91:2 111:5

usually 74:23
Utah 1:2,5 3:7,12
  6:1,2 14:13 15:8
  77:11 113:19
Utah's 113:23

_____

**V**

v 4:14 115:3 117:3
vacuum 98:1
Vague 19:15,18 20:2
  22:12 28:25 30:11
  38:15 46:21 55:3
  98:9
vaguely 103:2
valiantly 70:6
value 110:13
variety 7:6 32:14
  45:5
various 17:2 103:10
  103:12,12
Venable 2:15 24:2,8
  25:12,14
Vermont 98:23
versus 50:12 96:18
  98:20,21,21,22,23
  98:23,24
vicinity 24:17
video 43:12
Videoconference
  1:18
view 20:19 30:9,18
  31:24 33:10,16
  38:22 41:15 43:18
  50:1,8,11,20,23
  51:24 52:4,9,14,19
  55:17 56:2,5 57:6
  57:11,18 58:3 59:9
  59:25 80:3 82:25
  89:5 90:18 91:20
  94:18 112:5
vs 1:8

_____

**W**

W 1:12
wage 109:25 110:2
  111:4
wages 107:23,24

108:25 112:8
waived 114:6
want 13:19 18:6
  32:24 39:10,13,15
  53:13 54:15,16
  61:6 64:15 68:18
  73:23 75:2 83:7
  85:9 86:7,9,11
  93:1 96:1
wanted 13:23 78:14
Washington 98:21
wasn't 17:6 19:19
  34:9 75:17,18
  96:20,25 101:19
  110:15
way 13:14 20:20
  31:2 34:18 36:25
  37:3,7 54:17 72:17
  75:1,7 108:16
Wayne 15:15 95:4
ways 32:14,15
we'll 32:22 79:13
  86:6
we're 114:5
we've 5:16 21:22
  53:16
Wehr 1:25 115:14
  115:15
went 9:25 14:13
  19:25 20:3 27:6
  81:3 86:2
weren't 22:9 97:21
  103:5 109:12
wholesaling 62:6,7,8
  62:11
widely 66:2
Williams 97:4
willing 29:23 73:14
witness 5:6,11 19:6
  19:19 20:3 22:13
  25:1 29:1 30:12
  32:13 33:22 35:7
  38:4,16 39:1 41:4
  46:22 50:16 55:4
  71:15 98:10 99:24
  107:11 112:21
  113:3,9 116:1

117:1
**word** 50:21 59:7
67:2 79:25
**words** 42:1
**work** 10:3 25:4,13
25:18,21 40:13
66:15,17 73:11
91:11,18 92:16
93:8 99:15 100:3,5
100:10,20 101:10
101:12,23 104:4
104:11
**worked** 24:11,16,23
**working** 70:16,18
71:10,19
**works** 93:9
**works'** 91:12
**workshop** 7:3,24 8:9
13:17,17,18 22:6
39:7 48:17,23 49:2
49:8,23 59:14
**workshops** 8:2
13:21 31:4 41:16
49:6,13,14,18
**worried** 55:15,19
56:3
**worry** 55:25 56:21
61:6
**worth** 110:15
**wouldn't** 39:13
54:10 55:1 57:22
70:12
**write** 60:5 63:17,25
71:6 74:8 81:5,11
**writes** 108:22
109:18

**X**

**X** 4:1

**Y**

**YANCEY** 3:3
**Yancy** 6:5
**yeah** 8:13 27:9 30:1
50:4 56:7 68:21
72:20,22 76:12
94:11 95:8,16

105:3,3
**year** 94:5,17 100:5
**years** 85:13,13,22
86:4 88:18 99:13
100:6 106:9
**yield** 59:20
**York** 2:8,8,18,18

**Z**

**Zoom** 1:18

**0**

**1**

**1** 2:6 4:9 5:3 6:8
26:15 59:12,12
83:17 87:14 96:8
**1,147** 48:13
**1,200** 25:11
**1:03** 79:2
**10** 35:23 72:7 84:11
**10:00** 1:21
**100,000** 51:7
**10004** 2:8
**10020** 2:18
**106** 4:14
**11** 69:2 72:8
**113** 4:5
**1150** 25:5,6
**119** 108:15,17,19
**12** 78:11 81:5 83:3
83:21,25 84:16
87:12
**12:20** 78:20
**120** 108:14
**122** 109:15
**1270** 2:17
**13** 86:19 88:1,13
91:7 92:24 93:10
94:20
**14** 67:1 88:18
**15** 85:6
**16** 107:18
**17** 1:17 103:24
115:4 117:2
**19** 93:3,5
**1970s** 43:6

**1996** 104:2
**1997** 101:7
**1st** 105:22

**2**

**2** 4:10 6:15 10:23
11:3,13 12:17,23
12:24 13:9 14:6
16:7,12 21:20
22:18 26:8 27:6
36:14 79:8 80:22
81:1,4 83:16 88:13
**2:06** 114:7
**2:19-CV-00867-D...**
1:7 115:2
**20** 93:7,14,18,24
**20,000** 51:12
**2000** 99:18
**2017** 14:10 105:21
**2021** 1:17 115:4,12
117:2
**212** 2:9,19
**22** 85:22 86:3,4
**24** 26:16
**24th** 2:17
**26** 84:1,2,3

**3**

**3** 4:11 5:3 35:16
36:2 71:12
**30,000** 93:14,18,24
**31** 115:12
**318** 2:7
**3459** 3:6
**370-6252** 2:19

**4**

**4** 4:12 6:14 73:9
79:3,7 87:11 93:3
**409-1122** 3:8

**5**

**5** 4:4,9,10,11,13
10:6 36:13 59:12
60:8 62:17 64:1
79:3,11 83:25 84:6
87:14

**50** 107:18 108:5
**585** 108:19

**6**

**6** 4:14 69:2 102:24
106:16,19
**6-year-olds** 103:16
**60** 24:17,18 25:5
37:14,14
**602** 109:15
**607-2804** 2:9
**62** 86:2
**67** 37:10

**7**

**7** 70:19,25 71:1
72:24 73:9 75:13
76:18
**79** 4:12,13

**8**

**8** 70:21 71:22,25
72:6 73:6 74:15
75:6 76:3,18
**80s** 99:9
**82** 85:21 86:1,2,4,13
**83** 86:8,14
**84043** 3:7
**844** 3:8
**89** 99:18

**9**

**9** 26:16 74:7 76:2

**ERRATA SHEET**

Case: *FTC, et al. v. Nudge, et al.*, 2:19-cv-867-DBB-DAO (D. Utah)
Witness: Howard Beales
Deposition Date: August 17, 2021

| Page No. | Line No. | Correction | Reason for Change |
|----------|----------|------------|-------------------|
| 42 | 17 | Insert "gecko" after GEICO" | Clarify meaning |
| 48 | 23 | Change "ten-day" to "two-day" | Stenographic error |
| 60 | 15 | Delete "You would have to find and"; Capitalize "think" | Clarify meaning |
| 61 | 4 | Change "you" to "you've" | Stenographic error |
| 62 | 25 | Change "sales" to "fails" | Stenographic error |
| 69 | 9 | Change "your" to "you're" | Stenographic error |
| 97 | 1 | Change "break" to "brake rotor" | Stenographic error; clarify meaning |

Signed _____   Date _9/14/21_

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

FEDERAL TRADE COMMISION, and

UTAH DIVISION OF CONSUMER
PROTECTION,

Plaintiffs,

v.

NUDGE, LLC, a Utah limited liability
company, et al.

Defendants.

:
:
:
:
:

**Case No.**

**2:10-cv-00867**

EXPERT REPORT OF HOWARD BEALES

**JUNE 17, 2021**

**EXHIBIT**

001

# Table of Contents

I.    Background and Professional Experience ........................................................................... 1

II.   Scope of Engagement ...................................................................................................... 2

III.  The Preview Events Do Not Make Earnings Claims ............................................................ 2

   A.   Express Disclaimers .................................................................................................. 3

   B.   Integrated Training Claims ....................................................................................... 5

   C.   Specific Transactions are Explicitly Identified as Case Studies .................................... 7

   D.   Numerical Claims Rely on Outside Statistical Sources ................................................. 8

IV.  Conclusion ..................................................................................................................... 9

## I.        Background and Professional Experience

1.       I am Emeritus Professor of Strategic Management and Public Policy at the George Washington University School of Business, where I taught from 1988 through 2019.  I received my Ph.D. in Economics from the University of Chicago in 1978, and I graduated magna cum laude and Phi Beta Kappa from Georgetown University in 1972.  From 2001 through 2004, I served as the Director of the Bureau of Consumer Protection at the Federal Trade Commission ("FTC" or "the Commission").  During my tenure, the Commission filed 258 federal court cases and obtained orders for nearly $1.3 billion in consumer redress.  These cases included numerous cases challenging advertising claims for dietary supplements, substantiation for other product claims, and business opportunity claims.  From 1981 to 1987, I served as the Bureau of Consumer Protection Associate Director for Policy and Evaluation, Acting Deputy Director, and Assistant to the Director.  I was also an economist with the Bureau of Economics from 1977 to 1981.  A copy of my curriculum vitae is attached as **Exhibit 1**.

2.       I have given speeches and written articles on the FTC and various aspects of consumer protection regulation, including advertising regulation.  I have also testified before Congress regarding consumer protection matters, including spam, identity theft, internet fraud, and dietary supplement fraud.

3.       While with the Bureau of Consumer Protection from 1981 to 1987, I was heavily involved in developing the FTC's *Policy Statement Regarding Advertising Substantiation* and its *Policy Statement on Deception*.[1]  Based on my ongoing work in the field, and regular interactions with the FTC, these Policy Statements remain the foundation of the FTC's approach to advertising regulation.

---

[1] FTC, *Policy Statement Regarding Advertising Substantiation* (1983), appended to Thompson Med. Co., Inc., 104 F.T.C. 648 (1984), *aff'd*, 791 F.2d 189 (D.C. Cir. 1986), *cert. denied*, 479 U.S. 1086 (1987); FTC, *Policy Statement on Deception* (1983), appended to *Cliffdale Assoc., Inc.*, 103 F.T.C. 110 (1984).

## II.      Scope of Engagement

4.      I have been retained by Venable LLP on behalf of its clients in this matter to evaluate whether there are earnings claims in the preview events for real estate training.  A list of the materials I reviewed is attached as **Exhibit 2**.  I am being compensated for my time at the rate of $1150 per hour.  My compensation does not depend in any way on my conclusions or the outcome of this litigation.

## III.     The Preview Events Do Not Make Earnings Claims

5.      The FTC's First Amended Complaint alleges that Nudge represents that consumers "are likely to earn substantial income," and "that consumers who purchase the Workshops or the Advanced Trainings are likely to earn several thousand dollars monthly."[2]  Examining the preview events to assess this allegation is appropriate, because the preview events are the first time consumers are actually asked to make a purchase decision.  As discussed below, however, the preview events cast the entire event, as well as the Workshops, as training events.   Training offers knowledge and skills that can be applied to yield a return but training itself implies that the consumer will have to take the necessary steps to apply what has been learned.  I make four essential points in reaching this conclusion:

A.      There are clear express disclaimers at the beginning of the preview events and in the Event Guide distributed to attendees at the event.

B.      Rather than relying solely on these express disclaimers, claims that the company only is providing training and disclosures of both risk and the need for effort are embedded throughout the preview events.

C.      Specific transactions referenced in the preview events are explicitly identified as case studies, a common method for presenting and explaining business strategies.

---

[2] FAC for Permanent Injunction and Other Equitable Relief, ECF No. 173, ¶¶ 78, 204.

D.      The only numerical claims made in the preview events about results are specifically attributed to outside statistical sources and are not challenged as misleading in the complaint.

## A.      Express Disclaimers

6.      An express disclaimer appears early in each preview event.  The disclaimer is both shown on a slide and read aloud.

7.      Before even playing the disclosure, the Sandy Springs Georgia preview event includes a motivational presentation featuring a dozen unidentified speakers and two testimonials who emphasize the importance of working hard,[3] including a quotation from Theodore Roosevelt: "The credit belong to the man who is actually in the arena, whose face is marred by dust and sweat and blood, who strives valiantly, who errs, who comes short again and again because there is no effort without error and shortcoming, but who does always actually strive to do the deeds, …"[4] Another speaker urges attendees to "Know that life is not fair and that you will fail often."[5]  The testimonials emphasize training, not earnings.  Crystal states that "I know I'd have to pay a lot of money for this over years' time to get what I'm getting in a very short period of time."[6]  Catherine says that "The education has been laid out very step by step which is critical in a learning process."[7]

8.      The following introduction and disclaimer occur immediately after the motivational discussion at the Sandy Spring preview event:

> Thank you for attending. The presentation you're about to participate in is brought to you by Response, a training and education company. We do not sell a business opportunity, get rich quick program or guaranteed moneymaking system. We believe with education, you can be better prepared to make investment decisions, but we cannot guarantee your success in investing.
>
> We do not make earnings claims, efforts claims, return on investment claims or claims that our training will make you any money. Investing of any kind carries risk and it is possible to lose some or all of your money. The training provided is general in nature and may not be appropriate for all individuals. It is highly recommended that you work with licensed professionals regarding securities and

---

[3] *See* Nudge.0000017810, p. 4.
[4] *See* Nudge.0000017810, p. 5.
[5] *See* Nudge.0000017810, p. 6.
[6] *See* Nudge.0000017810, p. 4.
[7] *See* Nudge.0000017810, p. 5.

3

other investments. We are not a licensed broker, registered investment advisor, tax accountant or a law firm. It is highly recommended that you consult with appropriately licensed experts before engaging in any specific investment [transaction]. The companies hired presenters, trainers and staff may hold various registration and licensing, but they do not operate in such a capacity as agents of the company. Please be aware that the training may include case studies and hypothetical examples that are used for illustrative and education purposes only. You should not view such illustrations as common or typical. Each investor and circumstances of investment are unique. Customer results vary significantly and depend on many factors such as market conditions and individual effort, time and skill of the student. For more information, please visit www.response.com/disclosure.

9.     Just as the motivational introduction seeks to motivate students to work hard and rise to challenges, the disclosure at the beginning of the presentation is likely to set attendees' expectations as they hear other information during the course of the event.  They are told that this is an education event, not a get rich quick scheme or a business opportunity, that there are risks, and that there is no guarantee of success.  Subsequent statements will likely be interpreted against this backdrop.

10.     The printed Event Guide distributed to each attendee at the Sandy Springs preview event also includes an explanation of the event, integrated into the text rather than standing alone. A paragraph headlined "our central focus is you" states that "Snap Flip is the seller and provider of direct to consumer financial training."[8]  The paragraph headlined "how we help you succeed" states that "we offer direct to consumer financial education."  Buyers "will be taught many techniques which have brought financial success to others.  However, we do not guarantee your success … we do not make earnings claims, efforts claims, return on investment claims, or claims that our techniques will make you any specific amount of money.  A separate footnote disclaimer provides that: "We provide real estate and stock market education and training.  We do not sell a business opportunity.  We make no earnings or return on investment claims."[9]  It appears that attendees receive the Event Guide when they arrive, so they have time to read it before the actual program begins.

---

[8] Response.FTC.00008941at -8943.
[9] Response.FTC.00008941at -8943.

4

11.     The Idaho preview included a similar audio and video disclosure, advising that "[m]ost students that attend this introductory preview event do not make money," and advising attendees to consult their own legal, accounting, and tax advisors.[10]

## B.     Integrated Training Claims

12.     Moreover, Nudge does not rely solely on up-front disclosures of the nature of its training.  Instead, disclosures are integrated throughout the presentation.  At the Idaho preview event, for example, the presenter discusses barriers to moving forward in real estate investing, and states that "Our number one reason is lack of knowledge,"[11] and goes on to explain that "we as a company, we offer training and education.  We offer classes."[12]  Later, the presentation includes a video testimonial where the endorser states that "it was very good training."[13]

13.     Statements about investment risk and the need for effort are also embedded throughout the preview events.  These are not separate disclosures that contradict the main message; rather, they *are* the message the preview events convey.  For example, at the Sandy Springs preview, for example, the presenter states that "every investment entails risks."  Risks are tied directly to training as well: "Rookies make mistakes."[14]  The need for effort is also discussed. The presenter states that "it takes work.  If you're not willing to put the work in you should not do this program."[15]  In discussing a flipping deal, the presenter states that "nobody gets rich on this. This is not about – get rich quick does not work in any investment. I've never found get rich quick that works."[16] In a discussion of buying tax liens, the presenter notes that "if you buy a lien on a piece of swamp land and then they don't pay you back, you're the proud owner of a gator farm, everybody understand that?"[17]

---

[10] *See* FTC-00242917, p. 11.
[11] *See* FTC-00242917, p. 25.
[12] *See* FTC-00242917, p. 26.
[13] *See* FTC-00242917, p. 99.
[14] *See* Nudge.0000017810, p. 12.
[15] *See* Nudge.0000017810, p. 13.
[16] *See* Nudge.0000017810, p. 19–20.
[17] *See* Nudge.0000017810, p. 34.

14.     The Idaho preview event includes similar integrated claims.  Regarding potential profits from flipping transactions, the presenter states that "I'm going to talk about the potential to make money with real estate flipping.  Y'all know that it's there.  But to be fair, I'm going to talk about the other side as well."[18]  The presenter discusses the need for effort as well: "I never use the word easy.  But if you put the time into it, it's (inaudible).… You put less time into it, you still do deals, you just do less deals. … I can't guarantee how much money you'll make or how big the deals will be or how fast they'll come to you."[19]  As in the Sandy Springs event, the presenter disavows get rich quick schemes:  "So real estate has never been get rich quick, never has been, never will be. … Usually it's create wealth over time following the right path, with consistent efforts down the right path."[20]  He continues, "What we're doing here today is not providing a secret sauce to everybody.  That's not what it is.  What we're providing are the proven tools…"[21]  Again, the risks, limitations, and requirements are integral parts of the overall message.

15.     Even some of the testimony cited in the FTC's Motion for a TRO indicates that attendees understood that the program offered training, rather than earnings claims.  One witness, Richard Ruby, said of the preview event that it "peaked my interest as how could this company offer me an education that I would be able to go out and do the same transactions that a real estate agent could do," but "they just threw out teasers. They didn't give any specific information as far as, if you do this, you will make this . . . .").[22]  He went on to say, "what I took away is that [the speakers] were well versed in the real estate business and that they had been making good money[ ] by performing the different real estate transactions that Response was going to teach me and the other students how to do."[23]  This testimony is inconsistent with the notion that preview events included earnings claims.  In fact, Ruby testified in his deposition that "The way I understood it is that once you went through their training program and you used the principles that were taught in

---

[18] *See* FTC-00242917, pp. 23–24.
[19] *See* FTC-00242917, pp. 105–106.
[20] *See* FTC-00242917, p. 81.
[21] *See* FTC-00242917, pp. 81–82.
[22] Ruby IH, Tab 16, at 18:8–19:22, cited in TRO Motion note 17.
[23] Ruby IH, Tab 16, at 16:24–17:4, cited in TRO Motion note 21.

their program, you could possibly make money."[24]  He also testified that the presenter did not say he was guaranteed to make money in real estate,[25] and that Response did not guarantee that students would succeed.[26]

16.     Of course, an important motivation for purchasing training is the prospect that the education obtained can be put to profitable use.  The same is true of any investment in education.  Most colleges and universities simply offer education.  The offer does not become an "earnings claim" simply because financial gain is part, or even a primary, motivation for a student's decision to invest.  Moreover, most academic institutions host events featuring prominent alumni, if only to promote the name of the institution.  The George Washington School of Business held many events that featured alumnus Colin Powell.  Plainly, however, there is no reasonable interpretation of those events as an implied claim that a GW education will make one Secretary of State, or even a successful general.

17.     The Idaho preview event explicitly addressed the analogy to college.  In discussing his decision to attend college, the presenter stated that he went to college because "…my odds of success in life financially were going to be greater with it than without it.  The only reason why I did it.  Same thing is applicable here in my opinion."[27]  He continued, "people pay us to show them how to do it.  That means there's a tuition for our paid training."[28]  And like any other education, results depend on further effort by the student.

### C.     Specific Transactions are Explicitly Identified as Case Studies

18.     Case studies are a common method for presenting and explaining business strategies.  They enable students to see the implementation of a strategy in a concrete setting, to better understand the proper application of the strategy and its implications.  Case studies, however, are only examples.  They are not claiming that everyone who follows the strategy will achieve the same results that occurred in the case used as the example.

---

[24] *See* Deposition of Richard J. Ruby, p. 70 ("Deposition").
[25] Deposition pp. 69–70.
[26] Deposition p. 114.
[27] *See* FTC-00242917, p. 64.
[28] *See* FTC-00242917, p. 64.

19.     When preview events discuss specific transactions, they are presented as case studies.  At the Sandy Springs event, the presenter introduces the "quick flip" strategy with a specific, profitable example.  He is express, however, that the point is the strategy, not the specific result: "I'm going to share a strategy; you're going to love this."[29]

20.     At the Idaho preview event, the presenter is even more specific in presenting an example.  He states:

> I do not want you to focus on the numbers in the deal.… Because on every deal that you will ever do, the numbers are going to what? … Change.  Every single time.  Numbers fluctuate, they go up and down.  But the strategies that we utilize to do them stay the same every time.[30]

To emphasize the point, he adds: "Numbers change.  Property changes.  Strategies stay the same."[31]

21.     There are circumstances in which lessons can be learned by studying instances in which a strategy failed.  Particularly in a relatively short presentation, however, using examples of successful implementation is far more likely to make the point.  For example, one of the most used cases in teaching about business response to a crisis is Johnson & Johnson's response to the Tylenol poisonings in the 1980s.  Many professors have used the case to help students understand what makes a response effective.

## D.     Numerical Claims Rely on Outside Statistical Sources

22.     In some instances, preview event presentations do include specific numerical results about an investment strategy generally, rather than using only examples.  In the Idaho preview event, for example, the presenter provides data on the average profit from flipping transactions, completed within one year, stating that average profit per deal was $64,000.  The data is expressly attributed to a well-respected outside source, Realty Track, however, and identified as including all such transactions in the U.S.  Nothing in the complaint suggests that the description of the data is in any way misleading.

---

[29] *See* Nudge.0000017810, p. 13.
[30] *See* FTC-00242917, pp. 31–32.
[31] *See* FTC-00242917, p. 32.

8

23.     Such claims are claims about market results, not about program performance. When truthful, they provide valuable information to a consumer who is trying to decide whether pursuing a flipping strategy is worth the time and effort.  They do not become claims about program performance unless they are specifically connected to the program—these claims are not. Suppressing such information on the theory that some consumers might think it applies to this program specifically would deprive consumers of valuable information.  That result would be inconsistent with both the First Amendment, and the FTC's long history of defending the value of truthful commercial speech.

## IV.     **Conclusion**

24.     Based upon my review of a selection of Response Preview Event materials and other materials, as well as my experience with consumer protection matters, I find that the preview events do not make earnings claims and that Response adequately included disclaimers at the beginning and during the course of the preview events.  Response aims to provide training and education and generally discloses both the risks and the need for effort and hard work throughout the preview events to succeed.

I hereby affirm under the penalty of perjury that the foregoing is true and correct.

Executed this 17th of June, 2021

_____
Howard Beales

9

# CURRICULUM VITAE
J. Howard Beales, III

███████████████

Phones: ████████████████████                    Born ███████████
email: ████████████████                          married, two children

## EDUCATION AND ACADEMIC HONORS

The University of Chicago, Chicago, Illinois.  Ph.D. in Economics awarded June, 1978.
Concentrated in Industrial Organization and Macroeconomic Theory.  Received
fellowships from the Earhart Foundation and the Walgreen Foundation.

Georgetown University, Washington, D.C.  Awarded B.A. May, 1972.  Magna Cum Laude, Phi
Beta Kappa.  Major in Economics.  Named the outstanding student in economics by vote
of the department faculty; numerous awards for excellence in intercollegiate debate.

## WORK EXPERIENCE

**Taskforce on Federal Consumer Financial Law, Consumer Financial Protection
Bureau**, 2020, Member.

**Professor of Strategic Management and Public Policy, George Washington
University,** August, 1988 - June, 2001; August, 2004 - Present. (Assistant Professor, 1988;
Associate Professor 1991; Professor, 2010; Emeritus, 2020.)  Department Chair, January 2014 –
June 2017.  Taught courses in applied microeconomics, managerial economics, and the
relationship between business and government.  Research interests include law and economics,
economic and legal aspects of marketing and advertising, the new drug approval process, and
other aspects of government regulation of the economy.

**Director, Bureau of Consumer Protection, Federal Trade Commission,** June, 2001 -
August, 2004.  Responsible for policy development, law enforcement, rulemaking activity, and
consumer and business education for the nation's general purpose consumer protection agency.
Numerous speeches, press conferences, and Congressional appearances to explain the Bureau, its
mission, and its actions. With a staff of 270 and a budget of $100 million, the Bureau enforces
more than 20 consumer protection statutes.  Major accomplishments include:

- Redirected the Agency's approach to privacy to focus on consequences of information use
and misuse.
- Proposed, promulgated, and implemented the National Do Not Call Registry.
- Worked with Congress and the Administration to develop and implement the Fair and
Accurate Credit Transactions Act of 2003.
- Pursued an aggressive law enforcement program that produced the largest redress orders
in FTC history and attacked high volume frauds promoted through heavy television
advertising.

J. Howard Beales, III                  Curriculum Vitae                    Page 2

**Chief, Human Resources and Housing Branch, Office of Information and Regulatory Affairs, Office of Management and Budget,** June, 1987 - July, 1988. OIRA reviewed all proposed and final regulations under Executive Order 12291 to assure that agencies only regulate based on adequate information that the benefits of regulation exceed the cost. Under the Paperwork Reduction Act, agencies also needed OIRA's approval for any activity that imposes information collection responsibilities on the private sector. The Branch handled all transactions with the Departments of Labor, Health and Human Services, Housing and Urban Development, and Treasury, as well as the Office of Personnel Management, Equal Employment Opportunity Commission, and the Veterans Administration. Major responsibilities included:

- Work with the Presidential Task Force on Regulatory Relief to develop proposals to accelerate the new drug approval process.
- Review of proposed and final regulations from the **Food and Drug Administration,** including a proposed rule to permit health claims on food labels, a proposed rule to restrict use of sulfiting agents on certain foods, and various OTC drug monographs.
- Review of paperwork and regulations from the **Occupational Safety and Health Administration,** including the hazard communication rule, the proposal to update exposure limits for some 400 substances, and rules concerning formaldehyde, benzene, and ethylene oxide.
- Review of **Health Care Financing Administration** rules concerning quality standards for clinical laboratories, nursing home requirements, Medicare coverage policy, and Medicaid drug reimbursement policies.

**Associate Director for Policy and Evaluation, Bureau of Consumer Protection, Federal Trade Commission,** August, 1983 -June, 1987. The Division's multidisciplinary staff actively participated in developing Commission policy regarding all aspects of consumer protection, focusing on unfair or deceptive practices (such as deceptive advertising) and various consumer credit statutes. It reviewed proposed law enforcement matters from five other divisions and ten regional offices to ensure consistency with policy objectives. Accomplishments and responsibilities included:

- Received **Award for Distinguished Service** in June, 1987, and **Senior Executive Service Awards** for outstanding management performance in 1984 and 1986.
- Policy development in a number of key areas, including the Commission's Deception and Advertising Substantiation Policy Statements and civil penalty assessments.
- Evaluating staff recommendations for formal investigations, administrative or district court litigation, consent negotiations, and rulemaking, as well as reviewing existing rules and policies.
- Supervised the Commission's program of commenting on regulatory matters before other federal and state agencies.
- Supervising the conduct of empirical studies of general policy issues, rulemaking proposals, and individual cases.

April 27, 2021

J. Howard Beales, III                    Curriculum Vitae                    Page 3

**Acting Deputy Director, Bureau of Consumer Protection, Federal Trade Commission,** October, 1985 - July, 1986.  Jointly with the acting Bureau Director, managed the Bureau's staff of 145 lawyers.  Primary responsibility for:

- Law enforcement activities involving consumer credit, marketing practices, and energy advertising.
- Rulemaking activities, including new rulemaking proposals and reviews of existing rules.
- Management of consumer protection activities in 10 FTC Regional Offices.
- Joint responsibility for allocating the Bureau's $12.5 million budget among various programs as a means of achieving objectives.

**Assistant to the Director, Bureau of Consumer Protection, Federal Trade Commission,** November, 1981 - August, 1983.  As the first Economist to work in this capacity, reviewed staff recommendations on cases and rules to ensure sound economic and legal reasoning and consistency with policy objectives.  Special projects and accomplishments included:

- Received the Commission's **Award for Excellence** for integrating economics into consumer protection law enforcement.
- Assisted in review of the definition of deceptive acts or practices, including proposed statutory definition and Commission Policy Statement.
- Primary responsibility for supervising review of the Commission's advertising substantiation doctrine.
- Assisted in developing evidentiary standards for review of Commission rulemakings, and applied the standards to rulemakings involving food advertising and creditors' contractual remedies.

**Economist, Bureau of Economics, Federal Trade Commission,** September, 1977 - November, 1981.  Served as expert consultant to the Commission's operating bureaus, and offered independent policy advice to the Commission.  Specialized in consumer protection problems, particularly those involving the economics of information and advertising.

- The only staff economist involved in rulemakings on food advertising, over the counter drug advertising, and children's advertising.
- Wrote sections for policy review sessions on consumer information remedies and policy toward the media.
- Designed major empirical studies of lawyer advertising and the effects of state restrictions on generic drug substitution.

**1974 - 1976:**  Part time teaching assistant in economics at the University of Chicago, Assistant Debate Coach at Northwestern University, and consultant in a private antitrust suit.

**April - September, 1973:**  Economic Analyst, American Trucking Associations, Inc., Washington, D.C.  Evaluated ATA position on deregulation of trucking.

April 27, 2021

J. Howard Beales, III                     Curriculum Vitae                          Page 4

## PUBLICATIONS

Textbook

    *Business & Government Relations:  An Economic Perspective* (Second Edition, Kendall Hunt Publishing, 2012).

    *Business & Government Relations:  An Economic Perspective* (Kendall Hunt Publishing, 2009).

Major Articles

    Taskforce on Federal Consumer Financial Law Report, with Todd J. Zywicki, Thomas A. Durkin,, William C. MacLeod, and L. Jean Noonan, Consumer Financial Protection Bureau, January, 2021.

    Section 13(b) of the FTC Act at the Supreme Court:  The Middle Ground, with Benjamin M. Mundel and Timothy J. Muris, The Antitrust Source, December, 2020.

    "The Obama FTC Departed from Its Predecessors to the Detriment of Consumers," with Timothy J. Muris, Antitrust, Vol. 31, No. 3, pp. 124-138 (Summer 2017).

    "Behavioral Economics and Credit Regulation," Journal of Law, Economics & Policy, Vol. 11, No. 3, pp. 349-365 (2015).

    "FTC Consumer Protection at 100:  1970s Redux or Protecting Markets to Protect Consumers," with Timothy J. Muris, George Washington University Law Review, Vol. 83, No. 6, pp. 2157-2229 (2015).

    "The FTC at 100:  The Need for Improvement in Advertising and Privacy Regulation," Antitrust Chronicle, Vol. 5 No. 1, Spring, 2014 (online publication).

    "Rationality, Revolving, and Rewards:  An Analysis of Revolving Behavior on New Credit Cards," with Lacey L. Plache,  Supreme Court Economic Review, Vol. 21, No. 1, pp. 133-156 (2014).

    "In Defense of the Pfizer Factors," with Timothy J. Muris and Robert Pitofsky, in  *The Regulatory Revolution at the FTC:  A 30-Year Perspective on Competition and Consumer Protection*, James C. Cooper, Ed. (Oxford University Press, 2013), pp. 83-108.

    "Striking the Proper Balance:  Redress Under Section 13(b) of the FTC Act," with Timothy J. Muris,  Antitrust Law Journal, Vol. 79, pp. 1-43 (2013).

    "Does Advertising on Television Cause Childhood Obesity?  A Longitudinal Analysis," with Robert Kulick,  Journal of Public Policy and Marketing, Vol. 32, No.2, pp. 185-194 (2013).

J. Howard Beales, III                    Curriculum Vitae                              Page 5

"Health Related Claims, the Market for Information, and the First Amendment," Health Matrix:  Journal of Law-Medicine, Vol. 21, No. 1, pp. 7-31 (2011).

"Consumer Protection and Behavioral Economics:  To BE or not to BE?"  Competition Policy International, Spring, 2008, Vol. 4, No. 1 pp. 149-168.

"Choice or Consequences:  Protecting Privacy in Commercial Information," with Timothy J. Muris, University of Chicago Law Review, Winter, 2008, Vol. 75, No. 1, pp. 109-135.

"Brightening the Lines: The Use of Policy Statements at the Federal Trade Commission," Antitrust Law Journal, 2005, Vol. 72, No. 3, pp. 1057-1074.

"Advertising to Kids and the FTC:  A Regulatory Retrospective That Advises the Present," George Mason Law Review, Summer, 2004, Vol. 12, No. 4, p. 873-894.

"Remarks before the 2003 Symposium on the Patriot Act, Consumer Privacy, and Cybercrime," North Carolina Journal of Law and Technology, Fall, 2003, Vol. 5, No. 1, pp. 1-31.

"The FTC's Use of Unfairness Authority: Its Rise, Fall, and Resurrection," Journal of Public Policy and Marketing, Fall, 2003, Vol. 22, No. 2, pp. 192-200.

"Modification and Consumer Information:  Modern Biotechnology and the Regulation of Information," Food and Drug Law Journal, 2000, Vol. 55, No. 1, pp. 105-117.

"Licensing and Certification Systems," in The New Palgrave Dictionary of Economics and the Law, Peter Newman, ed. London: Macmillan Reference; New York, NY: Stockton Press, 1998.

"Marketing Pharmaceuticals:  New Uses for Old Drugs," in Robert Helms, Ed., Competitive Strategies in the Pharmaceutical Industry, Washington:  American Enterprise Institute Press, 1996, pp. 281-305.

"Assessments of Pharmaceutical Advertisements:  A Critical Analysis of the Criticism," with William C. MacLeod, Food and Drug Law Journal, 1995, Vol. 50, No. 3, pp. 415-449.

"Regulatory Consistency and Common Sense:  FTC Policy Toward Food Advertising Under Revised Labeling Regulations," Journal of Public Policy and Marketing, Spring, 1995, Vol. 14, No. 1, pp. 154-163.

"The Foundations of Franchise Regulation:  Issues and Evidence," with Timothy J. Muris, Journal of Corporate Finance:  Contracting, Organization, and Governance, 1995, Vol. 2, pp. 157-197.

April 27, 2021

J. Howard Beales, III                    Curriculum Vitae                    Page 6

"Economic Analysis and the Regulation of Pharmaceutical Advertising," Seton Hall Law Review, 1994, vol. 24, No. 3, pp. 1370-1398.

"State and Federal Regulation of National Advertising," with Timothy J. Muris (Washington:  American Enterprise Institute, 1993).

"What State Regulators Should Learn from Federal Experience in Regulating Advertising," Journal of Public Policy & Marketing, Spring, 1991, Vol. 10, No. 1, pp. 101-117.

"Information, Competition, and Health:  Regulatory Standards for Health Messages," with Timothy J. Muris, in America's Foods Health Messages and Claims:  Scientific, Regulatory and Legal Issues, J.E. Tillotson, ed. (CRC Press, 1993).

"The Efficient Regulation of Consumer Information," with S. Salop and R. Craswell, Journal of Law and Economics, December, 1981, pp. 481-539.

"A Framework for Evaluating Consumer Protection Regulation," with R. Staelin, M. Mazis, and S. Salop, Journal of Marketing, Winter, 1981, pp. 11-21.

"Consumer Search and Public Policy," with R. Staelin, M. Mazis, and S. Salop, Journal of Consumer Research, June, 1981, pp. 11-22.

"Information Remedies for Consumer Protection," with S. Salop and R. Craswell, American Economic Review, May, 1981, pp. 410-413.

"Benefits and Costs of Label Information Programs," Banbury Report 6:  Product Labeling and Health Risks, 1980, pp. 243-60.

"Selling Consumer Information," with S. Salop, Advances in Consumer Research, J. Olson, ed., Vol. VII, Association for Consumer Research, 1980, pp. 238-40.

"The Economics of Regulating the Professions," in Regulating the Professions, R. Blair and S. Rubin, eds., Lexington Books, 1980, pp. 125-142.

Other Publications

"Privacy and Consumer Control," in Internet, Big Data &Algorithms: Gateway to a New Future or a Threat to Privacy and Freedom, with Timothy J. Muris, May, 2019, Aspen Institute Congressional Program.

"Public Goods, Private Information:  Providing an Interesting Internet," Competition Policy International, Antitrust Chronicle (Online, April, 2019), available at https://www.competitionpolicyinternational.com/public-goods-private-information-providing-an-interesting-internet/.

April 27, 2021

J. Howard Beales, III                     Curriculum Vitae                          Page 7

Public Comment on FTC Hearings on Competition and Consumer Protection in the 21st Century, on behalf of U.S. Chamber Institute for Legal Reform, with Timothy J. Muris, Alan Charles Raul, Kate Heinzelman, Gabrielle Whitehall, December 21, 2018, available at https://www.ftc.gov/system/files/documents/public_comments/2018/12/ftc-2018-0098-d-0037-163376.pdf.

Public Comment on NHTSA's Federal Automated Vehicles Policy: Accelerating the Next Revolution in Roadway Safety, with Sofie E. Miller and Daniel R. Perez, November 16, 2016, available at https://regulatorystudies.columbian.gwu.edu/public-comment-nhtsa%E2%80%99s-federal-automated-vehicles-policy-accelerating-next-revolution-roadway-safety.

"BIAS at the FCC," Commentary, George Washington Regulatory Studies Center, June 6, 2016, available at https://regulatorystudies.columbian.gwu.edu/bias-fcc.

"Small-Dollar Installment Loans:  An Empirical Analysis," with Anand M. Goel (Navigant Economics, March 2, 2015) (available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2581667.).

"An Empirical Analysis of the Value of Information Sharing in the Market for Online Content," with Jeffrey A. Eisenach, published online by Digital Advertising Alliance, available at http://www.aboutads.info/resource/fullvalueinfostudy.pdf, January, 2014.

"Putting Consumers First: A Functionality-Based Approach to Online Privacy," with Jeffrey A. Eisenach, (January 1, 2013). Available at SSRN: http://ssrn.com/abstract=2211540 or http://dx.doi.org/10.2139/ssrn.2211540.

"Television Advertising and Childhood Obesity," published online by Grocery Manufacturers Association, available at http://www.gmaonline.org/publicpolicy/docs/obesity/Beales%20Review%20of%20Recent%20Studies.pdf, October, 2010.

"The Value of Behavioral Targeting," published online by Network Advertising Initiative, available at http://www.networkadvertising.org/pdfs/Beales_NAI_Study.pdf, March, 2010.

"Modern Biotechnology and the Regulation of Information," Update: Food and Drug Law, Regulation, and Education, October, 2000, p. 10.

"Advertising is Less Powerful but More Important than Critics Believe," Book Review of Fear of Persuasion:  A New Perspective on Advertising and Regulation, by John E. Calfee, in Commercial Speech Digest, Spring 1998, pp. 6-7.

"On the Eighth Day," Book review of Policy Controversy in Biotechnology:  An Insider's View, by Henry I Miller, M.D., in Regulation, Winter 1997, pp. 50-51.

April 27, 2021

J. Howard Beales, III                    Curriculum Vitae                    Page 8

"Is there and FDA in your Future?"  Medical Marketing and Media, June, 1995, Vol. 30, No. 6, pp. 34-47.  (Roundtable discussion).

"Teenage Smoking:  Fact and Fiction," The American Enterprise, March/April, 1994, p. 20.

Book Review of Richard T. Kaplar, ed., Bad Prescription for the First Amendment, in Journal of Public Policy and Marketing, Vol. 12, pp. 288-289, Fall, 1993.

"Congressional Confusion on Labeling and Advertising Could Deny Consumer Information and Free Speech," with Timothy J. Muris, Washington Legal Foundation Legal Opinion Letter, 1991.

"The Limits of Unfairness Under the Federal Trade Commission Act," with T. Muris (Association of National Advertisers, 1991).

"The Federal Trade Commission in the 1980s," in Marketing and Advertising Regulation: The Federal Trade Commission in the 1990s, P. Murphy and W. Wilkie, eds., University of Notre Dame, 1990, pp. 154-163.

"Dying For Drugs," Regulation:  AEI Journal on Government and Society, December, 1988, pp. 9-11 (unsigned contributed editorial).

"Agency Focuses on the Most Harmful [food advertising] Claims," Los Angeles Times, October 27, 1986, p. V3.

"Comment" (on two advertising substantiation papers), in Empirical Approaches to Consumer Protection Economics, P. Ippolito and D. Scheffman, eds., Federal Trade Commission, March, 1986.

"Advertising Substantiation Program," with C. Guerard, E. Popper, D. Cheek, P. Skidmore, Report to the Federal Trade Commission, 1984.

Congressional Testimony

The Consumer Protection and Recovery Act: Returning Money to Defrauded Consumers,  Subcommittee on Consumer Protection and Commerce, Committee on Energy and Commerce, United States House of Representatives, April 27, 2021.

Understanding the Digital Advertising Ecosystem, Subcommittee on Digital Commerce and Consumer Protection, Committee on Energy and Commerce, United States House of Representatives, June 14, 2018.

April 27, 2021

J. Howard Beales, III                    Curriculum Vitae                    Page 9

An Overview of the Credit Reporting System, Subcommittee on Financial Institutions and Consumer Credit, Committee on Financial Services, United States House of Representatives, September 10, 2014.

The FTC at 100:  Views from the Academic Experts, Subcommittee on Commerce, Manufacturing, and Trade, Committee on Energy and Commerce, United States House of Representatives, February 28, 2014.

Credit Reports:  What Accuracy and Errors Mean for Consumers, Subcommittee on Consumer Protection, Senate Committee On Commerce, Science, and Transportation, May 7, 2013

Legislative Hearing on H.R. 6149, the "Precious Coins and Bullion Disclosure Act," Subcommittee on Commerce, Trade and Consumer Protection, Committee on Energy and Commerce, United States House of Representatives , September 23, 2010.

Examining the Need for H.R. 2885, The Credit Monitoring Clarification Act, Committee on Financial Services, United States House of Representatives, May 20, 2008.

Peer-To-Peer ("P2P") File-Sharing Technology, Subcommittee on Competition, Infrastructure, and Foreign Commerce of the Committee on Commerce, Science, and Transportation, United States Senate, June 23, 2004.

Information Security -- Challenges for Businesses and Consumers, Subcommittee on Technology, Information Policy, Intergovernmental Relations, and The Census of the Committee On Government Reform, United States House of Representatives, June 16, 2004.

Efforts to Ensure the Truthfulness and Accuracy of the Marketing of Dietary Supplements for Children, Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce, United States House of Representatives, June 16, 2004.

Identity Theft and Social Security Numbers, Subcommittee On Social Security of the Committee On Ways and Means, United States House of Representatives, June 15, 2004.

Hearing on Online Pornography: Closing the Door on Pervasive Smut, Subcommittee On Commerce, Trade, and Consumer Protection of the Committee on Energy and Commerce, United States House of Representatives, May 6, 2004.

Spyware, Subcommittee On Commerce, Trade, and Consumer Protection of the Committee on Energy and Commerce, United States House of Representatives, April 29, 2004.

Efforts to Fight Fraud on the Internet, Special Committee On Aging, United States Senate, March 23, 2004.

April 27, 2021

J. Howard Beales, III                 Curriculum Vitae                 Page 10

Efforts to Combat Unfair and Deceptive Subprime Lending, Special Committee on Aging, U.S. Senate, February 24, 2004.

Consumer Protection Issues in the Credit Counseling Industry, Subcommittee on Oversight, Committee on Ways and Means, U.S. House of Representatives, November 20, 2003.

Unsolicited Commercial Email, Subcommittee on Regulatory Reform and Oversight, Committee on Small Business, U.S. House of Representatives, October 30, 2003.

Contact Lens Legislation, Committee on Energy and Commerce, U.S. House of Representatives, September 9, 2003.

Issues Relating to Ephedra Containing Dietary Supplements, Subcommittee on Oversight and Investigations, and the Subcommittee on Commerce, Trade, and Consumer Protection, . House of Representatives, July 24, 2003.

Unsolicited Commercial Email, Subcommittee on Commerce, Trade and Consumer protection and the Subcommittee on Telecommunications and the Internet, Committee on Energy and Commerce, U.S. House of Representatives, July 9, 2003.

Identity Theft: Prevention and Victim Assistance, Financial Institutions and Consumer Credit Subcommittee, Financial Services Committee, U.S. House of Representatives, June 24, 2003.

Identity Theft: Prevention and Victim Assistance, Committee on Banking, Housing, and Urban Affairs, U.S. Senate, June 19, 2003.

Fair Credit Reporting Act, Financial Institutions and Consumer Credit Subcommittee, Financial Services Committee, U.S. House of Representatives, June 4, 2003.

Fair Credit Reporting Act, Committee on Banking, Housing, and Urban Affairs, U.S. Senate, May 15, 2003.

Identity Theft, Financial Services Committee, U.S. House of Representatives, April 3, 2003.

Internet Sales of Prescription Drugs, Committee on Government Reform, U.S. House of Representatives, March 27, 2003.

Marketing of Dietary Supplements, Subcommittee on Oversight of Government Management, Restructuring and the District of Columbia, Committee on Governmental Affairs, U.S. Senate, October 18, 2002.

Senior Identity Theft, Special Committee on Aging, U.S. Senate, July 18, 2002.

April 27, 2021

J. Howard Beales, III                     Curriculum Vitae                          Page 11

Identity Theft Penalty Enhancement Act of 2002, Subcommittee on Technology, Terrorism, and Government Information, Judiciary Committee, U.S. Senate, July 9, 2002.

The Franchise Rule, Subcommittee on Commerce, Trade, and Consumer Protection, Committee on Energy and Commerce, U.S. House of Representatives, June 25, 2002.

The Sports Agent Responsibility and Trust Act, H.R. 4701, Subcommittee on Commerce, Trade, and Consumer Protection, Committee on Energy and Commerce, U.S. House of Representatives, June 5, 2002.

The Integrity and Accuracy of the WHOIS Database, Subcommittee on Courts, the Internet and Intellectual Property, Committee on the Judiciary, U.S. House of Representatives, May 22, 2002.

Identity Theft, Subcommittee on Technology, Terrorism, and Government Information, Judiciary Committee, U.S. Senate, March 20, 2002.

Charitable Solicitation Fraud, Subcommittee on Oversight and Investigations, Committee on Energy and Commerce, U.S. House of Representatives, November 6, 2001.

Dietary Supplement Fraud, Special Committee on Aging, U.S. Senate, September 10, 2001.

Rent-to-Own, Financial Services Committee, U.S. House of Representatives, July 12, 2001.

Teenage smoking, Subcommittee on Health and Environment, Committee on Commerce, U.S. House of Representatives, December 9, 1997.

Lectures and Presentations

"Policy Issues Relating to the Abusive standard under Dodd-Frank," Consumer Financial Protection Bureau Symposium on Abusive Acts or Practices, June 25, 2019.

"Economics of Commercial Data Regulation," George Mason Law and Economics Center, Workshop for Attorneys General and Regulators on the Economics of Information, Advertising, and Privacy, May 12, 2019.

"Economics of Advertising," George Mason Law and Economics Center, Workshop for Attorneys General and Regulators on the Economics of Information, Advertising, and Privacy, May 12, 2019.

"Competition and Consumer Protection Issues in Online Advertising," FTC Hearings on Competition and Consumer Protection in the 21st Century, November 7, 2018.

April 27, 2021

J. Howard Beales, III                     Curriculum Vitae                          Page 12

"The Regulation of Consumer Data," FTC Hearings on Competition and Consumer Protection in the 21st Century, September 13, 2018.

"Economics of Commercial Data Regulation," George Mason Law and Economics Center, Workshop for Attorneys General and Regulators on the Economics of Information, Advertising, and Privacy, May 31, 2018.

"Economics of Advertising," George Mason Law and Economics Center, Workshop for Attorneys General and Regulators on the Economics of Information, Advertising, and Privacy, May 31, 2018.

"Lessons in Liability:  The US Privacy Landscape and Proposals for Reform," IAPP Global Privacy Summit, April 2017.

"Wrap Up Panel," Federal Trade Commission PrivacyCon 2017, Washington, DC, January 12, 2017.

"The Value of Advertiser-supported Online Content," Digital Advertising Alliance Summit 2016, Los Angeles, CA, May, 2016.

"Monetary Remedies in FTC Consumer Protection Actions," American Bar Association, Antitrust Law Section, Spring Meeting, Washington DC, April 6, 2016.

Discussant, Research Roundtable for Privacy Fellows, George Mason Law and Economics Center, Arlington, VA, December 2015.

"Nomi, Spokeo, and Privacy Harms," George Mason Law and Economics Center Public Policy Briefing, Arlington, VA, November 2015.

Moderator, Economics of Data Breach Regulation, Public Policy Conference on Privacy and Data Security, George Mason Law and Economics Center, Arlington, VA, June 2015.

"Advertising Substantiation," American Bar Association, Antitrust Law Section, Consumer Protection Conference, Washington DC, February 12, 2015.

"Behavioral Economics and Credit Regulation," George Mason University, Arlington, VA, November 14, 2014.

"The Law and Economics of Consumer Protection," George Mason University, Arlington, VA, October 23, 2014.

"Where is the FTC Heading On Digital Consumer Protection," Tech Freedom Conference, Washington, DC, July 31, 2014.

April 27, 2021

J. Howard Beales, III                    Curriculum Vitae                         Page 13

"The Value of Information Sharing," Digital Advertising Alliance, San Francisco, CA, June 26, 2014.

"The FTC's Proper Role in Privacy and Data Security Regulation," George Mason Law and Economics Center Conference on the Future of Privacy and Data Security Regulation," Arlington, VA, May 14, 2014.

"Behavioral Economics," George Mason Law and Economics Center, Arlington, VA, May 2, 2014.

"The FTC at 100," Association of National Advertisers, Washington, DC, April 23, 2014.

"The Internet of Things," American Bar Association, Business Law Section, Washington, DC, March 26, 2014

"The Regulatory Environment," Federal Reserve Bank of Philadelphia, Conference on "Small-Dollar Credit:  Products, Economics, and Regulation," Philadelphia, Pa., July 11-12, 2013.

"The Economics of Relevant Advertising:  Preserving the Consumer Value from the Ad-Supported Internet," Digital Advertising Alliance Summit, Washington, DC, June 5, 2013.

"The Consumer Finance Market as a Reflection of Growing Income Disparity in America:  The Social Benefits and Costs," American Bar Association, Business Law Section, Washington, DC, April 5, 2013.

"Current Issues in Advertising Regulation," American Bar Association, Antitrust Law Section, Consumer Protection Conference, Washington, DC, February 7, 2013.

"Protecting Consumers, Protecting Privacy:  Addressing Privacy Issues as "Unfair or Deceptive Acts or Practices," George Mason Law and Economics Center Conference on the Law & Economics of Privacy and Data Security, Arlington, VA, December 13, 2012.

"Benefits and Risks of Comprehensive Data Collection," FTC Workshop on The Big Picture:  Comprehensive Online Data Collection, Washington, DC, December 6, 2012.

"Product Selection:  Unfair, Deceptive, and Abusive Practices," Conference on Consumer Financial Protection Regulations: How Well do they Measure Up?, Federal Reserve Bank of Philadelphia, Payment Card Center, Philadelphia, PA, September 14, 2012.

"Consumer Protection and the Financial Crisis," Experian Legal Conference, Bluffton, SC, March 20, 2012.

 "The FTC and the CFPB," American Bar Association, Antitrust Law Section, Fall Forum, Washington, DC, November, 2011.

April 27, 2021

J. Howard Beales, III                    Curriculum Vitae                    Page 14

"In Defense of the Pfizer Factors," with Timothy J. Muris and Robert Pitofsky, George Mason University Law and Economics Center, Arlington, VA, September, 2011.

"Privacy Regulation in the U.S. and Europe," Google Legal Summit, Los Angeles, CA, September, 2011.

"The Impact of the Interagency Working Group's Proposed Restrictions on Advertising," U.S. Chamber of Commerce Regulatory Affairs Committee, Washington, DC, June, 2011.

"The Value of Behavioral Targeting," American Marketing Association, Marketing and Public Policy Conference, Washington, DC, June, 2011.

"A New Era for the FTC Advertising Substantiation Standards?" American Bar Association, Antitrust Law Section, Spring Meetings, Washington, DC, April, 2011.

"FTC Preliminary Privacy Report: Key Takeaways for Business," International Association of Privacy Professionals, Global Privacy Summit, Washington, DC, March, 2011.

"Substantiation:  Is the FTC Changing the Rules?  Will The Courts Go Along?" American Bar Association, Antitrust Law Section, Consumer Protection Conference, Washington, DC, February, 2011.

"Regulating Online Advertising: What Will it Mean for Consumers, Culture & Journalism?" Progress & Freedom Foundation Capitol Hill Briefing, Washington, DC, July, 2009.

"The Bureau Director's Roundtable," American Bar Association, Antitrust Law Section, Consumer Protection Conference, Washington, DC, June, 2009.

"A Two Decade Perspective on Changing FTC Priorities, Initiatives, and Impact," American Marketing Association Marketing and Public Policy Conference, Washington, DC. May, 2009.

"Public Goods, Private Information, and Anonymous Transactions: Providing a Safe and Interesting Internet,"   George Mason University/Microsoft Conference on the Law and Economics of Innovation, Arlington, Virginia, May, 2009.

"Historical Perspectives on Privacy in the United States," Data Privacy in Transatlantic Perspective: Conflict or Cooperation? Durham, North Carolina, January, 2008.

"Media and Public Policy," Future of Children Conference, Princeton, New Jersey, April, 2007.

"Regulating Through Consent Decrees,"   American Bar Association, Business Law Section, Frederic Fisher Memorial Program, Washington, DC, March, 2007.

April 27, 2021

J. Howard Beales, III                    Curriculum Vitae                         Page 15

   "The Bureau Director's Perspective," American Bar Association, Antitrust Law Section, Consumer Protection Conference, Washington, District DC, January, 2007.

   "Privacy Law: Enough Already!" American Bar Association, Antitrust Law Section, Washington, DC, October, 2006.

   Numerous speeches to trade groups, consumer groups, and others while Director of the Bureau of Consumer Protection, 2001-2004.

   "Off Label Uses of Prescription Drugs," Conference on Marketing and Public Policy, sponsored by American Marketing Association, May 17-18, 1996, Washington, D.C.

   Discussant at Conference on Marketing and Public Policy, sponsored by American Marketing Association, May 19-20, 1995, Atlanta, Ga.

   "What Happens After Approval?  Regulatory Policy and the Flow of Information," American Enterprise Institute Conference on Reforming the Food and Drug Administration:  The Pharmaceutical Approval Process," March 10, 1995, Washington, D.C.

   "State Regulation of Franchise Contracts," with Timothy J. Muris, George Maxon University School of Law Faculty Workshop Series, November, 1994.

   "Regulating the Franchise Relationship:  Issues and Evidence," with Timothy J. Muris, Conference on Franchise Contracting, Organization, and Regulation, Michigan Business School, May 26-27, 1994.

   Discussant at Conference on Marketing and Public Policy, sponsored by American Marketing Association, May 13-14, 1994, Washington, D.C.

   "The Impact of Information in the Marketplace:  Promoting New Uses for Old Drugs," Southern Economic Association, New Orleans, La., November 21-23, 1993.

   "Regulating Pharmaceutical Advertising," Symposium, The Pharmaceutical Industry: Surviving Reform, Regulation, and Litigation," Seton Hall University School of Law, Newark, N. J., November 16, 1993.

   Discussant at Conference on Marketing and Public Policy, sponsored by American Marketing Association, May 17-18, 1992, Washington, D.C.

   "Marketing Pharmaceuticals:  New Uses for Old Drugs," Conference on Competitive Strategies in the Pharmaceutical Industry, American Enterprise Institute, Washington, Oct. 27-28, 1993.

   "Civil Penalties and Organizational Sanctions," Lecture at the Commodity Futures Trading Commission, Washington, D.C., January 30, 1992.

April 27, 2021

J. Howard Beales, III                    Curriculum Vitae                        Page 16

"The Economics of Information," Lecture at the Commodity Futures Trading Commission, Washington, D.C., October 14, 1991.

"Economic Analysis and the Regulatory Process," American Society of Association Executives, Washington, D.C., November 18, 1990.

Participant in Foresight Seminars on Pharmaceutical Research, Economic Issues in Genetic Screening, Washington, D.C., September, 1988.

Discussant at the Association for Consumer Research, Boston, Mass., October, 1987.

Food and Drug Law Institute, Seminar on Health Claims for Foods, Washington, D.C., September, 1987.

American Marketing Association Doctoral Consortium, Duke University, August, 1985.

Georgetown University Law Center for Continuing Legal Education, February, 1985.

Practicing Law Institute, Washington, December, 1984.

Unpublished Papers

"Public Comment on NHTSA's Federal Automated Vehicles Policy:  Accelerating the Next Revolution in Roadway Safety," with Sofie E. Miller and Daniel R. Perez, George Washington Regulatory Studies Center, November 16, 2016, available at https://regulatorystudies.columbian.gwu.edu/public-comment-nhtsa%E2%80%99s-federal-automated-vehicles-policy-accelerating-next-revolution-roadway-safety.

"Comment on Putting Disclosure to the Test," FTC Workshop Putting Disclosure to the Test, October 30, 2016.

"Public Comment on Protecting the Privacy of Customers of Broadband and Other Telecommunications Services," George Washington Regulatory Studies Center, May 27, 2016, available at https://regulatorystudies.columbian.gwu.edu/public-comment-protecting-privacy-customers-broadband-and-other-telecommunications-services.

Artie's Auto Body, Inc. v. The Hartford Fire Insurance Company, SC 19219, Amicus brief, Supreme Court of the State of Connecticut, with Timothy J. Muris, January 4, 2014.

POM Wonderful, LLC, v. Federal Trade Commission, Brief of Amici Curiae Consumer Healthcare Products Association and Council for Responsible Nutrition, U.S. Court of Appeals for the D.C. Circuit, August 21, 2013, with Timothy J. Muris

"Putting Consumers First:  A Functionality-Based Approach to Online Privacy," with Jeffery A. Eisenach, http://ssrn.com/abstract=2211540, January 1, 2013.

April 27, 2021

J. Howard Beales, III                    Curriculum Vitae                    Page 17

"Consumer Welfare Implications of Regulating Rent-to-Own Transactions," with Jeffrey A. Eisenach and Robert E. Litan, http://ssrn.com/abstract=2060984, May 16, 2012.

"Short-Term Consumer Credit:  Literature Review," October 2011.

"Associations between Screen Media and Language Development in Infants," with Elizabeth Vandewater (2010).

"Market Oriented Consumer Protection," (2009).

"Advertising and Teenage Smoking Behavior," November, 2000.

Public Interest comment on FDA's proposed rule regarding nutrition labeling of trans fatty acids, submitted by the Regulatory Studies Program, Mercatus Center, George Mason University, April, 2000.

"The Inefficiency of State Regulation of Franchise Contracts," with Timothy J. Muris, (1998).

"The Health Consequences of Decisions About Drugs," August, 1996.

"Regulating the Franchise Relationship:  Issues and Evidence," with Timothy J. Muris, (1994).

"The Determinants of Teenage Smoking Behavior," Working Paper 96-34, School of Business and Public Management, The George Washington University (1996).

"Marketing Information and Pharmaceuticals: New Uses for Old Drugs,"  Working Paper No. 2, Department of Strategic Management and Public Policy, The George Washington University (1993).

"Advertising and the Determinants of Teenage Smoking Behavior,"  Working Paper No. 1, Department of Strategic Management and Public Policy, The George Washington University (1993).

"Television Program Quality and Restrictions on the Number of Commercials," presented at the Eighth Annual Conference on Telecommunications Policy Research, April, 1980 (Bureau of Economics Working Paper Number 30, June, 1980).

"Disseminating Defect Information," with E. Golding, October, 1980.

"Economic Effects of Standards and Disclosures," February, 1979.

"An Analysis of Exposure to Non-Network Television Advertising," Testimony submitted to the FTC, Hearings on Children's Advertising Rulemaking, November, 1978.

April 27, 2021

J. Howard Beales, III                    Curriculum Vitae                         Page 18

"The Gains and Losses from Industrial Concentration Revisited," July, 1978.

"The Distribution of Advertising Within an Industry," Ph.D. Dissertation, The University of Chicago, June, 1978.

"A Simple Model of Industry Adjustment to a Cost Saving Innovation," February, 1978.

Other Professional Activities

Member, Regulatory Transparency Project, Working Group on Regulatory Process, The Federalist Society, 2016 – present.

Member, Data Protection and Integrity Advisory Committee, Department of Homeland Security, 2004 – 2014; Chairman, 2006 - 2009.

Member, Institute of Medicine Committee on Food Marketing and the Diets of Children and Youth, 2004 - 2006.

Consultant for Facebook, Walt Disney Company, Pepsico, American Express, Visa, Exxon Mobil, America Online, Primerica, Mortgage Insurance Companies of America, Federated Department Stores, Ford Motor Co., General Mills, Grocery Manufacturers of America, R.  J.  Reynolds, and others.

Ad Hoc referee for the Journal of Public Policy and Marketing.

 Reviewer for papers for American Marketing Association's Marketing and Public Policy Conference, 1992-1996.

Referee for Bureau of Economics Staff Report on comparative price advertising.

Textbook Reviewer for McGraw Hill (1997).

April 27, 2021

## Prior Testimony via Trial Testimony or Deposition

Euro-Pro Operating LLC v. Dyson, Inc., and Dyson Ltd., U.S. District Court, Massachusetts, Case No. 1:14-cv-13720, Rebuttal Expert Report Dated January 29, 2016, Deposition, February 24, 2016.

State of Oregon v. Living Essentials, LLC, and Innovation Ventures, LLC, Circuit Court of the State of Oregon for Multnomah County, Case No. 14-cv-09149, Testimony July 19, 2016.

CFPB vs. CashCall, Inc., U.S. District Court, Central District of California, Case No. 2:15-cv-07522-JFW (RAOx), Expert Report Dated May 27, 2016, Deposition July 22, 2016.

State of Washington v. Living Essentials, LLC et al., King County Superior Court, No. 14-2-19684-9, Report dated January 22, 2016, Deposition March 28, 2016, Testimony September 7, 2016.

Federal Trade Commission v. DIRECTV, U.S. District Court, Norther District of California, Case No. 3:15-cv-01129 HSG, Report dated September 16, 2016, Depositions October 25, 2016; December 16, 2016.

State of Colorado v. Center for Excellence in Higher Education, Inc. et al., District Court, City and County of Denver, Case No. 2014cv34530, Expert Report dated August 4, 2017, Deposition, August 21, 2017, Trial Testimony November 1, 2017.

State of Vermont v. Living Essentials, LLC, State of Vermont Superior Court, Washington Unit Case No. 443-7-14 wMCV, Deposition July 26, 2018.

In Re:  Think Finance, LLC, et al., Debtors, United States Bankruptcy Court for the Northern District of Texas, Dallas Division, No. 17-33964 (HDH),  Expert Report dated August 13, 2018; Deposition September 20, 2018.

Lula Williams et al. vs. Big Picture Loans, LLC, et al., U.S. District Court, Eastern District of Virginia, Richmond Division, Civil Action No. 3:17-cv-461 (REP), Expert Report dated January 11, 2019, Deposition March 28, 2019.

PNC Bank, N.A. v. Trilegiant Corporation et al., Court of Common Pleas of Allegheny County, Pennsylvania, Civil Division, G.D. 15-020824.  Expert Report dated April 26, 2019, Deposition May 14, 2019.

State of Hawaii v. Living Essentials, LLC, et al., Circuit Court of the First Circuit, Civil No. 15-1-0142-01 (DEO).  Expert Report dated June 27, 2019, Deposition October 17, 2019.

Justin Lytle and Christine Musthaler v. Nutramax Laboratories, Inc. and Nutramax Laboratories Veterinary Sciences, Inc. U.S. District Court, Central District of California, Case No. 5:19-cv-00835-FMO-SP.  Expert Report dated February 25, 2021, Deposition May 19, 2021.

Brian Smith and Michael Ilardo vs. LifeVantage Corporation, U.S. District Court, District of Utah, Central Division, Case No: 2:18-cv-00621-DBB-JCB.  Expert Report dated April 30, 2021, Deposition May 21, 2021.

EXHIBIT 2 – Documents Relied Upon

| Document | Citation | Date |
|---|---|---|
| *Policy Statement Regarding Advertising Substantiation and Policy Statement on Deception*, Federal Trade Commission | FTC, *Policy Statement Regarding Advertising Substantiation* (1983), appended to Thompson Med. Co., Inc., 104 F.T.C. 648 (1984), *aff'd*, 791 F.2d 189 (D.C. Cir. 1986), *cert. denied*, 479 U.S. 1086 (1987); FTC, *Policy Statement on Deception* (1983), appended to *Cliffdale Assoc., Inc.*, 103 F.T.C. 110 (1984). | |
| *First Amended Complaint*, Federal Trade Commission and Utah Division of Consumer Protection vs. Nudge, LLC and Response Marketing Group, LLC | ECF No. 173 | Filed November 18, 2020 |
| *Investigational Hearing Testimony*, Richard J. Ruby | FTC-PI 4342.001–4343.024 Tab 16, cited in TRO Motion | June 19, 2018 |
| *Deposition*, Richard J. Ruby | Deposition | December 9, 2020 |

| Training Type | Course | Date | Media Type | File Name | Bates Number |
|---|---|---|---|---|---|
| Preview Event | Sandy Springs, Georgia | September 9, 2020 | Transcript | F191028-ATL-5P | Nudge.0000017810 |
| Preview Event | Sandy Springs, Georgia | | Document | Event Guide | Response.FTC.00008941 |
| Preview Event | Twin Falls, Idaho taught by Steve Johnson | August 31, 2017 | Transcript | FTC-00242917 | FTC-00242917 |

**EXHIBIT**

**002**

# EVENT GUIDE

## INSIDE:

**Event Agenda**

**Who We Are**

**Customer Ratings**

**Customer Success**

EXHIBIT

003

Response.FTC.00008941

# *Welcome!*

## Here's what will happen in this room today...



Dear Guest,

Congratulations on making the time to join us today for this important event. The information you will receive will be new and refreshing for you!

If there is anything we can do to make your experience more comfortable, please ask one of the assistants. We will do whatever we can to accommodate you.

This event will cover a lot of ground. We will focus on different investment concepts and strategies.



### Drew Levin & Danny Perkins

Drew Levin & Danny Perkins are the hosts of HGTV & DIY's hit show **"Renovate to Rent"**. When it comes to purchasing and renovating successful rental properties, Realtor Drew Levin and General Contractor Danny Perkins are profitable and unstoppable.

With Drew as the moneyman and Danny as the get it done guy, over the last several years, the two have renovated, rented & currently own more than dozens of properties.

### Here is the agenda:

- **New Ways to Profit from Real Estate (what's working right now)**

- **Why Real Estate?**
- **Smart Investing Strategies**
- **Proven 3-Step Investing Plan**
- **How to Fund Your Real Estate Deals**

- **Break**

- **Bonus Presentation (you'll really enjoy it!)**

- **Free Gifts to All Guests**

Now, please sit back and relax as we share unique real-life insights for creating smart and practical investments. This is information that real investors use to profit.

Again, congratulations for joining us.

## *Enjoy!*



## BONUS GIFT
### WERE YOU ONE OF THE FIRST FIFTY?

If you were one of the *first people* to register, attend, and complete the event in your market region, you will be eligible to receive the *free gift.*

Eligible participants are chosen by a third party provider from those registered for an event in a given market region and pursuant to the terms and conditions set forth at: **snapflip.com/first50rules**

Gifts will be mailed after the event. The third party provider is solely responsible for the fulfillment thereof.

Response.FTC.00008942

# Who We Are and What We Do

## Our Central Focus is You

Snap Flip is the seller and provider of direct to consumer financial training. Our Company's philosophy is simple: *We are in business to inspire and empower individuals to find greater freedom through financial prosperity.* That's why Customer Service is the central focus of everything we do. Your feedback is very important to us. We strongly encourage you to contact us with any questions, comments, or concerns regarding your experience with us:

**Snap Flip**
**877-208-1407 | support@response.com**

## Our Vision

To be a world leader in financial products and services. Our resource network includes:

 Income Tax Planning/Prep       Stock Market Investing       Land Sales

 Entity Set Up/Asset Protection       Title/Escrow       Property Sales

 Traditional Mortgage Lending       Private Lending       Advanced Training

## How We Help You Succeed

After reviewing our marketing materials, presentations, and order forms – your net impression should be clear: we offer direct to consumer financial education. Those who purchase our education or services will be taught many techniques which have brought financial success to others. However, we do not guarantee your success and based upon many market factors that we cannot control, techniques we teach may or may not be applicable to a given real estate or financial transaction. Further, we do not make earnings claims, efforts claims, return on investment claims, or claims that our techniques will make you any specific amount of money. We do not sell a business in a box, a franchise system or a business opportunity. You should not purchase if that is your expectation. Instead, you should purchase with the understanding that implementing the techniques and strategies taught will take time and effort and may be applicable in some situations but not others. Also, we do not offer any tax, accounting, financial, or legal advice. Prior to undertaking any real estate or financial transaction, you should consult your own professional advisors to evaluate the risks, consequences, and suitability of that transaction.

## Proud Sponsors of:

Over recent years our company, partners, and employees have donated over a quarter million to these and other organizations:

               

© 2017 --Snap Flip

**Disclaimer:** We provide real estate and stock market education and training. We do not sell a business opportunity. We make no earnings or return on investment claims. Additionally, we do not offer tax, accounting, financial or legal advice. Investing in real estate and the stock market involves risk, and you could lose money. Prior to undertaking any real estate or stock market transaction, you should consult your own accounting, legal and tax advisors to to evaluate the risks, consequences and suitability of that transaction. Marketing, education and fulfillment services for Snap Flip are provided by Response, LLC.  The charitable organization logos above are registered trademarks of their respective owners.

Snap Flip  |  3651 N. 100 E., Ste 375,  Provo, UT 84604

Response.FTC.00008943

# Students Rave about Our Training & Service

Listening to what customers say is one of the best ways to evaluate the quality of a company. We diligently survey our students and receive feedback about their experience with us.

## The results speak for themselves..

**"Real Estate Preview"**
 **4.74** out of **5 Stars**

**"Workshop Real Estate Training"**
 **4.79** out of **5 Stars**

**"Boots on the Ground"**
 **4.93** out of **5 Stars**

**"Investor Expo"**
 **4.75** out of **5 Stars**

**"Stock Market Preview"**
 **4.75** out of **5 Stars**

**"Stock Market Workshop Training"**
 **4.86** out of **5 Stars**

**Customer Service & One-on-One Support**
 **4.95** out of **5 Stars**

**Total  Customer Satisfaction Surveys**
**105,815** Surveyed

**Average Rating**
**4.78** out of **5 Stars**

**Would you recommend the workshop to others?**
**97%** said **Yes**

**Did the workshop fulfill or exceed your expectations?**
**93%** said **Yes**

"Now I have a path I know what road I'm going to be going down tomorrow and the next day and it's very comforting for me..."  **– Gary S.**

"The whole crew helped us see our potential on where we can go and what we can do... Of course it's a little scary but I recommend jumping out of your box and taking this path."  **– Kellie S.**

"I greatly appreciate this opportunity to change my life around, the education I received today will influence the way I think for a life time."  **– Kathie P.**

"Valuable information presented. Lots of info to take in one weekend. A life changing event!"  **– Melvin M.**

"Looking forward to my son's success, this course has sent him on his way to a successful future."  **– Julie D.**

"Everything was handled so professionally. The instructor and team members were so genuine, nice and extremely knowledgeable. I am looking forward to a very rewarding association with this organization."  **– Julie K.**

"Felt comfortable and valued as a new member and student. Feeling confident that with support I will reach goals that I have now and set goals that I have yet to make."  **– Claudia M.**

"I can't wait to do my first deal! I am ecstatic about my future and the knowledge awaiting me at the advanced training! Thank you for a truly insightful weekend! How would you live if you were not afraid!"  **– Andrew E.**

"I was excited before I came, I am more excited! I know this is a great opportunity and look forward to getting started!"  **– Joelle P.**

©2017 --Response, LLC. All rights reserved. These survey results were compiled over a 12 month period, from the Company or an affiliated partner, and audited by a third party. Some students attend the training for education purposes only but were included in the satisfaction survey results. Some students attend the training and do not make money. Marketing, education and support services provided by Response, LLC. We provide educational products and training. We do not sell a business opportunity. Additionally, we do not offer any tax, accounting, financial or legal advice. Individual results will be determined by individual effort, experience, time spent and the ability to apply what has been learned. All surveys and student success audit results are updated quarterly. For more specific information regarding surveys and student success results please visit **www.response.com/experience.**

Response.FTC.00008944

# We Help Regular People Reach Their Goals

If you listen to Wall Street and other financial professionals, they want you to believe that you aren't smart enough to become an intelligent, prosperous investor.

*But it's not true.* You do have the ability to not only learn about real estate investing, but to also use these strategies to generate profit in your life. That's what we do – we guide you along this path to your own success.

When you start your journey, it doesn't matter if you are an absolute beginner or have a little experience. Because our education and training helps you gain the skills and knowledge you need to succeed on your own.

As you can see below, some of our students are just getting started, while others have completed many real estate transactions. Our successful students can be found in every state and in many countries around the world.

Student "success" is defined as a workshop attendee who purchases advanced training for $3,000 or more and completes a real estate transaction by purchasing a property, trust deed, tax lien, assigning a real estate contract, or locating real estate for an investor.

## We conducted an audit with our Advanced Training students:

**The audit of students includes those who had purchased and attended an Advanced Training Program greater than 12 months ago, with a survey sample over a 12 month period.**

| Total number of Advanced Training students | Total number of completed surveys |
|---|---|
| **4,667** | **2,201** |



### 47% - surveyed

During the audit we were able to reach **47%** of our students



### 67% - done a deal

Of those surveyed, **67%** have done a deal!



### 24% - making offers

Another **24%** have not done a deal, but are making offers or working with customer service



### 9% - other priorities

The remaining **9%** who have not done a deal say they are busy with other priorities or have decided not to pursue real estate at this time.

©2017 – Response, LLC. All rights reserved. Marketing, education and support services provided by Response, LLC. The overall response rate was 62%. An Advanced Training student is defined as an individual who attended the 3-Day workshop, and also purchased advanced training. The data behind the student success audit was collected through various reporting modalities - with the overall results being audited by a third-party law firm. Not every student like those shown here achieves similar results. The results were compiled from events worldwide, carried out by the Company or an affiliated partner. Student "success" is defined as completing a real estate transaction by purchasing a property, trust deed, tax lien, assigning a real estate contract, or locating real estate for an investor. We provide educational products and training. We do not sell a business opportunity. Additionally, we do not offer any tax, accounting, financial or legal advice. Individual results will likely be determined by individual effort, experience, time spent, and the ability to apply what has been learned. All student success audit results are updated quarterly. For more specific information regarding the student success results visit **www.response.com/experience**.

Response.FTC.00008945

# NOTES

# NOTES

Response.FTC.00008947

Response.FTC.00008948